# Exhibit F



COMMODITY FUTURES TRADING COMMISSION

# PRESIDENT'S BUDGET AND PERFORMANCE PLAN

FISCAL YEAR 2013



PREPARED FOR THE COMMITTEE ON APPROPRIATIONS, FEBRUARY 2012



**U.S. Commodity Futures Trading Commission**
Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581
*www.cftc.gov*

Gary Gensler
Chairman

(202) 418-5050
(202) 418-5533 Facsimile
ggensler@cftc.gov

# Chairman's Transmittal Letter

February 13, 2012

The Honorable Daniel K. Inouye
Chairman
Committee on Appropriations
U.S. Senate
Washington, D. C. 20510

The Honorable Thad Cochran
Vice Chairman
Committee on Appropriations
U.S. Senate
Washington, D. C. 20510

The Honorable Harold Rogers
Chairman
Committee on Appropriations
U.S. House of Representatives
Washington, D. C. 20515

The Honorable Norman D. Dicks
Ranking Member
Committee on Appropriations
U.S. House of Representatives
Washington, D. C. 20515

Dear Senators Inouye and Cochran and Representatives Rogers and Dicks:

I am pleased to transmit the Commodity Futures Trading Commission (CFTC) Budget and Performance Estimate for FY 2013. The CFTC's budget request strikes a balance between important investments in technology and human capital, both of which are essential to carrying out the agency's mandate under the Commodity Exchange Act and the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act).

Congress has mandated that the CFTC oversee both the approximately $37 trillion U.S. futures markets, as well as the $300 trillion U.S. swaps market. It is essential that the derivatives markets – both the futures and swaps markets – work for the benefit of the American public; that they are transparent, open and competitive; and that they do not allow risk to be spread through the economy.

In addition to directing the CFTC to oversee the swaps market, the Dodd-Frank Act also provides the Commission with specific authorities to address areas of need under its traditional mission in the oversight of commodity-based futures markets. Included in the law is specific direction with regard to the protection of the retail investing public in foreign exchange and other commodities.

The CFTC's new responsibilities to oversee both swaps and futures markets necessitated an agency restructuring to ensure the Commission uses its resources as efficiently as possible. The Commission created the Division of Swap Dealer and Intermediary Oversight and the Office of Data and Technology. The reorganization was put in place October 9, 2011.

As we move into FY 2013, the CFTC will need additional resources consistent with the agency's expanded mission and scope. The challenge before the agency is significant, but manageable, provided we are sufficiently resourced.

In FY 2012, the Commission expects to utilize 710 staff-years. At this size, we are but 10 percent larger than our peak in the 1990s. Since then, though, the futures market has grown fivefold, and Congress added oversight of the swaps market, which is far more complex and eight times the size of the futures market the agency currently oversees.

The budget request estimates the need for an appropriation of $308,000,000 and 1,015 staff-years for the agency. This amount is a $102,706,000 increase over the $205,294,000 FY 2012 enacted appropriations level and a 305 staff-years increase over the anticipated staff-years for FY 2012.

In addition, I am pleased to present the CFTC's Annual Performance Report (APR) for FY 2011, which provides a detailed analysis of the CFTC's performance. The agency's performance measures for 2011 were strengthened and expanded under the CFTC's new strategic plan for fiscal years 2011-2015. As described in the report, the agency's performance is affected by the challenges of limited resources. The Commission has validated the accuracy, completeness, and reliability of the performance data contained in this report.

A well-funded CFTC is a good investment for the American public. Three years ago, the financial system failed, and the financial regulatory system failed as well. It is evident that swaps played a central role in these twin failures. When financial institutions fail, real people's lives are affected. More than eight million jobs were lost. Millions of Americans lost their homes. Today, families continue struggling to make ends meet.

The CFTC will continue working hard to effectively oversee the futures market and write new rules of the road for the unregulated swaps market. We anticipate completing these rules this year. In addition, though the agency has already put in place some important enhancements to customer protection, including protection of the investment of customer funds, there is more work to be done. Without sufficient funding, however, the nation cannot be assured that this agency can oversee the futures and swaps markets, that customers are protected, and that the public gets the benefit of transparent markets and lower risk.

I am available to discuss this budget request and to answer any questions you may have.


Sincerely yours,

Gary Gensler
Chairman

cc:

The Honorable Daniel K. Inouye
Chairman
Committee on Appropriations
U.S. Senate
S-128 Capitol Building
Washington, D. C. 20510

The Honorable Thad Cochran
Vice Chairman
Committee on Appropriations
U.S. Senate
S-128 Capitol Building
Washington, D. C. 20510

The Honorable Harold Rogers
Chairman
Committee on Appropriations
U.S. House of Representatives
H-128 Capitol Building
Washington, D. C. 20515

The Honorable Norman D. Dicks
Ranking Member
Committee on Appropriations
U.S. House of Representatives
Washington, D. C. 20515

The Honorable Richard Durbin
Chairman
Subcommittee on Financial Services
and General Government
Committee on Appropriations
U.S. Senate
Washington, D. C. 20510

The Honorable Jerry Moran
Ranking Member
Subcommittee on Financial Services
and General Government
Committee on Appropriations
U.S. Senate
Washington, D. C. 20510

The Honorable Jack Kingston
Chair
Subcommittee on Agriculture, Rural
Development, Food and Drug Administration,
and Related Agencies
Committee on Agriculture
U.S. House of Representatives
Washington, D. C. 20515

The Honorable Sam Farr
Ranking Member
Subcommittee on Agriculture, Rural
Development, Food and Drug Administration,
and Related Agencies
Committee on Appropriations
U.S. House of Representatives
Washington, D. C. 20515

# The FY 2013 President's Budget & Performance Plan

## Table of Contents

CHAIRMAN'S TRANSMITTAL LETTER.......................................0

TABLE OF CONTENTS .............................................4

FIGURES AND TABLES ............................................7

EXECUTIVE SUMMARY ........................................... 1
    Organizational Changes ...................................................1
    Tactical Efforts in FY 2012 ...............................................2
    Balancing Investments in Technology and Human Capital............. 3
    Mission Activities and Resource Planning ........................ 4

OVERVIEW OF THE FY 2013 BUDGET & PERFORMANCE
ESTIMATE .................................................5
    Summary of Requested Increases of $102.7 Million by Activity .......5
    Breakout of $308 Million Budget Estimate by Division ................. 6
    Breakout of $308.0 Million Budget Estimate by Object Class ..........7
    Statement of Availability on Basis of Obligations ............................ 8

PURPOSE STATEMENT .........................................9
    Regulated Entities ..................................................... 11
    Regulatory Activities...................................................14
    Commission-Wide Economic and Legal Analysis ...........................21
    Commission-Wide International Policy Coordination ................. 24
    Commission-Wide Data Infrastructure .......................................... 24
    Commission-Wide Management and Administrative Support ...... 26

JUSTIFICATION OF INCREASES BY MISSION ACTIVITY ...........28
    Registration and Registration Compliance (29 FTE, $8.115
    million)................................................................. 28
    Reviews of Products and Rules of Operation (41 FTE, $10.045
    million)................................................................. 32
    Data Acquisition, Analytics and Surveillance (65 FTE, $22.215
    million)................................................................. 34
    Examinations (72 FTE, $18.970 million) ....................................... 38
    Enforcement (50 FTE, $16.101 million) ......................................... 42
    Commission-Wide Economic and Legal Analysis (24 FTE, $6.840
    million)................................................................. 44
    Commission-Wide International Policy Coordination (6 FTE,
    $1.470 million)................................................................. 48
    Commission-Wide Data Infrastructure (11 FTE, $17.235 million .. 50
    Commission-Wide Management and Administrative Support (6
    FTE, $1.470 million)................................................... 52

EXHIBIT 1. INFORMATION TECHNOLOGY AT CFTC .............53
    Introduction .............................................................. 53
    IT Investment Portfolio: Surveillance, Enforcement, Infrastructure
    and Management.......................................................... 53
    Management of the IT Portfolio in FY 2012 ............................ 54
    Management of the IT Portfolio in FY 2013 ...................................55

EXHIBIT 2. WHISTLEBLOWER PROGRAM AND CFTC
CUSTOMER PROTECTION FUND ...........................................57
    Introduction ..................................................... 57
    Operation of Fund in FY 2012 ......................................... 57
    Operation of Fund in FY 2013 ......................................... 58

DIVISION SUMMARY.......................................... 59
    Administrative Management & Support ........................................59
    Chief Economist ....................................................62
    Clearing & Risk .....................................................65
    Data and Technology ................................................70
    Enforcement.......................................................76
    General Counsel ...................................................79
    International Affairs .................................................83
    Market Oversight ...................................................87
    Swap Dealer and Intermediary Oversight.........................................93

APPENDIX 1.................................................... 99
    The Commissioners.................................................99

APPENDIX 2 ................................................. 103
    Analysis of New Responsibilities and Authorities on FY
    2013 Budgetary Requirements .......................................103
    Introduction .....................................................103
    Analysis of CFTC Registrants ........................................103
    Analysis of Registered Derivatives Clearing Organizations ..........104
    Analysis of Foreign Boards of Trade ...................................108
    Analysis of Swap Execution Facilities ...............................110
    Analysis of Designated Contract Markets ......................................115

APPENDIX 3 ................................................. 118
    Inspector General.................................................118

APPENDIX 4 ................................................. 119
    Overview of Planned Objectives by Strategic Goal ........................119
    Summary of Goals, Objectives, and Strategies .........................119
    FY 2013 Planned Objectives by Strategic Goal .............................. 123

APPENDIX 5 .................................................147
    The Commission and the Industry We Regulate ........................... 147
    Industry Growth in Volume, Globalization and Complexity......... 147
    Growth in Volume of Futures & Option Contracts Traded ........... 148
    Estimated Annual Swap Event Volume.......................................... 149
    Actively Traded Futures & Option Contracts ................................. 150
    Notional Value of Futures/ Option Open Contracts...................... 151
    Notional Value of Exchange-Traded and OTC Contracts............. 152
    Customer Funds in Futures Commission Merchants Accounts.... 153
    Aggregate Sum of House Origin Margin on Deposit .................... 154
    Number of Registrants.................................................... 155
    Contract Markets Designated by the CFTC.................................. 156
    Number of DCOs Registered with the CFTC................................157
    Exempt Commercial Markets ........................................ 158
    Exempt Boards of Trade ............................................. 160

APPENDIX 6....................................................................... 162

Summary of OMB and Congressional Action on Appropriations FY
2003 – FY 2013...............................................................162

APPENDIX 7 ...................................................................... 163

Privacy Policy for the CFTC Web Site ............................................163

APPENDIX 8 ...................................................................... 167

Table of Acronyms .........................................................167

# The FY 2013 President's Budget & Performance Plan

## Figures and Tables

Table 1:  Summary of Requested Increases of $102.7 Million by Activity ....... 5
Figure 1:  $102.7 Million Budget Increase by Activity ..................................... 5
Table 2:  Budget Estimate by Program ........................................................... 6
Figure 2:  $308.0 Million Budget Estimate by Program ................................. 6
Table 3:  Budget Estimate by Object Class .................................................... 7
Figure 3:  $308.0 Million Budget Estimate by Object Class ........................... 7
Figure 4: Registration and Registration Compliance Increases by Program  31
Table 5:  Review of Products and Rules of Operation Increases ................... 33
Figure 5: Review of Products and Rules of Operation Increases by Program 33
Table 6:  Data Acquisition, Analytics, and Surveillance Increases ............... 36
Figure 6: Data Acquisition, Analytics, and Surveillance
Increases by Program ..................................................................................... 37
Table 7:  Examinations Increases .................................................................. 40
Figure 7:  Examinations Increases by Program ............................................. 41
Table 8:  Enforcement Increases ................................................................... 43
Figure 8: Enforcement Increases by Program ............................................... 43
Table 9:  Economic and Legal Analysis Increases ........................................ 47
Figure 9: Economic and Legal Analysis Increases by Program..................... 47
Table 10:  International Cooperation Increases.............................................. 49
Table 11: Data Infrastructure Increases ........................................................ 51
Table 12:  Management Direction and Administrative Support Increases.... 52
Table 13:  CFTC Customer Protection Fund ................................................. 58
Table 14:  Breakout of Goal One by Objective............................................... 126
Figure 11: Breakout of Goal One Request by Objective ................................ 126
Table 15: Breakout of Goal One Request by Program Activity .................... 127
Figure 12: Breakout of Goal One Request by Program Activity ................... 127
Table 16:  Breakout of Goal Two by Objective .............................................. 132
Figure 13: Breakout of Goal Two Request by Objective ................................ 132
Table 17:  Breakout of Goal Two Request by Program Activity ................... 133
Figure 14: Breakout of Goal Two Request by Program Activity ................... 133
Table 18:  Breakout of Goal Three by Objective............................................ 135
Figure 15: Breakout of Goal Three Request by Objective ............................. 135
Table 19: Breakout of Goal Three by Program Activity ................................ 136
Figure 16: Breakout of Goal Three Request by Program Activity ................ 136
Table 20:  Breakout of Goal Four by Objective.............................................. 139
Figure 17:  Breakout of Goal Four Request by Objective .............................. 139
Table 21: Breakout of Goal Four by Program Activity .................................. 140
Figure 18: Breakout of Goal Four Request by Program Activity .................. 140
Table 22:  Breakout of Goal Five by Objective ............................................. 145
Figure 19:  Breakout of Goal Five Request by Objective............................... 145
Table 23: Breakout of Goal Five by Program Activity .................................. 146
Figure 20: Breakout of Goal Five Request by Program Activity ................... 146
Figure 21:  Growth of Volume of Contracts Traded ..................................... 148
Figure 22:  Estimated Swap Event Volume.................................................... 149
Figure 23:  Actively Traded Futures and Option Contracts ......................... 150
Figure 24:  Notional Value of Futures and Option Open Contracts.............. 151
Figure 25:  Notional Value of Exchange-Traded and OTC Contracts .......... 152
Figure 26:  Customer Funds  in FCM Accounts ............................................ 153
Figure 27:  Aggregate Sum of House Origin Margin on Deposit.................. 154
Table 24:  Number of Registrants .................................................................. 155

Table 25:  Contract Markets Designated by the CFTC ...................................156
Table 26:  Derivatives Clearing Organizations Registered with the CFTC... 157
Table 27:  Exempt Commerical Markets ......................................................159
Table 28:  Exempt Boards of Trade ............................................................ 161

# Executive Summary

The CFTC regulates a futures and options industry that increased from 250 million contracts in 2001 to more than 2.5 billion contracts in 2011. The value of customer funds held in Futures Commission Merchants Accounts, during the same period, increased from $56.7 billion to more than $203.7 billion, and the value of these contracts is notionally estimated at $40 trillion. With the passage of the Dodd-Frank Act, the CFTC is tasked with regulating the swaps markets with an estimated notional value of approximately $300 trillion – roughly eight times the size of the regulated futures markets.

The Commission made significant progress in implementing its new mandate under the Dodd-Frank Act in FY 2011. During the year, 59 proposed rules were published and 15 rules were finalized; an estimated 45 rules are to be finalized in the upcoming year. The timeline for finalizing the regulatory framework necessary to provide the protections offered by Dodd-Frank has been delayed from the twelve months laid out in the Act. This delay has afforded the Commission the opportunity to more fully engage with industry, the U.S. Securities and Exchange Commission and other federal stakeholders, and the international community in bringing transparency to, and reducing the uncertainty in, the global swaps market.

Implementation of the new Dodd-Frank rules began in FY 2011, with the Commission receiving data on cleared swaps. The pace of implementation will accelerate in FY 2012, with provisional and full registration of new entities in the swaps market. And, in FY 2013, the Commission's focus will shift to the full implementation of the swaps market regulation. The budget request presented in this document represents the Commission's best judgment on the scope of final regulation, the span of regulated entities, and the resources required to fulfill the Commission's statutory and regulatory mandate.

This budget request builds on four main elements:
- Organizational changes to support the Dodd-Frank mandate,
- Tactical efforts to bridge the resource gap in FY 2012,
- A balance of investments in technology and human capital in FY 2012 and 2013, and
- The articulation of mission-specific activities and the requisite resources to carry them out.

## Organizational Changes

The Commission has undertaken a series of internal realignments of its management structure and business processes to improve its efficiency and effectiveness in delivering its mission. Two new offices have been created to provide dedicated focus on the swaps market and data analytics. To address the scope of the swaps marketplace and ensure that the CFTC is well-situated to fulfill its expanded mission of overseeing swaps markets, the CFTC created a new division for oversight of swap dealers and intermediaries. This group will report to the Chairman's office, and will facilitate standing up the new regulatory regime for the swaps marketplace by creating a group whose primary focus is on the regulation and oversight of swap dealers. It will also provide consolidated oversight over other regulated intermediaries.

Second, technology will play a critical role in leveraging financial and human resources as the CFTC executes its expanded oversight and surveillance responsibilities over both the futures and swaps markets pursuant to the Dodd-Frank Act. Accordingly, the Commission has reorganized its technology programs by establishing a new group reporting to the Chairman's office for the collection, management and analysis of data. This group is staffed by personnel drawn from multiple disciplines and existing divisions and offices and will facilitate the improved oversight and enforcement of the derivatives markets by providing tools and analytics to support the individuals charged with those responsibilities. It will also serve as the primary interface for market participants in adapting to the new data standards and reporting requirements for market data required under the Dodd-Frank Act.

The Commission has also undertaken significant efforts to build flexibility into its business processes. The most significant example of this is the changes the Division of Enforcement has introduced to promote efficiency, the effective use of resources, and take better advantage of the considerable expertise of its staff. The Division implemented four changes to accomplish these goals:

- Movement to a case-based assignment system within regions. By eliminating pre-set team rosters, the new approach allows teams to be assigned based on the demands of the docket. For each new matter, a team will be assembled with the size and expertise demanded by the scope and complexity of the matter. Not only will this method allow the deployment of teams targeted to the matter at hand, with gains in both efficiency and effectiveness, but this flexibility will promote professional development as team members are exposed to a wider group of colleagues and matters.

- Establishment of two cross-divisional squads to bring focus to new Dodd-Frank mission areas. The Manipulation and Disruptive Trading Squad and a Swaps Squad will be comprised of trial attorneys and investigators selected from across the regions, giving the Commission a jump-start on developing the deep expertise needed to enforce the new authorities in a short period of time. The squads will evaluate leads and act as a clearinghouse for related issues and policies, while matters will be addressed by both squad members and non-members. The goal of the new squad structure is to balance the need to develop focused expertise with the need to create opportunities for diversification of experience for all staff.

- Flattening the internal Division review process, moving the approval for final recommendations to the Commission from a centralized review team to the trial attorneys and their supervisors closest to the matter. This will expedite the review process and free up resources that can be redeployed to other advisory and oversight functions.

- Improving internal communication and consistency. The Division is establishing a formal committee structure, to be apprised of proposed charges and settlements, and consider policies and practices that can be leveraged across the Division.

Likewise, the Commission has undertaken steps to improve its recruitment processes, on-boarding over 100 new employees in FY 2011. The ability to develop position descriptions, recruit, hire and on-board employees is a critical area of focus for the Office of the Executive Director to support the expanded needs of the Commission. In FY 2012, the Office will expand its focus to developing a more robust resource planning and execution process, as demanded by the expanded mission-driven requirements and the greater complexity in the operation of the Commission's business.

These internal changes, as well as others across the CFTC, will position the Commission to deliver on its expanded authorities within the current operating constraints, and prepare it to absorb the additional workload outlined in this request in FY 2013.

## Tactical Efforts in FY 2012

Implementation of the Dodd-Frank regulations will begin in earnest for CFTC in FY 2012. In its internal planning, the Commission must anticipate resources below the President's FY 2012 Budget of $308 million and 1,015 FTE, while still fulfilling its mandate. The Commission must be prepared for a surge of registration applications; requests from the National Futures Association seeking to process registration applications; requests for reviews of products and rules of operation by exchanges, clearing organizations, and self-regulatory organizations; requests from international bodies for standardization and harmonization; as well as efforts to develop examination programs for previously unregulated entities. While enforcement efforts for Dodd-Frank registrants will lag somewhat, the Commission continues its efforts to enforce the registration requirements of the retail foreign exchange dealers mandated by the 2008 Farm Bill and 2010 implementing regulations.

The Commission will redeploy resources internally to process the surge of Dodd-Frank registrations and reviews during FY 2012. Staff will be reassigned from examinations and enforcement as necessary to support registration and reviews. The Commission acknowledges that this realignment

creates risks in its critical oversight roles. CFTC has identified robust and systematic examination programs as essential to early identification of weaknesses in customer and market protections. Likewise, visible and public enforcement actions are one factor in deterring retail fraud and ensuring redress for consumers. Nonetheless, the overarching concerns of bringing transparency and certainty to the $300 trillion swaps market must take precedence. As such, the Commission will make a series of tactical decisions over the course of the year (beyond those specifically identified) to balance the risk of operating under constrained resources.

The FY 2013 budget as presented here assumes that personnel hired to support the initial surge in Dodd-Frank activity will be redeployed in future years to examinations. The Commission has been unable to muster the resources necessary to conduct annual examinations on major entities in prior years – even biennial reviews have been foregone in some instances.

## Balancing Investments in Technology and Human Capital

The budget request presented here attempts to strike a balance between investments in technology and human capital. It is clear that the Commission is facing an enormous technical challenge under the Dodd-Frank regulatory framework. Prior to the Dodd-Frank Act, the Commission processed over 5 billion records per month for market surveillance, financial and risk surveillance, and business analytics applications. The Commission anticipates a tripling in the number of exchanges and/or trading platforms under its purview between FY 2011 and FY 2013 and many new significant data streams will be added. FY 2013 estimates for increased Commission infrastructure capacity are based on current rates of growth, project related estimates to launch Dodd-Frank projects based on experience with prior projects, and anticipated technology industry reductions in cost per unit of storage, processing, and communication bandwidth. Given the uncertainty over the actual volume and growth rate of volume of trading on these new platforms as well as the size of the subset of information stored at SDRs that will need to be ingested by the CFTC, we have planned for roughly doubling the capacity of our infrastructure related to market surveillance. More important, the capacity can be scaled when needed based on sustained demand.

In conjunction with managing the increased flow of data, the Commission will have an increased need for analytics. In order to understand the behavior of the derivatives market and its participants, to identify circumstances and behaviors that increase the risk to investors and the overall marketplace, this vast quantity of data has to be organized, processed, and analyzed to identify significant events. This requirement depends on high-performance computing hardware and software; the creation, testing, and refinement of models to identify risk; the development of the analytical alerts to "push" findings to individuals for evaluation; and the ability to evolve as the Commission's experience base as expertise grows. Surveillance and enforcement focused technology investments will rise to almost 55 percent of the information technology portfolio in FY 2012, an increase of $23 million based upon current planning estimates).

At the same time, the Commission requires subject matter experts and managers to perform the full-scope of regulatory and support activities. These individuals require on-the-job training in many cases, as those with industry knowledge need grounding in the CFTC's regulatory framework, while those with a regulatory background need to understand the specifics of the industry the Commission regulates. In addition, many of the activities require incremental travel funding, expert support and other day-to-day operational expenses. The Commission has endeavored to reflect the true cost of maintaining a highly-skilled workforce in its request, while realizing that offsets within its base programs can be realigned to support new priorities.

By presenting a budget request that integrates the technology requirements into the discussion of the mission-requirements, the CFTC hopes to present a picture of how investments in technology and staff provide unique yet necessary and complementary resources to fulfill the Commission's mission.

## Mission Activities and Resource Planning

The FY 2013 budget as presented here has been restructured to articulate resource requirements in support of specific mission activities. By examining the activities that the Commission performs and how the scope and complexity of those activities have expanded with the new statutory and regulatory mandates, requested increases can be tied directly to the expanded mission. This allows the reader deeper insight into the how the CFTC conducts its work and the commensurate resources required.

Despite delays in finalization of Dodd-Frank rules necessitated by the notice and comment process, the Commission is aggressively positioning itself for full implementation in FY 2013. To that end, the Commission requires an increase of $102.7 million and 305 FTE over FY 2012, for a total request of $308 million and 1,015 FTE.

**FY 2013 President's Budget & Performance Plan**

# Overview of the FY 2013 Budget & Performance Estimate

## Summary of Requested Increases of $102.7 Million by Activity

| | FY 2012 Base | | FY 2013 Request | | FY 2013 Increase | | Percent of $ Increase |
|---|---|---|---|---|---|---|---|
| | $ (000) | FTE | $ (000) | FTE | $ (000) | FTE | % |
| **Total All Mission Activities** | **$205,294** | **710** | **$308,000** | **1,015** | **$102,706** | **305** | **100%** |
| Registration and Registration Compliance | $11,073 | 34 | $19,188 | 63 | $8,115 | 29 | 8% |
| Reviews of Products and Rules of Operation | 7,540 | 38 | 17,585 | 79 | 10,045 | 41 | 10% |
| Data Acquisition, Analytics and Surveillance | 43,399 | 140 | 65,614 | 205 | 22,215 | 65 | 22% |
| Examinations | 15,937 | 89 | 34,907 | 161 | 18,970 | 72 | 18% |
| Enforcement | 44,293 | 175 | 60,394 | 225 | 16,101 | 50 | 16% |
| Commission-Wide Economic and Legal Analysis | 20,947 | 64 | 27,787 | 88 | 6,840 | 24 | 7% |
| Commission-Wide International Policy Coordination | 3,553 | 10 | 5,023 | 16 | 1,470 | 6 | 1% |
| Commission-Wide Data Infrastructure | 31,214 | 41 | 48,449 | 52 | 17,235 | 11 | 17% |
| Commission-Wide Management and Administrative Support | 26,204 | 114 | 27,674 | 120 | 1,470 | 6 | 1% |
| Inspector General | 1,134 | 5 | 1,379 | 6 | 245 | 1 | 0% |

Table 1: Summary of Requested Increases of $102.7 Million by Activity



Figure 1: $102.7 Million Budget Increase by Activity

## Breakout of $308 Million Budget Estimate by Division

| | FY 2011 EOY | FY 2011 Actual | | FY 2012 Base | | FY 2013 Request[1] | |
|---|---|---|---|---|---|---|---|
| | Employment | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| Agency Direction | 35 | 35 | $7,907 | 34 | $8,167 | 34 | $8,167 |
| Administrative Management & Support | 74 | 74 | 16,718 | 80 | 18,150 | 86 | 19,620 |
| Chief Economist | 15 | 13 | 2,937 | 17 | 3,630 | 29 | 7,530 |
| Clearing & Risk | 54 | 50 | 11,296 | 56 | 12,705 | 103 | 24,220 |
| Data & Technology | 80 | 80 | 60,073 | 85 | 62,139 | 122 | 96,204 |
| Enforcement | 161 | 164 | 37,051 | 166 | 38,198 | 214 | 51,979 |
| General Counsel | 49 | 48 | 10,844 | 55 | 12,478 | 69 | 15,908 |
| International Affairs | 8 | 9 | 2,033 | 10 | 2,042 | 16 | 3,512 |
| Inspector General | 5 | 4 | 904 | 5 | 1,134 | 6 | 1,379 |
| Market Oversight | 118 | 118 | 26,658 | 123 | 28,812 | 206 | 49,147 |
| Swap Dealer & Intermediary Oversight | 70 | 71 | 16,040 | 79 | 17,839 | 130 | 30,334 |
| **Total** | **669** | **666** | **$192,461** | **710** | **$205,294** | **1,015** | **$308,000** |

Table 2:  Budget Estimate by Program



Figure 2:  $308.0 Million Budget Estimate by Program

---

[1] After submission to OMB MAX, the Commission refined its request for FY 2013.

**FY 2013 President's Budget & Performance Plan**

## Breakout of $308.0 Million Budget Estimate by Object Class

|  |  | FY 2011 Estimate | FY 2012 Estimate | FY 2013 Budget Request |
|---|---|---|---|---|
|  |  | ($000) | ($000) | ($000) |
| 11.1-11.5 | Personnel Compensation | $95,439 | $100,723 | $145,059 |
| 12.1 | Personnel Benefits: Civilian | 27,336 | 28,637 | 41,101 |
| 13.0 | Benefits for Former Personnel | 0 | 0 | 0 |
| 21.0 | Travel & Transportation of Persons | 1,374 | 2,000 | 2,500 |
| 22.0 | Transportation of Things | 76 | 100 | 100 |
| 23.2 | Rental Payments to Others | 15,686 | 16,300 | 19,500 |
| 23.3 | Comm., Utilities & Miscellaneous | 4,712 | 5,700 | 7,500 |
| 24.0 | Printing and Reproduction | 986 | 1,000 | 1,500 |
| 25.0 | Other Services | 40,798 | 40,634 | 75,640 |
| 26.0 | Supplies and Materials | 1,086 | 2,000 | 3,100 |
| 31.0 | Equipment | 4,967 | 8,200 | 11,000 |
| 32.0 | Building/Fixed Equipment | 1 | 0 | 1,000 |
| **99.0** | **Total Obligations** | **$192,461** | **$205,294** | **$308,000** |

Table 3: Budget Estimate by Object Class



Figure 3: $308.0 Million Budget Estimate by Object Class

## Statement of Availability on Basis of Obligations

Estimates for 2011, 2012 and 2013

|  | FY 2011 Amount $ (000) | FTE | FY 2012 Amount $ (000) | FTE | FY 2013 Amount $ (000) | FTE |
|---|---|---|---|---|---|---|
| Total Obligations and Expenditures | $192,461 | 666 | $205,294 | 710 | $308,000 | 1,015 |
| Unobligated balance lapsing | - | | - | | - | |
| Unobligated balance from recoveries of prior year | - | | - | | - | |
| Unobligated balance forward to the prior years | - | | (9,809) | | - | |
| Unobligated balance forward to the next year | 9,809 | | - | | - | |
| **Total Available or Estimate** | **$202,270** | **666** | **$195,485** | **710** | **$308,000** | **1,015** |

**FY 2013 President's Budget & Performance Plan**

# Purpose Statement

The mission of the Commodity Futures Trading Commission (CFTC or Commission) is to protect market users and the public from fraud, manipulation, abusive practices and systemic risk related to futures, options and swaps and to foster open, competitive, and financially sound markets. Congress established the CFTC as an independent agency in 1974, after its predecessor operated within the Department of Agriculture. Its mandate was renewed and/or expanded in 1978, 1982, 1986, 1992, 1995, 2000, 2008 and 2010. The CFTC and its predecessor agencies were established to protect market users and the public from fraud, manipulation and other abusive practices in the commodity futures and options markets. After the 2008 financial crises and the subsequent enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act or DFA), the CFTC's mission expanded to include oversight of the swaps marketplace.

The Commission administers the Commodity Exchange Act (CEA), 7 U.S.C. section 1, et seq. The 1974 Act brought under Federal regulation futures trading in all goods, articles, services, rights and interests; commodity options trading; leverage trading in gold and silver bullion and coins; and otherwise strengthened the regulation of the commodity futures trading industry. It established a comprehensive regulatory structure to oversee the volatile futures trading complex.

On July 21, 2010, President Obama signed the Dodd-Frank Act. The Dodd-Frank Act amended the CEA to establish a comprehensive new regulatory framework for swaps, as well as enhanced authorities over historically regulated entities. Title VII of the DFA, which relates to swaps, was enacted to reduce systemic risk, increase transparency and promote market integrity within the financial system by, among other things:

- Providing for the registration and comprehensive regulation of swap dealers and major swap participants;

- Imposing clearing and trade execution requirements on standardized derivatives products;

- Creating robust recordkeeping and real-time reporting regimes; and

- Enhancing the Commission's rulemaking and enforcement authorities with respect to, among others, all registered entities and intermediaries subject to the Commission's oversight.

Though the Commission has much experience regulating the on-exchange derivatives marketplace—having done so for more than 70 years— the Dodd-Frank Act presents new responsibilities and authorities. The U.S. swaps and futures market estimate $300 trillion and $40 trillion, respectively—that is more than $22 of derivatives for every dollar of goods and services produced in the U.S. economy. That is why it is essential that the Commission ensure that these markets work for the benefit of the American public; that they are transparent, open and competitive; and that they do not allow risk to spread through the economy

The Dodd-Frank Act gives the CFTC flexibility to set effective dates and a schedule for compliance with rules implementing Title VII of the DFA, consistent with the overall deadlines in the DFA. The order in which the Commission finalizes the rules does not determine the order of the rules' effective dates or applicable compliance dates. Phasing the effective dates of the DFA's provisions will give market participants time to develop policies, procedures, systems and the infrastructure needed to comply with the new regulatory requirements.

In February 2011, the Commission published a new Strategic Plan integrating the expanded responsibilities under the Dodd-Frank Act with its existing mission and goals. The goals of the CFTC largely remain the same with the regulation of swaps being incorporated within the regulatory structure currently applied to the futures and options markets. The CFTC's primary focus will be to write the rules to regulate the swaps markets, implement those rules, test and adjust those rules and write new rules as necessary to bring effective regulation to all derivatives markets over the next five years.

The Commission's strategic goals for FY 2011-2015 are:

- _Goal One_.  Protect the public and market participants by ensuring market integrity, promoting transparency, competition and fairness and lowering risk in the system.

- _Goal Two_.  Protect the public and market participants by ensuring the financial integrity of derivatives transactions, mitigation of systemic risk, and the fitness and soundness of intermediaries and other registrants.

- _Goal Three_.  Protect the public and market participants through a robust enforcement program.

- _Goal Four_.  Enhance integrity of U.S. markets by engaging in cross-border cooperation, promoting strong international regulatory standards, and encouraging ongoing convergence of laws and regulation worldwide.

- _Goal Five_.  Promote Commission excellence through executive direction and leadership, organizational and individual performance management, and effective management of resources.

The focused rule writing efforts required by the Dodd-Frank Act are not being treated as a "Strategic Goal" but as a tactical goal that has an Objective, Strategy and Performance Measure. The CFTC believes developing and implementing the Dodd-Frank Act rules is one of the most important and difficult efforts it has ever undertaken.  The Dodd-Frank Act set a timeframe of 360 days (or less in a few instances) for completion of the rules, but the agency was unable to comply with this for several reasons:

- The Commission operated under a Continuing Resolution for most of FY 2011 and was unable to hire needed staff and apply their critical effort and skills to the completion of this effort.

- Significant and open interaction with Congress, industry, and the public was necessary and appropriate to ensure development and implementation of rules that are well balanced between  risk mitigation and cost to the industry and public.

- While some rules are fairly straight forward, many are intricate and raise interrelated and complex issues.  Staff requires appropriate time to analyze, summarize, and consider all comments and aspects of a proposed rule, present and discuss the proposed rule and considerations with the Commissioners, gain feedback and develop draft final rules for deliberation by the Commission.

The comment and consideration aspects of the rule-making process take an enormous amount of time and the Commission will continue to ensure all appropriate thought is given to rule development.  At this point the CFTC anticipates completion of the vast majority of the rules within 24 months of enactment of the Dodd-Frank Act.

The Commission consists of five Commissioners.  The President appoints and the Senate confirms the CFTC Commissioners to serve staggered five-year terms.  No more than three sitting Commissioners may be from the same political party.  With the advice and consent of the Senate, the President designates one of the Commissioners to serve as Chairman.  The Commission is headquartered in Washington D.C. with regional offices in Chicago, Kansas City and New York.

**FY 2013 President's Budget & Performance Plan**

## Regulated Entities

The Commission's regulatory scope spans the full array of participants across the derivatives markets: contract markets and soon-to-be established swap execution facilities (SEFs) and swap data repositories; derivatives clearing organizations (DCOs); swap dealers, registered futures associations, and a host of intermediaries. The Dodd-Frank Act established a number of new market participants, the registration and regulation of which have been identified as priorities in the new Strategic Plan. Within this plan, the Commission set specific strategic goals to ensure market participant compliance with the core principles, timely identification of deficiencies and corrective measures, and enforcement actions to be taken where warranted.

**Designated Contract Markets and Swap Execution Facilities**

Designated contract markets (DCMs) and SEFs provide transparent, liquid, and competitive marketplaces for trades occurring on regulated exchanges. Historically, contract market futures and/or options contracts have been traded by both institutional and retail participants. Beginning in the second half of FY 2012, the Commission will have established the regulatory framework for the execution of swaps by eligible contract participants on a new type of regulated trading platform, the swap execution facility.

The Commission anticipates a tripling in the number of exchanges and/or trading platforms under its purview between FY 2011 and 2013. In FY 2011, CFTC regulated 16 DCMs. This number is anticipated to grow to 21 DCMs in FY 2013, as new entrants seek designation. It is highly likely that some DCMs, which in the past only listed futures and options, will start listing swaps. And, an additional 20 to 30 entities are likely to become SEFs, based on the number of exempt commercial markets, exempt boards of trades, interdealer brokers, information service providers and swap dealers that have formally or informally expressed an interest in registering. See Appendix 5.

DCMs currently have to comply with certain core principles, including requirements to perform basic self-regulatory functions regarding their trading platforms. Under the Dodd-Frank Act, these core principles have been expanded from 18 to 23. SEFs will also have core principles and self-regulatory responsibilities. A key objective of the Strategic Plan is ensuring that U.S. DCMs and SEFs have the systems, procedures and resources necessary for effective self-regulation and ongoing compliance with core principles.

**Foreign Boards of Trade**

Authority for the Commission to register foreign boards of trade (FBOTs) that wish to make their order entry and trade matching systems available from within the United States to their identified members and other participants (direct access) was provided by the Dodd –Frank Act. The registration of such FBOTs will replace the practice of issuing direct access no-action relief letters. The registration rule, expected to become effective in January, 2012, provides, among other things, the procedures for registration, including a limited application procedure for FBOTs currently operating under existing no-action relief. It also identifies the requirements that the FBOT must meet before it can be registered and, once registered, the conditions that the FBOT must continue to satisfy in order to remain registered. The Commission anticipates that 21 FBOTs will submit applications for registration in 2012.

**Exempt boards of trade and exempt commercial markets**

Exempt boards of trade and exempt commercial markets are subject only to the CEA's anti-fraud and anti-manipulation provisions. Both entities are prohibited from claiming that the facility is registered with, or recognized, designated, licensed, or approved by the Commission. In addition, if the entities perform a price discovery function, they must provide certain pricing information to the public. A total of 37 exempt commercial markets and 29 exempt boards of trade filed notices with the Commission in FY 2011. In FY 2011, 21 exempt commercial markets and 21 exempt boards of trade were in business during the fiscal year. The CFTC expects that a number of exempt commercial markets and exempt boards of trade will apply to be SEFs.

**Swap data repositories**

The category of swap data repository was created by the Dodd-Frank Act and the CFTC identified in its Strategic Plan that it must establish new regulations to register swap data repositories and ensure that swap data is collected, maintained and made available to the Commission and other regulators consistent with the new statutory and regulatory mandates which include requirements for real-time public reporting. A swap data repository is a centralized recordkeeping facility for the collection and maintenance of information and records with respect to swaps transactions and positions. The Dodd-Frank Act specifically requires that all cleared and uncleared swaps be reported to a swap data repository. Swap data repositories will have, in turn, a set of registration, regulation, reporting and recordkeeping obligations that will require oversight by the CFTC. These services in the non-security futures and options markets are performed by exchanges, other contract markets and DCOs. As many swap transactions are anticipated to be conducted outside of exchanges and clearing organizations, swap data repositories will establish transparency at the transaction level by accepting and maintaining trade information, providing access to the data to the CFTC and other regulators. The swaps data held at SDRs will be invaluable for many regulatory functions, such as evaluating systemic risk monitoring the swaps markets for manipulation, and publishing aggregate market information. The Commission estimates that a total of five to eight data repositories will apply for registration. In addition, the Commission anticipates that at least one SDR will be established and registered for each swap asset class. This will preclude the need for any counter-party to report a swap transaction directly to the Commission and the need for the Commission to establish an SDR.

**Derivatives clearing organizations**

DCOs play an important role in mitigating risk in the markets that the CFTC regulates. A DCO's registration is predicated on its demonstration of compliance with the core principles contained in the CEA. The CEA requires that any entity that seeks to provide clearing services with respect to futures contracts, options on futures contracts, or swaps must first obtain registration as a DCO. In addition, the Dodd-Frank Act expanded the scope of the CFTC's regulatory mandate significantly with respect to the clearing of swaps and operation of DCOs. This expansion includes:

- Mandating clearing for most swaps;

- Expanding the core principles with which a clearing organization must comply to gain and maintain its registration; and

- Establishing heightened risk management and prudential standards for systemically important DCOs.

The Commission's Strategic Plan addresses its statutory responsibility to ensure the financial integrity of derivatives transactions and avoid systemic risk. Commission staff conduct daily risk surveillance across all markets regulated by the Commission by reviewing the risk profiles of DCOs, clearing firms and market participants with large positions. To discharge this responsibility, staff receives and reviews reports that detail positions in the regulated markets. Staff calculates margin requirements, conducts stress tests, and compares potential losses to available resources such as futures commission merchant capital and the DCO guarantee fund. Staff contacts DCOs, futures commission merchants, and large market participants regularly, on a proactive basis, to discuss risk posed by large positions and the measures in place to mitigate those risks. In addition, the Commission periodically reviews DCOs' procedures for monitoring risks and protecting customer funds.

The Commission anticipates an estimated 18 DCOs will be registered by the beginning of FY 2013, up from 17 registered in FY 2011. Four to five of these may be located outside the United States, based upon current information. The Commission estimates that no more than four of the 18 will be designated as systemically important by the Financial Stability Oversight Council.[2] Systemically-

---

[2] Title I of the Dodd-Frank Act creates the Financial Stability Oversight Council to serve as an early warning system identifying risks in firms and market activities, to enhance oversight of the financial system as a whole and to harmonize prudential standards across agencies.

**FY 2013 President's Budget & Performance Plan**

important DCOs will be subject to higher standards for financial resources, risk management, and other operational standards.

**Intermediaries and swap dealers/major swap participants**

Futures market intermediaries are entities that act on behalf of another person in connection with the purchase or sale of any commodity for future delivery, security futures product, swap, or commodity option. These intermediaries are generally required to register with the Commission[3] in order to ensure that futures industry professionals meet minimum standards of fitness and competency, and the Commission and members of the public have a means of addressing wrongful conduct by industry professionals. Intermediaries may also be, depending on the nature of their activities, subject to various financial, disclosure, reporting, and recordkeeping requirements. Intermediaries include:

- Futures commission merchants, who solicit or accept orders from customers for the purchase or sale of any commodity for future delivery, a security futures product, a swap, or commodity options and, in or in connection with such solicitation or acceptance of orders, accept any money, securities, or property to margin, guarantee, or secure any trades or contracts that result or may result from the solicitation or acceptance of orders.

- Introducing brokers, who solicit or accept orders for the purchase or sale of any commodity for future delivery, a security futures product, a swap, or commodity options. Introducing brokers are prohibited, however, from accepting any money, securities, or property from any customer to margin, guarantee, or secure any trades or contracts.

- Commodity pool operators (CPOs), who engage in the operation of commodity pools that are formed for the purpose of trading in any commodity for future delivery, security futures products, swap, or commodity options. CPOs solicit or accept funds, securities, or property from participants who obtain an ownership interest in the commodity pool.

- Commodity trading advisors (CTAs), who (for compensation or profit) engage in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in, any futures or options contract traded on or subject to the rules of a contract market, or any commodity option; or as part of a regular business, issue or promulgate analyses or reports concerning any of the activities referred to above.

The Commission regulates approximately 65,000 intermediaries, including over 50,000 salespeople (see Appendix 5) and anticipates no material change in the number of historically regulated intermediaries between 2011 and 2013.

With the promulgation of final rules in October 2010, the Commission established a comprehensive regulatory regime for off-exchange foreign currency transactions involving retail participants. This regime included a new class of registered entity, retail foreign exchange dealers (RFEDs). An RFED is an individual or organization that acts, or offers to act, as a counterparty to an off-exchange foreign currency transaction with a person who is not an eligible contract participant and the transaction is either a futures contract, an option on a futures contract or an option contract (except options traded on a securities exchange); or offered or entered into, on a leveraged or margined basis, or financed by the offeror, counterparty or person acting in concert with the offeror or counterparty on a similar basis. At the end of FY 2011, fourteen such dealers are registered.

As part of comprehensive reform under the Dodd-Frank Act, swap dealers and major swap participants[4] must also register with the CFTC[5]. These entities will be required to meet reporting

---

3 The Commission has delegated the registration processing of intermediaries to the only U.S. registered futures association, the National Futures Association – see follow-on discussion.

4 A Major swap participant is defined as any person who is not a swap dealer and: (1) maintains a substantial position in swaps for any of the major swap categories as determined by the Commission; (2) whose outstanding swaps create substantial counterparty exposure that could have serious adverse effects on the financial stability of the United States banking system or financial markets; or (3) is a financial entity that is highly leveraged relative to the amount of capital that it holds and is not

requirements, minimum capital requirements, margin requirements, and business conduct standards. There is significant uncertainty in the number of swap entities that will seek to register in FY 2012 and 2013. However, the Commission's currently estimates that approximately 125 entities will register as swap dealers or major swap participants[6].

**Registered Futures Associations**

Companies and individuals who handle customer funds, solicit or accept orders, or give trained advice on futures and options must apply for CFTC registration through a registered futures association under the CEA.  Currently, the National Futures Association is the only registered futures association with delegated oversight authority from the Commission.  In 1983, the Commission began a series of delegations to the National Futures Association regarding the registration of intermediaries. Over the course of the last 28 years, the Commission's delegations have assigned nearly the entirety of registration and fitness examination activities for futures and options to the National Futures Association. The Commission retains an oversight role over the execution of these activities by the National Futures Association.

The National Futures Association's financial surveillance and compliance oversight program entails examinations of commodity pool operators, commodity trading advisors and introducing brokers. The National Futures Association also has been delegated or directed to perform other non-financial functions for the Commission that will be subject to ongoing Commission monitoring and assessment. Non-financial functions performed by NFA include commodity pool operator/commodity trading advisor disclosure document reviews, registration processing, telemarketing reviews, and operating a dispute resolution program.

Likewise, under proposed Commission regulations, swap dealers and major swap participants will be required to register with the National Futures Association (as the only registered futures association) and be subject to National Futures Association's oversight.  This oversight will involve National Futures Association staff conducting examinations to assess swap dealers' and major swap participants' compliance with the CEA, Commission regulations, and National Futures Association rules including compliance with certain financial requirements (e.g., capital, margin, segregation of counterparty funds, and financial reporting) and non-financial requirements (e.g., business conduct requirements).

## Regulatory Activities

### Registration and Registration Compliance

The Commission performs a thorough review of the registration applications of all entities seeking to be registered as DCMs and DCOs.  Multi-disciplinary review teams of attorneys, industry economists, trade practice analysts and risk analysts are needed to ensure that the Commission undertakes a thorough analysis of such applications to ensure compliance with the applicable statutory core principles and Commission regulations. Site visits may be required to validate needed technical and self-regulatory capabilities.

Implementation of Dodd-Frank regulations will begin in FY 2012 with a surge of new registration activity in all market segments.  This activity will include an increase in the number of entities, as well as an expansion of the scope of registration requirements as a result of amendments to and the addition of new core principles.  To facilitate the orderly transition to a regulated marketplace, the Commission will undertake a phased approach to implementation for SEFs.  This phased approach includes temporary registrations, which grant "grandfather" relief for those entities that currently provide a marketplace for the listing and trading of swaps. Under the proposed rule, upon the request of an applicant, the Commission may grant temporary relief for qualifying entities that, due to their

---

subject to capital requirements established by an appropriate Federal banking agency, and maintains a substantial position in outstanding swaps in any major swap category as determined by the Commission.
5 Swap dealers and major swap participants must register with the CFTC, even if they are registered as security-based swap dealers or major security-based swap participants with the Securities and Exchange Commission.
6 See the Commission's final rulemaking establishing the registration process for swap dealers and major swap participants, 77 FR 2613, 2622 (January 19, 2012).

operations, will be required to register as a SEF in order to continue operating as of the effective date of the regulations. It will enable a qualifying entity to operate without full registration on a short-term basis during the pendency of the application review process on the condition that it otherwise operate in compliance with requirements under the Dodd-Frank Act. Many applicants will be able to continue operations under temporary registration, while the Commission performs the due diligence necessary for full registration. Likewise, the Commission intends to undertake a phased approach to implementation for swap data repositories, by allowing provisional registrations. There is currently no provision for comparable, phased implementation for DCMs, designated clearing houses, or other entities.

The Commission anticipates that it will receive a surge in applications of SEFs for registration beginning in the second half of FY 2012 through the beginning of FY 2013, as rules are finalized. The Commission intends to re-prioritize staff to meet this one-time expected surge.

The Commission's Strategic Plan emphasizes the importance of working closely with the NFA to ensure that intermediaries meet high qualification and fitness standards through the registration process. In addition, the Commission thoroughly reviews the registration processes and conducts direct examinations of swap dealers and major swap participants to identify deficiencies and confirm that they are corrected in a timely manner.

## Reviews and assessments of products and rules relating to products

The Commission has obligations to review new product filings and amendments to rules relating to products by registered entities, as well as issuing no-action letters related to product issues. The current scope of work includes reviewing new futures and option contract filings, reviewing contract rule submissions, participating in reviews of applications for designation as contract markets, and developing new rules and policies to accommodate innovations in the industry. Currently, the Commission conducts due diligence reviews of new contract filings to ensure that the contracts are not readily susceptible to manipulation or price distortion, and that the contracts are subject to appropriate position limits or position accountability. The Commission also analyzes amendments to contract terms and conditions to ensure that the amendments do not render the amended contracts readily susceptible to manipulation and do not otherwise affect the value of existing positions. In order to prioritize work with product reviews and rulemakings, the Commission has begun to implement a procedure that assigns greater review priority to contracts that have achieved certain thresholds of trading volume and open interest.

Regulation of the swaps marketplace will drive the need to review a large number of new products introduced by DCMs and SEFs to verify that the contracts are not readily susceptible to manipulation and are subject to appropriate position limits or position accountability. In addition, the Commission will have several product-review responsibilities. The Commission will need to evaluate transaction and pricing data collected by swap data repositories to determine appropriate block trade threshold levels that registered SEFs, DCMs, and market participants may use to delay public reporting of swap transaction and pricing data. In addition the Commission may need to evaluate market data and characteristics to determine whether a swap contract that is listed on a DCM or SEF has been "made available to trade" and, accordingly, is subject to the trade execution mandate of the Dodd-Frank Act. In this regard, the Commission expects that SEFs and DCMs will actively seek such determinations for swaps that are subject to the mandatory clearing requirement. Moreover, the Commission expects to evaluate event contracts under a special review process to determine if they involve prohibited activities and other DCM contracts to determine whether a sufficient proportion of trades occur on the centralized marketplace in compliance with the Core Principle 9 requirement that the price discovery process of listed contracts be protected. The Commission has established a new objective and performance measure in its Strategic Plan to ensure that reviews of swaps submitted to the Commission are completed within statutory and regulatory deadlines.

### Reviews of aggregate position limits for physical commodity derivatives

A primary mission of the CFTC is to foster the fair, open and efficient functioning of the commodity derivatives markets. Critical to fulfilling this statutory mandate is the protection of market users and

the public from undue burdens that may result from excessive speculation.  Large concentrated positions in the physical commodity markets can potentially facilitate price distortions given that the capacity of any market to absorb the establishment and liquidation of large positions in an orderly manner is related to the size of such positions relative to the market and the market's structure. Concentration of large positions in one or a few traders' accounts can also create the unwarranted appearance of appreciable liquidity and market depth which, in fact, may not exist. Trading under such conditions can result in sudden changes to commodity prices that might otherwise not have occurred if traders' positions were more evenly distributed among market participants. Position limits address these risks by ensuring the participation of a minimum number of traders that are independent of each other and have different trading objectives and strategies. Consistent with the Strategic Plan, the Commission anticipates performing risk analysis and stress-testing on large trader and clearing member positions, a total of approximately 600,000 positions in FY 2013, to ascertain those with significant risk and confirm that such risks are being appropriately managed.

The Commission currently sets and enforces position limits with respect to certain agricultural products.  In addition, the Commission authorizes DCMs to set position limits and accountability rules to protect against manipulation and congestion and price distortions. The proliferation of economically-equivalent instruments trading in multiple trading venues, however, warrants extension of the Commission-set position limits beyond agricultural products to metals and energy commodities. The Commission anticipates that this market trend will continue as, consistent with the regulatory structure established by the Dodd-Frank Act, economically-equivalent derivatives based on exempt and agricultural commodities are executed pursuant to the rules of multiple DCMs, SEFs, and other Commission registrants. Under these circumstances, uniform position limits should be established across such venues to prevent regulatory arbitrage and ensure a level playing field for all trading venues. Because it has the authority to gather data and impose regulations across trading venues, the Commission is uniquely situated to establish uniform position limits and related requirements for all economically-equivalent derivatives.

**Reviews of block trade sizes for swaps**

A block trade is a large transaction that is negotiated off a trading floor or facility and then executed on an exchange's trading facility, as permitted under exchange rules.  The size of the transaction is presumed to be of a sufficient size that its execution on the centralized market could not be filled at a single price and would move the market.  The trade would then be transacted off the centralized market, with the details of the trade reported to the exchange as soon as practicable.  The exchange then reports the trade to the market, with an appropriate time delay.  The Dodd-Frank Act expands the Commission's authority to swaps, requiring that appropriate block sizes be established.

**Mandatory clearing determination for swaps**

The Commission will be required to review, evaluate, and make a determination on the eligibility of a swap to be cleared, as well as the eligibility or continuing qualification of the DCO to clear such a swap. All DCOs that clear swaps must submit the contracts to the Commission, who must then make a decision as to whether the swaps are subject to mandatory clearing.  The CFTC has 90 days after the submission, including a 30-day comment period, to make such determinations.  There currently is no requirement for the CFTC to make similar determinations in the futures market.  Though estimates of the total number of contracts that will be submitted for clearing, and how they will be handled with the Commission (e.g., the Commission may be able to group many by class) are highly uncertain, one data point is that the largest swaps clearinghouse currently clears nearly one million unique contracts. Furthermore, according to data from the Bank for International Settlements, the total notional amount of over-the-counter derivatives outstanding as of the end of December 2010 is $415 trillion for interest rates; $29 trillion for credit default swaps and $2 trillion for commodities. It is safe to assume there will be more DCOs clearing more products and that the risk profile of these cleared products will be more complex than the historically regulated futures and options.

## Reviews of registered entities' rules of operation

The Commission routinely reviews new rules and rule changes adopted by registered entities to assure they meet the statutory core principles of the CEA and the regulations of the Commission. The CEA and Commission regulations establish procedures for certification and/or approval of new contracts, new rules and rule amendments submitted by existing registered entities— DCMs and DCOs — as well as new registered entities — SEFs and swap data repositories. Under the enhanced certification review procedures, staff must determine whether rules subject to the 10-day review timeline present novel or complex issues, are certified with inadequate explanation, or are potentially inconsistent with the CEA or Commission regulations, requiring a stay of the certification to conduct a more in-depth 90-day review.

In addition, the Commission must undertake a review of all current regulated entities to ensure they meet the new and amended core principles, and Commission regulations implementing such core principles, set forth in the Dodd-Frank Act. The Commission's Strategic Plan includes specific performance measures that address the review of entity rules.

## Data acquisition and analysis for oversight and surveillance

Market oversight and surveillance are highly dependent on the ability to acquire large volumes of data and the development of sophisticated analytics to identify trends and/or outlying events that warrant further investigation. To the extent possible, the CFTC is seeking to leverage applications and analysis across the organization through the use of XML-based industry standardized data sets. It is anticipated that through the collection of standardized data sets, the Commission will have the unique and essential ability to aggregate data received by all market participants, allowing a more encompassing view of futures, options and swaps transactions. This aggregated data will allow the Commission to conduct market-level surveillance and perform financial risk analyses of market participants. This capability is particularly important with the expansion of the Commission's mandate in the disaggregated swaps markets, as market participants may have swaps data residing in multiple swap data repositories, multiple DCMs, and multiple SEFs. The Commission's ability to view aggregated data across this industry landscape is essential. Investment in information technology (IT) is mandatory for this aggregation and also supports all facets of Commission market, financial, and risk surveillance programs. Furthermore, to address this need the Commission established a Strategic Plan objective to ensure that information technology systems support the Commission's existing and expanded responsibilities to ensure financially sound markets, mitigate systemic risk, and monitor intermediaries.

### Market and trade practice surveillance

The Commission monitors trading and the positions of market participants on an on-going basis. Commission staff screen for potential market manipulations and disruptive trading practices, as well as trade practice violations. Staff also monitors changing market conditions and developments, such as shifting patterns of commercial or speculative trading or the introduction of new trading activities, to assess possible market impacts on internal review techniques and/or evaluate the impact such changes may have on exchange trading rules and contracts.

Market and trade practice surveillance technology receives and processes seven to eight million transaction records multiple times a day for multiple scenarios, taking less than 15 minutes per scenario. Where previously eight hours were needed to review approximately 1,000 transactions manually, Commission staff is now alerted to questionable activity in the millions of daily transaction records and thousands of daily position records so that they may analyze market activity and systematically identify market manipulations and suspicious market activity. Automated surveillance tools allow staff to identify market participants that have concentrated market power and arms the CFTC with the knowledge and analytic capabilities necessary to take appropriate market surveillance actions. Futures and options end-of-day position data for large traders are collected from reporting firms and open interest, volume, price, and clearing member data is collected from exchanges. Exchanges electronically transmit to the CFTC the daily positions of each clearing member. Clearing members, futures commission merchants and foreign brokers (that is, the reporting firms)

electronically file daily reports consisting of the futures and option positions of traders that hold positions above specific reporting levels set by CFTC regulations. This data is used to monitor futures and options trading in order to detect any market anomalies that may occur and to identify situations that could pose a threat of manipulation so that appropriate preventive actions can be initiated. Automated alerts and profiles enable staff to conduct surveillance in the rapidly expanding area of electronic trading, both intra and inter-exchange and across side-by-side platforms. The details of each individual trade are collected from exchanges overnight and loaded and processed for reporting, analysis, and profiling, providing staff with greater efficiency and flexibility by performing sophisticated pattern recognition and data mining and helping detect novel and complex abusive practices. Alerts of potential trade practice violations are generated for review by market compliance and surveillance staff. In FY 2012, CFTC will begin receiving large trader commodity swaps position data that will be integrated with futures and options data to enhance market surveillance.

Beginning in FY 2012, the Commission anticipates enhancing its automated surveillance tools to: 1) include participant profiling (to determine trading/activities out of the norm), 2) include new alert models and additional analytic reports based on new data types not currently received at the Commission (e.g., order data), 3) build upon the existing list of automated alerts to refine existing alerts and create new ones, and 4) incorporate ownership and control records data. In FY 2013, CFTC anticipates receiving ownership and control records in order to associate end-of-day position data with the intra-day trade data, building an integrated view of this data that allows the market surveillance staff to better oversee the markets. This functionality will culminate in the detection of intra-day position limit violations.

**Financial and risk surveillance**

Staff conducts risk and financial surveillance of DCOs, clearing futures commission merchants, and other market participants such as swap dealers, major swap participants, and large traders that may pose a risk to the clearing process.

Financial and risk surveillance technology allows staff to identify large traders whose positions may pose financial risk to the industry or a clearing firm, analyze an owner's holdings and project the effect of market moves on these holdings, perform "what if" stress testing and risk scenarios to determine the effect of market movement on margin, and evaluate overall portfolio risk under different market conditions. Financial and risk surveillance technology also allows staff to monitor futures commission merchants by storing and analyzing monthly financial statements and annual reports provided to the Commission to report net capital positions and other financial information. The Commission's current financial and risk surveillance technology has been primarily applied to futures and options on futures products. Following the collection of position data on cleared swaps and over-the-counter products, which began in a limited capacity for existing DCOs in FY 2011 and will continue expanding through FY 2013, the Commission will update existing and introduce new financial and risk surveillance technology to expand data intake, surveillance, analysis, and reporting. This effort will begin in FY 2012 and continue into FY 2013, focusing on the different requirements for each asset class (e.g., interest rate swaps and credit default swaps).

**Business analytics**

CFTC also maintains a business analytics platform that provides staff with a powerful set of tools for performing data analysis. The platform allows staff analyzing industry data to keep pace with the continuing growth in industry data volume and complexity. The Commission will improve its ability to conduct economic analysis by providing additional data partitioning, parallel processing, high-performance indexing, and query optimization. These improvements will allow staff to more quickly gather subsets of enterprise data for analysis, optimize the analytics performance, and reduce extraction, transformation and loading times for very large order message volumes, market reconstructions and simulation, complex swap valuation, and high frequency and algorithmic datasets. In FY 2012 and FY 2013 the Commission anticipates deploying hardware and software tools to increase the loading and analysis of high volume datasets, and facilitating the sharing and reuse of independently-developed analytic routines and problem-specific datasets.

**FY 2013 President's Budget & Performance Plan**

The implementation of automated surveillance systems is designed to improve the efficiency and effectives of the Commission's surveillance programs across four dimensions: first, staff will have more time for analyzing pre-screened data, and allow them to focus on the participants, issues and trends that have the biggest market impact. Second, it will expand the breadth of surveillance by using computer algorithms to routinely scan data for potential trade violations or market conditions that may have previously been overlooked. Third, documented staff analyses can be used as an additional source of information to identify trends or patterns of concern; and fourth, potential violations will be recorded, tracked and referred to other divisions (e.g., enforcement) to ensure appropriate follow-up. The Commission anticipates building upon the automated surveillance capability, started in its trade practice compliance area and expanded into the large trader reporting area, to also cover financial and risk surveillance functions.

## Examinations

Examinations are formal, structured assessments of a regulated entities' operations or oversight programs to assess on-going compliance with statutory and regulatory mandates. Regular examinations are the most effective method of ensuring that the entities' are complying with the core principles established in the CEA:

- Reviews of DCMs (and SEFs and swap data repositories in the future) focus on the structural sufficiency of their self-regulatory and compliance programs.

- Examinations of DCOs' compliance with core principles, and regulations implementing such core principles, to ensure the soundness of the financial condition of those entities. The Commission is required to examine systemically important DCOs at least annually.

- Reviews of registered intermediaries ensure compliance with mandated standards regarding the fitness and conduct necessary to ensure the protection of market participants and the financial soundness of the market.

- Examinations of futures commission merchants' and retail foreign exchange dealers' compliance with applicable capital, segregation, and financial reporting requirements help ensure that markets are protected from systemic risk and that the funds belonging to customers are protected from loss.

- Oversight of the financial surveillance and compliance programs of self-regulatory organizations (the exchanges and RFAs) are designed to ensure that the SROs are effectively monitoring the financial integrity of market intermediaries and protecting customer funds.

Examinations are performed by multi-disciplinary teams of individuals, attorneys, industry economists, trade practice analysts, risk analysts and accountants depending on the scope. As described in Goal Two of the Strategic Plan, it is the Commission's goal to move to annual reviews of significant entities, to ensure the effectiveness of Commission regulations.

## Enforcement

The Commission protects market participants and other members of the public from fraud, manipulation and other abusive practices in the commodities, futures and swaps markets. Its cases range from quick strike actions against Ponzi enterprises that victimize investors across the country, to sophisticated manipulative and disruptive trading schemes in markets the Commission regulates including oil, gas, precious metals and agricultural goods. The importance of the Commission's enforcement responsibilities are specifically addressed in Strategic Plan Goal Three, which emphasizes cooperative enforcement to increase the Commission's effectiveness in identifying and deterring illegal conduct.

The Commission has the authority to: 1) shut down fraudulent operations and immediately preserve customer assets through asset freeze and receivership orders, 2) terminate manipulative and disruptive schemes, 3) ban defendants from trading and being registered in its markets, and 4) seek

restitution, disgorgement and monetary penalties up to the greater of three times the amount of a defendant's gain or a fixed statutory amount. From FY 2002 to date, orders for more than $3 billion in civil monetary penalties, restitution and disgorgement have been imposed in Commission cases.

For example, in FY 2011, the Court ordered an interim distribution of nearly $800 million to Ponzi victims, equivalent to more than 60 percent of the victims' losses in that case. In another case, the Commission charged a group of defendants with manipulating the price of crude oil, and alleged they made in excess of $50 million in ill-gotten gains (that case is pending in Federal court in New York).

Since FY 2009, the Commission has received more than 2,500 leads from multiple sources concerning potential wrongdoing. Most of these leads were from members of the public and other miscellaneous sources. While all leads merit careful attention, most leads do not ultimately result in an enforcement action for a number of reasons including limitations on CFTC jurisdiction. Experience proves that leads generated internally at the CFTC, or from others in law enforcement or self-regulatory organizations, are much more likely to lead to a CFTC enforcement action.

As the outreach and education activities, funded through the Customer Protection Fund in FY 2012, reach a wide audience, it is likely that the number of leads will increase and strain the Commission's ability to triage and investigate them efficiently.

During the past two fiscal years, the Commission has opened more than 800 investigations including a record number of new investigations in FY 2011. The scope and level of effort associated with investigations varies widely. Manipulation investigations are generally far more time consuming than fraud and other types of investigations. For example, based on a review of length of time spent on investigations for approximately 150 enforcement actions filed by the Division of Enforcement, the average length of time spent on investigations resulting in charges filed involving fraud and trade practice have been less than one year, investigations leading to charges for supervision have been open for slightly more than one year, while investigations leading to charges of manipulation have taken more than two years to complete.

Enforcement of the Dodd-Frank Act and regulations promulgated thereunder will increase the Commission's enforcement burdens for a number of reasons. For example, the Dodd-Frank Act extends the Commission's anti-fraud jurisdiction to the swaps markets, and clarifies its jurisdiction with respect to certain retail off-exchange transactions, including transactions in precious metals. This expansion is expected to translate into more investigations, and more enforcement actions. Indeed, in just the first wave of DFA enforcement, concerning registration violations, the Commission filed 23 actions in FY 2011.

As a result of the Dodd-Frank Act, there will be new types and an increase in the number of CFTC registrants including exchanges, SEFs, swap data repositories, clearing organizations, intermediaries and dealers that require the Commission to issue concomitant regulations. The Commission's enforcement workload will include investigations concerning any violations by these new registrants of these new rules.

In addition, the Dodd-Frank Act established anti-manipulation authority over swaps and new broader anti-manipulation authority in the futures markets. While preventing manipulation is critical to the Commission's mission to help protect taxpayers and the markets, as noted above manipulation investigations and litigations are quite time consuming. The Dodd-Frank Act also includes a prohibition on disruptive trading. The Commission anticipates that disruptive trading investigations and litigation will be time intensive, particularly when high-frequency and algorithmic trading is involved, due to an inherent complexity comparable to that of market-wide manipulation investigations.

The Commission will continue to aggressively pursue domestic and international cooperative enforcement efforts. The Commission routinely works with domestic and international financial regulatory and criminal counterparts on multi-jurisdictional and multi-national investigations. There has been a significant increase in both the number of outgoing and incoming international requests

each year since FY 2008. This change is directly related to the increase in enforcement cases in general, but is likely to be accelerated given the global nature of the swaps marketplace.

**Legal Support Technology**

The new CFTC oversight of the swaps market, new anti-manipulation and other authorities, incentives for whistleblowers, and the increasing effectiveness of market surveillance, financial and risk surveillance, and business analytics technology will require expanding the capacity and increasing the capability of legal support technology that is provided through the Commission's case management system (eLaw). eLaw provides a variety of critical automated litigation support services to Commission staff in connection with their investigative and litigation matters. These services include technology designed to assist with the overall management of documents and data that may be relevant to a matter, case or request. The eLaw Electronic Data and Discovery Group processes data either received or to be produced by the Commission for further review by staff. The Litigation Support Group helps staff search and review potentially relevant documents using a suite of applications. The Computer Forensics Group employs specialized tools and techniques to properly identify, preserve, recover and analyze digital evidence.

The Commission increasingly relies upon digital evidence to establish and prosecute violations of the CEA. This evidence may include, for example, website content, audio tapes of trader calls with customers, customer account statements, bank records, and/or a computer hard drive or corporate server. The body of active enforcement digital evidence has grown from less than one terabyte or approximately 200 million pages in 2006 to over 15 terabytes today, the equivalent of 3 billion pages, and is expected to continue to increase. With eLaw technology support, staff is able to review significantly larger amounts of evidentiary material in a fraction of the time it would take to conduct a manual review. For example, with automated tools staff can search for certain keywords in the more than 500,000 documents in a typical price investigation in less than 30 seconds rather than taking 50,000 hours to conduct the same search manually. Staff can search the more than 250,000 audio files in a large price investigation in less than 30 seconds rather than taking 20,000 hours to review the evidence manually. The eLaw PreDiscovery tool rapidly ingests digital evidence and loads it into Commission databases, providing the evidence to Enforcement staff in one to two days rather than the several days it would normally take to outsource such processing.

In addition to supporting enforcement, eLaw supports: 1) legal activities throughout the Commission, which are also expanding with increased CFTC authorities, 2) the increased scope of the market, and 3) increased Commission legal activity in support of Dodd-Frank implementation. eLaw supports the Commission's defensive litigation, internal investigations, and the processing of privacy and Freedom of Information Action (FOIA) requests, all of which involve the management of large volumes of information. eLaw Forensics supports the preservation of electronically stored information that is subject to a "litigation hold" or other preservation obligations.

## Commission-Wide Economic and Legal Analysis

**Commission-wide economic analysis**

As the Commission's statutory and regulatory mandate vastly expands, it is imperative that the Commission continues to invest in building robust economic analysis teams.

The Commission supports an in-depth, analytical research program that focuses on innovations in trading technology, developments in trading instruments, and the role of market participants in the futures, options, and swap markets. This team of specialized economists supports the Commission's numerous divisions by analyzing these constantly evolving components of markets to help anticipate and mitigate significant regulatory, surveillance, clearing, and enforcement challenges. Economic expertise is especially important for the development and implementation of new financial regulations related to the Dodd Frank Act and the oversight of a new swaps regime.

Economic analysis is pervasive in supporting the regulatory activities in:

- Assessing whether newly developed products/contracts have a price discovery function and whether those products/contracts are eligible for trading;

- Determining the requirements for reporting and data rules;

- Developing analytical tools and methods in support of the Commission's automated surveillance initiatives, especially as they pertain to SEFs and the connections between SEFs and DCMs;

- Determining whether certain products/contracts are eligible for clearing and the levels for capital and margin;

- Valuation of complex swaps in support of clearing functions;

- Assessing the impact of position limits on markets, and

- Developing analytical tools and methods in support of the Commission's enforcement activities, including economic and statistical analysis or expert testimony to promote compliance with and deter violations of commodity laws.

The Commission is committed to integrating robust economic analysis into its regulatory activities and has established a network of well-renowned researchers and academics in quantitative financial methods, applied mathematics, econometrics, and statistics. By engaging the academic community in developing the necessary ground-breaking analyses, the Commission has access to a pool of credible, independent experts to support its regulatory activities. Furthermore, the Commission's continued engagement with an extended network of experts across the Federal government has fostered the necessary dialogue to promote a common framework for interagency consensus-building. For example, the Commission's involvement with the Financial Stability Oversight Council (FSOC) ensures financial regulatory agencies communicate perceived financial and economic issues with one another. This dialogue allows for a well-coordinated approach to address these potential issues.

**Commission-wide legal analysis**

The Commission's legal services include: 1) engaging in defensive, appellate, and amicus curiae litigation; 2) interpreting the CEA; 3) providing legal advice and support for Commission programs; 4) drafting and assisting other program areas in preparing Commission regulations; 5) assisting the Commission in the performance of its adjudicatory functions; and 6) providing advice on legislative and regulatory issues.

- Regulatory Issues. The Commission's legal analysis teams provide written interpretations of Commission statutory and regulatory authority and, where appropriate, provide exemptive, interpretive, and no-action letters to regulatees and potential regulatees of the Commission. Legal analysis also supports all substantial Commission actions such as registrations, Commission rules and regulations, product reviews, and clearing and market issues.

- Litigation Program. Through the litigation program, legal teams represent the Commission in appellate litigation, including participation as amicus curiae; certain trial-level cases, including bankruptcy cases involving futures industry professionals; and certain kinds of administrative litigation. Following the implementation of DFA regulations, the Commission anticipates a significant amount of litigation in FY 2012 and FY 2013. The Commission also maintains the capability to personnel, labor, contract, and employment law matters, including cases arising under Title VII of the Civil Rights Act of 1964 and other antidiscrimination statutes, and Merit Systems Protection Board cases arising under the Civil Service Reform Act of 1978.

- General Law. In the area of General Law, OGC manages the Commission's Information Governance Program. Information Governance describes how the CFTC manages its

**FY 2013 President's Budget & Performance Plan**

information in compliance with applicable laws. This program includes three major activities: Freedom of Information Act (FOIA) compliance, the Privacy Act, and Electronic Discovery (e-Discovery). The Commission maintains a robust capability with respect to all matters related to requests received under FOIA, and responds to requests for non-public Commission records. In addition, the Commission also handles administrative appeals from initial determinations regarding FOIA requests for records. There has been a marked increase in the number of FOIA requests since the Commission began implementing the Dodd-Frank Act. Additionally, the Commission maintains the capability to review and process all Privacy Act requests, and it reviews proposed Privacy Act Systems of Records and Privacy Impact Assessments. The Commission also maintains an e-discovery program manages the processes, policies, and information systems to ensure that the Commission appropriately manages electronically stored information as set forth in the Federal Rules of Civil Procedure and relevant judicial decisions. As the enforcement caseload increases, the e-Discovery staff will have an increased role in advising on litigation holds and discovery strategies.

The Commission maintains the ability to assure compliance with laws of government-wide applicability such as the Administrative Procedure Act as well as the Government in the Sunshine, Regulatory Flexibility, Paperwork Reduction, and Federal Advisory Committee Acts. And, the Commission maintains an effort to manage all matters related to the Commission's ethics standards and compliance with its Code of Conduct, as well as with government-wide ethics regulations promulgated by the Office of Government Ethics.

- Adjudicatory Opinions. The Commission also supports its adjudicatory functions through its Opinions and Review program, and responds to appeals from decisions by an Administrative Law Judge or a Judgment Officer in administrative reparations or enforcement actions.

- Legislation and Intergovernmental Affairs. Through the legislation and intergovernmental affairs program, the Commission monitors, reviews, and comments on proposed legislation affecting the Commission or the derivatives industry, and prepares technical assistance regarding draft legislation as requested by members of Congress or their staff. Additionally, the program staff liaisons with other Federal regulators to analyze and resolve jurisdictional issues, as well as address specific matters implicating the jurisdiction of multiple agencies.

## Commission–Wide International Policy Coordination

The global nature of the swaps markets makes it imperative that the United States consult and coordinate with foreign authorities. The Commission is actively communicating internationally to promote robust and consistent standards and avoid conflicting requirements, wherever possible. For example, the Commission has engaged in bilateral discussions and shared many of our pre-decisional memos, term sheets and draft proposals with international regulators, such as the European Commission, the European Central Bank, the United Kingdom Financial Services Authority and the new European Securities and Markets Authority. The Commission participates in numerous international working groups regarding swaps, including the International Organization of Securities Commissions (IOSCO) Task Force on OTC Derivatives, which the CFTC co-chairs. The CFTC, SEC, European Commission and European Securities Market Authority are intensifying discussions through a technical working group. The Commission also is consulting with many other jurisdictions such as Hong Kong, Singapore, Japan, and Canada. Discussions have focused on the details of the Dodd-Frank rules, including mandatory clearing, trading, reporting and regulation of derivatives market intermediaries. The Commission's international outreach efforts directly support global consistency in the oversight of the swaps markets. This important, evolving aspect of CFTC's mission is specifically addressed in Goal Four of the Strategic Plan.

## Commission–Wide Data Infrastructure

The Commission's over-arching information technology (IT) strategy is to increase the integration of IT into the Commission operating model, which is described in Goal Five of the Strategic Plan. This strategy has become increasingly more important and complex as the Commission's regulatory scope has expanded faster than its resources. In order to do this rapidly with the most practical investment, the Commission's approach is to manage data as an enterprise asset, promote and adopt industry data standards, give priority to services that provide the greatest mission benefit, architect services using small components that can be assembled and reassembled with agility, and deliver solutions in short, iterative phases. The first area of focus must be on data understanding and ingestion—particularly because CFTC has a unique imperative to aggregate various types of data from multiple industry sources across multiple markets, much of which is new to the Commission staff. Receipt and analysis of the first wave of registrant reporting will give Commission staff insight into the markets and business process, which can be used to firm-up requirements and designs for internal surveillance systems. Likewise, the same business analytics tools used for data understanding and ad hoc mining of mature datasets will also be used to automate transparency reporting.

This approach is supported by several strategic objectives:

- Provide accurate, centralized source and reference data;

- Protect proprietary industry, individual, and sensitive government information;

- Connect industry straight-thru processing to automated internal processes;

- Exploit publicly available and industry-provided information and facilities;

- Leverage data as an enterprise asset, avoid redundant or "siloed" data collections;

- Develop software components for enterprise use;

- Consider total cost of ownership and use or buy or build to achieve best value with acceptable risk; and

- Provide a secure and stable technology infrastructure to receive, ingest, store, mine, and analyze data, including acquisition of commercial, off-the-shelf products when possible.

**FY 2013 President's Budget & Performance Plan**

From an implementation planning perspective, the Commission examines existing software technology prior to building software solutions. The Commission explores open technology solutions that allow for the integration of software and data between software products and custom-built systems. Similarly, the Commission considers whether systems are suitable for cloud-based hosting. Security, privacy, and integration are strategic considerations of hosted solutions. It is essential that the Commission is able to aggregate data and integrate software to provide support for a wide variety of analytical functions. As a result, the Commission utilizes a combination of commercial, off-the-shelf products, and custom-built software and has adopted cloud-based solutions wherever practical.

The Commission is adopting a service-oriented approach to building technology systems. The objective is to design and build technology components once, but leverage those components throughout the Commission. Similarly, efforts are focused on building a "straight-thru processing" capability as a core requirement of its implementation efforts – collecting information directly from the industry source and automating the ingestion into CFTC internal systems. This approach will reduce the amount of manual data entry required of Commission staff, improve data quality, and increase information availability. For large volumes of data, data will be received and processed based on industry data standards and automatically loaded into CFTC systems. For low volume and forms-based data, CFTC will be creating a web-based portal to enable data collection and "straight-thru processing" into CFTC systems.

As emphasized throughout the Strategic Plan, transparency is a key component of Commission surveillance, enforcement, and policy-making strategy. The Commission uses transparency reporting to involve the public and industry in the market oversight process, significantly increasing the effect of Commission activity. The CFTC.gov website provides that transparency. Hundreds of information content changes are updated to the CFTC.gov website each day. The Commission is committed to providing excellent external communications through its public website and other social network outreach initiatives. The CFTC.gov website communicates the Commission's mission, actions, and activities to all stakeholders, including the Dodd-Frank Act activities, pending industry filings, solicitations of comments on those filings and proposed rules, links to all open comment periods, and highlights on the home page that contains deadlines for comment periods for Federal Register releases. The CFTC.gov website also includes webcasts of all open meetings and archives of previous webcasts, as well as contact information for futures market customer protection; Equal Employment Opportunity; Freedom of Information Act compliance; employment and information quality; fraud, waste, and abuse; procurement opportunities; NFA registration; small businesses; and website accessibility and technical issues. The CFTC.gov website also disseminates market reports to provide information to industry participants and the public about the futures, options, and swaps markets. The Commission promotes communication and transparency through its social media presence on Facebook, Flickr, Twitter, and YouTube.

Data Management is integral to all new program initiatives and integrating swaps oversight into existing program initiatives. The Office of Data and Technology (ODT) will implement CFTC enterprise technology solutions that enable the sharing and reuse of data for cross-divisional purposes. Policy, procedures, and resources established in FY 2012 to govern, manage, and access data using a Commission-wide information architecture and framework will allow ODT to coordinate the definition, collection, loading, and availability of data from external parties (e.g., DCMs, swap data repositories) for use in automated systems and independently by CFTC analysts.

ODT will continue to improve information technology and management capabilities in the areas of data management to support analytics, statistical processing, and market research. CFTC will provide quality data to empower its staff to perform the complex data analyses needed to regulate the futures market. To ensure that CFTC staff has access to quality data, ODT will continue to lead efforts to provide a consolidated data set that is the single source of reference for its operational production systems.

Prior to the Dodd-Frank Act, the Commission processed over 5 billion records per month into market surveillance, financial and risk surveillance, and business analytics applications. The Commission anticipates a tripling in the number of exchanges and/or trading platforms under its purview between FY 2011 and FY 2013, as a result of the Dodd-Frank Act, and many new significant data streams will be added. These streams will continue to increase in variety, complexity, and volume and will come

from an increasing number of participants. CFTC will support this expanding data ingest using strategies that limit the amount of manual intervention required by both industry and Commission staff, and at the same time ingesting only data that is clean and reliable. New datasets ingested include:

- Large trader swaps position data;

- Designated clearing organization margin, position, and cash flow information;

- Form 40 and 102 swaps participant registration data streams; and

- Order message data.

The Commission undertook a reorganization in FY 2012 to better integrate the technical and mission drivers for IT investment. The new data management program will manage these data streams effectively, facilitate using the streams in new and innovative ways to increase the efficiency and effectiveness of Commission oversight, and help to identify gaps that might reduce the effectiveness of the Commission.

Following technology best practices, the Commission seeks to build software solutions using an iterative, rapid application development approach. IT development, integration, and enhancements support critical business requirements through delivery of technological capability represented by quick, secure information access, analytical capabilities, and successful business process automation. To effectively accomplish its mission, the CFTC adapts to frequent and innovative changes in the derivatives markets, increasing use of technology and growing market complexity. The Commission must invest in IT to timely track market activity, understand the markets, and provide effective oversight. Prior year investments in infrastructure and system capabilities must be leveraged and built upon to provide services that multiply the effectiveness of staff, accomplishing integration between futures and swaps data and increased integration of CFTC systems and processes for monitoring registered entities, market and financial risk, market integrity, and trade practice as well as systems and processes for enforcement and economic analysis.

Maintaining a blended workforce that optimizes the use of contract services through effective management is a key component of the Commission IT strategy. As the size and complexity of the Commission's investment in IT increases, it is essential to maintain a cadre of FTE with industry, technical, and contract oversight expertise who ensure that IT investments are managed effectively and provides reliable business continuity support, ultimately lowering IT ownership costs and reducing the risk inherent in large IT projects.

## Commission–Wide Management and Administrative Support

As stated in the CFTC's Strategic Plan, the Commission's ability to achieve its mission of protecting the public, derivative market participants, U.S. economy and the U.S. position in global markets is driven by well-informed and reasoned executive direction, strong and focused management, and an efficiently-resourced, dedicated, and productive workforce – this is a top-to-bottom requirement. These attributes of an effective organization combine to lead and support the critical work of the Commission to provide sound regulatory oversight and enforcement program for the U.S. public. To ensure the Commission's continued success, continuity of operations, and adaptation to the ever-changing markets it is charged with regulating, the Commission must lead effectively and maintain a well-qualified workforce supported by a modern IT infrastructure and working environment.

Starting in 2011 and carrying through 2013, the Commission will develop and implement a host of rules, many of which address the Dodd-Frank Act requirements and many of which will significantly alter and expand the Commission's mission and operation. To successfully develop, implement, and manage these rules, as well as perform its existing mission, the Commission requires unambiguous and timely direction, and the right quantity and quality of staff, aligned in an optimal operating structure supported by the necessary training, development, tools, resources and working environment.

**FY 2013 President's Budget & Performance Plan**

The Commission said it will take a number of actions to ensure its ability to perform with excellence. Accomplishments have been achieved in each area and further work is needed and will be completed. We have followed through and in section ---- we chronicle many of the accomplishments and expected outcomes for 2012 and 2013. Broadly the efforts align as shown below and established in Goal Five of the CFTC's Strategic Plan:

- Organization is structured, aligned and streamlined to successfully carry out its mission while flexible and adaptable to changes to its mission and available resources;

- Planning Program effectively develops and implements a resource management program to support the optimal operation and maintenance of a growing agency (scope and staff) with the capability and tools to achieve its mission;

- Human Capital Program attracts, retains and continuously develops an exceptionally qualified, diverse, dedicated, capable and productive staff; and

- Technology Program is engineered at the enterprise level to support the mission as it:

  o Sustains and maximizes the return on investment in various aspects of the program (infrastructure, systems and services);

  o Provides the capability and transparency to capture access, analyze and report on data and mission critical information;

  o Transforms CFTC-wide business processes to benefit staff and to adapt to evolving markets; and

  o Financial Management Program judiciously manages and administers the financial resources provided to the Commission while taking measures through integrity and management controls to prevent waste, fraud and abuse.

# Justification of Increases by Mission Activity

## Registration and Registration Compliance (29 FTE, $8.115 million)

**Registration of Swap Execution Facilities and Designated Contract Markets**

The Commission anticipates that, beginning in the second quarter of FY 2012 through FY 2013, four DCMs will file for registration and another 26 SEFs will file for temporary registration. The Commission is under a statutory mandate of 180 days to complete an application of a DCM. In addition, the Commission is mindful of the competitive nature of the derivatives market and the advantages a registered SEF could garner over one operating under a temporary registration. Given these constraints, the Commission sees the need to complete the full application reviews of both DCMs and SEFs as expeditiously as possible. To that end, the Commission will dedicate four review teams of six FTE each to review applications. In order to address the significant staffing needs that will be engendered by such a surge of applications, the Commission will temporarily re-allocate resources from across the organization. In this regard, the Commission will re-allocate staff conducting examinations in the Division of Market Oversight and will reassign attorneys from enforcement activities. While even a short-term diminution of the examination and enforcement program is not ideal, this approach should enable the CFTC to process the initial surge of applications in FY 2012 and the first half of 2013 by newly established entities in a timely manner without seriously compromising its ability to carry out other key responsibilities.

Concurrently with registering new entities, the Commission will need to evaluate all existing DCMs to ensure that the exchanges are in compliance with the expanded core principles and Commission regulations implementing such core principles, and that the public is appropriately protected. On-going resources will also be needed to support the additional volume of work for compliance reviews for the three-fold expansion in registrants. While there are currently 14 FTE to support the DCM registration and compliance review effort, the Commission seeks an additional five FTE to support the on-going expanded workload. (5 FTE, $1.225 million)

**Registration of Swap Data Repositories**

The Commission assumes that five to eight swap data repositories will submit registration applications in FY 2012 and 2013. The activities necessary to ensure timely review of the applications for compliance with core principles and regulations are comparable to those for DCM and SEF applications. The Commission will use the provisional registration approach, which requires under its rules that the swap data repository show operability and compliance with regulations. Resources will continue to be needed to support on-going compliance-based reviews, including annual Chief Compliance Officer and financial reports. The Commission anticipates needing a single team of six FTE to perform swap data repository registration and reviews in FY 2012, which will also support swap product reviews on a capacity-available basis, redeploying resources from the Division of Enforcement and other divisions as necessary. On an on-going basis, the Commission anticipates a significant effort in registration, review and policy development in support of these new entities and requests one dedicated FTE to support SDR registrants. (1 FTE, $0.245 million)

**Registration of Foreign Boards of Trade**

The Commission is anticipating that 21 FBOTs will seek registration; most of these will come from those currently operating with no-action relief letters. A significant effort will be necessary up-front to standardize the comparability review of foreign regulatory regimes of the home countries under which the FBOTs operate. As with registration of other new entities, the Commission will seek to use a phased approach to application review beginning in FY 2012. During FY 2012, the current two FTE dedicated to review FBOTs, along with additional personnel drawn from other areas of the Commission on an as-needed basis, will be assigned to two-person teams to handle each registration. After disposing of the expected initial surge of applications, the staff will, on an ongoing basis, maintain relationships with FBOTs for the purpose of reviewing required supplemental filings, assessing changes to the FBOT rules and regulatory regimes, and ensuring compliance with any

**FY 2013 President's Budget & Performance Plan**

conditions imposed, including position limits and position transparency requirements for contracts linked to DCM contracts. With the increased volume of work in moving from operating under no-action relief letters to a more standardized and stringent regulatory framework, the Commission anticipates a need for three additional FTE to implement the FBOT registration program. (3 FTE, $0.735 million)

**Registration of Swap Dealers and Major Swap Participants**

The Commission requests an additional seven FTE for FY 2013 to develop and implement a program to oversee the National Futures Association's program for monitoring swap dealers' and major swap participants' compliance with applicable business conduct standards. DFA directs the Commission to adopt both external and internal business conduct standards for these entities. The proposed business conduct standards address such areas as: risk management, monitoring position limits, diligent supervision, business continuity and disaster recovery, conflicts of interest, recordkeeping, reporting, swap confirmation, portfolio reconciliation, portfolio compression, and disclosure. These detailed business conduct standards are new regulatory requirements, and generally outside of the scope of CFTC requirements for other registrants such as futures commission merchants or introducing brokers. The additional FTE are necessary to develop and implement a program to assess National Futures Association's swap dealer and major swap participant compliance program to assess such entities' compliance with these fundamentally new business conduct requirements.

An initial component of this program will require Commission staff to work with the staff of the National Futures Association in the design and implementation of an effective National Futures Association examination program. Once such a program has been established and implemented by National Futures Association, the Commission's role will switch to one of oversight over National Futures Association's execution of the business conduct program. Commission staff also will conduct direct examinations of certain swap dealers and major swap participants to access their compliance with the business conduct requirements. Such direct examinations may be part of Commission's assessment of National Futures Association's execution of its oversight program. Alternatively, the direct examinations may be conducted in response to a specific issue or general Commission concern with a particular swap dealer or major swap participant. Direct examinations also are necessary to ensure that Commission staff maintains an adequate understanding of the operations at major swap participants and swap dealers so that staff is better positioned to respond to evolving business processes and other developments, particularly in responding to urgent situations.

The request for seven additional FTE to fulfill these responsibilities is based upon the Commission's overall experience with the staffing resources needed to conduct financial surveillance oversight of self-regulatory organizations. (7 FTE, $1.715 million)

The National Futures Association expects to establish membership categories for swap dealers and major swap participants during the course of FY 2012. The Commission will be required to respond to numerous requests for information regarding the registration obligations of certain entities, including domestic and foreign-based swap dealers and major swap participants in FY 2012 and beyond. In addition, the Commission will also be required to review numerous National Futures Association rule submissions in support of registration of these entities, to assess whether the proposed rules are consistent with the CEA and Commission regulations. Four additional FTE are requested to respond to issues in registration and retail foreign currency issues. (4 FTE, $0.980 million)

The Commission also anticipates that numerous registration issues will arise regarding foreign-domiciled entities that would otherwise be required to register as swap dealers or major swap participants as those terms are defined under the CEA and Commission regulations. These issues may require the establishment of a program to assess the comparability of developing swap regulations in foreign jurisdictions in a manner consistent with the Commission's current Part 30 program. The Commission anticipates that it will need four additional FTE to properly staff this function. (4 FTE, $0.980 million)

**Streamlining the entity submission process**

The Commission will be applying technology to improve the efficiency of the process by which registered entities submit applications for registration and other filings. The current submission process is highly manual. Applications, filings, and requests are received via email and broadly distributed throughout the CFTC. Metadata from the submission is extracted from the submitted materials and manually entered into existing systems. This data is not shared with other Commission systems, leading to duplicative data entry efforts and the possibility of missing or erroneous data. In FY 2013, the CFTC will be continuing the phased deployment of a web-based registration system, called OPERA (organizations, products, events, rules and actions). The OPERA system will allow for the direct registration of entities, registration of FBOTs, rule and product filings, and requests for Commission actions or interpretations. With OPERA, market participants will be able to apply directly using CFTC.gov and the information collected will flow directly into internal CFTC systems (2 FTE, $0.770 million)

**Direct submission by registered entities**

The Online Portal (Portal) located on the CFTC.gov website will be a secure online gateway that will provide a more efficient method of submitting entity registration applications and other submissions to the Commission. The Portal will become a central location for all external business interactions with the Commission. The Portal will improve data quality, minimize the need for CFTC to update participant data, and provide those interacting with the Commission with a view of their submissions to the CFTC. The Portal will improve transparency of CFTC processes and procedures, providing automated notifications to those interacting with the Commission regarding required actions. (3 FTE, $1.465 million)

**Summary**

Organizationally, the Commission's registration and registration compliance related increases will support the requirements of four program areas:

Table 4:  Registration and Registration Compliance Increases

| | FTE | Personnel ($000) | IT ($000) | Total ($000) |
|---|---|---|---|---|
| Data & Technology | 5.00 | $1,225 | $1,010 | $2,235 |
| General Counsel | 1.00 | 245 | 0 | 245 |
| Market Oversight | 8.00 | 1,960 | 0 | 1,960 |
| Swap Dealer and Intermediary Oversight | 15.00 | 3,675 | 0 | 3,675 |
| TOTAL | **29.00** | **$7,105** | **$1,010** | **$8,115** |

**FY 2013 President's Budget & Performance Plan**



Figure 4: Registration and Registration Compliance Increases by Program

## Reviews of Products and Rules of Operation (41 FTE, $10.045 million)

**Products and rules introduced by designated contract markets, swap execution facilities and swap data repositories**

As indicated above, the Commission anticipates a surge in requests for new product approvals with the expansion of authority under the Dodd-Frank Act. An estimated 26 FTE are required to support the increased volume of work associated with new product approval requests and certifications implementing the Core Principle 9 provisions, and reviewing novel products raising SEC and CFTC jurisdictional issues. Staff also will be deployed to evaluate block trade threshold levels in addition to "made available for trade" determinations for swaps.

Furthermore, consistent with its current experience, the Commission anticipates numerous rule filings from registered entities that must be reviewed. Under the Dodd-Frank Act, the rule review process will be more resource-intensive due to the more rigorous 10/90-day review track for rule submission, the increased number of registered entities, and the new or amended core principles. Reviews to evaluate the effectiveness of rules adopted and consider whether any modifications are warranted will be on-going. Staff increases will support product reviews, reviews of new rules and rule amendments, event contracts, quarterly reports on financial resources, and rule effectiveness. Moreover, the Commission expects to evaluate event contracts under a special review process to determine if they involve prohibited activities and other DCM contracts to determine whether a sufficient proportion of trades occur on the centralized marketplace in compliance with the Core Principle 9 requirement that the price discovery process of listed contract be protected. (26 FTE, $6.370 million)

**Mandatory clearing determination**

DFA imposes a new requirement on the CFTC to review, evaluate, and make a determination concerning a swap as to whether the swap should be cleared — i.e., a mandatory clearing determination — as well as evaluate the continuing qualification of the DCO to clear such a swap. As noted above, data from the Bank for International Settlements indicates that the total notional amount of over-the-counter derivatives outstanding as of the end of December 2010 is $415 trillion for interest rates; $29 trillion for credit default swaps and $2 trillion for commodities. The Commission will deploy seven current FTE to this high-priority activity that will require the review of data relating to pricing, outstanding notional exposures, and trading liquidity. In addition, the Commission requests an additional ten FTE to support this effort. (10 FTE, $2.450 million)

**Registration of derivatives clearing organizations, rules review, applications for portfolio margining**

CFTC will be required to review, evaluate and make recommendations to the Commission in response to applications for registration as DCOs and in response to rule submissions submitted by them. As noted earlier, the Commission is anticipating an increase in the number of DCOs, from 17 to 18 for the beginning of FY 2013. Further, the Dodd-Frank Act amended the CEA to permit, pursuant to an exemption, rule or regulation, futures and options on futures to be held in a portfolio margining account that is carried as securities account and approved by the Securities and Exchange Commission, and added a reciprocal provision to the Securities Exchange Act of 1934. The Commission also will be required to process portfolio margining applications in accordance with rules that will implement these statutory provisions. On average, these applications take about six months to one year to process. (5 FTE; $1.225 million)

**FY 2013 President's Budget & Performance Plan**

## Summary

Organizationally, the Commission's increases related to reviews of products and rules of operation will support the requirements of four program areas:

Table 5: Review of Products and Rules of Operation Increases

|  | FTE | Pay ($000) | IT ($000) | Total ($000) |
|---|---|---|---|---|
| Chief Economist | 1.00 | $245 | $0 | $245 |
| Clearing and Risk | 12.00 | 2,940 | 0 | 2,940 |
| General Counsel | 5.00 | 1,225 | 0 | 1,225 |
| Market Oversight | 23.00 | 5,635 | 0 | 5,635 |
| TOTAL | **41.00** | **$10,045** | **$0** | **$10,045** |



Figure 5: Review of Products and Rules of Operation Increases by Program

## Data Acquisition, Analytics and Surveillance (65 FTE, $22.215 million)

**Swap data acquisition and analytics for oversight and surveillance**

This activity, coupled with any follow-on enforcement actions, represents the core of the Commission's expanded mandate. The Commission has identified a need for 25 FTE to oversee the recordkeeping and reporting requirements applied to swap market participants and the management and analysis of swaps data that would be reported to swap data repositories. These staff will conduct information analysis; use economic analysis to develop requirements and data rules; develop and maintain CFTC summaries and aggregation of swap repository data; report on findings; define business data and process requirements; audit data submission quality; and assess reporting compliance. They will also review and update data reporting standards; govern information policies and standards; manage data taxonomies, dictionaries and inventories; manage information quality and confidentiality; direct external information requests and data rulemaking; steward master data and reference data; manage Commission dashboards and views of swap repository data; and provide data mining and analysis support. And they will deploy and maintain data systems and data analytics tools; implement and maintain direct access, data transfer, and data loading between the Commission and data repositories; and deploy information quality and confidentiality controls.

It is anticipated that the Commission will leverage existing repositories wherever possible. The standardized data sets that will be submitted to CFTC are expected to represent only the subset of data required for internal analysis and aggregation purposes. In FY 2012, the Commission will be implementing direct access to external swap data repositories for the purposes of market oversight activities, but to also further define data submission requirements for standardized data feeds. The Commission anticipates defining the data standards across multiple data categories including: position data, transaction data, and reference data. Once defined, the Commission will work with industry participants on the application and testing of those standards to their data submission processes. Similarly, the Commission will be developing software to load swaps data into a Commission data warehouse for use by CFTC staff for market surveillance, risk monitoring, enforcement, and economic analysis. The Commission anticipates that it will conduct data analysis, working with industry to define data standards, and develop data loading software to support Commission systems for swaps data.

The CFTC has looked for efficiencies in carrying out its surveillance obligations. In that regard, the market surveillance (monitoring of positions) and trade practice surveillance (monitoring of trading activity) have been consolidated into a single branch. Combining these functions will achieve synergies that will make the CFTC's surveillance efforts more effective with available staff. Staff will be better able to address violations that blur the distinction between market and trade practice surveillance and staff can readily be shifted to evaluation of emerging issues, to work on reviews of potential violations, and to work with enforcement staff in the prosecution of violations.

Additional capabilities will also be required to support swaps position and transaction surveillance, enhancing surveillance systems to collect and incorporate that data into analyses covering both swaps and futures markets. The Commission anticipates developing automated surveillance capabilities by building new models to generate alerts, thereby facilitating market and financial surveillance. The Commission also anticipates needing to modify its large trader reporting and financial and risk surveillance systems to support new swaps data analysis, internal reporting requirements, and transparency reporting on the CFTC.gov website. (25 FTE, $9.435 million)

**Aggregate Position Limits**

The Commission is requesting additional staffing to monitor aggregate position limits adopted by the Commission; manage the hedge exemption process and evaluate the effectiveness of limits adopted and consider whether any modifications are warranted. The Commission will begin collecting commodity swap positions in future equivalent standards in FY 2012. Once data is collected, modifications will need to be made to the existing surveillance reports and new or modified surveillance processes will need to be developed. In addition, alerts will be written to notify staff when position limits have been violated and incorporated into the business process for surveillance. The CFTC will seek to acquire or develop a system that will support the analysis and monitoring of

position limits and hedge exemptions, aggregating futures positions with enumerated commodity swap positions, and develop surveillance processes that combine swaps, futures and options for intra-day and end-of-day position limits surveillance. (15 FTE, $4.715 million)

**Order message data**

In the support of market surveillance in the futures industry, a project to define order message standards and data loading procedures is anticipated by the Commission. Order message data is needed in order to analyze for disruptive trading activities, such as when a market participant places multiple orders into the market that are not filled but impact market prices. Without order message data, the Commission is not able to conduct such pre-trade market analyses on a routine or automated basis. The ability to conduct additional automated market surveillance activities, such as identifying withheld orders, is impaired by this lack of data. Access to order message data will improve the quality and scope of economic analysis for surveillance, compliance, and enforcement activities by providing transparency into the entire lifecycle of trades. The Commission will define the data requirements for order messages and begin developing data loading software in FY 2012. We anticipate phasing the receipt of data by industry participant and also phasing by subset of data based on surveillance priorities. (2 FTE; $2.980 million)

**Electronic Forms**

The CFTC needs to develop the capability to receive electronic forms from traders, reporting firms, and exchanges.  Currently, the process is managed by the receipt of paper forms that require a significant manual process to ingest into CFTC systems.  It is anticipated that automating this process through the receipt of electronic forms will improve data quality while decreasing the cost of ingesting the information.  Electronic implementations of CFTC Form 102 and Form 40, which collect account and trader identification data, will be initiated in FY 2012. CFTC anticipates continuing the phased deployment of these and other electronic forms on the CFTC.gov website in FY 2013 to allow direct submission of forms data to facilitate straight-through processing into internal Commission systems. (3 FTE, -$0.275 million).  This transition will include an increase in FTE and a small offset in overall funding.

**Risk Surveillance of futures, options and cleared swaps**

The CFTC will have to conduct risk surveillance of futures and options and cleared swaps.  It is estimated that the notional value of cleared swaps that will require surveillance is about seven times that of futures and options.  This responsibility will be discharged through the use of automated surveillance systems and applications and other risk assessment tools to assess, evaluate and report financial and market risk and risk management procedures at DCOs, clearing futures commission merchants, non-futures commission merchant clearing participants, and other market participants that may pose a risk to the clearing process, including swap dealers, major swap participants, and large traders. Current financial and risk surveillance systems will be modified to monitor volatility, variation margin, and increased financial reporting. The Commission anticipates that it will require six teams to discharge this responsibility in a comprehensive manner. Risk surveillance will approximately be divided by asset class, e.g., interest rates (eight FTE), equity index products (four FTE), foreign currencies (four FTE), broad-based index CDs (eight FTE), agricultural products (two FTE), energy products (six FTE), and metals products (two FTE).   The Commission currently has 23 FTE performing this function and seeks an additional 10 FTE in FY 2013.

The Commission's current financial and risk surveillance applications were designed to address futures and options on futures products.  Unlike futures margin setting where each DCO uses the same application to margin positions, each DCO margining swaps positions will be using a unique margin methodology and a unique way to stress test positions. Futures and swaps risk management software will be implemented to enable the CFTC to analyze margin requirements; determine price impact on portfolios; conduct margin trend analyses and back testing; and stress test swaps positions - including interest rate swaps, energy swaps and credit default swaps. To support this expansion of capabilities, the Commission requires an additional three FTE and a technology investment of an estimated $0.460 million (13 FTE, $3.645 million)

**Capital, Margin and Segregation requirements for intermediaries**

The capital, margin, and segregation level of effort is currently eight FTE. The staff is responsible for responding to requests for guidance or informal interpretation of the Commission's capital, segregation, and financial reporting regulations. In addition, staff also provide guidance and interpretation on the financial reporting and capital requirements for retail foreign exchange dealers, and provide guidance on the financial reporting requirements imposed upon commodity pool operators. The staff also provides guidance on the applicability of generally accepted accounting principles to the regulatory accounting requirements of futures commission merchants, introducing brokers and commodity pool annual reports. Staff further provides assistance and technical support in the analysis of potential regulatory violations and other issues.

The Commission requests an additional seven FTE in FY 2013 to respond to requests for clarification, guidance, and interpretation promptly and completely. The Commission further anticipates that revised or new regulations will be necessary after the implementation of the proposed regulations to address issues that were not foreseen in the original rule proposals. Finally, additional FTE are necessary for the Commission to respond to the anticipated requests of numerous major swap participants and swap dealers to compute both initial margin and market risk and credit risk capital charges using proprietary mathematical models. After the initial review and assessment of such models, staff will be required to perform periodic reviews of such models to assess their performance.

While of limited scope in FY 2013, the Commission anticipates a major effort in 2014 to review bank entities that are registered with the Commission to assess their compliance with certain restrictions or limitations on proprietary trading and investments in hedge funds (i.e., the Volcker Rule). (7 FTE, $1.715 million)

**Summary**

Organizationally, the Commission's increases related to data acquisition, analytics, and surveillance will support the requirements of five program areas:

Table 6: Data Acquisition, Analytics, and Surveillance Increases

|  | FTE | Pay ($000) | IT ($000) | Total ($000) |
|---|---|---|---|---|
| Chief Economist | 4.00 | $980 | $0 | $980 |
| Clearing and Risk | 10.00 | 2,450 | 0 | 2,450 |
| Data and Technology | 19.00 | 4,655 | 6,290 | 10,945 |
| Market Oversight | 26.00 | 6,370 | 0 | 6,370 |
| Swap Dealer and Intermediary Oversight | 6.00 | 1,470 | 0 | 1,470 |
| TOTAL | 65.00 | $15,925 | $6,290 | $22,215 |

Case: 1:19-cr-00669 Document #: 98-6 Filed: 02/10/20 Page 47 of 178 PageID #:1006

Figure 6: Data Acquisition, Analytics, and Surveillance Increases by Program

## Examinations (72 FTE, $18.970 million)

**Designated Contract Markets, Swap Execution Facilities, and Swap Data Repositories**

The Examinations staff performs direct oversight of self-regulation at all DCMs to help ensure market integrity, customer protection, and compliance with the CEA and Commission regulations. The cornerstone of the work is the rule enforcement reviews (RERs), which consist of detailed examinations assessing DCMs' compliance with applicable "core principles" under the CEA. Different aspects of DCMs' self-regulatory programs are reviewed, including: audit trail creation and retention; trade practice surveillance; market surveillance; disciplinary proceedings; system safeguards (e.g., information security, business continuity, physical security and environmental controls); and dispute resolution mechanisms. RER results for each DCM are documented in comprehensive public reports, including specific recommendations to remedy any deficiencies identified by Examinations staff. In the future, the Commission will be required to conduct comparable RERs of SEFs and swap data repositories, swap-market entities brought under the Commission's jurisdiction by the Dodd-Frank Act.

Examinations staff will begin to establish a program for routine examinations (RERs) of new registered entities (SEFs and swap data repositories), while continuing our focus on reviews of the DCMs. These reviews are necessary to ensure compliance with statutory and regulatory requirements, including those applicable to market continuity. The additional resources requested are based upon the assumption that there will be a total of approximately 57 registered DCMs, SEFs and swap data repositories. The Commission plans to begin conducting RERs to ensure compliance with any one of the six core principles. Large exchanges will be examined annually and smaller entities every two to three years. Currently these examinations are being conducted infrequently or not at all with respect to specific core principles. Without these examinations, RERs lose their value as a Commission tool for promoting effective self-regulation and market integrity, and ensuring compliance with the CEA and Commission regulations. The Examinations section has attempted to use its limited resources in the most efficient manner possible, and has focused its RER program on the areas of highest need and risk. In the future, however, the number of regulated entities subject to RERs is expected to increase from the current 16 DCMs to a projected 50 or more DCMs, SEFs and swap data repositories. The Commission estimates that the level of effort for examinations of large exchanges is one FTE for each review, while medium to small exchanges that about one-half of an FTE per review. General market continuity examinations take approximately one FTE for each review. In general, the Commission is staffed at just over 0.6 staff years for each registered exchange. A meaningful injection of new staff resources is vital for examinations to meet even minimum expectations for effective oversight of both futures and swaps market platforms in FY 2013 and beyond. While the Commission seeks to move towards annual examination of the major entities[7], while scheduling reviews of non-major entities less frequently, the current request of 21 FTE will provide for just under 0.6 staff years per registered entity. While reducing the overall focus on examinations, this increase will ensure that the Commission can conduct for-cause examinations and a limited number of routine examinations of exchanges as resources become available. (21 FTE; $5.145 million)

**Derivatives Clearing Organizations**

The DFA requires annual examinations of systemically important DCOs. DCOs that are determined to be systemically important under Title VIII of DFA must comply with heightened risk management and prudential standards concerning payment, clearing, and settlement supervision. The mandatory annual examinations of systemically important DCOs must review the entities' adherence to these heightened standards. Title VIII also requires ongoing consultation between the CFTC, the SEC, and the Board of Governors of the Federal Reserve System, including the scope and methodology of planning examinations of systemically important entities. The Commission currently anticipates no more than four entities will be determined to be systemically important.

The Commission currently has 14 staff on board to conduct examinations of DCOs. On average, an examination requires a team of eight FTE dedicated for six months. Examinations of larger entities,

---

[7] A major designated contract market or swap execution facility will be defined as the largest entities that contribute to at least 75 percent of observed volumes in the overall futures and swaps markets.

**FY 2013 President's Budget & Performance Plan**

particularly those determined to be systemically important, will require 12 to 16 FTE and up to a year to complete.

While the Commission ultimately will seek resources to perform annual reviews of all major DCOs, the Commission is currently seeking an increase of 24 FTE to support annual examinations of the four systemically important entities. Including the 14 staff on-board, the Commission will be able to provide 10 FTE per review team, for a 12 month period. As the Commission gains experience with the Dodd-Frank requirements, additional resources may be required or resources could be deployed to support reviews of other clearing organizations. (24 FTE, $5.880 million)

### Major Swap Participants, Swap Dealers and Managed Funds

Currently, the Commission has no staff devoted to the examinations and financial statement reviews of major swap participants and swap dealers. The Commission requests an increase of 15 FTE to support this requirement. The additional FTE resources would allow the Commission to initiate a program for the oversight of swap dealers and major swap participants, including:

- Review monthly financial statements submitted by the 150 entities;

- Review and respond to regulatory notices filed by swap dealers and major swap participants, and, if necessary, make determinations when entities fail to meet certain regulatory requirements (including being undercapitalized or failing to maintain current books and records); and

- Perform limited direct examinations of the entities.

While the bulk of the examinations of major swap participants and swap dealers will be performed by the NFA, the Commission will be required to undertake direct examinations of these entities in response to possible violations of the Commission's regulations, or as part of the oversight of the NFA's major swap participant and swap dealer surveillance program. The Commission also supports routine direct examinations of these entities as necessary for staff to obtain an understanding of the books and records, and general back-office operations. Such knowledge and familiarity of the operations of a major swap participant or swap dealer is necessary in order for staff to be properly prepared to respond in situations when these entities fail to meet its minimum financial requirements or other regulatory requirements. The Commission would focus its direct examinations that are not conducted on a for-cause basis on those entities that present the greatest potential exposure. These entities generally would be the most active and largest major swap participants and swap dealers, including the six members of the "G-14" dealers that are part of domestic banking organizations.

Approximately three-to-five staff members are required to conduct a limited scope direct examination of a large FCM or, as measured by regulatory capital and customer funds on deposit, other comparable intermediary. These examinations generally run for six months from start to report generation. Staff currently performs approximately 20 direct examinations each year. An increase of 15 FTE would allow the Commission to conduct limited scope direct examinations of selected swap dealers or major swap participants annually on a for-cause and routine basis, while also performing the other functions highlighted above.

In addition, the Commission requires two additional FTE to be allocated to the review of financial data submitted by the operators of large funds, including hedge funds. Under the Dodd-Frank Act, the operators of large funds that are subject to the jurisdiction of both the CFTC and SEC are required to file financial data with the SEC through the Financial Industry Regulatory Authority (FINRA). Operators of large funds that are only registered with the CFTC as commodity pool operators will file financial data with NFA. Both the CFTC and SEC would review the financial data for potential systemic risk issues and provide information to the Financial Stability Oversight Council. The two additional FTE would review such data to identify potential systemic risk issues. Financial and risk surveillance systems will be augmented or modified to support this monitoring (15 FTE, $4.265 million).

**National Futures Association**

In addition to working with NFA on the development of NFA's program to oversee major swap participants and swap dealers, the CFTC also will develop a program to assess NFA's self-regulatory responsibilities with respect to major swap participants and swap dealers. The development of this program began in the first quarter of 2012 in order to ensure that the Commission is prepared to fulfill its regulatory responsibility to oversee the NFA once NFA commences its reviews.

The Commission currently has 20 FTE committed to conducting annual reviews of the financial surveillance programs of the NFA and CME. In order to conduct an annual review of the NFA's oversight program over major swap participants and swap dealers, and to continue the current review of self-regulating organization, it is estimated that an additional 12 FTE would be necessary to fulfill the Commission's mandate. The additional FTE reflect that NFA and CME currently oversee 123 futures commission merchants, while the Commission is anticipating approximately 200 swap-related entities to register as a result of the DFA rulemakings. In addition, hedge funds, large financial entities, large commercial entities and other major swap participants are likely to be much more sophisticated from an operational and bookkeeping perspective than many of the current futures commission merchants that have limited balance sheets and engage primarily in on-exchange futures transactions and/or off-exchange retail forex transactions. These sophisticated institutions will require additional staff for data acquisition and analysis. In addition, the staff assessing these sophisticated institutions will be supported by the integration of NFA systems and data with CFTC systems and data. Information will be presented for analysis in consolidated views so they can focus on analysis and review and spend less time correlating data from multiple sources. (12 FTE, $2.940 million)

**Pre-Examination Management Tools**

An overarching goal of the CFTC is to leverage and connect common business processes and technologies across the organization. The integration of examination tools and data with registration, surveillance, and case management tools and data in FY 2013 will allow the Commission to more effectively and efficiently conduct examinations and initiate and manage follow-on activities. The Commission will be looking at tools that will support the pre-examination management process of managing the selection and scheduling of examination activities, as well as the management of examination activities in the field and post examination report development. ($0.740 million)

**Summary**

Organizationally, the Commission's examinations-related increases will support the requirements of four program areas:

Table 7: Examinations Increases

| | FTE | Pay ($000) | IT ($000) | Total ($000) |
|---|---|---|---|---|
| Clearing and Risk | 24.00 | $5,880 | $0 | $5,880 |
| Data and Technology | 2.00 | 490 | 1,330 | 1,820 |
| Market Oversight | 21.00 | 5,145 | 0 | 5,145 |
| Swap Dealer and Intermediary Oversight | 25.00 | 6,125 | 0 | 6,125 |
| TOTAL | **72.00** | **$17,640** | **$1,330** | **$18,970** |

**FY 2013 President's Budget & Performance Plan**



Figure 7: Examinations Increases by Program

## Enforcement (50 FTE, $16.101 million)

In FY 2011 the Commission filed 99 enforcement actions, the highest annual number of filings in program history, and opened more than 450 new investigations, also a program high. During the same time period the Commission obtained orders imposing over $290 million in civil monetary penalties, and directing the payment of more than $160 million in restitution and disgorgement, which more than doubled the prior fiscal year's imposition of such sanctions. At the same time, the FTE level dedicated to enforcement matters has only reached the operating levels that it had nearly a decade ago with a much smaller docket (in size and complexity).

The Dodd-Frank Act significantly enhances and expands the Commission's powers and responsibility to police the markets for fraud, manipulation and other abuses and will, certainly by FY 2013 if not much sooner, result in a substantial increase in our workload. Moreover, the size of the docket stemming from pre-DFA enforcement authorities, particularly with respect to the investigation and prosecution of frauds against retail customers, manipulation, supervision failures, recordkeeping, reporting and trade practice violations, is projected to continue its upward trend.

By FY 2013, the Commission's enforcement workload will increase for a number of reasons including:

- Addition of fraud-based manipulation to the Commission's existing "price-based" anti-manipulation authority;

- New prohibitions targeting disruptive trading, practices and conduct on registered entities;

- Establishment of anti-fraud and anti-manipulation authority over swaps;

- New prohibitions against reporting false information;

- Clarified jurisdiction with respect retail foreign currency transactions and new authority over retail commodity transactions such as precious metals;

- Increase in the number and types of registrants, including exchanges, SEFs, swap data repositories, clearing organizations, intermediaries and dealers;

- New regulations applying to swaps and other intermediaries including those involving business conduct standards, fraud, record-keeping, reporting and trade practice; and

- An increase in international scope of activities.

The enforcement activity generated by this broadened regulatory authority will necessitate the development of specific areas of expertise, and require an increased capacity for proactive identification of violations. Our litigated cases, particularly any involving anti-manipulation and disruptive trading practices, will tax our resources more than in prior years.

To begin preparing for the increase regulatory scope the Commission made internal changes to the management of its enforcement function to promote greater flexibility and efficiency in the Commission's enforcement team in FY 2011. These changes include flattening of the organization; changing from small teams with pre-set rosters to a system that forms teams depending upon the needs of cases; and developing areas of specialization for staff in certain enforcement areas.

In FY 2013, the Commission seeks an additional 50 FTE to support fraud enforcement matters, including retail investor fraud (13 FTE); manipulation and disruptive trading enforcement matters (21 FTE); regulatory, supervision and trade practice matters (9 FTE); and enforcement matters related to swaps (7 FTE). The largest increase for manipulation and disruptive trading matters reflects the complexity and time intensity of those investigations. The smaller increase in staffing for swaps enforcement reflects the newness of the regulatory framework. It is likely that the Commission will request additional resources for enforcement matters related to the expanded swaps mandate in future years. In addition to staff years, the Commission is requesting an increase in resources to support the additional travel, expert services and transcript needs commensurate with an increase in

**FY 2013 President's Budget & Performance Plan**

case load. These costs are inherent in the successful investigation and litigation of enforcement matters. (50 FTE, $14.271 million)

Additional funding will be necessary in FY 2013 to further automate investigation, discovery, forensics, evidentiary analysis, and case management. The Commission will seek to expand its current system or migrate to another commercial off the shelf product. Implementation of new tools for forensics, eDiscovery, tips and referrals, and early case assessment together with enhancement of existing tools for deposition management, case management, searching, and analytics will support both a higher volume of investigations and more effective measurement of program results. Better integration of unstructured investigation-related data with structured surveillance and position data will enable more proactive identification of high-impact enforcement actions. The Commission will seek to expand its current system or migrate to another commercial off the shelf product in support of enterprise-wide case management, integrating surveillance referrals into the ingestion process for enforcement cases. ($1.830 million)

**Summary**

Organizationally, the Commission's examinations-related increases will support the requirements of three program areas:

Table 8: Enforcement Increases

| | FTE | Pay ($000) | IT ($000) | Other ($000) | Total ($000) |
|---|---|---|---|---|---|
| Chief Economist | 2.00 | $490 | $0 | $0 | $490 |
| Data and Technology | 0.00 | 0 | 1,830 | 0 | 1,830 |
| Enforcement | 48.00 | 11,760 | 0 | 2,021 | 13,781 |
| TOTAL | **50.00** | **$12,250** | **$1,830** | **$2,021** | **$16,101** |



Figure 8: Enforcement Increases by Program

# Commission–Wide Economic and Legal Analysis (24 FTE, $6.840 million)

**Commission-wide economic analysis**

The Commission's economic analysis framework stems from an analytical research program focused on answering some of the most complex issues facing derivatives markets. The ever-evolving changes in trading technology, trading instruments, and types of market participants present a great challenge to financial regulators and emphasize the need to thoroughly understand such developments. With the implementation of DFA rules and jurisdiction over swap markets, research in these areas will involve an added level of complexity. Specifically, the Commission focuses its quantitative research program to analyze the following four broad areas:

- Analysis of the composition of speculative market participants;

- Analysis of the linkages between futures, option, swap, securities, and cash markets;

- Analysis of swap markets' and new participants' effects on existing exchanges and market structure; and

- Analysis of high frequency and algorithmic trading.

The analysis of the composition of speculative market participants allows the Commission to make informed policy decisions to address potential impact of these traders in markets. Such analyses include identifying certain categories of traders and whether their individual or collective positions or trading activity impact price, volatility, or liquidity in markets. Accordingly, the Commission will use the results from these analyses to determine whether tools or regulations should be implemented in order to correct any potential unwarranted impact.

The analysis of the linkages between various markets helps the Commission to assess the correlations of markets and whether an event in one market can trigger similar events in related markets. Strong market linkages between derivatives markets and securities and cash markets may present systemic risk concerns. Understanding these linkages will aid the Commission in implementing sound policies to mitigate cross-market effects.

After the implementation of DFA rules, the Commission will be responsible for assessing how swap markets and swap participants affect existing exchanges and market structure. Analyzing these effects allows the Commission to determine whether regulations are successful or have adverse economic consequences. Further, economic analysis will serve as the basis for many studies mandated after the DFA regulations are in effect.

The performance of new and existing derivatives markets has a potentially large impact on the stability of domestic and international financial markets. Therefore, analytical market research helps to ensure that the Commission has in place sound regulatory policies to reduce systemic risk across financial markets. Economic analysis is also an essential component for protecting the economic function of these markets without undermining innovation and the development of new approaches to risk management.

High frequency and algorithmic trading analysis allows the Commission to analyze and detect market anomalies caused by high-frequency algorithmic traders who execute large numbers of transactions in a very short period of time. The effort will provide tools to help the Commission's surveillance and enforcement divisions to detect disruptive trading patterns and participants who unfairly manipulate markets.

Valuation of complex swaps will support comparative and economic analysis and modeling of valuation methods, especially for complex swaps. This will be necessary to fully understand both counterparty and clearing risk and provide insight into how the over-the-counter swap market affects the overall economic environment. Phased implementation will begin in FY 2012 and continue into FY 2013. (5 FTE $2.185 million)

**FY 2013 President's Budget & Performance Plan**

Research, analysis, and the initial development for these areas will identify methods and tools that will be operationalized for ongoing enforcement, surveillance, and clearing activities. This process will require services for planning, architecting, and performing the integration of the tools and methods with Commission systems. Processing and storage intensive infrastructure will also be required.

**Commission-wide legal counsel**

FY 2013 will be the first full year under DFA rules. The complexity and scope of the Commission's regulatory framework, pursuant to its new statutory mandate, will meet with the day-to-day reality of a significantly expanded and global marketplace, including fundamental changes to historically regulated entities as well as to participants in the previously unregulated swap markets.

- Interpretation and Guidance. Market participants will have requests for clarification and guidance once the new regulations are adopted and during the implementation period. Further, rules that have been proposed jointly by the CFTC and SEC would establish a formal process to address inquiries regarding the treatment of products as swaps or security-based swaps and the applicable regulation of mixed swaps. Staff will be required to review and develop proposed interpretations, policies, and possibly regulations for all aspects of the DFA changes. Based on experience over the years with the implementation of other new registration schemes (e.g., for commodity pool operators and commodity trading advisors, for introducing brokers, and for retail foreign exchange dealers), there are bound to be questions arising that need a response – whether informally, by way of email or telephonic inquiry, or formally, by way of a staff-issued interpretative, no-action or exemptive letter or a Commission-issued order or regulation (or amendment thereto). Because of the tremendous consequences of not providing adequate support for new regulated entities, the Commission is requesting resources to ensure prompt, well-reasoned and accurate responses. Also, because many of these issues will be questions of first impression, the time taken to provide responses to the issues will be longer than it is today. The Commission also anticipates the need to be actively involved in the preparation of interpretations relating to jurisdictional issues arising under the Dodd-Frank Act amendments to the CEA. Timeliness is key to minimizing disruption to the orderly workings of the marketplace. (12 FTE; $2.940 million)

In addition, the Commission is requesting an additional seven FTE to supplement the following activities: (7 FTE; $1.715 million)

- *Litigation.* The Commission is called upon to support appellate litigation (including participation as amicus curiae) and certain trial-level cases (including bankruptcy cases involving futures industry professionals). Following the implementation of the Dodd-Frank regulations, the CFTC could face rulemaking challenges, potentially beginning in the first quarter of FY 2012. The actual number of challenges cannot be predicted; however, as evidenced by the recent challenge to the SEC's proxy access rule (which reportedly took 2700 staff hours to defend in the D.C. Circuit), these cases are both time and resource intensive. Further, because of the increased enforcement activity expected in FY 2012 and 2013, the CFTC anticipates an increase in the appellate litigation caseload. The Commission believes that the cases that involve new enforcement authorities under the Dodd-Frank Act have a higher chance of being appealed. The litigation program also encompasses personnel, labor, contract, and employment law matters. The Commission will also likely see an increase in personnel-related litigation proportional to the growth in the workforce. Attorneys supporting the CFTC litigation program also respond to subpoena requests and review enforcement matters for legal sufficiency and compliance with precedent; as noted, enforcement actions are also expected to increase in FY 2013. In order to maintain the litigation program, the CFTC is requesting one additional legal counsel and additional contractor paralegal support.

- *Legislation and Intergovernmental Affairs.* The Commission monitors, reviews, and comments on proposed legislation affecting the Commission or the derivatives industry, and prepares technical assistance regarding draft legislation as requested by members of Congress

or their staff. CFTC expects this workload to increase substantially in FY 2013 when Congress is expected to consider reauthorization legislation for the CEA and will likely undertake a thorough review of the substantial amendments that were enacted as part of the Dodd-Frank Act. The CFTC also reviews and analyzes jurisdictional issues and liaisons with other Federal regulators as necessary to address specific matters implicating the regulatory interests of multiple agencies. In FY 2012 and FY 2013, the CFTC will continue to support the activities of the Financial Stability Oversight Committee, and will require additional legal resources in areas such as banking and securities law, given the need for cross-disciplinary coordination and consistency to effectively implement the Dodd-Frank Act. To support this increase in workload, the Commission requests an additional two FTE.

- *General Law*: The Commission is requesting three additional FTE in the area of General Law. One of these FTE will support the Information Governance program and ensure compliance with CEA Section 8 confidentiality provisions. Under the Dodd-Frank Act, the Commission will begin capturing, and have access to, substantial amounts of data related to swaps which will be protected under Section 8. Having the appropriate staff to oversee the protection of the statutory confidentiality of this data will be critical. Two additional FTE will also support the Commission in interpreting and applying the Administrative Procedure Act in regulatory actions taken to implement the Dodd-Frank Act, as well as the Regulatory Flexibility Act, and the Paperwork Reduction Act. These FTE will also counsel the Commission to ensure compliance with the Sunshine Act and the Federal Advisory Committee Act.

- *Ethics*. The Commission maintains an active program with respect to all matters related to the Commission's ethics standards and compliance with its Code of Conduct, as well as with government-wide ethics regulations promulgated by the Office of Government Ethics. To maintain adequate response times for ethics issues and to process the required ethics forms as the CFTC and its new responsibilities grow pursuant to the Dodd-Frank Act, the Commission anticipates needing one additional FTE in FY 2013, bringing the total to three FTE.

In addition, eLaw, which has been integrated with FOIA Express to support the Commission FOIA program, extended to support the Commission rulemaking process, and extended to support case and document management for certain functions within the General Counsel's Office, will also continue to be enhanced for Commission-Wide legal analysis and support activities. These costs are captured in the requested increase under Enforcement, above.

**Summary**

Organizationally, the Commission's examinations-related increases will support the Commission-wide requirements through six program areas:

**FY 2013 President's Budget & Performance Plan**

Table 9: Economic and Legal Analysis Increases

|  | FTE | Pay ($000) | IT ($000) | Other ($000) | Total ($000) |
|---|---|---|---|---|---|
| Chief Economist | 5.00 | $1,225 | $0 | $960 | $2,185 |
| Clearing and Risk | 1.00 | 245 | 0 | 0 | 245 |
| General Counsel | 8.00 | 1,960 | 0 | 0 | 1,960 |
| Market Oversight | 5.00 | 1,225 | 0 | 0 | 1,225 |
| Swap Dealer and Intermediary Oversight | 5.00 | 1,225 | 0 | 0 | 1,225 |
| TOTAL | 24.00 | $5,880 | $0 | $960 | $6,840 |



Figure 9: Economic and Legal Analysis Increases by Program

## Commission–Wide International Policy Coordination (6 FTE, $1.470 million)

The Commission's international policy coordination activities take place primarily within IOSCO and within U.S. Treasury and G-20 working groups. The aftermath of the financial crisis has prompted the formation of numerous initiatives in all of these forums, such as: cooperation and coordination in the areas of swaps regulation, central counterparty clearing standards, the monitoring and control of systemic risk, the protection of customer funds, and mechanisms to share systemically important information internationally. International concerns regarding volatility in commodity futures markets resulted in the formation of an IOSCO Task Force on Commodity Futures Markets, which is co-chaired by the Commission's international staff. Participation in these work-streams is critical because the work-product is often transformed into international standards of best practice, which are then subject to compliance assessment by the International Monetary Fund in its Financial Sector Assessment program. The Commission's participation historically has focused on incorporating the Commission's (and hence, the U.S.'s) regulatory approach into these internationals standards, encouraging international harmonization.

The Commission's international agenda also includes responding to requests by the U.S. Treasury to participate in international dialogues (e.g., U.S.— China dialogue), participating in National Security Council organized discussions to coordinate U.S. Government commodity policy, providing technical assistance to developing market jurisdictions, and engaging in bilateral negotiations with foreign regulators to resolve cross-border issues that affect the competitiveness of the U.S. futures industry. The Commission's current work is supported by 10 FTE.

The adoption of DFA legislation and the ongoing development of implementing rules by the Commission have significantly increased demands on international staffing. For example, the Commission's international staff has engaged in an unprecedented outreach to European regulatory authorities, most notably the European Commission. This effort has focused on encouraging foreign regulatory authorities to adopt rules that are harmonized with the Commission's DFA approach. International staff also is participating in cooperation with the SEC in the DFA mandated study on the approaches to over-the-counter derivatives swap regulation and the regulation of over-the-counter clearing in major jurisdictions.

Once the new DFA regulations are in effect, international staff will be required to develop supervisory coordination arrangements with foreign authorities in major jurisdictions where regulated entities will reside, such as the European Union, Canada, and Japan. Focusing solely on the EU, the Commission contemplate the need to engage not only the European Commission, but also the European Securities and Markets Authority and relevant national regulators, such as the U.K. FSA, French AMF and German BAFIN, to negotiate coordinating supervisory arrangements for entities that likely will be subject to regulation in both the EU and the United States. Likewise, the Commission anticipates that similar arrangement will be needed in major market jurisdictions such as Australia, Canada and Japan.

Finally, IOSCO recently converted the Task Force on Commodity Futures Markets into a permanent standing committee, which will require stable, long-term staffing if the Commission is to retain its leadership role as co-chair of that standing committee.

In order to adequately staff the existing work-streams and accommodate the growing demands of DFA rules, the Commission requests six additional FTE. (6 FTE, $1.470 million)

**FY 2013 President's Budget & Performance Plan**

**Summary**

Organizationally, the Commission's examinations-related increases will support the Commission-wide requirements through one program area:

Table 10: International Cooperation Increases

|  | FTE | Pay ($000) | IT ($000) | Total ($000) |
|---|---|---|---|---|
| International Affairs | 6.00 | $1,470 | $0 | $1,470 |
| **TOTAL** | **6.00** | **$1,470** | **$0** | **$1,470** |

## Commission–Wide Data Infrastructure (11 FTE, $17.235 million)

The Commission will continue to sustain CFTC-wide enterprise technology solutions that enable the sharing and reuse of software across the Commission. The Commission continues to sustain technology to provide support for automated market and trade practice surveillance, enforcement and other legal counsel matters (eLaw), financial and risk surveillance, the CFTC.gov website, and document management. IT development, integration, and enhancements support critical business requirements through delivery of technological capability represented by quick, secure information access, analytical capabilities, and successful business process automation. To effectively accomplish its mission, the CFTC must adapt to frequent and innovative changes in the derivatives markets, increasing use of technology and growing market complexity. The Commission must invest heavily and judiciously in IT to timely track market activity, understand the markets and provide effective oversight. Prior year investments in infrastructure and system capabilities must be leveraged and built upon to provide services that multiply the effectiveness of staff, accomplishing integration between futures and swaps data and increased integration of CFTC systems and processes for monitoring registered entities, market and financial risk, market integrity, and trade practice as well as systems and processes for enforcement and economic analysis. The CFTC must sustain existing program initiatives, providing mission operations and maintenance. Several systems and services will require, in addition to ongoing routine maintenance and support, enhancements to support the implementation of the Dodd-Frank Act. ($7.389 million)

The Commission is expected to receive a continually increasing volume of transaction, position, reference, financial risk, and enforcement-related data. Each of these streams is increasing in variety and complexity and is sourced from an increasing number of participants. Transaction data will include pre-trade information and is complicated by the addition of swaps and high frequency trading. Position data must be aggregated from multiple sources for participants with complex organizational structures and must be correlated with transaction data. Definition and cataloguing of reference data related to exchange-traded futures was relatively straight-forward. Product reference data for standardized swaps transactions is significantly more complex and varies considerably by asset class. Financial risk data varies significantly by asset class and must be evaluated at multiple levels (trader, owner and counterparty; clearing member, clearing organization). Enforcement-related data has connections to the other data streams that can be mined and patterned. It is imperative that the CFTC have the appropriate capabilities to manage these data streams effectively, assist in applying the data streams in new and innovative ways to increase the efficiency and effectiveness of Commission oversight, and identify gaps that might reduce the effectiveness of the Commission. (4 FTE, $1.679 million)

CFTC network services are responsible for the underlying infrastructure of every single IT program at the Commission. The network enables messaging and communications, network security, database administration, IT business continuity, and data storage management. Storage and servers are at the core of our business. The CFTC network consist of over 300 servers between the primary network site in Washington, D.C., three secondary sites in Chicago, Kansas City, and New York, and a continuity facility at a remote site. The network handles internal email messages and the data transfer necessary to support Commission-wide technology solutions. Mission critical data on the network is replicated from the network hub site in Washington, D.C., to the co-location alternate computing facility. Enforcement and other staff, on an as-needed basis are also provided alternative, "off-network" access to the internet to support anonymity during investigations and access to external resources that pose a potential information security risk to the CFTC production network. As the scope of CFTC oversight increases and expands surveillance, analytics, enforcement, and transparency capabilities, the Commission must continue to scale communication, processing, and storage infrastructure to meet demand in both FY 2012 and FY 2013.

In addition to scaling up technology capacity, like industry participants and other regulators, the Commission must also continue to increase, automate, and scale information security controls in the face of evolving security threats. In FY 2012 the Commission will invest in automated physical network access controls and additional traffic monitoring and scanning tools and in FY 2013 the Commission will need to continue automating security controls and increasing the level of continuous monitoring of threats. The Commission is charged with protecting sensitive information assets that are critical to overseeing the markets, such as position data, and this data must be secured to ensure

**FY 2013 President's Budget & Performance Plan**

market integrity. CFTC anticipates continuing its investment in IT security to keep pace with ever evolving threats to data and systems.

The Commission currently stores more than 350 terabytes of data with data storage requirements increasing 64 percent annually. Implementation of the Dodd-Frank Act is anticipated to increase this rate of increase, particularly in the initial years of implementation. Increasingly aggressive automated surveillance strategies and analysis of very large datasets, as well as market reconstruction and simulation, valuation of complex swaps, and analysis of high speed and algorithmic trading require that the Commission acquire high speed computing capabilities for rapid analysis of datasets approaching one petabyte in FY 2013. Data communication capacity must also be increased to support connectivity to swap data repositories, high-volume DCMs, and increased communication with newly-regulated industry participants as well as other regulators.

In FY 2012, the Commission will complete the first phase of a three-phase effort to improve business continuity. The Commission has established an Alternate Computing Facility (ACF) as part of the first phase and will complete the first phase by implementing the replication of mission critical and mission essential data to the ACF. The second phase will implement the capability to restore mission critical and mission essential systems from the ACF in accordance with recovery time and recovery point objectives. With Phase 3, which will begin in FY 2013, we will implement recovery capability for all Commission systems. (7 FTE, $8.167 million)

**Summary**

Organizationally, the Commission's data infrastructure increases will support the Commission-wide requirements through one program area:

Table 11: Data Infrastructure Increases

|  | FTE | Pay ($000) | IT ($000) | Total ($000) |
|---|---|---|---|---|
| Data and Technology | 11.00 | $2,695 | $14,540 | $17,235 |
| TOTAL | **11.00** | **$2,695** | **$14,540** | **$17,235** |

## Commission–Wide Management and Administrative Support (6 FTE, $1.470 million)

The Commission's expanded statutory mandate and accompanying resources requires a related expansion in critical planning and resource management functions. In FY 2012, the Commission will re-engineer its financial management processes to enhance funds control, increase the planning and predictability of its spending, and facilitate priority-driven resource allocation. Based on the outcome of these planned activities and its increased resources, the Commission requests one additional FTE with budget and resource management skills.

To support its expanded workforce, the Commission requests five additional FTE, with skills sets encompassing:

- Privacy and records issues, to ensure compliance with privacy and records-related legal requirements, and advice on new systems, data collections and proposed rulemakings, including matters pertaining to sensitive enforcement and internationally shared information;

- Compensation, to ensure a correct and timely payroll, implement automated time and attendance procedures, and to maintain pay parity with other financial regulatory agencies; and

- Operations, to provide logistical and security support for employees in the Commission's regional offices in New York and Kansas City, which have been expanded to enhance our oversight of continuity of operations, personnel and physical security, facilities and space management.

These additional resources will provide the Commission with an enhanced ability to streamline its processes, prudently invest and implement automated solutions, and comply with Federal regulatory and legal requirements to ensure the effective, efficient allocation and use of Commission resources. (6 FTE, $1.470 million)

### Summary

Organizationally, the Commission's management direction and administrative support increases will support the Commission-wide requirements through two program area:

Table 12:  Management Direction and Administrative Support Increases

| | FTE | Pay ($000) | IT ($000) | Total ($000) |
|---|---|---|---|---|
| Executive Direction | 6.00 | $1,470 | $0 | $1,470 |
| TOTAL | **6.00** | **$1,470** | **$0** | **$1,470** |

# Exhibit 1.  Information Technology at CFTC

## Introduction

The Commission's over-arching information technology (IT) strategy is to manage data as an enterprise asset, promote and adopt industry data standards, give priority to services that provide the greatest mission benefit, architect services using small components that can be assembled and reassembled with agility, and deliver solutions in short, iterative phases. The Dodd-Frank Act expanded the regulatory scope of the CFTC nearly eight fold and the effective use of information technology will help the CFTC exercise this unprecedented increase in authority by providing staff with information and tools that serve as force multipliers.

## IT Investment Portfolio: Surveillance, Enforcement, Infrastructure and Management

The Commission has organized its IT investments into three areas: Surveillance, Enforcement, and Infrastructure.  The Surveillance Investment supports market oversight, trade practice oversight, and financial and risk oversight.  Surveillance is highly dependent on the ability to acquire large volumes of data and the development of sophisticated analytics to identify trends and/or outlying events that warrant further investigation.  The Commission's ability to view aggregated data across the futures and swaps landscape is essential.  Surveillance technology receives and processes seven to eight million transaction per day and alerts Commission staff to questionable activity. The details of each individual trade are collected from exchanges overnight and loaded and processed for reporting, analysis, and profiling, providing staff with greater efficiency and flexibility by performing sophisticated pattern recognition and data mining, helping detect novel and complex abusive practices. Alerts of potential trade practice violations are generated for review by market compliance and surveillance staff.  Surveillance technology also allows staff to identify large traders whose positions may pose financial risk to the industry or a clearing firm, analyze an owner's holdings and project the effect of market moves on these holdings, perform "what if" stress testing and risk scenarios to determine the effect of market movement on margin, and evaluate overall portfolio risk under different market conditions. It allows staff to monitor intermediaries by storing and analyzing monthly financial statements and annual reports provided to the Commission to report net capital positions and other financial information.

The Enforcement Investment provides a variety of critical automated litigation support services to Commission staff that facilitate the overall management of documents and data:

- Provides the ability to rapidly query and retrieve information about investigations and litigation;

- Provides recurrent and ad hoc analytics;

- Provides a collaborative electronic work environment across geographically dispersed locations (Washington, Chicago, Kansas City, and New York);

- Manages client contacts, leads, investigations, litigation and trial schedules;

- Provides mobile access to and presentation of documentary and analytic evidence;

- Supports digital-based trial presentations; and

- Tracks forensics information on seized computer equipment.

Exhibit 1 —Information Technology at CFTC     53

The investment also supports the Commission's defensive litigation, internal investigations, the processing of privacy and Freedom of Information Action (FOIA) requests, and the preservation of electronically stored information that is subject to a "litigation hold" or other preservation obligations.

Both the Surveillance and Enforcement depend on the Infrastructure and Management, which provides the underlying infrastructure for IT services including messaging and communications, network security, database administration, IT business continuity, and data storage management. The investment also provides transparency through the CFTC.gov website, staff collaboration and knowledge management through the CFTCnet intranet, Commission-wide document and records management, and internal management and administrative systems that supplement Commission use of financial and human resource services provided by government service providers.

## Management of the IT Portfolio in FY 2012

- The Commission planned spending for FY 2012 is $45.0 Million for services and $16.2 Million for FTE.

- Surveillance:

  o Implement software to load swaps data into a Commission data warehouse for use by CFTC staff for market surveillance, risk monitoring, enforcement, and economic analysis.

  o Work with industry to define data standards and will develop data loading software to support Commission systems for swaps data.

  o Integrate NFA systems and data stored at NFA with CFTC systems and data.

  o Implement futures and swaps risk management software to enable the CFTC to analyze margin requirements; determine price impact on portfolios; conduct margin trend analyses and back testing; and stress test swaps positions - including interest rate swaps, energy swaps and credit default swaps.

  o Modify current financial and risk surveillance systems to monitor volatility, variation margin, and increased financial reporting.

- Enforcement:

  o Complete eDiscovery implementation and FOIAExpress integration to manage improve litigation, reduce litigation risk, and improve transparency through FOIA.

  o Complete FIS software implementation to improve acquisition of case-specific financial data.

  o Continue to refresh Enforcement COTS to adapt to financial industry adoption of new technology.

- Infrastructure and Management:

  o Begin the phased deployment of a web-based registration to allow for the direct registration of entities, registration of foreign boards of trade, submission of rules and products, and requests for Commission actions or interpretations and to flow information directly into internal CFTC systems.

  o Host on CFTC.gov an Online Submission and Communication Portal to and provide industry users with an account-specific view of their submissions to the CFTC to improve transparency of CFTC processes and procedures, providing automated notifications to external accounts regarding required actions.

- o Receive electronic forms from traders, reporting firms, and exchanges to improve data quality and decrease industry costs for providing the information and CFTC costs for ingesting the information.

- o Scale communication, processing, and storage infrastructure to meet demand.

- o Continue business continuity and security control automation (continuous monitoring) implementation to reduce operational risk.

## Management of the IT Portfolio in FY 2013

- The Commission's request for FY 2013 is $70.0 Million for services and $26.2 Million for FTE.

- Surveillance:

  - o Enhance surveillance systems to collect and incorporate that data into analyses covering both swaps and futures markets.

  - o Develop new models to generate alerts, thereby facilitating market and financial surveillance.

  - o Modify large trader reporting and financial risk surveillance systems to support new swaps data analysis, internal reporting requirements, and transparency reporting on CFTC.gov.

  - o Begin using market order data to monitor disruptive trading activities and conduct additional automated market surveillance activities such as identifying withheld orders.

  - o Augment or modify financial and risk surveillance systems to monitor Commodity Pool Operators and Commodity Trading Advisors.

- Enforcement:

  - o Provide support for enforcement tips, referrals and early case assessment to exercise new authority.

  - o Expand case management component to support enterprise-wide case management and integrate surveillance referrals into the ingestion process for enforcement cases.

  - o Update Forensics, eDiscovery, deposition management, trial support, and analytics to support both a higher volume of investigations and more effective measurement of program results

- Infrastructure and Management:

  - o Implement Enterprise Search (including integrated search of unstructured investigative-related and structured surveillance data) and automate electronic records management processes to improve productivity.

  - o Support Integrated Strategic, Budget, Operating Plan Processes and BPAC Modernization initiatives to improve resource prioritization and utilization.

  - o Scale communication, processing, and storage infrastructure to meet demand.

  - o Continue business continuity and security control automation (continuous monitoring) implementation to reduce operational risk.

Exhibit 1 —Information Technology at CFTC                                                      55

**FY 2013 President's Budget & Performance Plan**

### Total IT Budget ($000s)

| | FY 2011 Actual | FY 2012 Estimate | FY 2013 Estimate |
|---|---|---|---|
| **Surveillance** | **17.64** | **26.61** | **43.32** |
| DME | 6.12 | 12.71 | 22.94 |
| *Services* | *4.98* | *11.31* | *20.17* |
| *FTE* | *1.13* | *1.40* | *2.77* |
| O&M | 11.52 | 13.90 | 20.38 |
| *Services* | *6.33* | *7.52* | *9.09* |
| *FTE* | *5.19* | *6.38* | *11.29* |
| **Enforcement** | **7.73** | **4.91** | **9.79** |
| DME | 1.35 | 1.10 | 2.66 |
| *Services* | *1.20* | *0.90* | *2.45* |
| *FTE* | *0.15* | *0.20* | *0.21* |
| O&M | 6.38 | 3.81 | 7.13 |
| *Services* | *5.78* | *3.01* | *6.28* |
| *FTE* | *0.60* | *0.80* | *0.85* |
| **Infrastructure and Management** | **27.87** | **30.62** | **43.09** |
| DME | 5.03 | 5.99 | 6.23 |
| *Services* | *4.33* | *4.99* | *5.16* |
| *FTE* | *0.70* | *1.00* | *1.07* |
| O&M | 22.84 | 24.63 | 36.86 |
| *Services* | *16.51* | *17.27* | *26.85* |
| *FTE* | *6.34* | *7.36* | *10.01* |
| **Total IT Budget** | **53.25** | **62.14** | **96.20** |
| *Non-personnel IT* | *39.13* | *45.00* | *70.00* |
| *FTE* | *14.11* | *17.14* | *26.20* |

DME – Costs related to the development, modernization, and enhancement of technology.
O&M – Costs related to the operations and maintenance of technology.
FTE – Costs of government personnel.
IT – Hardware, software, and contracted data and technology services and labor.

# Exhibit 2.  Whistleblower Program and CFTC Customer Protection Fund

## Introduction

To enhance regulatory enforcement, the Dodd-Frank Act established the "Commodity Futures Trading Commission Customer Protection Fund" (the Fund), which mandates that the Commission set aside funds from monetary sanctions to award whistleblowers who voluntarily provide information related to violations of the CEA, as well as provide education initiatives to help customers protect themselves against fraud or other violations of the CEA or Commission regulations.  Corrupt practices and fraud in the securities and commodity businesses now face increased scrutiny with this Act.  Whistleblowers are encouraged to report and assist in preventing any illegal practices affecting the CEA.

Section 748 of the Dodd-Frank Act regarding "Commodity Whistleblower Incentives and Protection," obligates the CFTC to pay an award to eligible whistleblowers who voluntarily provide the Commission with original information about violations of the CEA that lead to the successful enforcement of a covered judicial or administrative action, or any other related action, as defined by the CEA.  The term "covered judicial or administrative action" means any judicial or administrative action brought by the Commission that results in total monetary sanctions exceeding $1,000,000. The term "monetary sanctions" refer to monies that are ordered to be paid, including (1) penalties, disgorgement, restitution and interest; and (2) any monies deposited into a disgorgement fund or other fund pursuant to section 308(b) of the Sarbanes Oxley Act of 2002. An award to a whistleblower cannot be less than 10 percent or more than 30 percent of what has been collected of the monetary sanctions imposed in the Commission action or related actions.

To implement the Dodd-Frank Act, the CFTC issued final regulations that were published in the *Federal Register* on August 25, 2011. Whistleblowers are eligible for an award based on any judgment after the date of the Dodd-Frank Act, even if such violations occurred prior to the passage of the Dodd-Frank Act. The CFTC has the authority to pay whistleblowers as the final regulations were effective on October 24, 2011.

## Operation of Fund in FY 2012

- CFTC deposited $23.755 million into the Fund in FY 2011.

- In Fiscal Year 2012 the CFTC estimates that it will use $15.6 million of these funds:

  o Approximately $1 million of the Fund will be used for customer education initiatives and funding an estimated three staff of the Consumer Outreach Office.

  o Approximately $14.6 million of the Fund will be used for the Commission's Whistleblower Program; payments of whistleblower awards could equal $13 million and administrative costs could be approximately $1.6 million, including funding of three staff of the Whistleblower Office.

**Management of the Whistleblower Program**

In FY 2012, the Commission will establish the Whistleblower Office to will perform ministerial functions and determination of preliminary award eligibility, which will involve both factual and legal determinations.  More specifically, the Office will be responsible for:

- Performing intake, tracking and recordkeeping of whistleblower tips;

- Reviewing whistleblower tips;

Exhibit 2 —Whistleblower Program and CFTC Customer Protection Fund          57

- Communicating with whistleblowers and their representatives;

- Communicating with DOE staff regarding the status of whistleblower related matters, including the level of the whistleblower's assistance;

- Communicating with other authorities (i.e., the Department of Justice, an appropriate department/agency of the Federal Government, registered entities, registered futures associations or self-regulatory organizations, or State criminal or appropriate civil agencies) regarding the status of related actions that are based upon the information submitted by a whistleblower to the Commission;

- Communicating with the Whistleblower Award Determination Panel (to be established in FY 2012), including providing the panel with the record for its determination; and

- Reporting to the Commission and to Congress on the whistleblower program.

The Commission anticipates establishing the Whistleblower Award Determination Panel in FY 2012.

## Operation of Fund in FY 2013

- The Commission does not anticipate an increase in the Consumer Outreach staff during FY 2013.

- The Commission's final rulemaking estimates that once the program is established and publicized, the CFTC will receive approximately 100 whistleblower tips per year. The Commission also estimates that, of the 100 tips, approximately nine will result in a whistleblower claim application. The Commission will evaluate the level of effort necessary to support the whistleblower program in FY 2012, based on actual number of tips received and investigation time. At this time, the Commission does not anticipate an increase in staff during FY 2013.

- The Commission anticipates a number of claims will be paid to eligible whistleblowers in FY 2012, providing a basis for estimating future spending. At this time, the Commission estimates $12.1 million in awards payment in FY 2013.

Table 13: CFTC Customer Protection Fund

|  | FY 2011 Actual ($000) | FY 2012 Estimate ($000) | FY 2013 Estimate ($000) |
|---|---|---|---|
| Budget Authority – Prior Year | $18,000 | $23,755 | $23,155 |
| Budget Authority – New Year | 5,755 | 15,000 | 12,918 |
| Total Budget Authority | $23,755 | $38,755 | $36,073 |
| | | | |
| Planned Expenditures | 0 | 15,600 | 15,050 |
| Whistleblower Program Direction | 0 | 1,000 | 1,050 |
| Whistleblower Enforcement Activities | 0 | 500 | 750 |
| Whistleblower Awards | 0 | 13,000 | 12,100 |
| Customer Education Program | 0 | 1,000 | 1,050 |
| Administrative Overhead | 0 | 100 | 100 |
| Unobligated Balance | 23,755 | 23,155 | 21,023 |

# Division Summary

## Administrative Management & Support

The Commission's ability to achieve its mission of protecting the public, derivative market participants, U.S. economy and the U.S. position in global markets is driven by well-informed and reasoned executive direction, strong and focused management, and an efficiently-resourced, dedicated, and productive workforce. To ensure the Commission's continued success, the Commission's Executive Director directs the effective and efficient allocation of CFTC resources, develops, implements and provides oversight to the management and administrative policy and programs, and ensures program performance is measured and tracked Commission-wide. Administration Management and Support is administered by the Office of the Executive Director, which includes the following offices: Business Management and Planning, Counsel to the Executive Director, Financial Management, Human Resources, Logistics and Operations, Privacy, Records, Proceedings (reparations), Secretariat and the Library.

## Budget Overview by Mission Activity

| | FY 2011 Actual | | | FY 2012 Base | | FY 2013 Request | |
|---|---|---|---|---|---|---|---|
| | Positions | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| Administrative Management and Support | 74 | 74 | $16,718 | 80 | $18,150 | 86 | $19,620 |

| | FY 2012 Base | | FY 2013 Request | | Change | | |
|---|---|---|---|---|---|---|---|
| | FTE | $ (000) | FTE | $ (000) | | FTE | $ (000) |
| **Administrative Management and Support** | **80** | **$18,150** | **86** | **$19,620** | | **6** | **$1,470** |
| Management and Administrative Support | | | | | + | 6 | 1,470 |

**Administrative Management and Support**

The Commission's expanded statutory mandate and accompanying increase in program resources requires a related expansion in critical planning and resource management functions.

To support its expanded workforce, the Commission requests six additional FTE, with skills sets encompassing:

- Budget and resource management, to re-engineer its financial management processes to enhance funds control, increase the planning and predictability of its spending, and facilitate priority-driven resource allocation;

- Privacy and records, to ensure compliance with privacy and records-related legal requirements, and advice on new systems, data collections and proposed rulemakings, including matters pertaining to sensitive enforcement and internationally shared information;

- Compensation, to ensure a correct and timely payroll, implement automated time and attendance procedures, and to maintain pay parity with other financial regulatory agencies; and

- Operations, to provide logistical and security support for employees in the Commission's regional offices in New York and Kansas City, which have been expanded to enhance our

oversight of continuity of operations, personnel and physical security, facilities and space management.

These additional resources will provide the Commission with an enhanced ability to streamline its processes, prudently invest and implement automated solutions, and comply with Federal regulatory and legal requirements to ensure the effective, efficient allocation and use of Commission resources.

## Top FY 2011 Accomplishments

CFTC Reorganization approved and adopted.

CFTCnet (new Intranet) launched.

CFTC's Management Framework Approach (Framework) developed, adoption initiated.
- Developed and implemented a set of governance processes to integrate strategic and operational planning with budget and resource management to ensure successful outcomes in support of mission delivery.

- Developed and began implementation of Planning Process guidelines.

- Utilized interdivisional leadership forums for strategic planning, priority setting and budget formulation.

- Designed, developed and implemented Budget Process Activity Code repository.

Facilities: Construction and expansion in Washington DC and Kansas City to accommodate Commission growth and modernization required to fulfill broadened mission scope

CFTC-wide learning strategy developed (See Strategic Plan Objective 5.3)

## Top FY 2012 Planned Outcomes

Achieve significant efficiencies through restructuring the Office of Proceedings and the elimination of two permanent Administrative Law Judge (ALJ) positions. The Commission will utilize borrowed, detailed or retired ALJs as needed to manage the proceedings formerly handled by the permanent ALJs, and will incorporate several other functions into existing and developing programs, e.g.,:
- Consumer Outreach;

- Secretariat;

- Division of Enforcement; and

- Reorganized Office of Proceedings.

Reorganization: Complete implementation of new organizational structure.
- Identify and hire key leadership positions.

- Assign/re-assign staff to new divisions and offices as required.

- Draft new career ladder and associated position descriptions as needed.

Management Framework:
- Track High level priorities and projects as defined through planning process.

- Reengineer Budget Project Activity Codes.

**FY 2013 President's Budget & Performance Plan**

Learning & Development:
- Augment and expand in-house legal and technical training to a comprehensive CFTC regulatory training program.

- Develop leadership and management training curriculum.

Automate key business processes to improve efficiency and productivity.
- Pilot and implement web based time and attendance Implement automated hiring system.

- Explore risks/benefits of payroll conversion to different provider.

Electronic Records Document Management and CFTCnet Phase II.
- Pilot standardized record keeping governance processes.

- Increase utilization of agency intranet as collaborative workspace sharing and communication portal.

## Top FY 2013 President's Budget & Performance Planned Outcomes

Management Framework and Governance – CFTC-wide annual operating plans developed and in place.

Implement new Budget Project Activity Codes.

Track all costs, including staff hours, against major projects & activities.

Optimize automated hiring system demonstrating a reduction in FTEs dedicated to recruiting and staffing.

Reduce time to hire by 10 percent over FY 2012.

## Chief Economist

The OCE provides economic support and advice to the Commission, conducts research on policy issues facing the Commission, and educates and trains Commission staff. The OCE plays an integral role in the preparation of new financial market regulations by providing economic expertise and analysis of cost-benefit considerations underlying those regulations. As new financial market regulations are implemented, the OCE will assess the impact of these regulations on derivatives markets.

## Budget Overview by Mission Activity

|  | FY 2011 Actual | | | FY 2012 Base | | FY 2013 Request | |
|---|---|---|---|---|---|---|---|
|  | Positions | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| Chief Economist | 15 | 13 | $2,937 | 17 | $3,630 | 29 | $7,530 |

|  | FY 2012 Base | | FY 2013 Request | | Change | |
|---|---|---|---|---|---|---|
|  | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| **Chief Economist** | **17** | **$3,630** | **29** | **$7,530** | **12** | **$3,900** |
| Review of Products and Rules of Operation |  |  |  |  | + 1 | $245 |
| Data Acquisition, Analytics, and Surveillance |  |  |  |  | + 4 | $980 |
| Enforcement |  |  |  |  | + 2 | $490 |
| Economic and Legal Analysis |  |  |  |  | + 5 | $2,185 |

**Review of Products and Rules of Operation**

_Products and rules introduced by designated contract markets, swap execution facilities and swap data repositories_. The OCE will support the Commission's functions with respect to the review and approval of products to be made available for trading. The OCE will also participate in the evaluation of the real time reporting process, including the determination of block trade threshold levels. The OCE will conduct economic analysis pertaining to exchange traded contracts and block trade levels so that such contracts maintain the market's price discovery function and offer market participants who use these contracts sufficient ability to hedge their risk.

**Data Acquisition, Analytics, and Surveillance**

_Swap data acquisition and analytics for oversight and surveillance_. The OCE will help evaluate the reporting requirements applied to swap market participants. The OCE will also conduct economic and statistical analysis of swaps data that would be reported to swap data repositories. The OCE will provide support in the development of automated surveillance capabilities by building new models to generate alerts, thereby facilitating market and financial surveillance. Moreover, the OCE will provide input into the modification of the Commission's large trader reporting and financial and risk surveillance systems to support new swaps data analysis, internal reporting requirements, and transparency reporting on the CFTC.gov website.

_Position Limits_. The OCE will help to quantitatively evaluate the impact of position limits utilizing data from both commodity futures and swap markets as it becomes available. Using this data and analysis, the OCE will propose modifications to the existing surveillance reports and new or modified surveillance processes that will need to be developed.

**FY 2013 President's Budget & Performance Plan**

_Capital, Margin and Segregation requirements for intermediaries_. The OCE will aid in responding to the anticipated requests of numerous major swap participants and swap dealers to compute both initial margin and market risk and credit risk capital charges using proprietary mathematical models. After the initial review and assessment of such models, the OCE will assist in performing periodic reviews of such models to assess their performance.

**Enforcement**

The OCE will provide significant analytical support to the Commission's enforcement program to police the markets for fraud, manipulation and other abuses. Specifically, the OCE will provide economic expertise for the analysis and evaluation of data pertaining to anti-manipulation and disruptive trading practice violations in both futures and swap markets.

**Economic Analysis**

_Commission-wide economic analysis_. The OCE maintains an economic research program focused on the quantitative analysis of the ever-evolving changes in trading technology, trading instruments, and types of market participants. Specifically, the OCE focuses its quantitative research program to analyze the following four broad areas:

- Analysis of the composition of speculative market participants in futures and options markets;

- Analysis of the linkages between futures, option, swap, securities, and cash markets;

- Analysis of the effects of swap markets and swap market participants on market structure; and

- Analysis of high frequency and algorithmic trading.

The analysis of the composition of speculative market participants provides input into the Commission's policy decisions on the potential impact of these traders in markets. Such analyses include identifying certain categories of traders and whether their individual or collective positions or trading activity impact price, volatility, or liquidity in markets.

The analysis of the linkages between various markets helps to assess the transmission mechanisms between derivatives markets and securities and cash markets in order to monitor systemic risk issues. Such analysis includes identifying correlations among various markets and asset classes and determining whether an event in one market may trigger similar events in other markets.

The analysis of the effects of swap execution facilities and swap market participants on the market structure of derivatives markets provides input into the Commission's assessment of new market participants and trading venues. Further, economic analysis will serve as the basis for many studies mandated after the DFA regulations are in effect.

The analysis of high frequency and algorithmic trading provides tools to help the Commission's surveillance and enforcement divisions to detect disruptive trading patterns and participants who attempt to manipulate markets.

## Top FY 2011 Accomplishments

Participated in the preparation of proposed and all finalized Dodd-Frank rulemakings, especially with respect to the consideration of costs and benefits.

Provided quantitative analyses for at least 11 enforcement investigations.

Organized and held the 1st annual CFTC Conference in Commodities Markets.

Composed at least 7 working papers on Commission oriented topics made available to the public with 25 presentations and 3 publications.

Participated in the preparation of the FSOC annual report.

## Top FY 2012 Planned Outcomes

Participation in all proposed and finalized Dodd-Frank rulemakings, especially with respect to the consideration of costs and benefits of the estimated 42 rules.

Provide quantitative analyses for 13 enforcement investigations.

Host the 2nd annual CFTC Conference in Commodities Markets and compose 10 working papers on Commission oriented topics to make available to the public with 28 presentations and 6 publications.

Preparation of market simulation and reconstruction model and automated simulated alerts.

Publication of transparency measures based on transaction level data.

## Top FY 2013 President's Budget & Performance Planned Outcomes

Participation in the implementation of Dodd-Frank rules, including entity and product review, review of trading and clearing facilities, valuation of complex swaps, and positions limits.

Provide quantitative analyses for 15 enforcement investigations.

Participation in data collection and analysis of swaps, futures, and options data.

Provide quantitative analysis of trading strategies of market participants in derivatives markets.

Host the 3rd annual CFTC Conference in Commodities Markets and compose 13 working papers on Commission oriented topics to make available to the public with 31 presentations and 9 publications.

**FY 2013 President's Budget & Performance Plan**

## Clearing & Risk

The DCR program oversees the clearing of futures, options on futures, and swaps by derivatives clearing organizations (DCOs) and other market participants that may pose risk to the clearing process including futures commission merchants, swap dealers, major swap participants and large traders. The DCR staff prepare proposed regulations, orders, guidelines, and other regulatory work products on issues pertaining to DCOs; review DCO applications and rule submissions and make recommendations to the Commission; make determinations and recommendations to the Commission to which types of swaps should be cleared; make determinations and recommendations to the Commission as to the initial eligibility or continuing qualification of a DCO to clear swaps; assess compliance by DCOs with the CEA and Commission regulations, including examining systemically important DCOs at least once a year; and conduct risk assessment and financial surveillance to identify, quantify, and monitor the risks posed by DCOs, clearing members, and market participants and its financial impact.

### Budget Overview by Mission Activity

|  | Positions | FTE | FY 2011 Actual $ (000) | FTE | FY 2012 Base $ (000) | FY 2013 Request FTE | $ (000) |
|---|---|---|---|---|---|---|---|
| Clearing and Risk | 54 | 50 | $11,296 | 56 | $12,705 | 103 | $24,220 |

| | FY 2012 Base FTE | $ (000) | FY 2013 Request FTE | $ (000) | Change FTE | $ (000) |
|---|---|---|---|---|---|---|
| **Clearing and Risk** | **56** | **$12,705** | **103** | **$24,220** | **47** | **$11,515** |
| Review of Products and Rules of Operation | | | | | + 12 | $2,940 |
| Data Acquisition, Analytics, and Surveillance | | | | | + 10 | $2,450 |
| Examinations | | | | | + 24 | $5,880 |
| Economic and Legal Analysis | | | | | + 1 | $245 |

**Review of Products and Rules of Operation**

_Mandatory clearing determination_. DFA imposes a new requirement on the CFTC to review, evaluate, and make a determination concerning a swap as to whether the swap should be cleared — i.e., a mandatory clearing determination — as well as evaluate the continuing qualification of the DCO to clear such a swap. As noted above, data from the Bank for International Settlements indicates that the total notional amount of over-the-counter derivatives outstanding as of the end of December 2010 is $415 trillion for interest rates; $29 trillion for credit default swaps and $2 trillion for commodities. The Commission will deploy seven current FTE to this high-priority activity that will require the review of data relating to pricing, outstanding notional exposures, and trading liquidity. In addition, DCR requests an additional eight FTE to support this effort.

_Registration of derivatives clearing organizations, rules review, applications for portfolio margining_. CFTC will be required to review, evaluate and make recommendations to the Commission in response to applications for registration as DCOs and in response to rule submissions submitted by them. As noted earlier, the Commission is anticipating an increase in the number of DCOs, from 17 to 18 for the beginning of FY 2013. Further, the Dodd-Frank Act amended the CEA to permit, pursuant to an exemption, rule or regulation, futures and options on futures to be held in a portfolio margining account that is carried as securities account and approved by the Securities and Exchange

Commission, and added a reciprocal provision to the Securities Exchange Act of 1934. The Commission also will be required to process portfolio margining applications in accordance with rules that will implement these statutory provisions. On average, these applications take about six months to one year to process.

**Data Acquisition, Analytics, and Surveillance**

*Risk Surveillance of futures, options and cleared swaps*. The CFTC will have to conduct risk surveillance of futures and options and cleared swaps. It is estimated that the notional value of cleared swaps that will require surveillance is about seven times that of futures and options. This responsibility will be discharged through the use of automated surveillance systems and applications and other risk assessment tools to assess, evaluate and report financial and market risk and risk management procedures at DCOs, clearing futures commission merchants, non-futures commission merchant clearing participants, and other market participants that may pose a risk to the clearing process, including swap dealers, major swap participants, and large traders. Current financial and risk surveillance systems will be modified to monitor volatility, variation margin, and increased financial reporting. The Commission anticipates that it will require six teams to discharge this responsibility in a comprehensive manner. Risk surveillance will approximately be divided by asset class, e.g., interest rates (eight FTE), equity index products (four FTE), foreign currencies (four FTE), broad-based index CDs (eight FTE), agricultural products (two FTE), energy products (six FTE), and metals products (two FTE). DCR currently has 23 FTE performing this function and seeks an additional 10 FTE in FY 2013.

The Commission's current financial and risk surveillance applications were designed to address futures and options on futures products. Unlike futures margin setting where each DCO uses the same application to margin positions, each DCO margining swaps positions will be using a unique margin methodology and a unique way to stress test positions. Futures and swaps risk management software will be implemented to enable the CFTC to analyze margin requirements; determine price impact on portfolios; conduct margin trend analyses and back testing; and stress test swaps positions - including interest rate swaps, energy swaps and credit default swaps.

**Examinations**

*Derivatives Clearing Organizations*. The DFA requires annual examinations of systemically important DCOs. DCOs that are determined to be systemically important under Title VIII of DFA must comply with heightened risk management and prudential standards concerning payment, clearing, and settlement supervision. The mandatory annual examinations of systemically important DCOs must review the entities' adherence to these heightened standards. Title VIII also requires ongoing consultation between the CFTC, the SEC, and the Board of Governors of the Federal Reserve System, including the scope and methodology of planning examinations of systemically important entities. The Commission currently anticipates no more than four entities will be determined to be systemically important.

The Commission currently has 14 staff on board to conduct examinations of DCOs. On average, an examination requires a team of eight FTE dedicated for six months. Examinations of larger entities, particularly those determined to be systemically important, will require 12 to 16 FTE and up to a year to complete.

While the Commission ultimately will seek resources to perform annual reviews of all major DCOs, the Commission is currently seeking an increase of 24 FTE to support annual examinations of the four systemically important entities. Including the 14 staff on-board, the Commission will be able to provide 10 FTE per review team, for a 12 month period. As the Commission gains experience with the Dodd-Frank requirements, additional resources may be required or resources could be deployed to support reviews of other clearing organizations.

**Economic and Legal Analysis**

_Commission-wide legal counsel_. FY 2013 will be the first full year under DFA rules. The complexity and scope of the Commission's regulatory framework, pursuant to its new statutory mandate, will meet with the day-to-day reality of a significantly expanded and global marketplace, including fundamental changes to historically regulated entities as well as to participants in the previously unregulated swap markets.

_Interpretation and Guidance_. Market participants will have requests for clarification and guidance once the new regulations are adopted and during the implementation period. Based on experience over the years with the implementation of other new registration schemes (e.g., for commodity pool operators and commodity trading advisors, for introducing brokers, and for retail foreign exchange dealers), there are bound to be questions arising that need a response – whether informally, by way of email or telephonic inquiry, or formally, by way of a staff-issued interpretative, no-action or exemptive letter or a Commission-issued order or regulation (or amendment thereto). Because of the tremendous consequences of not providing adequate support for new regulated entities, the Commission is requesting resources to ensure prompt, well-reasoned and accurate responses. Also, because many of these issues will be questions of first impression, the time taken to provide responses to the issues will be longer than it is today. The Commission also anticipates the need to be actively involved in the preparation of interpretations relating to jurisdictional issues arising under the Dodd-Frank Act amendments to the CEA. Timeliness is key to minimizing disruption to the orderly workings of the marketplace.

## Top FY 2011 Accomplishments

Led eight Commission rulemaking teams to develop regulations mandated by the Dodd-Frank Act in the following regulatory areas: Segregation and Bankruptcy; DCO Core Principles; Governance and Possible Limits on Ownership and Control; Systemically Important DCO Rules Authorized under Title VIII; Portfolio Margining Procedures; Conforming Rules; Client Clearing Documentation; and Clearing Member Risk Management.

Reviewed the application for registration as a DCO of the CME Clearing Europe Limited and recommended to the Commission that registration be granted. The Commission issued an Order granting CME Clearing Europe Limited registration as a DCO effective September 2, 2011. Under the terms of the Order, CME Clearing Europe Limited is authorized to clear swaps on energy, agricultural, freight and metals products as specified by the Order, in addition to authorization to clear forward contracts on such products.

Reviewed the application for registration as a DCO of the New York Portfolio Clearing LLC Limited and recommended to the Commission that registration be granted. The Commission issued an Order granting New York Portfolio Clearing LLC registration as a DCO effective January 31, 2011. Under the terms of the Order, New York Portfolio Clearing LLC is authorized to clear U.S. dollar-dominated interest rate futures contracts traded on NYSE Liffe U.S.

Initiated examinations of seven DCOs - CME Clearing House, ICE Clear Europe Limited, ICE Clear US, LCH.Clearnet Ltd, Kansas City Board of Trade Clearing Corporation, North American Derivatives Exchange Inc, and International Derivatives Clearinghouse LLC – to evaluate their compliance with the Commodity Exchange Act and Commission regulations, including applicable Core Principles.

Prepared notice of proposed rulemaking for amendments to Commission regulations for Investment of Customer Funds (published November 3, 2010).

Contributed to the development of the interagency report on "Risk Management Supervision of Designated Clearing Entities," a report mandated under Title VIII of the Dodd-Frank Act.

Developed an "option tree" that performs analysis on complex option positions and produces a simplified output that allows risk analysts to identify each type of risk.

## Top FY 2012 Planned Outcomes

Complete and issue final regulations mandated by Dodd-Frank Act in the following regulatory areas: Segregation and Bankruptcy; DCO Core Principles; Governance and Possible Limits on Ownership and Control; Systemically Important DCO Rules Authorized under Title VIII; Portfolio Margining Procedures; Conforming Rules; Client Clearing Documentation; and Clearing Member Risk Management.

Complete and issue final regulations for Investment of Customer Funds and Acknowledgment Letters.

Complete and issue report of findings on examinations of DCOs commenced in FY 2011, and initiate examinations of five DCOs to evaluate their compliance with the Commodity Exchange Act and Commission regulations, including applicable Core Principles.

Complete the review of applications for registration as a DCO from the Eurex Clearing AG to clear swaps and from the LCH.Clearnet SA to clear credit default swaps and make recommendations to the Commission as to whether registration should be granted.

Review, evaluate and make determinations concerning the mandatory clearing of swaps from product categories such as interest rate and currency products, credit and equity products, and commodity products.

Review, evaluate and make public interest determination regarding exemption pursuant to CEA §4(c)(6) for Regional Transmission Organizations operating pursuant to Federal Energy Regulatory Commission and Public Utility Commission of Texas Tariffs.

Review DCOs that clear swaps to evaluate and to make determinations concerning the acceptance of a swap for clearing on the DCO as to its eligibility or continuing qualification of the DCO to clear such a swap.

Review, evaluate and make determinations concerning portfolio margining applications, including the review and assessments of margin models, methodologies, and systems used by DCOs for purposes of calculating margin requirements and monitoring and managing risk.

Review, evaluate and make determinations concerning requests to commingle futures and swaps positions pursuant to DCO rules or Commission 4d order and concerning quarterly financial resource reports filed by each DCO.

Review, as part of the Designations Committee of the Financial Stability Oversight Council, six DCOs to determine whether they are systemically important.

Develop and implement risk assessment and evaluation application tools necessary to evaluate on an ongoing basis the risk of new cleared swap contracts, including the capacity to identify required data to be transmitted by the appropriate market participants, to identify the enhancements that will required of existing risk surveillance applications, and to identify third party software that may be appropriate for these tasks.

## Top FY 2013 President's Budget & Performance Planned Outcomes

Develop and issue rulemakings, orders, interpretations, and other regulatory work product related to the DCOs, clearing, and product review.

Review, evaluate and make determinations concerning the mandatory clearing of swaps from product categories such as interest rate and currency products, credit and equity products, and commodity products.

**FY 2013 President's Budget & Performance Plan**

Review, evaluate and make determinations concerning portfolio margining applications, including the review and assessments of margin models, methodologies, and systems used by DCOs for purposes of calculating margin requirements and monitoring and managing risk.

Initiate examinations of four DCOs that are determined to be systemically important, i.e., designated clearing entities, to evaluate their compliance with heightened risk management, prudential standards concerning payment, clearing and settlement supervision, and advance notice of changes to their rules, procedures, or operations.

Review, evaluate and make determinations concerning requests to commingle futures and swaps positions pursuant to DCO rules or Commission 4d order; concerning quarterly financial resource reports filed by each DCO; and concerning the annual compliance report filed by each DCO.

Develop procedures for conducting firm level stress test across all registered DCOs.

## Data and Technology

The ODT is led by the Chief Information Officer and delivers services to CFTC through three components: Systems and Services, Data Management, and Infrastructure and Operations. Systems and Services focuses on several areas: market and financial oversight and surveillance; enforcement and legal support; document, records, and knowledge management; CFTC-wide enterprise services; and management and administration. Managing data as an enterprise asset and applying a data-centric approach to service delivery, Data Management focuses on data analysis activities that support data acquisition, utilization, management, reuse, transparency reporting, and data operations support. Infrastructure and Operations organizes delivery of services around network infrastructure and operations, telecommunications, and desktop and customer services. These three service delivery components are unified by an enterprise-wide approach that is driven by the Commission's strategic goals and objectives and incorporates information security, enterprise architecture, and project management.

## Budget Overview by Mission Activity

| | FY 2011 Actual | | | FY 2012 Base | | FY 2013 Request | |
|---|---|---|---|---|---|---|---|
| | Positions | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| Data and Technology | 80 | 80 | $60,073 | 85 | $62,139 | 122 | $96,204 |

| | FY 2012 Base | | FY 2013 Request | | Change | |
|---|---|---|---|---|---|---|
| | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| **Data and Technology** | **85** | **$62,139** | **122** | **$96,204** | **37** | **$34,065** |
| Registration and Registration Compliance | | | | | + 5 | 2,235 |
| Data Acquisition, Analytics, and Surveillance | | | | | + 19 | 10,945 |
| Examinations | | | | | + 2 | 1,820 |
| Enforcement | | | | | + 0 | 1,830 |
| Data Infrastructure | | | | | + 11 | 17,235 |

Over the last decade, the futures and other derivatives markets have grown exponentially in terms of their innovation of products, trading practices, trading speed and complexity. These advances have been the result of massive changes and investments in technology and data use. In order to supervise the futures and derivatives markets effectively, the CFTC has to approach its use of data and technology strategically and holistically. The creation and integration of the enterprise-focused data function and the elevation of the Office of Data and Technology as a direct report to the Chairman are designed to give the Commission the ability to effectively leverage Data and Technology to facilitate a comprehensive approach to developing advanced technology investments, automate regulatory functions and improve the Commission's data analysis.

**Registration and Registration Compliance**

_Streamlining the entity submission process_. The Commission will be applying technology to improve the efficiency of the process by which registered entities submit applications for registration and other filings. The current submission process is highly manual. Applications, filings, and requests are received via email and broadly distributed throughout the CFTC. Metadata from the submission is extracted from the submitted materials and manually entered into existing systems. This data is not shared with other Commission systems, leading to duplicative data entry efforts and the possibility of missing or erroneous data. In FY 2013, the CFTC will be continuing the phased deployment of a web-

**FY 2013 President's Budget & Performance Plan**

based registration system, called OPERA (organizations, products, events, rules and actions). The OPERA system will allow for the direct registration of entities, registration of FBOTs, rule and product filings, and requests for Commission actions or interpretations. With OPERA, market participants will be able to apply directly using CFTC.gov and the information collected will flow directly into internal CFTC systems.

*Direct submission by registered entities.* The Online Portal (Portal) located on the CFTC.gov website will be a secure online gateway that will provide a more efficient method of submitting entity registration applications and other submissions to the Commission. The Portal will become a central location for all external business interactions with the Commission. The Portal will improve data quality, minimize the need for CFTC to update participant data, and provide those interacting with the Commission with a view of their submissions to the CFTC. The Portal will improve transparency of CFTC processes and procedures, providing automated notifications to those interacting with the Commission regarding required actions.

**Data Acquisition, Analytics, and Surveillance**

*Swap data acquisition and analytics for oversight and surveillance.* In support of this activity ODT staff will review and update data reporting standards; govern information policies and standards; manage data taxonomies, dictionaries and inventories; manage information quality and confidentiality; direct external information requests and data rulemaking; steward master data and reference data; manage Commission dashboards and views of swap repository data; and provide data mining and analysis support. And they will deploy and maintain data systems and data analytics tools; implement and maintain direct access, data transfer, and data loading between the Commission and data repositories; and deploy information quality and confidentiality controls.

It is anticipated that the Commission will leverage existing repositories wherever possible. The standardized data sets that will be submitted to CFTC are expected to represent only the subset of data required for internal analysis and aggregation purposes. In FY 2012, the Commission will be implementing direct access to external swap data repositories for the purposes of market oversight activities, but to also further define data submission requirements for standardized data feeds. The Commission anticipates defining the data standards across multiple data categories including: position data, transaction data, and reference data. Once defined, the Commission will work with industry participants on the application and testing of those standards to their data submission processes. Similarly, the Commission will be developing software to load swaps data into a Commission data warehouse for use by CFTC staff for market surveillance, risk monitoring, enforcement, and economic analysis. The Commission anticipates that it will conduct data analysis, working with industry to define data standards, and develop data loading software to support Commission systems for swaps data.

Additional capabilities will also be required to support swaps position and transaction surveillance, enhancing surveillance systems to collect and incorporate that data into analyses covering both swaps and futures markets. The Commission anticipates developing automated surveillance capabilities by building new models to generate alerts, thereby facilitating market and financial surveillance. The Commission also anticipates needing to modify its large trader reporting and financial and risk surveillance systems to support new swaps data analysis, internal reporting requirements, and transparency reporting on the CFTC.gov website.

*Aggregate Position Limits.* The Commission will begin collecting commodity swap positions in future equivalent standards in FY 2012. Once data is collected, modifications will need to be made to the existing surveillance reports and new or modified surveillance processes will need to be developed. In addition, alerts will be written to notify staff when position limits have been violated and incorporated into the business process for surveillance. The CFTC will seek to acquire or develop a system that will support the analysis and monitoring of position limits and hedge exemptions, aggregating futures positions with enumerated commodity swap positions, and develop surveillance processes that combine swaps, futures and options for intra-day and end-of-day position limits surveillance.

**Examinations**

_National Futures Association_. The staff assessing these sophisticated institutions will be supported by the integration of NFA systems and data with CFTC systems and data. Information will be presented for analysis in consolidated views so they can focus on analysis and review and spend less time correlating data from multiple sources.

_Pre-Examination Management Tools_. An overarching goal of the CFTC is to leverage and connect common business processes and technologies across the organization. The integration of examination tools and data with registration, surveillance, and case management tools and data in FY 2013 will allow the Commission to more effectively and efficiently conduct examinations and initiate and manage follow-on activities. The Commission will be looking at tools that will support the pre-examination management process of managing the selection and scheduling of examination activities, as well as the management of examination activities in the field and post examination report development.

**Data Infrastructure**

The Commission will continue to sustain CFTC-wide enterprise technology solutions that enable the sharing and reuse of software across the Commission. The Commission continues to sustain technology to provide support for automated market and trade practice surveillance, enforcement and other legal counsel matters (eLaw), financial and risk surveillance, the CFTC.gov website, and document management. IT development, integration, and enhancements support critical business requirements through delivery of technological capability represented by quick, secure information access, analytical capabilities, and successful business process automation. To effectively accomplish its mission, the CFTC must adapt to frequent and innovative changes in the derivatives markets, increasing use of technology and growing market complexity. The Commission must invest heavily and judiciously in IT to timely track market activity, understand the markets and provide effective oversight. Prior year investments in infrastructure and system capabilities must be leveraged and built upon to provide services that multiply the effectiveness of staff, accomplishing integration between futures and swaps data and increased integration of CFTC systems and processes for monitoring registered entities, market and financial risk, market integrity, and trade practice as well as systems and processes for enforcement and economic analysis. The CFTC must sustain existing program initiatives, providing mission operations and maintenance. Several systems and services will require, in addition to ongoing routine maintenance and support, minor enhancements to support the implementation of the Dodd-Frank Act.

The Commission is expected to receive a continually increasing volume of transaction, position, reference, financial risk, and enforcement-related data. Each of these streams is increasing in variety and complexity and is sourced from an increasing number of participants. Transaction data will include pre-trade information and is complicated by the addition of swaps and high frequency trading. Position data must be aggregated from multiple sources for participants with complex organizational structures and must be correlated with transaction data. Definition and cataloguing of reference data related to exchange-traded futures was relatively straight-forward. Product reference data for standardized swaps transactions is significantly more complex and varies considerably by asset class. Financial risk data varies significantly by asset class and must be evaluated at multiple levels (trader, owner and counterparty; clearing member, clearing organization). Enforcement-related data has connections to the other data streams that can be mined and patterned. It is imperative that the CFTC have the appropriate capabilities to manage these data streams effectively, assist in applying the data streams in new and innovative ways to increase the efficiency and effectiveness of Commission oversight, and identify gaps that might reduce the effectiveness of the Commission.

CFTC network services are responsible for the underlying infrastructure of every single IT program at the Commission. The network enables messaging and communications, network security, database administration, IT business continuity, and data storage management. Storage and servers are at the core of our business. The CFTC network consist of over 300 servers between the primary network site in Washington, D.C., three secondary sites in Chicago, Kansas City, and New York, and a continuity

**FY 2013 President's Budget & Performance Plan**

facility at a remote site. The network handles internal email messages and the data transfer necessary to support Commission-wide technology solutions. Mission critical data on the network is replicated from the network hub site in Washington, D.C., to the co-location alternate computing facility. Enforcement and other staff, on an as-needed basis are also provided alternative, "off-network" access to the internet to support anonymity during investigations and access to external resources that pose a potential information security risk to the CFTC production network. As the scope of CFTC oversight increases and expands surveillance, analytics, enforcement, and transparency capabilities, the Commission must continue to scale communication, processing, and storage infrastructure to meet demand in both FY 2012 and FY 2013.

In addition to scaling up technology capacity, like industry participants and other regulators, the Commission must also continue to increase, automate, and scale information security controls in the face of evolving security threats. In FY 2012 the Commission will invest in automated physical network access controls and additional traffic monitoring and scanning tools and in FY 2013 the Commission will need to continue automating security controls and increasing the level of continuous monitoring of threats. The Commission is charged with protecting sensitive information assets that are critical to overseeing the markets, such as position data, and this data must be secured to ensure market integrity. CFTC anticipates continuing its investment in IT security to keep pace with ever evolving threats to data and systems.

The Commission currently stores more than 350 terabytes of data with data storage requirements increasing 64 percent annually. Implementation of the Dodd-Frank Act is anticipated to increase this rate of increase, particularly in the initial years of implementation. Increasingly aggressive automated surveillance strategies and analysis of very large datasets, as well as market reconstruction and simulation, valuation of complex swaps, and analysis of high speed and algorithmic trading require that the Commission acquire high speed computing capabilities for rapid analysis of datasets approaching one petabyte in FY 2013. Data communication capacity must also be increased to support connectivity to swap data repositories, high-volume DCMs, and increased communication with newly-regulated industry participants as well as other regulators.

In FY 2012, the Commission will complete the first phase of a three-phase effort to improve business continuity. The Commission has established an Alternate Computing Facility (ACF) as part of the first phase and will complete the first phase by implementing the replication of mission critical and mission essential data to the ACF. The second phase will implement the capability to restore mission critical and mission essential systems from the ACF in accordance with recovery time and recovery point objectives. With Phase 3, which will begin in FY 2013, we will implement recovery capability for all Commission systems.

## Top FY 2011 Accomplishments

Partnering with DMO and DCIO, ODT continued refining and extending automated surveillance systems to improve staff's ability to conduct market, trade practice, and financial and risk oversight. Market and trade practice surveillance systems were modified to profile market activity warranting review and to alert staff to potential front running and position concentrations. Reports and user views were also added and modified to improve usability to increase staff productivity. Financial oversight systems were enhanced to increase usability and to process bank and mutual fund data, variation margin data, and CDS data for currently-registered DCOs.

To support the Dodd-Frank rulemaking effort, a web-based online comment system was implemented. This system facilitated industry and public participation in the rulemaking process. It was integrated with CFTC eLaw technology, which has been providing legal support for enforcement activities, to increase rulemaking staff productivity by providing them with powerful document search, tagging, and analysis capabilities. Staff was also supported with customized SharePoint portals to improve their ability to collaborate during the rule writing process. The CFTC Filings and Actions System (FILAC) was modified to support the initial phase of Dodd-Frank rule implementation.

The Commission substantially completed the migration of Trade Capture Report (TCR) data to a FIXML-based, open industry standard. CFTC had been receiving this data from futures exchanges in disparate, legacy formats. The result is much-improved data quality which has produced a commensurate improvement in the effectiveness of automated alert systems. Data transparency has also been improved, increasing the effectiveness of data analysis for market and trade practice surveillance and for economic research. The effort has also prepared staff for data standardization activities in support of Dodd-Frank that will enable the effective correlation and aggregation of data from multiple industry sources. The Commission began systematically receiving Time and Sales data to improve surveillance and started a preliminary analysis of the potential receipt of order message data to improve surveillance. Enhancements to data receipt and loading systems were implemented that will also be applied to the receipt of swaps data.

In support of Commission transparency initiatives, the CFTC.gov public website was moved to a new hosting facility. As a result, time-sensitive information is posted much more rapidly. The new site will also better support future improvements to online services for industry and the public. Also, the 'This Month in Futures Report' was redesigned to improve usability, increase transparency, and reduce report preparation time.

The Commission substantially completed the first phase of a three-phase effort to improve business continuity. The Commission established an Alternate Computing Facility (ACF) and will complete Phase 1 with the replication of mission critical and mission essential data to the ACF. The second phase will implement the capability to restore mission critical and mission essential systems from the ACF in accordance with recovery time and recovery point objectives. Phase 3, which will begin in FY 2013, will implement recovery capability for all Commission systems.

## Top FY 2012 Planned Outcomes

The Commission will begin implementing software to load swaps data into a Commission data warehouse for use by CFTC staff for market surveillance, risk monitoring, enforcement, and economic analysis. The Commission will work with industry to define data standards and will develop data loading software to support Commission systems for swaps data. Additionally, staff assessing swap dealers and major swap participants will begin to be supported by the integration of NFA systems and data stored at NFA with CFTC systems and data. Information will be presented to them in consolidated views so they can focus on analysis and review and spend less time correlating data from multiple sources.

The CFTC will begin the phased deployment of a web-based registration system, called OPERA (Organizations, Products, Events, Rules and Actions). The OPERA system will allow for the direct registration of entities, registration of foreign boards of trade, submission of rules and products, and requests for Commission actions or interpretations. With OPERA, market participants will be able to apply directly using CFTC.gov and the information collected will flow directly into internal CFTC systems.

The CFTC will begin developing the capability to host on CFTC.gov and Online Submission and Communication Portal that will be a secure online gateway providing a more efficient method of submitting registration and other forms of data to the Commission. The CFTC Portal will become a central location for business interactions with the Commission. The Portal will improve data quality, minimize the need for CFTC to update submitted data, and provide users with an account-specific view of their submissions to the CFTC. It will improve transparency of CFTC processes and procedures, providing automated notifications to external accounts regarding required actions. The CFTC will also begin receiving electronic forms from traders, reporting firms, and exchanges to improve data and decrease the cost of ingesting the information. This will include the collection of account and trader identification data and account ownership and control data.

Futures and OTC Risk Management. Using data standardized by asset class, futures and swaps risk management software will begin to be implemented to enable the CFTC to analyze margin requirements; determine price impact on portfolios; conduct margin trend analyses and back testing; and stress test swaps positions - including interest rate swaps, energy swaps and credit default swaps.

**FY 2013 President's Budget & Performance Plan**

Current financial and risk surveillance systems will begin to be modified to monitor volatility, variation margin, and increased financial reporting.

The Commission will begin implementing a system to support the analysis and monitoring of position limits and hedge exemptions, aggregating futures positions with enumerated commodity swap positions. CFTC will also begin developing surveillance processes that combine swaps, futures and options for intra-day and end-of-day position limits surveillance.

eLaw technology will begin to be augmented to provide support for enforcement tips, referrals and early case assessment.

## Top FY 2013 President's Budget & Performance Planned Outcomes

The Commission will enhance surveillance systems to collect and incorporate that data into analyses covering both swaps and futures markets. CFTC will develop new models to generate alerts, thereby facilitating market and financial surveillance. The Commission will also modify its large trader reporting and financial risk surveillance systems to support new swaps data analysis, internal reporting requirements, and transparency reporting on CFTC.gov.

The Commission will expand its current eLaw case management component or migrate to another commercial off the shelf product to support enterprise-wide case management, integrating surveillance referrals into the ingestion process for enforcement cases.

The Commission will begin using market order data to monitor disruptive trading activities and conduct additional automated market surveillance activities such as identifying withheld orders. This will also improve the quality and scope of and economic analysis for surveillance, compliance, and enforcement activities by providing transparency into the entire lifecycle of trades.

The integration of examination tools and data with registration, surveillance, and case management tools and data will allow the Commission to more effectively and efficiently conduct examinations and initiate and manage follow-on activities. The pre-examination process of managing the selection and scheduling of examination activities, the management of examination activities in the field, and post examination reporting will also be addressed.

Financial and risk surveillance systems will be augmented or modified to monitor Commodity Pool Operators and Commodity Trading Advisors.

# Enforcement

The DOE program investigates and prosecutes alleged violations of the CEA and Commission regulations. Possible violations involve improper conduct related to commodity derivatives trading on U.S. exchanges, or the improper marketing and sales of commodity derivatives products to the general public.

## Budget Overview by Mission Activity

|  | FY 2011 Actual | | | FY 2012 Base | | FY 2013 Request | |
|---|---|---|---|---|---|---|---|
|  | Positions | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| Enforcement | 161 | 164 | $37,051 | 166 | $38,198 | 214 | $51,979 |

|  | FY 2012 Base | | FY 2013 Request | | Change | |
|---|---|---|---|---|---|---|
|  | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| **Enforcement** | **166** | **$38,198** | **214** | **$51,979** | **48** | **$13,781** |
| Enforcement |  |  |  |  | + 48 | 13,781 |

### Enforcement

In FY 2011 the Commission filed 99 enforcement actions, the highest annual number of filings in program history, and opened more than 450 new investigations, also a program high. During the same period the Commission obtained orders imposing over $290 million in civil monetary penalties, and directing the payment of more than $160 million in restitution and disgorgement, which more than doubled the prior fiscal year's imposition of such sanctions. At the same time, the FTE level dedicated to the DOE program has only reached the operating levels that it had nearly a decade ago with a much smaller docket (in size and complexity).

The Dodd-Frank Act significantly enhances and expands the Commission's powers and responsibilities and will, certainly by FY 2013 if not much sooner, result in a substantial increase in our workload. Moreover, the size of the docket stemming from pre-DFA enforcement authorities, particularly with respect to the investigation and prosecution of frauds against retail customers, manipulation, supervision failures, recordkeeping, reporting and trade practice violations, is projected to continue its upward trend.

By FY 2013, the Commission's enforcement workload will increase for a number of reasons including:

- Addition of fraud-based manipulation to the Commission's existing "price-based" anti-manipulation authority;

- New prohibitions targeting disruptive trading practices and conduct on registered entities;

- Establishment of anti-fraud and anti-manipulation authority over swaps;

- New prohibitions against reporting false information;

- Clarified jurisdiction with respect retail foreign currency transactions and new authority over retail commodity transactions such as precious metals;

- Increase in the number and types of registrants, including exchanges, SEFs, swap data repositories, clearing organizations, intermediaries and dealers;

- New regulations applying to swaps and other intermediaries including those involving business conduct standards, fraud, record-keeping, reporting and trade practice; and

- An increase in international scope of activities.

The enforcement activity generated by this broadened regulatory authority will necessitate the development of specific areas of expertise, and require an increased capacity for proactive identification of violations. Our litigated cases, particularly any involving anti-manipulation and disruptive trading practices, will tax our resources more than in prior years.

To begin preparing for the increased regulatory scope, the Commission made internal changes to the management of its enforcement function to promote greater flexibility and efficiency in the Commission's DOE program in FY 2011. These changes include flattening of the organization; changing from small teams with pre-set rosters to a system that forms teams depending upon the needs of cases; and developing areas of specialization for staff in certain enforcement areas.

In FY 2013, the Commission seeks an additional 48 FTE to support fraud enforcement matters, including retail investor fraud matters (13 FTE); manipulation and disruptive trading enforcement matters (19 FTE); regulatory, supervision and trade practice matters (9 FTE); and enforcement matters related to swaps (7 FTE). The largest increase for manipulation and disruptive trading matters reflects the complexity and time intensity of those investigations. The smaller increase in staffing for swaps enforcement reflects the newness of the regulatory framework. It is likely that the Commission will request additional resources for enforcement matters related to the expanded swaps mandate in future years. In addition to staff years, the Commission is requesting an increase in resources to support the costs associated with an increased enforcement docket, including additional travel, expert services and transcript needs. These costs are inherent in the successful investigation and litigation of enforcement matters.

## Top FY 2011 Accomplishments

Filed 99 enforcement actions, the highest yearly tally in the agency's history and a 74 percent increase over the prior fiscal year. The CFTC charged individuals and companies in these cases for manipulating commodity prices, perpetrating Ponzi schemes and other fraud, supervision and accounting failures, trading abuses, registration deficiencies, and committing other violations of the CEA and regulations.

Opened more than 450 investigations, another program high.

Obtained orders imposing over $290 million in civil monetary penalties, and directing the payment of more than $160 million in restitution and disgorgement, which more than doubled the prior fiscal year's imposition of such sanctions.

Actively engaged in cooperative enforcement with federal and state criminal and civil law enforcement authorities. During FY 2011, more than 70 indictments and convictions were obtained in criminal cases related to CFTC enforcement actions.

Engaged in cooperative enforcement with international authorities in a wide range of matters from retail fraud to market manipulation. The Division routinely works with domestic and international financial regulatory and criminal counterparts on multi-jurisdictional and multi-national investigations. Requests and referrals to and from foreign authorities continued to grow during FY 2011. Handled over 530 international requests and referrals, an approximate 20 percent increase over FY 2010.

Implementation of internal changes to the management of its enforcement functions to promote greater flexibility and efficiency in preparation for the increase in regulatory scope. These changes

included flattening of the organization; changing from small teams with pre-set rosters to a system that forms teams depending upon the needs of cases; and developing areas of specialization for staff in certain enforcement areas.

## Top FY 2012 Planned Outcomes

The maintenance of current levels of enforcement activity based upon pre-Dodd Frank authorities, particularly with respect to the investigation and prosecution of frauds against retail customers, manipulation, supervision failures, record-keeping, reporting and trade practice violations.

The continued expansion of enforcement activity involving manipulation, disruptive trading, swaps and retail commodity transactions based upon new Dodd Frank authorities.

Continued evaluation and improvement of effectiveness in investigations and pursuit of violative activity which affects the public, markets and market participants.

The enforcement program in FY 2012 will be guided by new and expanded enforcement authorities provided by the Dodd-Frank Act. These include the addition of fraud-based manipulation to the Commission's existing anti-manipulation authority, prohibitions targeting disruptive trading practices and other misconduct on registered entities, anti-fraud and anti-manipulation authority over swaps, clarified jurisdiction with respect to retail foreign currency transactions, and new authority over cash commodity transactions such as those involving precious metals.

Under the Dodd-Frank Act the Commission anticipates that significant increases in the number of registrants concerning swaps related activity will commence in FY 2012. Increases in the number of registrants and associated trading activity will likely increase the enforcement burden with regard to the investigation and prosecution of regulatory compliance failures (including business conduct standards), fraud, record-keeping, reporting and trade practice violations.

## Top FY 2013 President's Budget & Performance Planned Outcomes

Continued growth in enforcement cases filed under the new jurisdiction and enforcement powers provided under Dodd Frank including fraud based manipulation, manipulation authority over OTC trading, and enforcement of new false reporting prohibitions.

The deliberate and specialized growth of swaps enforcement activities and expertise.

Increased automation of investigation, discovery, forensics, evidentiary analysis, and case management. Implementation of new tools for forensics, eDiscovery, tips and referrals, and early case assessment together with enhancement of existing tools for deposition management, case management, searching, and analytics will support both a higher volume of investigations and more effective measurement of program results.

New case filings in FY 2011 and FY 2012 will carry a "delayed" resource burden in FY 2013 as those matters are litigated through the federal courts.

Domestic and international cooperative enforcement efforts will continue to be a force. The Commission has seen a significant increase in both the number of outgoing and incoming international requests over the last several years. This increase is directly related to the increase in enforcement cases in general, thus an escalation in international activity is expected to continue through FY 2013 and beyond.

## General Counsel

The OGC provides legal services and support to the Commission by engaging in defensive, appellate, and amicus curiae litigation; assisting the Commission in the performance of its adjudicatory functions; providing legal advice and support for Commission programs; drafting and assisting other program areas in preparing Commission regulations; interpreting the CEA; and providing advice on legislative and regulatory issues.

## Budget Overview by Mission Activity

| | FY 2011 Actual | | | FY 2012 Base | | FY 2013 Request | |
|---|---|---|---|---|---|---|---|
| | Positions | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| General Counsel | 49 | 48 | $10,844 | 55 | $12,478 | 69 | $15,908 |

| | FY 2012 Base | | FY 2013 Request | | Change | |
|---|---|---|---|---|---|---|
| | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| **General Counsel** | **55** | **$12,478** | **69** | **$15,908** | **14** | **$3,430** |
| Registration and Registration Compliance | | | | | + 1 | 245 |
| Review of Products and Rules of Operation | | | | | + 5 | 1,225 |
| Economic and Legal Analysis | | | | | + 8 | 1,960 |

In FY 2013, OGC will continue to support the CFTC's efforts to implement the swap regulatory structure mandated by the Dodd-Frank Act (in addition to its ongoing regulatory review work regarding the agency's existing authorities over futures contracts and commodity options). More specifically, OGC will provide legal analysis and counsel in the following areas, among others:

**Registration and Registration Compliance**

*Registration of Swap Execution Facilities and Designated Contract Markets*. OGC is requesting one FTE for review of registration applications of SEFs and DCMs. The Commission anticipates that, beginning in the second quarter of FY 2012 through FY 2013, four DCMs will file for registration and another 26 SEFs will file for temporary registration. The Commission is under a statutory mandate of 180 days to complete an application of a DCM. In addition, the Commission is mindful of the competitive nature of the derivatives market and the advantages a registered SEF could garner over one operating under a temporary registration. Given these constraints, the Commission sees the need to complete the full application reviews of both DCMs and SEFs as expeditiously as possible. OGC will continue its existing participation in the inter-divisional review of DCM registration applications, and will extend that role to the review of SEF registration applications as well. OGC will provide legal review of registration applicants' compliance with existing and new core principles as applied to trading in swaps. OGC review also will assure the legal sufficiency of Commission actions with respect to DCM and SEF registration applications, including that they are consistent with statutory requirements, the Commission's rules implementing those requirements, and past precedents.

**Review of Products and Rules of Operation**

_Registration of Swap Dealers and Major Swap Participants:_  OGC is requesting one FTE for review of registration applications of swap dealers and major swap participants.  OGC will provide legal review of registration applicants' compliance with new requirements such as internal and external business conduct standards.  OGC review also will assure the legal sufficiency of Commission actions with respect to swap dealer and major swap participants registration applications, including that they are consistent with statutory requirements, the Commission's rules implementing those requirements, and past precedents.  The Commission also anticipates potential registration issues that may arise regarding foreign-domiciled entities that may be required to register as swap dealers or major swap participants.  Legal analysis by OGC with respect to the extra-territorial application of the Dodd-Frank Act to these entities will be critical to resolution of these cross-border issues.

_Products and rules introduced by designated contract markets, swap execution facilities and swap data repositories_.  OGC is requesting two FTE for review of products and rules introduced by DCMs, DEFs, and SDRs.  OGC review will assure that Commission actions with respect to the rules of registered entities are consistent with statutory requirements, the Commission's rules implementing those requirements, and past precedents.  In addition, the Dodd-Frank Act provides the Commission with new authority to determine that certain event contracts (which may be futures, options, or swaps) are contrary to the public interest based on the application of specified statutory criteria.  OGC review will assure the legal sufficiency of Commission determinations in implementing this novel authority.

_Mandatory clearing determination_.  DFA imposes a new requirement on the CFTC to review, evaluate, and make a determination concerning a swap as to whether the swap should be cleared — i.e., a mandatory clearing determination — as well as evaluate the initial eligibility or continuing qualification of the DCO to clear such a swap. OGC is requesting one FTE for review of the mandatory clearing determinations.  In making these mandatory clearing determinations, the Commission must take into account several factors specified in the statute.  OGC review will assure the legal sufficiency and consistency of Commission determinations in implementing this novel authority.

_Registration of derivatives clearing organizations, rules review, applications for portfolio margining_.  OGC is requesting one FTE for review of DCO registrations, rule reviews, and portfolio margining applications.  The requirement that swaps subject to the mandatory clearing requirement be cleared by a registered DCO is one of the cornerstones of the protections implemented by Title VII of the Dodd-Frank Act.  OGC will provide legal review of DCO applicants' compliance with new core principles as applied not only to swaps, but also to futures and options as well.  OGC review also will assure the legal sufficiency of Commission actions with respect to DCO registration applications, including that they are consistent with statutory requirements, the Commission's rules implementing those requirements, and past precedents.

**Economic and Legal Analysis**

_Interpretation and Guidance_: OGC is requesting one FTE to perform the increased activity related to interpretations and guidance regarding the application of the Dodd-Frank Act and the Commission's implementing rules. OGC review of interpretations and guidance will assure their legal sufficiency, as well as the necessary consistency across the Commission.  Additionally, OGC will manage the process for interpretive guidance that relate to joint rules with the SEC.  OGC will also be actively involved in the preparation of interpretations relating to jurisdictional issues arising under the Dodd-Frank Act and implementing rules.  In particular, the Commission has proposed, in its joint product definitions proposed rulemaking with the SEC, separate processes for market participants to obtain guidance from the agencies with respect to whether an instrument under Title VII is a swap or a security-based swap, and with respect to the regulation of mixed swaps.  OGC will be managing these processes for interpretive guidance relating to these joint definitional rulemakings.

FY 2013 President's Budget & Performance Plan

In addition to the above areas which relate to the implementation of DFA, OGC is requesting 7 FTE to support Commission-wide legal analysis in the following areas:

*Litigation:*  OGC is requesting one FTE and paralegal contract support to supplement the appellate litigation team.  OGC represents the Commission in court cases in the U.S. Supreme Court, Courts of Appeals, and other Federal and State courts when the Commission appears as intervenor or amicus curiae or as either appellant or appellee in any appeals court or when suit is brought against the Commission.  Following the implementation of DFA, the CFTC could face rulemaking challenges.  OGC expects that the rulemaking challenges will be time and resource intensive, and therefore, is requesting additional resources to support this program.

*Legislative and Intergovernmental Affairs:* OGC is requesting two additional FTE for Legislative and Intergovernmental Affairs. OGC monitors, reviews, and comments on proposed legislation affecting the Commission or the derivatives industry, and prepares technical assistance regarding draft legislation as requested by members of Congress or their staff.  OGC expects this workload to increase substantially in FY 2013 when Congress is expected to consider reauthorization legislation for the CEA and will likely undertake a thorough review of the substantial amendments that were enacted as part of the Dodd-Frank Act.  OGC also reviews and analyzes jurisdictional issues and liaisons with other Federal regulators as necessary to address specific matters implicating the regulatory interests of multiple agencies.  In FY 2012 and FY 2013, OGC will continue to support the activities of the Financial Stability Oversight Committee, and will require additional legal resources in areas such as banking and securities law, given the need for cross-disciplinary coordination and consistency to effectively implement the Dodd-Frank Act.   To support this increase in workload, OGC requests an additional two FTE.

*General Law:* OGC is requesting three additional FTE in the area of General Law.  One of these FTE will support the Information Governance program and ensure compliance with CEA Section 8 confidentiality provisions.  Under the Dodd-Frank Act, the Commission will begin capturing, and have access to, substantial amounts of data related to swaps which will be protected under Section 8.  Having the appropriate staff to oversee the protection of the statutory confidentiality of this data will be critical.  The additional FTE will also support the Commission in interpreting and applying the Administrative Procedure Act in regulatory actions taken to implement the Dodd-Frank Act, as well as the Regulatory Flexibility Act, and the Paperwork Reduction Act.  These FTE will also counsel the Commission to ensure compliance with the Sunshine Act and the Federal Advisory Committee Act.

*Ethics*:  OGC is requesting one additional FTE to support the Ethics program.  OGC advises the Commission and its staff with respect to all matters related to the Commission's ethics standards and compliance with its Code of Conduct, as well as with government-wide ethics regulations promulgated by the Office of Government Ethics.  To maintain adequate response times for ethics issues and process the required ethics forms as the agency and its new responsibilities grow pursuant to the Dodd-Frank Act, OGC will need an additional FTE in FY 2013

## Top FY 2011 Accomplishments

Provided legal counsel on the Dodd-Frank Act and created a Commission-wide process for preparation of over 50 rulemakings.

Issued five guidance documents to staff on issues relating to Dodd-Frank Act rulemakings.

Created communication process with other financial regulators to coordinate rules related to the Dodd-Frank Act, where possible.

Implemented new software to better manage the Commission's FOIA process and handled a record number of FOIA requests.

Created a Commission-wide e-Discovery program and implemented new policies, processes, and tools to facilitate information governance throughout the Commission.

Represented the CFTC in appellate, bankruptcy, and human resource litigation.

Analyzed 112 recommended enforcement cases and settlements to assure legal sufficiency and conformity with precedent.

## Top FY 2012 Planned Outcomes

Provide legal counsel on implementation of all Dodd-Frank Act requirements.

Design and implement processes for assuring consistency in interpretations related to the provisions of the Dodd-Frank Act and regulations thereunder.

Defend litigation arising out of rulemaking challenges.

Support other Divisions by analyzing legal issues associated with activities such as registrations, international coordination, product and rule reviews, exchange trading, exercising new enforcement authorities, and clearing mandates.

Adapt organizational structure and develop strategic initiatives to better meet legal needs in light of the Commission's re-structuring, and to increase efficiency and effectiveness.

## Top FY 2013 President's Budget & Performance Planned Outcomes

Enhance the Commission's ethics program by implementing further ethics training and enhancing responsiveness to ethics inquiries.

Provide technical assistance to Congress and Commission on CEA reauthorization legislation.

Defend litigation arising out rulemaking challenges and appeals in enforcement actions.

Support other Divisions by analyzing legal issues associated with activities such as registrations, international coordination, product and rule reviews, exchange trading, exercising new enforcement authorities, and clearing mandates.

## International Affairs

The OIA advises the Commission regarding international regulatory initiatives; provides guidance regarding international issues raised in Commission matters; represents the Commission in international organizations, such as the International Organization of Securities Commissions (IOSCO); coordinates Commission policy as it relates to policies and initiatives of major foreign jurisdictions, the G20, Financial Stability Board and the U.S. Treasury Department; and provides technical assistance to foreign market authorities.

## Budget Overview by Mission Activity

| | FY 2011 Actual | | | FY 2012 Base | | FY 2013 Request | |
|---|---|---|---|---|---|---|---|
| | Positions | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| International Affairs | 8 | 9 | $2,033 | 10 | $2,042 | 16 | $3,512 |

| | FY 2012 Base | | FY 2013 Request | | Change | | |
|---|---|---|---|---|---|---|---|
| | FTE | $ (000) | FTE | $ (000) | | FTE | $ (000) |
| **International Affairs** | 10 | $2,042 | 16 | $3,512 | | 6 | $1,470 |
| International Cooperation | | | | | + | 6 | 1,470 |

### International Affairs

The Commission's international policy coordination activities take place primarily within IOSCO and within U.S. Treasury and G-20 working groups. The aftermath of the financial crisis has prompted the formation of numerous initiatives in all of these forums, such as: cooperation and coordination in the areas of swaps regulation, central counterparty clearing standards, the monitoring and control of systemic risk, the protection of customer funds, and mechanisms to share systemically important information internationally. International concerns regarding volatility in commodity futures markets resulted in the formation of an IOSCO Task Force on Commodity Futures Markets, which is co-chaired by the Commission's international staff. Participation in these work-streams is critical because the work-product is often transformed into international standards of best practice, which are then subject to compliance assessment by the International Monetary Fund in its Financial Sector Assessment program. The Commission's participation historically has focused on incorporating the Commission's (and hence, the U.S.'s) regulatory approach into these internationals standards, encouraging international harmonization.

The Commission's international agenda also includes responding to requests by the U.S. Treasury to participate in international dialogues (e.g., U.S.– China dialogue), participating in National Security Council organized discussions to coordinate U.S. Government commodity policy, providing technical assistance to developing market jurisdictions, and engaging in bilateral negotiations with foreign regulators to resolve cross-border issues that affect the competitiveness of the U.S. futures industry. The Commission's current work is supported by 10 FTE.

The adoption of DFA legislation and the ongoing development of implementing rules by the Commission have significantly increased demands on international staffing. For example, the Commission's international staff has engaged in an unprecedented outreach to European regulatory authorities, most notably the European Commission. This effort has focused on encouraging foreign regulatory authorities to adopt rules that are harmonized with the Commission's DFA approach. International staff also is participating in cooperation with the SEC in the DFA mandated study on the approaches to over-the-counter derivatives swap regulation and the regulation of over-the-counter clearing in major jurisdictions.

Once the new DFA regulations are in effect, international staff will be required to develop supervisory coordination arrangements with foreign authorities in major jurisdictions where regulated entities will reside, such as the European Union, Canada, and Japan. Focusing solely on the EU, the Commission contemplate the need to engage not only the European Commission, but also the European Securities and Markets Authority and relevant national regulators, such as the U.K. FSA, French AMF and German BAFIN, to negotiate coordinating supervisory arrangements for entities that likely will be subject to regulation in both the EU and the United States. Likewise, the Commission anticipates that similar arrangement will be needed in major market jurisdictions such as Australia, Canada and Japan.

Finally, IOSCO recently converted the Task Force on Commodity Futures Markets into a permanent standing committee, which will require stable, long-term staffing if the Commission is to retain its leadership role as co-chair of that standing committee.

In order to adequately staff the existing work-streams and accommodate the growing demands of DFA rules, the Commission requests six additional FTE.

## Top FY 2011 Accomplishments

Coordinated Dodd-Frank Outreach. Coordinated staff and Chairman's engagement with the European Commission and European Parliament with the objective of encouraging harmonization of European regulatory development with Dodd-Frank policies. Initiated similar discussions with other foreign regulators.

Created International Working Groups. The CFTC began technical level working groups on over-the-counter derivatives with the European Commission and European Securities Markets Authority, and regulatory authorities in Japan, Singapore, and Hong Kong. Additionally, the Office of International Affairs organized a joint CFTC-SEC roundtable on the cross-border application of Dodd-Frank.

Participated in Internal Dodd-Frank Policy Development. Coordinated a review of cross-border arrangements that will be needed under Dodd-Frank and developed draft memorandum of understanding on the supervision of dually-regulated cross-border clearinghouses. Participated in rule development where there were international implications.

Led Development of Principles for Commodity Market Supervision. Led the effort within the IOSCO Task Force on Commodity Futures Markets to develop a final report on "*Principles for the Regulation and Supervision of Commodity Derivatives Markets*," as requested by IOSCO and the G-20. IOSCO determined to convert the task force into a permanent standing committee.

Coordinated IOSCO Policy Work. Coordinated Commission policy within the IOSCO Technical Committee and Standing Committee 2 on secondary markets, Standing Committee 3 on intermediaries, the over-the-counter derivatives task force, and the task force on implementation of the IOSCO Principles, which revised the IOSCO Methodology.

Coordinated Financial Policy within U.S. Treasury-led Initiatives. Represented the Commission in U.S. treasury strategic and economic dialogues such as with China and India, the North American Free Trade Agreement, and with the European Commission. Participated in G-20 study groups on commodities and on fossil fuel volatility and coordinated policy with the National Security Council on agricultural commodity volatility.

Planned Technical Assistance Efforts. Planned the annual international regulatory conference at Boca Raton, Florida and the annual symposium for foreign regulators in Chicago. Coordinated staff technical assistance mission to Ethiopia and a secondment program for the Korean Financial Supervisory Service.

**FY 2013 President's Budget & Performance Plan**

## Top FY 2012 Planned Outcomes

Outreach to Harmonize International OTC polices.  OIA will continue to work with staff at the European Commission, in order to encourage harmonization of European Union law to the level of the Commission's Dodd-Frank rulemakings, to resolve policy differences, and avoid gaps that could lead to regulatory arbitrage.  OIA will continue to coordinate meetings between the Chairman and European Commission and European Union authorities.  OIA will engage with other foreign regulators (e.g., Canada, Japan, and Singapore) for similar purposes.

Coordinate Supervision of Global Entities with Foreign Authorities.  Work with foreign authorities, including the European Commission, European Securities Market Authority, and other foreign regulators to coordinate policies and to develop memorandum of understanding and other cooperative arrangements that will be needed to implement final Commission Dodd-Frank rules (e.g., with regard to swap data repositories).

Develop Internal Policy on the International Application of the Dodd-Frank Act.  Work with an internal team to determine when and how to apply the Dodd-Frank Act to "activities that have a direct and significant effect" on U.S. Commerce pursuant to Section 722(d) of the Dodd-Frank Act.

IOSCO Representation.  Continue to participate in IOSCO's Technical Committee, and co-chair the newly created standing committee on commodity futures markets. OIA will continue to participate in IOSCO standing committee 2 on secondary markets, 3 on intermediaries, the implementation task force and over-the-counter derivatives task force.  All of these activities relate collectively to the development of standards of best practices and guidance in securities and derivatives regulation.

Respond to Global Concerns About Volatility in Energy and Agricultural Futures Markets.  Participate in U.S. Treasury and National Security Commission coordinating groups, various G20 energy and commodity experts groups and co-chair the IOSCO standing committee on commodity futures markets, to address volatility in energy and agricultural commodity futures markets and develop supervisory standards for commodity futures markets.

U.S. Treasury and other Initiatives.  Coordinate CFTC participation in U.S. Treasury financial dialogues, financial stability Board projects and other multilateral initiatives (e.g., within the North American Free Trade Agreement and the International Monetary Fund).

Technical Assistance.  OIA will continue to plan and coordinate: The Commission's annual trading seminar for foreign market authorities; the Commission's annual hosting of an international conference for foreign regulators in Boca Raton, Florida;  visits to the Commission requested  by foreign regulators to the Commission; and on-site technical assistance to foreign market authorities, on a staff-available basis.

## Top FY 2013 President's Budget & Performance Planned Outcomes

Outreach to Harmonize International Over-the-Counter polices.  OIA will continue to work with staff at the European Commission, in order to encourage harmonization of European Commission law to the level of the Commission's Dodd-Frank rulemakings, to resolve policy differences, and avoid gaps that could lead to regulatory arbitrage.  OIA will continue to coordinate meetings between the Chairman and European Commission authorities.  OIA will engage with other foreign regulators (e.g., Canada, Japan, and Singapore) for similar purposes.

Coordinate Supervision of Global Entities with Foreign Authorities.  Work with foreign authorities, including the European Commission, European Securities Market Authority, and other foreign regulators to coordinate policies and to develop memorandum of understanding and other cooperative arrangements that will be needed to implement final Commission Dodd-Frank rules (e.g., with regard to swap data repositories).

Develop Internal Policy on the International Application of the Dodd-Frank Act. Work with an internal team to determine when and how to apply the Dodd-Frank Act to "activities that have a direct and significant effect" on U.S. Commerce pursuant to Section 722(d) of the Dodd-Frank Act.

IOSCO Representation. Continue to participate in IOSCO's Technical Committee, and co-chair the newly created standing committee on commodity futures markets. OIA will continue to participate in IOSCO standing committee 2 on secondary markets, 3 on intermediaries, the implementation task force and over-the-counter derivatives task force. All of these activities relate collectively to the development of standards of best practices and guidance in securities and derivatives regulation.

Respond to Global Concerns About Volatility in Energy and Agricultural Futures Markets. Participate in U.S. Treasury and NSC coordinating groups, various G20 energy and commodity experts groups and co-chair the IOSCO standing committee on commodity futures markets, to address volatility in energy and agricultural commodity futures markets and develop supervisory standards for commodity futures markets.

U.S. Treasury and other initiatives. Coordinate CFTC participation in U.S. Treasury financial dialogues, financial stability Board projects and other multilateral initiatives, such as the North American Free Trade Agreement and International Monetary Fund.

Technical Assistance. OIA will continue to plan and coordinate: The Commission's annual trading seminar for foreign market authorities; the Commission's annual hosting of an international conference for foreign regulators in Boca Raton, Florida; visits to the Commission requested by foreign regulators to the Commission; and on-site technical assistance to foreign market authorities, on a staff-available basis.

**FY 2013 President's Budget & Performance Plan**

## Market Oversight

The DMO program fosters markets that accurately reflect the forces of supply and demand for the underlying commodities and are free of disruptive activity. To achieve this goal, program staff oversee trade execution facilities; performs market and trade practice surveillance; review new exchange applications and examine existing exchanges to ensure their compliance with the applicable core principles; evaluate new products to ensure they are not susceptible to manipulation; review exchange rules and actions to ensure compliance with the CEA and CFTC regulations; and carry out the mandates of the Dodd-Frank Act related to oversight of swaps trading, including real time and regulatory reporting and compliance with the trade execution requirements.

### Budget Overview by Mission Activity

|  | FY 2011 Actual | | | FY 2012 Base | | FY 2013 Request | |
|  | Positions | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
|---|---|---|---|---|---|---|---|
| Market Oversight | 118 | 118 | $26,658 | 123 | $28,812 | 206 | $49,147 |

|  | FY 2012 Base | | FY 2013 Request | | Change | |
|  | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
|---|---|---|---|---|---|---|
| **Market Oversight** | **123** | **$28,812** | **206** | **$49,147** | **83** | **$20,335** |
| Registration and Registration Compliance |  |  |  |  | + 8 | 1,960 |
| Review of Products and Rules of Operation |  |  |  |  | + 23 | 5,635 |
| Data Acquisition, Analytics, and Surveillance |  |  |  |  | + 26 | 6,370 |
| Examinations |  |  |  |  | + 21 | 5,145 |
| Economic and Legal Analysis |  |  |  |  | + 5 | 1,225 |

**Registration and Registration Compliance**

*Registration of Swap Execution Facilities and Designated Contract Markets*. The Commission anticipates that, beginning in the second quarter of FY 2012 through FY 2013, four DCMs will file for registration and another 26 SEFs will file for temporary registration. The Commission is under a statutory mandate of 180 days to complete an application of a DCM. In addition, the Commission is mindful of the competitive nature of the derivatives market and the advantages a registered SEF could garner over one operating under a temporary registration. Given these constraints, the Commission sees the need to complete the full application reviews of both DCMs and SEFs as expeditiously as possible. To that end, the Commission will dedicate four review teams of six FTE each to review applications. In order to address the significant staffing needs that will be engendered by such a surge of applications, the Commission will temporarily re-allocate resources from across the organization. In this regard, the Commission will re-allocate staff conducting examinations in the Division of Market Oversight and will reassign attorneys from enforcement activities. While even a short-term diminution of the examination and enforcement program is not ideal, this approach should enable the CFTC to process the initial surge of applications in FY 2012 and the first half of 2013 by newly established entities in a timely manner without seriously compromising its ability to carry out other key responsibilities.

Concurrently with registering new entities, the Commission will need to evaluate all existing DCMs to ensure that the exchanges are in compliance with the expanded core principles and Commission

regulations implementing such core principles, and that the public is appropriately protected. On-going resources will also be needed to support the additional volume of work for compliance reviews for the three-fold expansion in registrants. While there are currently 14 FTE to support the DCM registration and compliance review effort, the Commission seeks an additional four FTE to support the on-going expanded workload.

_Registration of Swap Data Repositories_. The Commission assumes that five to eight swap data repositories will submit registration applications in FY 2012 and 2013. The activities necessary to ensure timely review of the applications for compliance with core principles and regulations are comparable to those for DCM and SEF applications. The Commission will use the provisional registration approach, which requires under its rules that the swap data repository show operability and compliance with regulations. Resources will continue to be needed to support on-going compliance-based reviews, including annual Chief Compliance Officer and financial reports. The Commission anticipates needing a single team of six FTE to perform swap data repository registration and reviews in FY 2012, which will also support swap product reviews on a capacity-available basis, redeploying resources from the Division of Enforcement and other divisions as necessary. On an on-going basis, the Commission anticipates a significant effort in registration, review and policy development in support of these new entities and requests one dedicated FTE to support SDR registrants.

_Registration of Foreign Boards of Trade_. The Commission is anticipating that 21 FBOTs will seek registration; most of these will come from those currently operating with no-action relief letters. A significant effort will be necessary up-front to standardize the comparability review of foreign regulatory regimes of the home countries under which the FBOTs operate. As with registration of other new entities, the Commission will seek to use a phased approach to application review beginning in FY 2012. During FY 2012, the current two FTE dedicated to review FBOTs, along with additional personnel drawn from other areas of the Commission on an as-needed basis, will be assigned to two-person teams to handle each registration. After disposing of the expected initial surge of applications, the staff will, on an ongoing basis, maintain relationships with FBOTs for the purpose of reviewing required supplemental filings, assessing changes to the FBOT rules and regulatory regimes, and ensuring compliance with any conditions imposed, including position limits and position transparency requirements for contracts linked to DCM contracts. With the increased volume of work in moving from operating under no-action relief letters to a more standardized and stringent regulatory framework, the Commission anticipates a need for three additional FTE to implement the FBOT registration program.

**Review of Products and Rules of Operation**

_Products and rules introduced by designated contract markets, swap execution facilities and swap data repositories_. As indicated above, the Commission anticipates a surge in requests for new product approvals with the expansion of authority under the Dodd-Frank Act. An estimated 26 FTE are required to support the increased volume of work associated with new product approval requests and certifications implementing the Core Principle 9 provisions, and reviewing novel products raising SEC and CFTC jurisdictional issues. Staff also will be deployed to evaluate block trade threshold levels in addition to "made available for trade" determinations for swaps.

Furthermore, consistent with its current experience, the Commission anticipates numerous rule filings from registered entities that must be reviewed. Under the Dodd-Frank Act, the rule review process will be more resource-intensive due to the more rigorous 10/90-day review track for rule submission, the increased number of registered entities, and the new or amended core principles. Reviews to evaluate the effectiveness of rules adopted and consider whether any modifications are warranted will be on-going. Staff increases will support product reviews, reviews of new rules and rule amendments, event contracts, quarterly reports on financial resources, and rule effectiveness. Moreover, the Commission expects to evaluate event contracts under a special review process to determine if they involve prohibited activities and other DCM contracts to determine whether a sufficient proportion of trades occur on the centralized marketplace in compliance with the Core Principle 9 requirement that the price discovery process of listed contract be protected.

**FY 2013 President's Budget & Performance Plan**

**Data Acquisition, Analytics, and Surveillance**

_Swap data acquisition and analytics for oversight and surveillance_.  This activity, coupled with any follow-on enforcement actions, represents the core of the Commission's expanded mandate.  The Commission has identified a need for 25 FTE to oversee the recordkeeping and reporting requirements applied to swap market participants and the management and analysis of swaps data that would be reported to swap data repositories.  These staff will conduct information analysis; use economic analysis to develop requirements and data rules; develop and maintain CFTC summaries and aggregation of swap repository data; report on findings; define business data and process requirements; audit data submission quality; and assess reporting compliance.  They will also review and update data reporting standards; govern information policies and standards; manage data taxonomies, dictionaries and inventories; manage information quality and confidentiality; direct external information requests and data rulemaking; steward master data and reference data; manage Commission dashboards and views of swap repository data; and provide data mining and analysis support.  And they will deploy and maintain data systems and data analytics tools; implement and maintain direct access, data transfer, and data loading between the Commission and data repositories; and deploy information quality and confidentiality controls.

It is anticipated that the Commission will leverage existing repositories wherever possible. The standardized data sets that will be submitted to CFTC are expected to represent only the subset of data required for internal analysis and aggregation purposes. In FY 2012, the Commission will be implementing direct access to external swap data repositories for the purposes of market oversight activities, but to also further define data submission requirements for standardized data feeds. The Commission anticipates defining the data standards across multiple data categories including: position data, transaction data, and reference data. Once defined, the Commission will work with industry participants on the application and testing of those standards to their data submission processes. Similarly, the Commission will be developing software to load swaps data into a Commission data warehouse for use by CFTC staff for market surveillance, risk monitoring, enforcement, and economic analysis. The Commission anticipates that it will conduct data analysis, working with industry to define data standards, and develop data loading software to support Commission systems for swaps data.

The CFTC has looked for efficiencies in carrying out its surveillance obligations. In that regard, the market surveillance (monitoring of positions) and trade practice surveillance (monitoring of trading activity) have been consolidated into a single branch.  Combining these functions will achieve synergies that will make the CFTC's surveillance efforts more effective with available staff. Staff will be better able to address violations that blur the distinction between market and trade practice surveillance and staff can readily be shifted to evaluation of emerging issues, to work on reviews of potential violations, and to work with enforcement staff in the prosecution of violations.

Additional capabilities will also be required to support swaps position and transaction surveillance, enhancing surveillance systems to collect and incorporate that data into analyses covering both swaps and futures markets. The Commission anticipates developing automated surveillance capabilities by building new models to generate alerts, thereby facilitating market and financial surveillance. The Commission also anticipates needing to modify its large trader reporting and financial and risk surveillance systems to support new swaps data analysis, internal reporting requirements, and transparency reporting on the CFTC.gov website.

_Aggregate Position Limits_. The Commission is requesting additional staffing to monitor aggregate position limits adopted by the Commission; manage the hedge exemption process and evaluate the effectiveness of limits adopted and consider whether any modifications are warranted.  The Commission will begin collecting commodity swap positions in future equivalent standards in FY 2012.  Once data is collected, modifications will need to be made to the existing surveillance reports and new or modified surveillance processes will need to be developed.  In addition, alerts will be written to notify staff when position limits have been violated and incorporated into the business process for surveillance.  The CFTC will seek to acquire or develop a system that will support the analysis and monitoring of position limits and hedge exemptions, aggregating futures positions with

enumerated commodity swap positions, and develop surveillance processes that combine swaps, futures and options for intra-day and end-of-day position limits surveillance. (12 FTE, $5.138 million)

**Examinations**

_Designated Contract Markets, Swap Execution Facilities, and Swap Data Repositories_. The Examinations staff performs direct oversight of self-regulation at all DCMs to help ensure market integrity, customer protection, and compliance with the CEA and Commission regulations. The cornerstone of the work is the rule enforcement reviews (RERs), which consist of detailed examinations assessing DCMs' compliance with applicable "core principles" under the CEA. Different aspects of DCMs' self-regulatory programs are reviewed, including: audit trail creation and retention; trade practice surveillance; market surveillance; disciplinary proceedings; system safeguards (e.g., information security, business continuity, physical security and environmental controls); and dispute resolution mechanisms. RER results for each DCM are documented in comprehensive public reports, including specific recommendations to remedy any deficiencies identified by Examinations staff. In the future, the Commission will be required to conduct comparable RERs of SEFs and swap data repositories, swap-market entities brought under the Commission's jurisdiction by the Dodd-Frank Act.

Examinations staff will begin to establish a program for routine examinations (RERs) of new registered entities (SEFs and swap data repositories), while continuing our focus on reviews of the DCMs. These reviews are necessary to ensure compliance with statutory and regulatory requirements, including those applicable to market continuity. The additional resources requested are based upon the assumption that there will be a total of approximately 57 registered DCMs, SEFs and swap data repositories. The Commission plans to begin conducting RERs to ensure compliance with any one of the six core principles. Large exchanges will be examined annually and smaller entities every two to three years. Currently these examinations are being conducted infrequently or not at all with respect to specific core principles. Without these examinations, RERs lose their value as a Commission tool for promoting effective self-regulation and market integrity, and ensuring compliance with the CEA and Commission regulations. The Examinations section has attempted to use its limited resources in the most efficient manner possible, and has focused its RER program on the areas of highest need and risk. In the future, however, the number of regulated entities subject to RERs is expected to increase from the current 16 DCMs to a projected 50 or more DCMs, SEFs and swap data repositories. The Commission estimates that the level of effort for examinations of large exchanges is one FTE for each review, while medium to small exchanges that about one-half of an FTE per review. General market continuity examinations take approximately one FTE for each review. In general, the Commission is staffed at just over 0.6 staff years for each registered exchange. A meaningful injection of new staff resources is vital for examinations to meet even minimum expectations for effective oversight of both futures and swaps market platforms in FY 2013 and beyond. While the Commission seeks to move towards annual examination of the major entities[8], while scheduling reviews of non-major entities less frequently, the current request of 21 FTE will provide for just under 0.6 staff years per registered entity. While reducing the overall focus on examinations, this increase will ensure that the Commission can conduct for-cause examinations and a limited number of routine examinations of exchanges as resources become available.

**Economic and Legal Analysis**

_Interpretation and Guidance_. Market participants will have requests for clarification and guidance once the new regulations are adopted and during the implementation period. Further, rules that have been proposed jointly by the CFTC and SEC would establish a formal process to address inquiries regarding the treatment of products as swaps or security-based swaps and the applicable regulation of mixed swaps. Staff will be required to review and develop proposed interpretations, policies, and possibly regulations for all aspects of the DFA changes. Based on experience over the years with the implementation of other new registration schemes (e.g., for commodity pool operators and

---

[8] A major designated contract market or swap execution facility will be defined as the largest entities that contribute to at least 75 percent of observed volumes in the overall futures and swaps markets.

**FY 2013 President's Budget & Performance Plan**

commodity trading advisors, for introducing brokers, and for retail foreign exchange dealers), there are bound to be questions arising that need a response – whether informally, by way of email or telephonic inquiry, or formally, by way of a staff-issued interpretative, no-action or exemptive letter or a Commission-issued order or regulation (or amendment thereto). Because of the tremendous consequences of not providing adequate support for new regulated entities, the Commission is requesting resources to ensure prompt, well-reasoned and accurate responses. Also, because many of these issues will be questions of first impression, the time taken to provide responses to the issues will be longer than it is today. The Commission also anticipates the need to be actively involved in the preparation of interpretations relating to jurisdictional issues arising under the Dodd-Frank Act amendments to the CEA. Timeliness is key to minimizing disruption to the orderly workings of the marketplace.

**Management and Administrative Support**

The Commission's expanded statutory mandate and accompanying resources requires a related expansion in critical planning and resource management functions. In FY 2012, the Commission will re-engineer its financial management processes to enhance funds control, increase the planning and predictability of its spending, and facilitate priority-driven resource allocation. Based on the outcome of these planned activities and its increased resources, the Commission requests one additional FTE with budget and resource management skills.

## Top FY 2011 Accomplishments

Completed proposed and final rulemakings related to the Dodd-Frank Act:

- Update to Part 40 (Provisions Common to Registered Entities) – became effective September 26, 2011;

- Swap Large Trader Reporting- became effective September 20, 2011;

- Swap Data Repository Registration and Core Principles- to be effective October 31, 2011; and

- Treatment of Agricultural Swaps- to be effective December 31, 2011.

Completed proposed rulemakings related to the Dodd-Frank Act:

- Update to Part 38 (Core Principles and Other Requirements for Designated Contract Markets) – published December 22, 2010;

- Provision of a regulatory framework for SEFs, under Part 37 (Core Principles and Other Requirements for Swap Execution Facilities) – published January 7, 2011;

- Real Time Public Reporting of Swap Transaction Data- published December 7, 2010;

- Swap Data reporting and recordkeeping- published December 8, 2010; and

- Position limits for physical commodities- published November 2, 2010.

Completed reviews of 57 new product certifications, 9 exempt market filings, 317 rule filings and one FBOT no-action request.

Chief or contributing drafter for two important IOSCO reports -- the Report on OTC Derivatives Data Reporting and Aggregation Requirements and the Report on Trading of OTC Derivatives – in fulfillment of a charge from the Financial Stability Board

Created   three new alerts and three new reports as well as enhanced four trade practice alerts in production for more effective market and trade surveillance

## Top FY 2012 Planned Outcomes

Completion of remaining Dodd-Frank rulemakings:

- Propose and finalize rules establishing appropriate minimum block size and large notional size for swaps;

- Implement priority review process for new futures and option certifications based on trading activity;

- Finalize Real Time Reporting Rulemaking; and

- Finalize SEF and DCM Rulemaking

- Finalize rulemaking establishing a framework for determining whether a swap that is subject to mandatory clearing has been "made available for trading."

Begin new swap data repository and SEF registration applications

Implement swap data reporting to swap data repositories.

Implement swap block trade provisions.

## Top FY 2013 President's Budget & Performance Planned Outcomes

Continued registration of new applicants: Swap data repositories, SEFs, FBOTs, and DCMs.

Swaps surveillance program:

- Integrate swaps data into surveillance program;

- Prepare reports on swap market activity mandated by the Dodd Frank Act; and

- Regularly review swap transaction data to determine appropriate minimum block sizes for swaps.

Implement Federal speculative limits for physical commodities.

Start examinations of SEFs and swap data repositories.

Determine which swaps that are subject to mandatory clearing are "made available for trading."

**FY 2013 President's Budget & Performance Plan**

## Swap Dealer and Intermediary Oversight

The DSIO program oversees the registration and compliance activities of intermediaries and the futures industry self-regulatory organizations (SROs), which include the U.S. derivatives exchanges and the National Futures Association (NFA). Program staff develops regulations concerning registration, fitness, financial adequacy, sales practices, protection of customer funds, cross-border transactions and anti-money laundering programs, as well as policies for coordination with foreign market authorities and emergency procedures to address market-related events that impact intermediaries. With the passage of the Dodd-Frank Act, DSIO is responsible for the development of, or monitoring for compliance with, regulations addressing registration requirements, business conduct standards, capital adequacy, and margin requirements for swap dealers and major swap participants.

### Budget Overview by Mission Activity

|  | FY 2011 Actual | | | FY 2012 Base | | FY 2013 Request | |
|---|---|---|---|---|---|---|---|
|  | Positions | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| Swap Dealer & Intermediary Oversight | 70 | 71 | $16,040 | 79 | $17,839 | 130 | $30,334 |

|  | FY 2012 Base | | FY 2013 Request | | Change | |
|---|---|---|---|---|---|---|
|  | FTE | $ (000) | FTE | $ (000) | FTE | $ (000) |
| **Swap Dealer & Intermediary Oversight** | **79** | **$17,839** | **130** | **$30,334** | **51** | **$12,495** |
| Registration and Registration Compliance |  |  |  |  | + 15 | $3,675 |
| Data Acquisition, Analytics, and Surveillance |  |  |  |  | + 6 | $1,470 |
| Examinations |  |  |  |  | + 25 | $6,125 |
| Economic and Legal Analysis |  |  |  |  | + 5 | $1,225 |

**Registration and Registration Compliance**

*Registration of Swap Dealers and Major Swap Participants*. The Commission requests an additional seven FTE for FY 2013 to develop and implement a program to oversee the National Futures Association's program for monitoring swap dealers' and major swap participants' compliance with applicable business conduct standards. DFA directs the Commission to adopt both external and internal business conduct standards for these entities. The proposed business conduct standards address such areas as: risk management, monitoring position limits, diligent supervision, business continuity and disaster recovery, conflicts of interest, recordkeeping, reporting, swap confirmation, portfolio reconciliation, portfolio compression, and disclosure. These detailed business conduct standards are new regulatory requirements, and generally outside of the scope of CFTC requirements for other registrants such as futures commission merchants or introducing brokers. The additional FTE are necessary to develop and implement a program to assess National Futures Association's swap dealer and major swap participant compliance program to assess such entities' compliance with these fundamentally new business conduct requirements.

An initial component of this program will require Commission staff to work with the staff of the National Futures Association in the design and implementation of an effective National Futures Association examination program. Once such a program has been established and implemented by National Futures Association, the Commission's role will switch to one of oversight over National Futures Association's execution of the business conduct program. Commission staff also will conduct direct examinations of certain swap dealers and major swap participants to access their compliance

with the business conduct requirements. Such direct examinations may be part of Commission's assessment of National Futures Association's execution of its oversight program. Alternatively, the direct examinations may be conducted in response to a specific issue or general Commission concern with a particular swap dealer or major swap participant. Direct examinations also are necessary to ensure that Commission staff maintains an adequate understanding of the operations at major swap participants and swap dealers so that staff is better positioned to respond to evolving business processes and other developments, particularly in responding to urgent situations.

The request for seven additional FTE to fulfill these responsibilities is based upon the Commission's overall experience with the staffing resources needed to conduct financial surveillance oversight of self-regulatory organizations.

The National Futures Association expects to establish membership categories for swap dealers and major swap participants during the course of FY 2012. The Commission will be required to respond to numerous requests for information regarding the registration obligations of certain entities, including domestic and foreign-based swap dealers and major swap participants in FY 2012 and beyond. In addition, the Commission will also be required to review numerous National Futures Association rule submissions in support of registration of these entities, to assess whether the proposed rules are consistent with the CEA and Commission regulations. Four additional FTE are requested to respond to issues in registration and retail foreign currency issues.

The Commission also anticipates that numerous registration issues will arise regarding foreign-domiciled entities that would otherwise be required to register as swap dealers or major swap participants as those terms are defined under the CEA and Commission regulations. These issues may require the establishment of a program to assess the comparability of developing swap regulations in foreign jurisdictions in a manner consistent with the Commission's current Part 30 program. The Commission anticipates that it will need four additional FTE to properly staff this function.

**Data Acquisition, Analytics, and Surveillance**

*Capital, Margin and Segregation requirements for intermediaries*. The capital, margin, and segregation level of effort is currently eight FTE. The staff is responsible for responding to requests for guidance or informal interpretation of the Commission's capital, segregation, and financial reporting regulations. In addition, staff also provide guidance and interpretation on the financial reporting and capital requirements for retail foreign exchange dealers, and provide guidance on the financial reporting requirements imposed upon commodity pool operators. The staff also provides guidance on the applicability of generally accepted accounting principles to the regulatory accounting requirements of futures commission merchants, introducing brokers and commodity pool annual reports. Staff further provides assistance and technical support in the analysis of potential regulatory violations and other issues.

The Commission requests an additional six FTE in FY 2013 to respond to requests for clarification, guidance, and interpretation promptly and completely. The Commission further anticipates that revised or new regulations will be necessary after the implementation of the proposed regulations to address issues that were not foreseen in the original rule proposals. Finally, additional FTE are necessary for the Commission to respond to the anticipated requests of numerous major swap participants and swap dealers to compute both initial margin and market risk and credit risk capital charges using proprietary mathematical models. After the initial review and assessment of such models, staff will be required to perform periodic reviews of such models to assess their performance.

While of limited scope in FY 2013, the Commission anticipates a major effort in 2014 to review bank entities that are registered with the Commission to assess their compliance with certain restrictions or limitations on proprietary trading and investments in hedge funds (i.e., the Volcker Rule).

**FY 2013 President's Budget & Performance Plan**

**Examinations**

_Major Swap Participants, Swap Dealers and Managed Funds_. Currently, the Commission has no staff devoted to the examinations and financial statement reviews of major swap participants and swap dealers. The Commission requests an increase of 13 FTE to support this requirement. The additional FTE resources would allow the Commission to initiate a program for the oversight of swap dealers and major swap participants, including:

- Review monthly financial statements submitted by the 150 entities;

- Review and respond to regulatory notices filed by swap dealers and major swap participants, and, if necessary, make determinations when entities fail to meet certain regulatory requirements (including being undercapitalized or failing to maintain current books and records);

- And perform limited direct examinations of the entities.

While the bulk of the examinations of major swap participants and swap dealers will be performed by the NFA, the Commission will be required to undertake direct examinations of these entities in response to possible violations of the Commission's regulations, or as part of the oversight of the NFA's major swap participant and swap dealer surveillance program. The Commission also supports routine direct examinations of these entities as necessary for staff to obtain an understanding of the books and records, and general back-office operations. Such knowledge and familiarity of the operations of a major swap participant or swap dealer is necessary in order for staff to be properly prepared to respond in situations when these entities fail to meet its minimum financial requirements or other regulatory requirements. The Commission would focus its direct examinations that are not conducted on a for-cause basis on those entities that present the greatest potential exposure. These entities generally would be the most active and largest major swap participants and swap dealers, including the six members of the "G-14" dealers that are part of domestic banking organizations.

Approximately three-to-five staff members are required to conduct a limited scope direct examination of a large FCM or, as measured by regulatory capital and customer funds on deposit, other comparable intermediary. These examinations generally run for six months from start to report generation. Staff currently performs approximately 20 direct examinations each year. An increase of 13 FTE would allow the Commission to conduct limited scope direct examinations of selected swap dealers or major swap participants annually on a for-cause and routine basis, while also performing the other functions highlighted above.

In addition, the Commission requires two additional FTE to be allocated to the review of financial data submitted by the operators of large funds, including hedge funds. Under the Dodd-Frank Act, the operators of large funds that are subject to the jurisdiction of both the CFTC and SEC are required to file financial data with the SEC through the Financial Industry Regulatory Authority (FINRA). Operators of large funds that are only registered with the CFTC as commodity pool operators will file financial data with NFA. Both CFTC and SEC would review the financial data for potential systemic risk issues and provide information to the Financial Stability Oversight Council. The two additional FTE would review such data to identify potential systemic risk issues. Financial and risk surveillance systems will be augmented or modified to support this monitoring.

_National Futures Association_. In addition to working with NFA on the development of NFA's program to oversee major swap participants and swap dealers, the CFTC also will develop a program to assess NFA's self-regulatory responsibilities with respect to major swap participants and swap dealers. The development of this program began in the first quarter of 2012 in order to ensure that the Commission is prepared to fulfill its regulatory responsibility to oversee the NFA once NFA commences its reviews.

The Commission currently has 20 FTE committed to conducting annual reviews of the financial surveillance programs of the NFA and CME. In order to conduct an annual review of the NFA's oversight program over major swap participants and swap dealers, and to continue the current review

of self-regulating organization, it is estimated that an additional 10 FTE would be necessary to fulfill the Commission's mandate. The additional FTE reflect that NFA and CME currently oversee 123 futures commission merchants, while the Commission is anticipating approximately 200 swap-related entities to register as a result of the DFA rulemakings. In addition, hedge funds, large financial entities, large commercial entities and other major swap participants are likely to be much more sophisticated from an operational and bookkeeping perspective than many of the current futures commission merchants that have limited balance sheets and engage primarily in on-exchange futures transactions and/or off-exchange retail forex transactions. These sophisticated institutions will require additional staff for data acquisition and analysis. In addition, the staff assessing these sophisticated institutions will be supported by the integration of NFA systems and data with CFTC systems and data. Information will be presented for analysis in consolidated views so they can focus on analysis and review and spend less time correlating data from multiple sources.

**Economic and Legal Analysis**

_Commission-wide legal counsel_. FY 2013 will be the first full year under DFA rules. The complexity and scope of the Commission's regulatory framework, pursuant to its new statutory mandate, will meet with the day-to-day reality of a significantly expanded and global marketplace, including fundamental changes to historically regulated entities as well as to participants in the previously unregulated swap markets.

_Interpretation and Guidance_. Market participants will have requests for clarification and guidance once the new regulations are adopted and during the implementation period. Further, rules that have been proposed jointly by the CFTC and SEC would establish a formal process to address inquiries regarding the treatment of products as swaps or security-based swaps and the applicable regulation of mixed swaps. Staff will be required to review and develop proposed interpretations, policies, and possibly regulations for all aspects of the DFA changes. Based on experience over the years with the implementation of other new registration schemes (e.g., for commodity pool operators and commodity trading advisors, for introducing brokers, and for retail foreign exchange dealers), there are bound to be questions arising that need a response – whether informally, by way of email or telephonic inquiry, or formally, by way of a staff-issued interpretative, no-action or exemptive letter or a Commission-issued order or regulation (or amendment thereto). Because of the tremendous consequences of not providing adequate support for new regulated entities, the Commission is requesting resources to ensure prompt, well-reasoned and accurate responses. Also, because many of these issues will be questions of first impression, the time taken to provide responses to the issues will be longer than it is today. The Commission also anticipates the need to be actively involved in the preparation of interpretations relating to jurisdictional issues arising under the Dodd-Frank Act amendments to the CEA. Timeliness is key to minimizing disruption to the orderly workings of the marketplace.

## FY 2011 Accomplishments

DSIO staff members were appointed Team Leads of six Commission rulemaking teams to develop regulations mandated by the Dodd-Frank Act. DSIO was the Team Lead of the following regulatory areas: Capital and Margin for Non-Banks; Registration; Internal Business Conduct Standards; Off-Exchange Foreign Currency Transactions with Retail Participants; Investment Adviser Reporting; and the Volcker Rule. DSIO also led interdivisional teams on the review and development of proposed amendments to the registration regulations and commodity pool operator and commodity trading advisor regulations contained in Part 3 and Part 4, respectively, of the Commission's regulations to conform such regulations with the Dodd-Frank Act.

DSIO conducted reviews of the financial surveillance oversight programs of the National Futures Association, CME Group, and Minneapolis Grain Exchange. DSIO's reviews focused on the self-regulatory organizations' program for the assessment of member-FCMs' compliance with exchange and Commission minimum capital, customer funds protection, and financial reporting requirements.

DSIO staff conducted direct examinations of select FCMs to assess their compliance with Commission requirements including minimum capital, customer funds segregation, and financial reporting

**FY 2013 President's Budget & Performance Plan**

regulations. These reviews provide staff with an opportunity to monitor and to assess the back-office operations of Commission registrants, including proprietary recordkeeping systems and recordkeeping systems provided by third-party service providers. Such reviews provide staff with the knowledge and experience necessary to respond promptly to a potential financial crisis, including instances of an FCM failing to comply with minimum capital or segregation requirements.

The Commission approved final regulations establishing a comprehensive regulatory regime governing off-exchange forex transactions with retail participants in September 2010. The regulations became effective October 2010. Since the adoption of these regulations, DSIO has addressed numerous requests for informal interpretation and general questions regarding the application of the forex regulations from the general public and other US regulators. In this regard, DSIO staff provided information concerning the development and operation of the forex regulations to staff of the Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, and Securities and Exchange Commission to assist with the development of their respective forex regulations. DSIO staff also drafted proposed technical amendments to the Commission forex regulations to incorporate necessary changes resulting from the Dodd-Frank Act, and drafted an interpretation of the Commission's jurisdiction over forex transactions involving retail foreign exchange dealers.

DSIO staff drafted and recommended to the Commission that it publish in the Federal Register final rule amendments affecting certain commodity pool operators of commodity pools whose units of participation are listed and trading on a national securities exchange. Specifically, the amendments codified certain relief from disclosure, reporting, and recordkeeping requirements that Commission staff previously had provided to these commodity pool operators on a case-by-case basis.

## FY 2012 Planned Outcomes

DSIO staff will recommend to the Commission final regulations mandated by Dodd-Frank Act in the following regulatory areas Capital and Margin for Non-Banks; Registration; Internal Business Conduct Standards; Off-Exchange Foreign Currency Transactions with Retail Participants; Investment Adviser Reporting; and Volcker Rule: Also, complete the proposed conforming amendments to Part 3 and Part 4 of the Commission's regulations.

DSIO staff will work closely with the National Futures Association on the development of a comprehensive program for the oversight and assessment of swap dealers' and major swap participants' compliance with the new business conduct standards established by the Commission under the Dodd-Frank Act. The program will be administered by the NFA, in consultation with DSIO staff. In addition to NFA conducting direct examinations, DSIO staff also will conduct direct examinations of swap dealers and major swap participants to assess their compliance with business conduct standards. DSIO direct examinations may be conducted jointly with NFA or on a separate basis.

DSIO staff will develop a program for staff to follow in assessing the NFA's oversight of swap dealers' and major swap participants' compliance with the Dodd-Frank requirements, including business conduct, capital, margin, and segregation requirements.

DSIO will perform a review of the financial surveillance programs of the major self-regulatory organizations, the NFA and the CME Group. The reviews will include an assessment of the SRO's oversight of members' compliance with minimum financial and related reporting requirements, as well as certain non-financial requirements including sales practices and disciplinary programs.

DSIO staff will respond to requests for interpretation or other requests for relief or information resulting from the Dodd-Frank rulemakings. In this regard, DSIO anticipates numerous requests from industry participants and other members of the public regarding clarification or relief from the swap dealer and major swap participant registration requirements. Staff further anticipates requests for interpretation of other rulemakings including capital, margin, and business conduct regulations.

## Top FY 2013 President's Budget & Performance Planned Outcomes

Develop and issue rulemakings, orders, interpretations, and other regulatory work product related to swap dealers, major swap participants, FCMs, IBs, CPOs, CTAs, and APs. .

Conduct annual reviews of SRO oversight programs, including NFA's program for the oversight of swap dealers and major swap participants.

Conduct direct reviews of Commission registrants, including FCMs, swap dealers, and major swap participants to assess their compliance with applicable regulations governing financial requirements and business conduct standards.

Review commodity pool financial data submitted by commodity pool operators for the purpose of assessing whether the financial positions of a commodity pool may pose systemic risk issues.

Review, evaluate and make determinations concerning applications submitted by FCMs, swap dealers, and major swap participants to use proprietary models to compute regulatory capital and margin for uncleared swap transactions.

**FY 2013 President's Budget & Performance Plan**

# APPENDIX 1

## The Commissioners

**Gary Gensler**, Chairman

Gary Gensler was sworn in as the Chairman of the Commodity Futures Trading Commission on May 26, 2009. Chairman Gensler previously served at the U.S. Department of the Treasury as Under Secretary of Domestic Finance (1999-2001) and as Assistant Secretary of Financial Markets (1997-1999). He subsequently served as a Senior Advisor to the Chairman of the U.S. Senate Banking Committee, Senator Paul Sarbanes, on the Sarbanes-Oxley Act, reforming corporate responsibility, accounting and securities laws.

As Under Secretary of the Treasury, Chairman Gensler was the principal advisor to Treasury Secretary Robert Rubin and later to Secretary Lawrence Summers on all aspects of domestic finance. The office was responsible for formulating policy and legislation in the areas of U.S. financial markets, public debt management, the banking system, financial services, fiscal affairs, federal lending, Government Sponsored Enterprises, and community development. In recognition of this service, he was awarded Treasury's highest honor, the Alexander Hamilton Award.

Prior to joining Treasury, Chairman Gensler worked for 18 years at Goldman Sachs, where he was selected as a partner; in his last role he was Co-head of Finance.

Chairman Gensler is the co-author of a book, *The Great Mutual Fund Trap*, which presents common sense investment advice for middle income Americans.

He is a summa cum laude graduate from the University of Pennsylvania's Wharton School in 1978, with a Bachelor of Science in Economics and received a Master of Business Administration from the Wharton School's graduate division in 1979. He lives with his three daughters outside of Baltimore, Maryland.

**Jill E. Sommers**, Commissioner

Jill E. Sommers was sworn in as a Commissioner of the Commodity Futures Trading Commission on August 8, 2007 to a term that expired April 13, 2009. On July 20, 2009 she was nominated by President Barack Obama to serve a five-year second term, and was confirmed by the United States Senate on October 8, 2009.

Commissioner Sommers serves as Chairman and Designated Federal Official of the Commission's Global Markets Advisory Committee, which meets periodically to discuss issues of concern to exchanges, firms, market users and the Commission regarding the regulatory challenges of a global marketplace. She also has the opportunity to frequently attend the Technical Committee meetings of the International Organization of Securities Commissions, the global cooperative body which is recognized as the international standard setter for securities and derivatives markets.

Commissioner Sommers has worked in the commodity futures and options industry in a variety of capacities throughout her career. In 2005 she was the Policy Director and Head of Government Affairs for the International Swaps and Derivatives Association, where she worked on a number of over-the-counter derivatives issues.

Prior to that, Ms. Sommers worked in the Government Affairs Office of the Chicago Mercantile Exchange (CME), where she was instrumental in overseeing regulatory and legislative affairs for the exchange. During her tenure with the CME, she had the opportunity to work closely with congressional staff drafting the Commodity Futures Modernization Act of 2000.

Commissioner Sommers started her career in Washington in 1991 as an intern for Senator Robert J. Dole (R-KS), working in various capacities until 1995. She later worked as a legislative aide for two consulting firms specializing in agricultural issues, Clark & Muldoon, P.C. and Taggart and Associates.

A native of Fort Scott, Kansas, Ms. Sommers holds a Bachelor of Arts degree from the University of Kansas. She and her husband, Mike, currently reside in the Washington, DC area and have three children ages 9, 8, and 7.

**Bart Chilton**, Commissioner

Bart Chilton was nominated by President Bush and confirmed by the U.S. Senate in 2007. In 2009, he was nominated by President Obama and reconfirmed by the U.S. Senate. His career spans 25 years in government service—working on Capitol Hill in the House of Representatives and in the Senate, and serving the Executive Branch during the Clinton, Bush, and Obama Administrations.

Prior to joining the CFTC, Mr. Chilton was the Chief of Staff and Vice President for Government Relations at the National Farmers Union where he represented average family farmers. In 2005, Mr. Chilton was a Schedule C political appointee of President Bush at the U.S. Farm Credit Administration where he served as an Executive Assistant to the Board. From 2001 to 2005, Mr. Chilton was a Senior Advisor to Senator Tom Daschle, the Democrat Leader of the United States Senate, where he worked on myriad issues including, but not limited to, agriculture and transportation policy.

From 1995 to 2001, Mr. Chilton was a Schedule C political appointee of President Clinton where he rose to Deputy Chief of Staff to the U.S. Secretary of Agriculture Dan Glickman. In this role, Mr. Chilton became a member of the Senior Executive Service (SES)—government executives selected for their leadership qualifications to serve in the key positions just below the most senior Presidential appointees. As an SES member, Mr. Chilton served as a liaison between Secretary Glickman and the Federal work force at USDA.

From 1985 to 1995, Mr. Chilton worked in the U.S. House of Representatives where he served as Legislative Director for three different Members of Congress on Capitol Hill and as the Executive Director of the bipartisan Congressional Rural Caucus.

Mr. Chilton previously served on the Boards of Directors of Bion Environmental Technologies and the Association of Family Farms.

**FY 2013 President's Budget & Performance Plan**

Mr. Chilton was born in Delaware and spent his youth in Indiana, where he attended Purdue University (1979—1982). He studied political science and communications and was a collegiate leader of several organizations.

**Scott O'Malia**, Commissioner

Scott O'Malia was confirmed by the U.S. Senate on October 8, 2009, as Commissioner of the Commodity Futures Trading Commission, and was sworn in on October 16, 2009. He is currently serving a five-year term that expires in April 2015.

Born in South Bend Indiana and raised in Williamston, Michigan, Commissioner O'Malia learned about commodity prices firsthand growing up on a small family farm. As a Commissioner of the Commodity Futures Trading Commission (CFTC), he brings both his agricultural background and experience in energy markets, where he has focused his professional career.

Before starting his term at the CFTC, Commissioner O'Malia served as the Staff Director to the U.S. Senate Appropriations Subcommittee on Energy and Water Development, where he focused on expanding U.S. investment in clean-energy technologies, specifically promoting low-cost financing and technical innovation in the domestic energy sector.

From 2003 to 2004, Commissioner O'Malia served on the U.S. Senate Energy and National Resources Committee under Chairman Pete Domenici (R-N.M.), as Senior Policy Advisor on oil, coal and gas issues. From 1992 to 2001, he served as Senior Legislative Assistant to U.S. Sen. Mitch McConnell (R.-Ky.), now the Senate Minority Leader. During his career, O'Malia also founded the Washington office of Mirant Corp., where he worked on rules and standards for corporate risk management and energy trading among wholesale power producers.

In his time at the CFTC Commissioner O'Malia has advanced the use of technology to more effectively meet the agency's oversight responsibilities and is seeking the reestablishment of the long dormant CFTC Technology Advisory Committee (C-TAC). As Chairman of the newly reinstated Committee, Commissioner O'Malia intends to harness the expertise of the C-TAC membership to establish technological 'best practices' for oversight and surveillance considering such issues as algorithmic and high frequency trading, data collection standards, and technological surveillance and compliance.

Commissioner O'Malia earned his Bachelor's Degree from the University of Michigan. He and his wife, Marissa, currently live in Northern Virginia with their three daughters.

**Mark Wetjen**, Commissioner

Mark P. Wetjen was sworn in as a Commissioner of the U.S. Commodity Futures Trading Commission on October 25, 2011. Commissioner Wetjen brings to the agency seven years of experience working for the Majority Leader of the U.S. Senate, Senator Harry Reid, whom he advised on all financial-services-related matters, including the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Commissioner Wetjen worked closely with the relevant congressional committees on Title VII of the Act, which the CFTC is charged with implementing. Before his service in the U.S. Senate, Commissioner Wetjen was a lawyer in private practice and represented clients in a variety of litigation, transactional and regulatory matters.

Born and raised in Dubuque, Iowa, Commissioner Wetjen received a bachelor's degree from Creighton University and a law degree from the University of Iowa College of Law. He lives with his wife, Nicole, and son on Capitol Hill.

**FY 2013 President's Budget & Performance Plan**

# APPENDIX 2

# Analysis of New Responsibilities and Authorities on FY 2013 Budgetary Requirements

## Introduction

The Dodd-Frank Act provided substantial new authorities and responsibilities for the Commission.

The CFTC mission has been expanded to include regulation of the over-the-counter derivatives market. As a result, the regulatory landscape which CFTC has oversight is changing. This analysis seeks to present these changes in a manner that permits the Commission to formulate its budgetary requirements for FY 2013.

What follows is an examination of the different groupings of projected registrant types for which CFTC has oversight responsibilities.

## Analysis of CFTC Registrants

Registration and regulation of over-the-counter derivatives dealers would be required. Dealers will be subject to capital and margin requirements (in some cases set by the Commission and in some by other prudential regulatory authorities). Dealers also will be required to meet robust business conduct standards to be established and enforced by the Commission. The Commission will also be responsible for enforcing recordkeeping requirements to be imposed on dealers, for establishing the requirements for reports that dealers must provide, and for reviewing those reports once submitted and taking action when necessary.

### Registrants

Companies and individuals who handle customer funds, solicit or accept orders, or give trained advice must apply for CFTC registration through the NFA, a registered futures association and self-regulatory organization with delegated oversight authority from the Commission. The Commission currently regulates the activities of over 65,000 registrants.

| Registration Category | Number as of September 30, 2011 |
|---|---|
| Associated Persons (APs) (Salespersons) | 52,369 |
| Commodity Pool Operators (CPOs) | 1,183 |
| Commodity Trading Advisors (CTAs) | 2,530 |
| Floor Brokers (FBs) | 6,316 |
| Floor Traders (FTs) | 1,286 |
| Futures Commission Merchants (FCMs) | 123 |
| Retail Foreign Exchange Dealers (RFEDs) | 14 |
| Introducing Brokers (IBs) | 1,535 |
| Swap Dealers (SDs) | 0 |
| Major Swap Participants (MSPs) | 0 |
| TOTAL | 65,356 |

In FY 2013, the Commission projects approximately 230 – 300 entities to register as swap dealers, FCMs or RFEDs. This includes:

- Approximately 80 global and regional banks currently known to offer swaps in the United States. Of the International Swaps and Derivatives Association's 830 members, 209 are "Primary Members." Though many of the dealers in emerging markets may not seek to register in the United States, it is likely that most, if not all, of the global and international members would along with many of their existing swap dealing affiliates;

- Approximately 60 affiliates of existing swap dealers based upon the Dodd-Frank Act's Section 716 requirement that banks push out much of their commodity, equity and credit default swaps desks to affiliates;

- Approximately 40 non-bank swap dealers currently offering commodity and other swaps;

- Approximately 20 potential new market makers that wish to become swap dealers;

- Approximately 75 entities that will register as FCMs; and

- Approximately 25 entities that will register as RFEDs.

Given the resource needs of the CFTC, we are working very closely with self-regulatory organizations, including the National Futures Association (NFA), to determine what duties and roles they can take on in the swaps markets. In particular, we proposed rules that swap dealers would be required to be members of the NFA. This could facilitate the NFA taking on responsibilities related to registration and examination of swaps dealers. Nevertheless, the CFTC has the ultimate statutory authority and responsibility for overseeing these markets. Therefore, it is essential that the CFTC have additional resources to reduce risk and promote transparency in the swaps markets.

## Analysis of Registered Derivatives Clearing Organizations

In FY 2013, the Commission will regulate the clearing of standardized swaps through CFTC-registered derivatives clearing organizations (DCOs). To regulate DCOs the CFTC will be required to:

- register entities that seek to act as DCOs for swaps;

- examine all new DCOs for compliance with statutory and regulatory requirements; including new DCO core principles;

- examine annually all systemically important DCOs for compliance with statutory and regulatory requirements of the Act;

- examine all swap dealers and major swap participants for compliance with the Act;

- examine entities that seek to act as swap dealers and major swap participants and draft regulations with respect to same; as well as,

- draft regulations that give effect to DCO core principles and require futures commission merchants and introducing brokers to implement conflict of interest systems and procedures.

All DCOs that clear swaps must submit the contracts to the CFTC, who must then make a decision as to whether the swaps are subject to clearing requirement. The CFTC has 90 days after the submission, including a 30-day comment period, to make such determinations. Though we do not yet know the total number of contracts that will be submitted for clearing, and the Commission may be able to group many by class, the largest swaps clearinghouse currently clears nearly one million

**FY 2013 President's Budget & Performance Plan**

unique contracts.  There currently is no requirement for the CFTC to make similar determinations in the futures market.

The CFTC will also designate which DCOs are systemically important.  These entities will have to comply with heightened risk management and other prudential standards.  The Commission will be required to examine systemically important DCOs at least yearly.  We also have to ensure that all DCOs comply and bring their rules up to the new Dodd-Frank Act Core Principles.  In FY 2011, 17 DCOs were registered with the CFTC.  The Commission projects that at least 20 DCOs will register in FY 2013.

| Registered Derivatives Clearing Organizations (DCOs) |
|---|
| 1.   Cantor Clearinghouse L.P. |
| 2.   Chicago Board of Trade |
| 3.   Clearing Corporation |
| 4.   CME Clearing House |
| 5.   CME Clearing Europe |
| 6.   ICE Clear Credit |
| 7.   ICE Clear Europe Limited |
| 8.   ICE Clear US Inc. |
| 9.   International Derivatives Clearinghouse, LLC |
| 10.  Kansas City Board of Trade Clearing Corporation |
| 11.  LCH Clearnet Ltd. |
| 12.  Minneapolis Grain Exchange Clearing House |
| 13.  Natural Gas Exchange Inc. |
| 14.  New York Portfolio Clearing, LLC |
| 15.  North American Derivatives Exchange Inc. |
| 16.  New York Mercantile Exchange Clearing House |
| 17.  Options Clearing Corporation |

**FY 2013 President's Budget & Performance Plan**

| Inventory and Status of New Rules Impacting Projected Registrants | |
|---|---|
| **Rules Under Development** | **Status** |
| Governance & Possible Limits | Still under Commission consideration |
| Financial Resources Requirements for DCOs and SIDCOs | Sep 22 meeting |
| Rule Certification | Done |
| Alternatives to Credit Ratings | Done |
| Investment of Customer Funds | On hold |
| Process for Review of Swaps for Mandatory Clearing | Done |
| Bankruptcy - Protection of cleared swaps (NPR) | Comment period still open |
| DCO Core Principles - Legal & Compliance | Sep 22 meeting |
| Information Management Requirements for DCOs | Sep 22 meeting |
| End User Exemption | (OGC) |
| Governance & Possible Limits - Core Principles Implement. | Still under Commission consideration |
| DCO Core Prin. & Systemically Imp. DCO (Risk Mgt) | Sep 22 meeting |
| Processing, Clearing & Transfer of Customer Positions | Comment period still open |
| Segregation of Cleared Swaps | Comment period still open |
| Inter-affiliate exemptions | (OGC) |
| End User Exemption for small credit unions and farm credit banks | (OGC) |
| Governance & Possible Limits - Core Principles Implementation | Still under Commission consideration |

**FY 2013 President's Budget & Performance Plan**

| Technology for DCOs | |
|---|---|
| **IT Category** | **IT Requirement[9]** |
| New Mission Authorities | Position Limit Monitoring |
| | CFTC.gov Online Participant Portal |
| | Electronic Forms (102, 40, etc.) |
| | Futures and OTC Risk Management |
| Current Mission Authorities | Large Trader Reporting, Trade Practice Compliance, Filings & Actions |
| | RSR, SPARK, FILAC, Comments Online, EMAT, PMP, FOIA |
| | RSR/SPARK Volatility Database, Variation Margin, Quarterly Financial Statements, Monthly Financial Statements, New Schedules and Reports |
| | Consistent Management of Commission Work Products - e.g., No Action Letters |

[9] The listing of technology requirements is not limited to registrants but support other activities Commission-wide.

## Analysis of Foreign Boards of Trade

In FY 2013, a new registered FBOT category will obviate the need for the current FBOT no-action letter program, but the substantive requirements that will be imposed on registered FBOTs will likely be more robust than the requirements imposed under the no-action regime. By FY 2013, up to 28 FBOTs will be registered. Currently, 20 FBOTs operate in the United States based upon no-action letters dating back to 1999. The Commission expects at least that number of FBOTs will apply to register upon the implementation of the FBOT regulations, plus an additional eight FBOTs who have recently expressed an interest in becoming registered.

| Projected Foreign Boards of Trade (FBOTs) |
|---|
| 1.   Australian Securities Exchange |
| 2.   BM&F Bovespa S.A. - Bolsa de Valores, Mercadorias & Futuros |
| 3.   Bourse de Montreal |
| 4.   Dubai Mercantile Exchange Limited |
| 5.   Eurex Deutschland |
| 6.   Eurex Zurich |
| 7.   Euronext Amsterdam |
| 8.   Euronext Paris |
| 9.   European Energy Exchange |
| 10.  Hong Kong Futures Exchange |
| 11.  ICE Futures Canada, Inc. |
| 12.  ICE Futures Europe |
| 13.  London International Financial Futures and Options |
| 14.  London Metal Exchange |
| 15.  Mercado Mexicano de Derivados S.A. de C.V. |
| 16.  MEFF AIAF SENAF Holding de Mercados S.A. |
| 17.  NASDAQ OMX Oslo ASA |
| 18.  Osaka Securities Exchange |
| 19.  Singapore Exchange Derivatives Trading Limited |
| 20.  Tokyo Financial Exchange, Inc. |

**FY 2013 President's Budget & Performance Plan**

| FBOTs who have recently expressed an interest in becoming registered |
|---|
| 1.  BlueNext Exchange (Paris) |
| 2.  Bursa Malaysia |
| 3.  Hong Kong Mercantile Exchange |
| 4.  Natural Gas Exchange (Canada) |
| 5.  NZX Limited (New Zealand) |
| 6.  Tokyo Commodity Exchange |
| 7.  Tokyo Stock Exchange |
| 8.  Turquoise |

| Inventory and Status of New Rules Impacting Projected Registrants | |
|---|---|
| **Rules Under Development** | **Status** |
| FBOT Registration | Still Under Commission Consideration |
| Position Limits for Exempt and Agricultural Commodities | Still Under Commission Consideration |

| Technology for FBOTs | |
|---|---|
| **IT Category** | **IT Requirement[10]** |
| New Mission Authorities | Dodd-Frank Participant Registration (Opera) |
| Current Mission Authorities | Large Trader Reporting, Trade Practice Compliance, Filings & Actions |
| | Data Standardization, Data Loading, Data Analysis - e.g., Order Data, Large Trader, Time & Sales |

---

[10] The listing of technology requirements is not limited to registrants but support other activities Commission-wide.

## Analysis of Swap Execution Facilities

In FY 2013, the Commission will enforce rules and requirements that standardized OTC derivatives contracts be executed on regulated trading platforms. The new requirements are intended to facilitate a transparent, liquid, and competitive marketplace with trades occurring on regulated exchanges or swap execution facilities. In implementing the new requirements, the CFTC will be required to:

- collect, assemble, analyze and report  aggregate swaps data;

- oversee  swap execution facilities;

- expand the Commission's position limit-setting authority beyond futures contracts to swaps that perform a significant price discovery function;

- establishment and execution of cross-exchange aggregate position limits; and

- a new contract and rule review process.

There are many new activities related to the oversight of swaps trading activity.  These include implementing procedures for the review and oversight of an entirely new regulated market category, SEFs.

Staff in the Market and Product Review and Market Compliance units must establish and implement procedures for the review of new SEF applications and for the annual examination of the operations of SEFs.  Staff in the Surveillance units must establish and carry out surveillance for new SEFs.

Based on industry comments, there could be at least 20-30 entities will apply to become SEFs.  This estimate is based on the number of exempt commercial markets (ECMs), exempt boards of trade (EBOTs), interdealer brokers, information service providers and swap dealers who have formally or informally expressed an interest in registering as SEFs.  Furthermore, some DCMs that in the past only listed futures will start listing swaps.

Each SEF must be thoroughly evaluated by staff before making determinations whether they should be approved.  Those that are approved also must be regularly examined for ongoing compliance.

The CFTC expects that a number of Exempt Commercial Markets and Exempt Boards of Trade would apply to Be SEFs.   Transactions by eligible contract participants in selected commodities may be conducted on an EBOT as set forth under the CEA and the Commission's regulations. EBOTs are subject only to the CEA's anti-fraud and anti-manipulation provisions. An EBOT is prohibited from claiming that the facility is registered with, or recognized, designated, licensed, or approved by the Commission. Also, if it is performing a price discovery function, the EBOT must provide certain pricing information to the public. To date, 20 EBOTs filed notices with the Commission.  In FY 2011, 21 EBOTs were in business for at least part of the year; one however, withdrew its EBOT notification during the fiscal year.

**FY 2013 President's Budget & Performance Plan**

| Potential SEF Registrants from Exempt Commercial Markets (ECMs) |
| --- |
| 1.  CME ECM Inc. |
| 2.  Chicago Climate Exchange, Inc. |
| 3.  EnergyCross.com |
| 4.  EOX Holdings, LLC |
| 5.  FCRM Electronic Markets LLC |
| 6.  GFI Group Inc., EnergyMatch |
| 7.  Houston Mercantile Exchange, LLC |
| 8.  HoustonStreet Exchange, Inc. |
| 9.  ICAP Commodity and Commodity Derivatives Trading System |
| 10.  ICAP Electronic Trading Community |
| 11.  ICAP Shipping Trading System |
| 12.  ICAP Truequote Multilateral Trading Facility |
| 13.  IntercontinentalExchange, Inc. |
| 14.  Liquidity Partners, LP |
| 15.  Natural Gas Exchange, Inc. |
| 16.  Nodal Exchange, LLC |
| 17.  OILX |
| 18.  Parity Energy, Inc. |
| 19.  TradeSpark, LP |
| 20.  TFSWeather.com |
| 21.  TraditionCoal.Com |
| 22.  WorldPulp.com |

**FY 2013 President's Budget & Performance Plan**

| Potential SEF Registrants from Exempt Boards of Trade (EBOTs) |
|---|
| 1.  CME Alternative Marketplace, Inc. |
| 2.  Concredex |
| 3.  Currenex |
| 4.  Derivatives Bridge, LLC |
| 5.  ERIS Exchange, LLC |
| 6.  FENICS |
| 7.  FX Alliance |
| 8.  FX Connect |
| 9.  GFI Group, Inc. – ForexMatch |
| 10.  Intrade Board of Trade |
| 11.  IRESE, Inc. |
| 12.  Longitude, LLC |
| 13.  M2 Trading Partners, LLC |
| 14.  MarketAxess |
| 15.  ODEX |
| 16.  SurfaceExchange |
| 17.  Swapstream Operating Services, Ltd. |
| 18.  Tera EBOT |
| 19.  The American Civics Exchange |
| 20.  trueBOT |

**FY 2013 President's Budget & Performance Plan**

| Inventory and Status of New Rules Impacting Projected Registrants | |
|---|---|
| **Rules Under Development** | **Status** |
| Agricultural Swaps (ANPR) | Still under Commission consideration |
| Governance & Possible Limits - Section 726 | Still under Commission consideration |
| Position reports for physical commodity swaps | Still under Commission consideration |
| Anti-Manipulation | (ENF) |
| Disruptive Trading Practices (ANPR) | (ENF) |
| Rule Certification | Completed |
| Swap Data Recordkeeping and Reporting | Completed |
| Real Time Reporting | Still under Commission consideration |
| SEF Registration and Rules | Still under Commission consideration |
| Position Limits for Exempt and Agricultural Commodities | Still under Commission consideration |
| Disruptive Trading Practices Interp. Order | (ENF) |
| Conforming Rules – Revising Part 1 | Comment period still open |
| Product Definitions (Joint with SEC) | (OGC) |
| Testing and Supervision (DRT and algorithms) | (ENF) |
| Governance & Possible Limits – Core Principles Implementation – Final Rule | Still under Commission consideration |

FY 2013 President's Budget & Performance Plan

| Technology for SEFs | |
|---|---|
| **IT Category** | **IT Requirement**[11] |
| New Mission Authorities | Swaps Position & Transaction Standards/Data Loading |
| | Swaps Position & Transaction Surveillance |
| | Position Limit Monitoring |
| | CFTC.gov Online Participant Portal |
| | Electronic Forms (102, 40, etc.) |
| | Dodd-Frank Participant Registration (SEF, SDR, etc.) |
| | Enterprise Case Management (Market Surveillance & Enforcement) |
| | Order Message Standards and Loading |
| Current Mission Authorities | Large Trader Reporting, Trade Practice Compliance, Filings & Actions |
| | New Alerts and Alerts Using Intraday Data |
| | Data Standardization, Data Loading, Data Analysis - e.g., Order Data, Large Trader, Time & Sales |
| | Automate Secure File Transfer Sign-Up |
| | Reporting Usability Enhancements |
| | Swaps Transparency Reporting |

---

[11] The listing of technology requirements is not limited to registrants but support other activities Commission-wide.

**FY 2013 President's Budget & Performance Plan**

## Analysis of Designated Contract Markets

In FY 2013, the Commission will enforce rules and requirements that standardized OTC derivatives contracts be executed on regulated trading platforms. The new requirements are intended to facilitate a transparent, liquid, and competitive marketplace with trades occurring on regulated exchanges.

In implementing the new requirements, the CFTC will be required to:

- collect, assemble, analyze and report data;

- expand the Commission's position limit-setting authority beyond futures contracts to swaps that perform a significant price discovery function;

- examination of exchanges for compliance with new and modified core principles;

- establishment and execution of cross-exchange aggregate position limits; and

- a new contract and rule review process.

The Commission projects it will regulate 21 DCMs in FY 2013.

| Projected Designated Contract Markets (DCMs) |
|---|
| 1. Board of Trade of the City of Chicago, Inc. |
| 2. Cantor Futures Exchange, L.P. |
| 3. CBOE Futures Exchange, LLC |
| 4. Chicago Climate Futures Exchange, LLC |
| 5. Chicago Mercantile Exchange, Inc. |
| 6. Commodity Exchange, Inc. |
| 7. ELX Futures, L.P. |
| 8. Green Exchange, LLC |
| 9. ICE Futures US, Inc. (was NYBOT) |
| 10. Kansas City Board of Trade |
| 11. Minneapolis Grain Exchange, Inc. |
| 12. NASDAQ OMX Futures Exchange, Inc. (was PBOT) |
| 13. New York Mercantile Exchange, Inc. |
| 14. North American Derivatives Exchange, Inc. (was HedgeStreet, Inc.) |
| 15. NYSE Liffe US, LLC |
| 16. OneChicago LLC Futures Exchange |
| 17. The Trend Exchange, Inc. |
| 18. [Eris Exchange, LLC – currently has DCM application pending] |

**FY 2013 President's Budget & Performance Plan**

| Inventory and Status of New Rules Impacting Projected Registrants | |
|---|---|
| **Rules Under Development** | **Status** |
| Agricultural Swaps (ANPR) | Still under Commission consideration |
| Governance & Possible Limits - Section 726 | Still under Commission consideration |
| Agricultural Commodity Definitions | (OGC) |
| Position reports for physical commodity swaps | Still under Commission consideration |
| Anti-Manipulation | (ENF) |
| Disruptive Trading Practices (ANPR) | (ENF) |
| Rule Certification | Completed |
| Swap Data Recordkeeping and Reporting | Completed |
| Real Time Reporting | Still under Commission consideration |
| DCM Core Principles and other requirements | Still under Commission consideration |
| Position Limits for Exempt and Agricultural Commodities | Still under Commission consideration |
| Disruptive Trading Practices Interp. Order | (ENF) |
| Conforming Rules – Revising Part 1 | Comment period still open |
| Product Definitions (Joint with SEC) | (OGC) |
| Testing and Supervision (DRT and algorithms) | (ENF) |
| Governance & Possible Limits – Core Principles Implementation – Final Rule | Still under Commission consideration |

**FY 2013 President's Budget & Performance Plan**

| Technology for DCMs | |
|---|---|
| **IT Category** | **IT Requirement[12]** |
| New Mission Authorities | Swaps Position & Transaction Standards/Data Loading |
| | Swaps Position & Transaction Surveillance |
| | Position Limit Monitoring |
| | CFTC.gov Online Participant Portal |
| | Electronic Forms (102, 40, etc.) |
| | Dodd-Frank Participant Registration (SEF, SDR, etc.) |
| | Enterprise Case Management (Market Surveillance & Enforcement) |
| | Order Message Standards and Loading |
| Current Mission Authorities | Large Trader Reporting, Trade Practice Compliance, Filings & Actions |
| | New Alerts and Alerts Using Intraday Data |
| | Data Standardization, Data Loading, Data Analysis - e.g., Order Data, Large Trader, Time & Sales |
| | Automate Secure File Transfer Sign-Up |
| | Reporting Usability Enhancements |
| | Swaps Transparency Reporting |

---

[12] The listing of technology requirements is not limited to registrants but support other activities Commission-wide.

# APPENDIX 3

## Inspector General

In accordance with the Inspector General Act, as amended:

The following amounts were included in the FY 2013 President's Budget:

| FY 2012 | Total Budget[13] | Training Budget Estimate | FTE |
|---|---|---|---|
| | $1,134,000 | $5,000 | 5 |

| FY 2013 | Total Budget | Training Budget Estimate | FTE |
|---|---|---|---|
| | $1,379,000 | $5,000 | 6 |

[13] Total Budget includes estimated direct salary and benefit costs of six (6) FTE and a proportional share of all estimated indirect costs, such as, travel, training, lease of space, utilities, communications, printing, supplies, equipment and all other services; including an estimated contribution of $2,873 and $3,437 in FY 2011 and FY 2012 respectively to support the Council of the Inspectors General on Integrity and Efficiency.

# APPENDIX 4

## Overview of Planned Objectives by Strategic Goal

The Commission allocates budgetary resources by Strategic Goal in accordance with the Government Performance and Results Act (GPRA). The Dodd-Frank reforms passed on July 21, 2010 will require a thorough review of the Commission's Strategic Goals structure and an update of those Goals and or at the least the underlying outcomes objectives and business processes. Since that process is not yet complete this budget allocates resources under the structure of the Commission's current strategic plan, incorporating where appropriated, new responsibilities flowing from Dodd-Frank.

The CFTC FY 2011 – 2015 Strategic Plan was issued February 2011. The issuance of the CFTC Strategic Plan creates a unique situation in that the mission expanding the Dodd-Frank Act was passed in July 2010.

The goals of the CFTC largely remain the same with the regulation of swaps being incorporated within the regulatory structure currently applied to the futures and options markets. The CFTC's primary focus will be to write the rules to regulate the swaps markets, implement those rules, test and adjust those rules and write new rules as necessary to bring effective regulation to all derivatives markets over the next five years.

The Dodd-Frank Act will greatly increase the scope of regulation by the CFTC by bringing oversight to the swaps marketplace. The regulation of the swaps markets included in the Dodd-Frank Act builds upon:

- the Commission's strengths applicable to oversight of the futures markets;
- the benefits of clearing in the futures markets;
- the transparency and price discovery that centralized trading brings to the futures markets;
- the concept that intermediaries should be regulated to lower risk in the markets; and,
- the understanding that effective oversight can only be accomplished if the regulator has access to all relevant information about activity in the markets.

## Summary of Goals, Objectives, and Strategies

| Goal One: *Protect the public and market participants by ensuring market integrity, promoting transparency, competition and fairness and lowering risk in the system.* | |
|---|---|
| **Objective** | **Strategy** |
| **1.1 Ensure that markets are structured to reflect the forces of supply and demand for the underlying commodity and are free from manipulation, disruptive activity and abusive trading practices.** | 1. Develop automated surveillance systems to monitor market conditions and trader activity, and develop an alert and case management system to identify and track potential trading violations.<br>2. Review and update the content requirements of currently used trader reporting forms and identify potential new reporting forms or methods.<br>3. Increase efficiency and reduce errors through the adoption of electronic filing of CFTC reporting forms.<br>4. Review all contracts that have significant market impact for compliance with Core Principles in a timely manner.<br>5. Timely review of new rules and rule changes for compliance with Core Principles.<br>6. Ensure that new exchanges adopt rules that comply with Core Principles. |

**FY 2013 President's Budget & Performance Plan**

| | |
|---|---|
| **1.2 Ensure that U.S. DCMs and SEFs have the systems, procedures and resources necessary for effective self-regulation and ongoing compliance with Core Principles.** | 1. Conduct examinations of individual DCMs and SEFs to ensure the structural sufficiency of their self-regulatory and Core Principle compliance programs.<br>2. Conduct regular reviews of DCMs' and SEFs' automated systems and business continuity and disaster recovery programs for compliance with Core Principles related to market continuity. |
| **1.3 Promote transparency by producing and publishing summary market statistics for the futures, options and swaps markets.** | 1. Develop and publish swaps market reports. |

| **Goal Two:** *Protect the public and market participants by ensuring the financial integrity of derivatives transactions, mitigation of systemic risk, and the fitness and soundness of intermediaries and other registrants.* | |
|---|---|
| **Objective** | **Strategy** |
| **2.1 Clearing organizations and firms participating in the derivatives industry are financially sound.** | 1. Monitor, review and assess DCOs' compliance with Core Principles.<br>2. Review and assess designated contract markets' applications for compliance with the financial integrity provisions of the CEA.<br>3. Review and analyze monthly and annual filings and conduct risk-based direct examination of FCMs' and RFEDs' compliance with financial requirements.<br>4. Review swaps submitted to the Commission for a determination regarding whether such swaps are required to be cleared.<br>5. Review new rules and rule amendments submitted by DCOs.<br>6. Review and analyze financial risks on large trader and clearing member positions and determine whether they are being appropriately managed by traders, firms and DCOs. |
| **2.2 Registered intermediaries meet standards for fitness and conduct.** | 1. Review Swap Dealers and Major Swap Participants to ensure that they comply with the CEA and Commission regulations.<br>2. Review RFAs to ensure they fulfill their statutory and delegated responsibilities.<br>3. Conduct risk-based examination of intermediaries not holding customer funds to ensure they are in compliance with Commission requirements. |
| **2.3 Ensure that self-regulatory organizations fulfill their financial surveillance responsibilities.** | 1. Conduct oversight of the financial surveillance programs of SROs. |
| **2.4 Ensure that information technology systems support the Commission's existing and expanded responsibilities to ensure financially sound markets, mitigate systemic** | 1. Deliver technology infrastructure, systems, and services that support the financial integrity of derivatives transactions, the mitigation of systemic risk, and the fitness and soundness of intermediaries. |

**FY 2013 President's Budget & Performance Plan**

| | |
|---|---|
| **risk, and monitor intermediaries.** | |

| Goal Three: *Protect the public and market participants through a robust enforcement program.* | |
|---|---|
| **Objective** | **Strategy** |
| **3.1 Identify and stop violations of the Commodity Exchange Act and Regulations; deter others from engaging in future misconduct.** | 1.  Investigate and prosecute potential violations of the Commodity Exchange Act and Commission Regulations. |
| **3.2 Increase cooperative enforcement.** | 1.  Leverage resources through active cooperative enforcement with domestic entities. |

| Goal Four: *Enhance integrity of U.S. markets by engaging in cross-border cooperation, promoting strong international regulatory standards, and encouraging ongoing convergence of laws and regulation worldwide.* | |
|---|---|
| **Objective** | **Strategy** |
| **4.1 Cooperate and coordinate with domestic and foreign regulatory authorities.** | 1.  Develop arrangements for expeditious cooperation with foreign governments. |
| **4.2 Promote high levels of internationally accepted standards of best practice.** | 1.  Promote high-quality principles internationally. |
| **4.3 Provide Global Technical Assistance.** | 1.  Provide technical assistance to foreign regulators. |

| Goal Five: *Promote Commission excellence through executive direction and leadership, organizational and individual performance management, and effective management of resources.* | |
|---|---|
| **Objective** | **Strategy** |
| **5.1 An organizational structure that is aligned and streamlined to operate and carry out its mission efficiently and effectively.** | 1.  Ensure organizational structure best reflects the needs of the CFTC. |

**FY 2013 President's Budget & Performance Plan**

| | | |
|---|---|---|
| **5.2** | **Effectively respond to a the regulatory needs of a dynamic and complex derivatives market place and efficiently allocate limited resources to the highest priority activities.** | 1. Develop and implement a set of integrated Strategic, Budget and Operating Plan processes. |
| **5.3** | **Attract, engage, develop and retain an exceptionally qualified, diverse, and productive workforce.** | 1. Assess, develop and implement automated hiring system.<br>2. Develop, implement, execute and sustain a workplace that is top in its class.<br>3. Develop, implement and execute a robust learning program. |
| **5.4** | **Information Technology (IT) supports and enhances mission accomplishment through effective and efficient infrastructure, systems and services.** | 1. Ensure the highest practical return on both business and IT investments.<br>2. Facilitate the usefulness and usage of information, increasing its availability, ensuring quality and reducing staff time necessary to analyze relevant data.<br>3. Automate key business processes. |
| **5.5** | **Ensure effective stewardship and management of CFTC financial resources.** | 1. Reengineer budget process accounting codes (BPAC).<br>2. Improve budget formulation and audit processes.<br>3. Implement web-based time and attendance system. |

**FY 2013 President's Budget & Performance Plan**

## FY 2013 Planned Objectives by Strategic Goal

**Goal One:** Protect the Public and Market Participants by Ensuring Market Integrity; Promoting Transparency; Competition and Fairness; and Lowering Risk in the System.

Derivatives markets are designed to provide a means for market users to offset price risks inherent in their businesses and to act as a public price discovery platform from which prices are broadly disseminated for public use. For derivatives markets to fulfill their role in the national and global economy, they must operate efficiently and fairly, and serve the needs of market users. The markets best fulfill this role when they are open, competitive and free from fraud, manipulation and other abuses such that the prices discovered on the markets reflect the forces of supply and demand.

The Commission strives to assure that Goal One is effectively met through the combined use of four oversight strategies: 1) the review of new contracts and rules and changes to contracts and rules; 2) continual surveillance of trading activity in the futures and swaps markets; 3) the review of regulated exchanges, DCMs and SEFs, to ensure that they are fulfilling their self-regulatory obligations; and, 4) the adoption of policies and strategies to promote market transparency.

### Summary of Goal One Performance Indicators

| Goal One: Protect the public and market participants by ensuring market integrity; promoting transparency; competition; and fairness; and lowering risk in the system. | | |
|---|---|---|
| **Outcome 1.1:** Ensure the markets are structured to reflect the forces of supply and demand for the underlying commodity and are free from manipulation, disruptive activity, and abusive trading practices. | | |
| **Strategy 1.1.1:** Develop automated surveillance systems to monitor market conditions and trader activity, and develop an alert and case management system to identify and track potential trading violations. | | |
| **Performance Measure 1.1.1.1:** Implement automated position limit alerts for futures, option, and swaps markets. | **Plan** | **Actual** |
| **FY 2011** Implement automated position limit monitoring for all additional commodities under CFTC position limits for futures and options traded on DCMs. | 100% | N/A |
| **FY 2012** Implement automated position limit monitoring for all commodities under CFTC position limits for the swaps market using large trader reporting data. | 100% | |
| **FY 2013** N/A | N/A | |
| **Performance Measure 1.1.1.2:** Implement automated surveillance alerts and a case management system. | **Plan** | **Actual** |
| **FY 2011** Implement four automated market alerts. | 100% | 70% |
| **FY 2012** Implement automated market profile alerts. Integrate swaps market data into two automated market alerts. | 100% | |
| **FY 2013** Implement automated market profile alerts for swaps markets | 100% | |
| **Performance Measure 1.1.1.3:** Implement automated trading violation alerts and a case management system. | **Plan** | **Actual** |
| **FY 2011** Implement five automated trade violation alerts. | 100% | 20% |
| **FY 2012** Implement five automated trade violation alerts. | 100% | |
| **FY 2013** Implement four automated trade violation alerts. | 100% | |
| **Strategy 1.1.2:** Review and update the content requirements of currently used trader reporting forms and identify potential new reporting forms or methods. | | |
| **Performance Measure 1.1.2.1:** Review information requirements of current and proposed forms. | **Plan** | **Actual** |
| **FY 2011** Conduct internal review and update current reporting forms. Collaborate with industry committee to develop recommendations for ownership and control information related to exchange-traded futures and options. | 100% | 50% |

**FY 2013 President's Budget & Performance Plan**

| | | | |
|---|---|---|---|
| **FY 2012** | Implement ownership and control reporting standards for futures and option markets. Implement reportable trader standards for swaps traders. | **100%** | |
| **FY 2013** | N/A | **N/A** | |

| **Strategy 1.1.3:** Increase efficiency and reduce errors through the adoption of electronic filing of CFTC reporting forms. | | | |
|---|---|---|---|
| **Performance Measure 1.1.3.1:** Transmit information and consult with the Office of Information Technology Services (OITS) to implement electronic filing of forms. | | **Plan** | **Actual** |
| **FY 2011** | Transmit information requirements to OITS for revised trader reporting forms. | **100%** | **50%** |
| **FY 2012** | Fully deploy electronic filing of trader reporting forms. | **100%** | |
| **FY 2013** | Fully deploy information systems for ownership and control reporting. Fully deploy information systems for reportable trader standards for swap traders. | **100%** | |

| **Strategy 1.1.4:** Review all contracts that have significant market impact for compliance with core principles in a timely manner. | | | |
|---|---|---|---|
| **Performance Measure 1.1.4.1:** Percentage of contracts that are reviewed, in a timely manner, following a finding of market significance, and determined to be in compliance with core principles or referred back to exchange for modification. | | **Plan** | **Actual** |
| **FY 2011** | | **100%** | **2%** |
| **FY 2012** | | **100%** | |
| **FY 2013** | | **100%** | |

| **Strategy 1.1.5:** Timely review of new rules and rule changes for compliance with core principles. | | | |
|---|---|---|---|
| **Performance Measure 1.1.5.1:** Rule submissions are reviewed and a determination is made regarding compliance with the CEA, or referred back to the exchange for correction, as amended by the Dodd-Frank Act and Commission regulations within the required 10-day or 90-day time period. | | **Plan** | **Actual** |
| **FY 2011** | | **100%** | **77%** |
| **FY 2012** | | **100%** | |
| **FY 2013** | | **100%** | |

| **Strategy 1.1.6:** Ensure that new exchanges adopt rules that comply with core principles. | | | |
|---|---|---|---|
| **Performance Measure 1.1.6.1:** DCM and SEF applications are reviewed and a determination is made regarding compliance with core principles within statutory time frames. | | **Plan** | **Actual** |
| **FY 2011** | | **100%** | **100%** |
| **FY 2012** | | **100%** | |
| **FY 2013** | | **100%** | |

| **Outcome 1.2:** Ensure that U.S. DCMs and SEFs have the systems, procedures, and resources necessary for effective self-regulation and ongoing compliance with core principles. | | | |
|---|---|---|---|
| **Strategy 1.2.1:** Conduct examinations of individual DCMs and SEFs to ensure the structural sufficiency of their self-regulatory and core principles compliance programs. | | | |
| **Performance Measure 1.2.1.1:** Percentage of major DCMs and SEFs reviewed, during the year. | | **Plan** | **Actual** |
| **FY 2011** | | **100%** | **40%** |
| **FY 2012** | | **100%** | |
| **FY 2013** | | **100%** | |
| **Performance Measure 1.2.1.2:** Percentage of non-major DCMs and SEFs reviewed, during the year. | | **Plan** | **Actual** |
| **FY 2011** | | **100%** | **20%** |
| **FY 2012** | | **100%** | |
| **FY 2013** | | **100%** | |

| **Strategy 1.2.2:** Conduct regular reviews of DCMs' and SEFs' automated systems and business continuity and | | | |
|---|---|---|---|

**FY 2013 President's Budget & Performance Plan**

| disaster recovery programs for compliance with core principles related to market continuity. | | | |
|---|---|---|---|
| **Performance Measure 1.2.2.1:** Percentage of major DCMs and SEFs reviewed, during the year. | | **Plan** | **Actual** |
| **FY 2011** | | **100%** | **80%** |
| **FY 2012** | | **100%** | |
| **FY 2013** | | **100%** | |
| **Performance Measure 1.2.2.2:** Percentage of non-major DCMs and SEFs reviewed, during the year. | | **Plan** | **Actual** |
| **FY 2011** | | **33%** | **0%** |
| **FY 2012** | | **33%** | |
| **FY 2013** | | **33%** | |

| **Outcome 1.3: Ensure that U.S. DCMs and SEFs have the systems, procedures, and resources necessary for effective self-regulation and ongoing compliance with core principles.** | | | |
|---|---|---|---|
| **Strategy 1.3.1:** Develop and publish swaps market reports. | | | |
| **Performance Measure 1.3.1.1:** Publish reports for swaps markets activity. | | **Plan** | **Actual** |
| **FY 2011** | N/A | **N/A** | **N/A**[14] |
| **FY 2012** | Develop and test aggregation methods to group interest rate swap products. | **100%** | |
| **FY 2013** | Develop and test aggregation methods to group all commodity swap products under CFTC position limits. Publish swaps market report for interest rate swap products. Publish Dodd-Frank Act required semiannual and annual swaps reports for all interest rate swap products. | **100%** | |

---

[14] N/A = Not applicable. Performance data not available until applicable regulations are effective.

**FY 2013 President's Budget & Performance Plan**

Breakout of Goal One Request by Objective

| | FY 2012 | | FY 2013 | | Change | |
|---|---|---|---|---|---|---|
| | $ (000) | FTE | $ (000) | FTE | $ (000) | FTE |

***GOAL ONE: Protect the public and market participants by ensuring market integrity; promoting transparency; competition and fairness; and lowering risk in the system.***

**Outcomes**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1.1 Ensure the markets are structured to reflect the forces of supply and demand for the underlying commodity and are free from manipulation, disruptive activity, and abusive trading practices. | $36,791 | 119 | $66,476 | 217 | $29,685 | 98 |
| 1.2 Ensure that U.S. DCMs and SEFs have the systems, procedures, and resources necessary for effective self-regulation and ongoing compliance with core principles. | 11,575 | 49 | 11,232 | 48 | -343 | -1 |
| 1.3 Promote transparency by producing and publishing summary market statistics for the futures, options, and swaps markets. | 6,022 | 17 | 10,964 | 29 | 4,942 | 12 |
| **Total Goal One** | **$54,388** | **185** | **$88,672** | **294** | **$34,284** | **109** |

Table 14: Breakout of Goal One by Objective



Figure 10: Breakout of Goal One Request by Objective

**FY 2013 President's Budget & Performance Plan**

## Breakout of Goal One Request by Program Activity

| | FY 2012 $ (000) | FTE | FY 2013 $ (000) | FTE | Change $ (000) | FTE |
|---|---|---|---|---|---|---|
| Agency Direction | $1,636 | 7 | $1,636 | 7 | $0 | 0 |
| Administrative Mgmt. & Support | 3,470 | 16 | 5,094 | 23 | 1,624 | 7 |
| Chief Economist | 778 | 3 | 1,882 | 7 | 1,104 | 4 |
| Clearing & Risk | 0 | 0 | 0 | 0 | 0 | 0 |
| Data & Technology | 16,470 | 22 | 27,001 | 34 | 10,531 | 12 |
| Enforcement | 0 | 0 | 0 | 0 | 0 | 0 |
| General Counsel | 2,995 | 13 | 3,636 | 16 | 641 | 3 |
| International Affairs | 0 | 0 | 0 | 0 | 0 | 0 |
| Inspector General | 227 | 1 | 276 | 1 | 49 | 0 |
| Market Oversight | 28,812 | 123 | 49,147 | 206 | 20,335 | 83 |
| Swap Dealer & Intermediary Oversight | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL:** | **$54,388** | **185** | **$88,672** | **294** | **$34,284** | **109** |

Table 15: Breakout of Goal One Request by Program Activity



Figure 11: Breakout of Goal One Request by Program Activity

Goal Two: Protect the public and market participants by ensuring the financial integrity of derivatives transactions, mitigation of systemic risk, and the fitness and soundness of intermediaries and other registrants.

In fostering financially sound markets, the Commission's main priorities are to avoid disruptions to the system for clearing and settling contract obligations and to protect the funds that customers entrust to FCMs. Clearing organizations and FCMs are integral to the financial integrity of derivatives transactions – together, they protect against the financial difficulties of one trader becoming a systemic problem.  Several aspects of the regulatory framework that contribute to the Commission achieving Goal Two are: 1) requiring that market participants post margin to secure their ability to fulfill financial obligations; 2) requiring participants on the losing side of trades to meet their obligations, in cash, through daily (sometimes intraday) margin calls; 3) requiring FCMs to maintain minimum levels of operating capital; and, 4) requiring FCMs to segregate customer funds from their own funds.

The Commission works with the exchanges and the NFA to closely monitor the financial condition of the FCMs themselves, who must provide the Commission, exchanges and NFA with various monthly and annual financial reports. The exchanges and NFA conduct routine, periodic audits and daily financial surveillance of their respective member FCMs. As a regulator, the Commission reviews the audit and financial surveillance programs of the exchanges and NFA and also monitors the financial condition of FCMs directly, as appropriate. This includes reviewing each FCM's exposure to risk from large customer positions that it carries. The Commission also conducts extensive daily surveillance of risks posed by traders, firms and DCOs and periodically reviews clearing organization procedures for monitoring risks and protecting customer funds.

The Commission works with the NFA to ensure that those seeking registration as intermediaries meet high qualification and fitness standards through the registration process. The Commission also drafts and interprets rules that apply to the conduct of business by these intermediaries.

With the implementation of the Dodd-Frank Act, the Commission has substantially greater responsibilities, including oversight of newly registered derivatives dealers, as well as implementation of enhanced compliance requirements for intermediaries and new core principle requirements for DCOs. The Commission also will be responsible for determining the initial eligibility or the continuing qualification of a DCO to clear swaps, as well as for the review of swaps submitted to the Commission for a determination as to whether the swaps are required to be cleared. The Commission also will be implementing new statutory provisions regarding review of new rules and rule amendments submitted by DCOs. In addition, the scope of the Commission's reviews of DCOs, designated self-regulatory organizations, and intermediaries will be expanded to include swap transactions and swap intermediaries.

Summary of Goal Two Performance Indicators

| Objective 2.1:  Clearing organizations and firms participating in the derivatives industry are financially sound. | | | |
|---|---|---|---|
| **Strategy 2.1.1:** Monitor, review, and assess DCOs' compliance with core principles | | | |
| **Performance Measure 2.1.1.1:**  Review systemically important DCOs annually. Percentage of systemically important DCOs reviewed. | | **Plan** | **Actual** |
| **FY 2011** | | 75% | 75% |
| **FY 2012** | | 100% | |
| **FY 2013** | | 100% | |
| **Performance Measure 2.1.1.2:**  On a risk-based basis, review all other DCOs annually to address compliance with DCO core principles and Commission requirements. | | **Plan** | **Actual** |
| **FY 2011** | | 100% | 44% |
| **FY 2012** | | 100% | |

**FY 2013 President's Budget & Performance Plan**

| FY 2013 | | 100% | |
|---|---|---|---|
| **Performance Measure 2.1.1.3:** Percentage of requests for Commission orders that are completed following review under the applicable provisions of the CEA. | | **Plan** | **Actual** |
| FY 2011 | | 90% | 0% |
| FY 2012 | | 92% | |
| FY 2013 | | 94% | |

| **Strategy 2.1.2:** Review and assess DCMs' applications for compliance with the financial integrity provisions of the CEA. | | | |
|---|---|---|---|
| **Performance Measure 2.1.2.1:** Applications are reviewed and a determination made regarding compliance with financial integrity provisions of the CEA within statutory time frames. Percent in compliance with financial integrity provisions. | | **Plan** | **Actual** |
| FY 2011 | | 100% | 100% |
| FY 2012 | | 100% | |
| FY 2013 | | 100% | |

| **Strategy 2.1.3:** Review and analyze monthly and annual filings and conduct risk-based direct examinations of the FCMs' and RFEDs' compliance with financial requirements. | | | |
|---|---|---|---|
| **Performance Measure 2.1.3.1:** All material exceptions in monthly and annual financial filings by FCMs and RFEDs and notices of noncompliance with respect to minimum capital and segregation are reviewed and assessed within one business day. Percent completed within one business day. | | **Plan** | **Actual** |
| FY 2011 | | 100% | 100% |
| FY 2012 | | 100% | |
| FY 2013 | | 100% | |
| **Performance Measure 2.1.3.2:** On a risk-based basis, conduct direct examinations of FCMs and RFEDs, identify deficiencies, and confirm that all deficiencies identified are corrected within the specified period of time. Percent corrected within specified time period. | | **Plan** | **Actual** |
| FY 2011 | | 90% | 100% |
| FY 2012 | | 92% | |
| FY 2013 | | 94% | |

| **Strategy 2.1.4:** Review swaps submitted to the Commission for a determination regarding whether such swaps are required to be cleared. | | | |
|---|---|---|---|
| **Performance Measure 2.1.4.1:** Reviews of swaps submitted to the Commission are completed within statutory and regulatory deadlines. | | **Plan** | **Actual** |
| FY 2011 | | 100% | N/A[15] |
| FY 2012 | | 100% | |
| FY 2013 | | 100% | |

| **Strategy 2.1.5:** Review new rules and rule amendments submitted by DCOs. | | | |
|---|---|---|---|
| **Performance Measure 2.1.5.1:** Reviews of DCO rules submitted to the Commission are completed within statutory and regulatory deadlines. | | **Plan** | **Actual** |
| FY 2011 | | 100% | 100% |
| FY 2012 | | 100% | |
| FY 2013 | | 100% | |

| **Strategy 2.1.6:** Review and analyze financial risks on large trader and clearing member positions and determine whether they are being appropriately managed by traders, firms, and DCOs. | | | |
|---|---|---|---|
| **Performance Measure 2.1.6.1:** Perform risk analysis and stress testing on large trader and clearing member positions to ascertain those with significant risk and confirm that such risks are being appropriately managed. Number of positions analyzed. | | **Plan** | **Actual** |
| FY 2011 | | 500,000 | 500,000 |
| FY 2012 | | 550,000 | |
| FY 2013 | | 600,000 | |

---

[15] N/A = Not applicable. Performance data not available until applicable regulations are effective.

| Performance Measure 2.1.6.2: On a risk-based basis, meet with large traders, FCMs, swap dealers, and other industry participants to discuss risk management issues. Number of entities met with and risk issues reviewed. | Plan | Actual |
|---|---|---|
| FY 2011 | 110 | 110 |
| FY 2012 | 122 | |
| FY 2013 | 132 | |

| Objective 2.2: Registered intermediaries meet standards for fitness and conduct. | | |
|---|---|---|

| Strategy 2.2.1: Review swap dealers and major swap participants to ensure that they comply with the CEA and Commission regulations. | | |
|---|---|---|

| Performance Measure 2.2.1.1: Conduct direct examinations of swap dealers and major swap participants identify deficiencies, and confirm that all deficiencies identified are corrected within specified period of time. | Plan | Actual |
|---|---|---|
| FY 2011 | 100% | N/A[14] |
| FY 2012 | 100% | |
| FY 2013 | 100% | |

| Strategy 2.2.2: Review registered futures associates to ensure they fulfill their statutory and delegated responsibilities. | | |
|---|---|---|

| Performance Measure 2.2.2.1: Under a risk-based approach, conduct reviews of selected programs of all RFAs to assess fulfillment of statutory and delegated responsibilities and confirm that any deficiencies identified are corrected within the specified period of time. Percent of deficiencies corrected within specified time period. | Plan | Actual |
|---|---|---|
| FY 2011 | 90% | 0% |
| FY 2012 | 92% | |
| FY 2013 | 94% | |

| Performance Measure 2.2.2.2: Percentage of RFA rules submitted for which determinations are made within statutory time frames. | Plan | Actual |
|---|---|---|
| FY 2011 | 90% | 100% |
| FY 2012 | 92% | |
| FY 2013 | 94% | |

| Strategy 2.2.3: Conduct risk-based examinations of intermediaries not holding customer funds to ensure they are in compliance with Commission requirements. | | |
|---|---|---|

| Performance Measure 2.2.3.1: On a risk-based basis, conduct direct examinations of non-FCM intermediaries, identify deficiencies, and confirm that any deficiencies identified are corrected within the specified period of time. Percent of time that deficiencies are corrected within specified time period. | Plan | Actual |
|---|---|---|
| FY 2011 | 90% | 0% |
| FY 2012 | 92% | |
| FY 2013 | 94% | |

| Objective 2.3: Ensure self-regulatory organizations fulfill their financial surveillance responsibilities. | | |
|---|---|---|

| Strategy 2.3.1: Conduct oversight of the financial surveillance programs of SROs. | | |
|---|---|---|

| Performance Measure 2.3.1.1: On a risk-based basis, review all SROs annually to assess compliance with CEA and Commission requirements, identify deficiencies and confirm that any deficiencies identified are corrected within the specified period of time. Percent of time in which deficiencies are corrected within specified time period. | Plan | Actual |
|---|---|---|
| FY 2011 | 90% | 80% |
| FY 2012 | 92% | |
| FY 2013 | 94% | |

| Performance Measure 2.3.1.2: Percentage of direct examinations of registered intermediaries that confirm proper execution of SRO programs. | Plan | Actual |
|---|---|---|
| FY 2011 | 90% | 100% |

**FY 2013 President's Budget & Performance Plan**

| FY 2012 | | 92% |
|---|---|---|
| FY 2013 | | 94% |

**Objective 2.4: Ensure that information technology systems support the Commission's existing and expanded responsibilities to ensure financially sound markets, mitigate systemic risk, and monitor intermediaries.**

**Strategy 2.4.1:** Deliver technology infrastructure, systems, and services that support the financial integrity of derivatives transactions, the mitigation of systemic risk, and the fitness and soundness of intermediaries.

| **Performance Measure 2.4.1.1:** Program redesign to cover new registrants monitored by the RSR and SPARK systems. Percentage of system redesign accomplished. | | **Plan** | **Actual** |
|---|---|---|---|
| FY 2011 | | 80% | 80% |
| FY 2012 | | 90% | |
| FY 2013 | | 95% | |
| **Performance Measure 2.4.1.2:** Program design to cover new data collection requirements to monitor systemic risk posed by CPOs and CTAs advising private funds, and new registration of swap dealers. Percentage of system redesign accomplished. | | **Plan** | **Actual** |
| FY 2011 | | 80% | N/A[16] |
| FY 2012 | | 90% | |
| FY 2013 | | 95% | |

---

[16] N/A = Not applicable. Performance data not available until applicable regulations are effective.

**FY 2013 President's Budget & Performance Plan**

## Breakout of Goal Two Request by Objective

| | FY 2012 $ (000) | FTE | FY 2013 $ (000) | FTE | Change $ (000) | FTE |
|---|---|---|---|---|---|---|
| *GOAL TWO: Protect the public and market participants by ensuring the financial integrity of derivatives transactions, mitigation of systemic risk, and the fitness and soundness of intermediaries and other registrants.* | | | | | | |
| **Outcomes** | | | | | | |
| 2.1 Clearing organizations and firms participating in the derivatives industry are financially sound. | $20,809 | 92 | $36,689 | 156 | $15,880 | 64 |
| 2.2 Registered intermediaries meet standards for fitness and conduct. | 9,224 | 41 | 19,097 | 82 | 9,873 | 41 |
| 2.3 Ensure self-regulatory organizations fulfill their financial surveillance responsibilities. | 6,119 | 27 | 7,309 | 31 | 1,190 | 4 |
| 2.4 Ensure that information technology systems support the Commission's existing and expanded responsibilities to ensure financially sound markets, mitigate systemic risk, and monitor intermediaries. | 6,026 | 17 | 9,739 | 22 | 3,713 | 5 |
| **Total Goal Two** | **$42,178** | **177** | **$72,834** | **291** | **$30,656** | **114** |

Table 16: Breakout of Goal Two by Objective



Figure 12: Breakout of Goal Two Request by Objective

**FY 2013 President's Budget & Performance Plan**

## Breakout of Goal Two Request by Program Activity

| | FY 2012 | | FY 2013 | | Change | |
|---|---|---|---|---|---|---|
| | $ (000) | FTE | $ (000) | FTE | $ (000) | FTE |
| Agency Direction | $1,631 | 7 | $1,638 | 7 | $7 | 0 |
| Administrative Mgmt. & Support | 2,936 | 13 | 2,264 | 10 | -672 | -3 |
| Chief Economist | 778 | 4 | 2,259 | 9 | 1,481 | 5 |
| Clearing & Risk | 12,470 | 55 | 24,008 | 102 | 11,538 | 47 |
| Data & Technology | 3,107 | 4 | 6,542 | 8 | 3,435 | 4 |
| Enforcement | 0 | 0 | 0 | 0 | 0 | 0 |
| General Counsel | 4,741 | 21 | 7,272 | 32 | 2,531 | 11 |
| International Affairs | 0 | 0 | 0 | 0 | 0 | 0 |
| Inspector General | 227 | 1 | 276 | 1 | 49 | 0 |
| Market Oversight | 0 | 0 | 0 | 0 | 0 | 0 |
| Swap Dealer & Intermediary Oversight | 16,288 | 72 | 28,575 | 122 | 12,287 | 50 |
| **TOTAL:** | **$42,178** | **177** | **$72,834** | **291** | **$30,656** | **114** |

Table 17: Breakout of Goal Two Request by Program Activity



Figure 13: Breakout of Goal Two Request by Program Activity

Goal Three: Protect the public and market participants through a robust enforcement program.

An increasing segment of the population has money invested in the derivatives markets, either directly or indirectly through pension funds or ownership of shares in publicly held companies that participate in the markets. Commission staff works to protect market users and the public by promoting compliance with and deterring violations of the CEA and Commission regulations. The range of available enforcement actions (including manipulation, disruptive trading practices and anti-fraud for example) will broaden beginning July 2011 when relevant provisions of the Dodd-Frank Act become effective. By providing a formalized structure and government oversight, the commodity laws carefully balance the desire for open, accessible and competitive markets with the need to protect market users.

This third strategic goal is to ensure that firms and individuals who come to the marketplace to fulfill their business and trading needs are in compliance with laws and regulations. In addition, market users and others must be protected from possible wrongdoing that may affect or tend to affect the integrity of the markets. The derivatives markets provide a great benefit to the U.S. economy; preserving the integrity of the markets ensures their continued vibrancy and promotes public confidence. Continuing IT investment in the eLaw program will support all Goal Three objectives by improving staff productivity, providing staff with a level IT playing field with those it investigates and effective tools to collaborate internally with oversight and clearing staff as well as with other regulators, and facilitating the use of information to identify high impact enforcement actions.

## Summary of Goal Three Performance Indicators

| Objective 3.1: Identify and stop violations of the CEA and Commission regulations; deter others from engaging in future misconduct. | | |
|---|---|---|
| **Strategy 3.1.1:** Investigate and prosecute potential violations of the CEA and Commission regulations. | | |
| **Performance Measure 3.1.1.1:** Percentage of enforcement investigations concluded within one year of opening. | **Plan** | **Actual** |
| **FY 2011** | **65%** | **81%** |
| **FY 2012** | **70%** | |
| **FY 2013** | **75%** | |
| **Performance Measure 3.1.1.2:** The CFTC will bring claims in due recognition of the broadened enforcement mandate provided by the Dodd Frank Act, and will seek proportionate remedies, including civil monetary penalties, undertakings and restitution, that have the highest impact on and greatest deterrent effect against potential future violations. | **Plan** | **Actual** |
| **FY 2011** | **N/A** | **N/A**[17] |
| **FY 2012** | **N/A** | |
| **FY 2013** | **N/A** | |

| Objective 3.2: Increase cooperative enforcement. | | |
|---|---|---|
| **Strategy 3.2.1: Leverage resources through active cooperative enforcement with domestic entities.** | | |
| **Performance Measure 3.2.1.1:** Percentage of CFTC case filings that include referrals to domestic civil and criminal cooperative authorities. | **Plan** | **Actual** |
| **FY 2011** | **60%** | **62%** |
| **FY 2012** | **65%** | |
| **FY 2013** | **70%** | |

[17] N/A = Not applicable. Performance data not available until applicable regulations are effective.

**FY 2013 President's Budget & Performance Plan**

Breakout of Goal Three Request by Objective

| | FY 2012 $ (000) | FTE | FY 2013 $ (000) | FTE | Change $ (000) | FTE |
|---|---|---|---|---|---|---|
| ***GOAL THREE: Protect the public and market participants through a robust enforcement program.*** | | | | | | |
| **Outcomes** | | | | | | |
| 3.1 Identify and stop violations of the CEA and Commission regulations; deter others from engaging in future misconduct. | $46,529 | 192 | $62,525 | 243 | $15,996 | 51 |
| 3.2 Increase cooperative enforcement. | 5,726 | 23 | 6,108 | 24 | 382 | 1 |
| **Total Goal Three** | **$52,255** | **215** | **$68,633** | **267** | **$16,378** | **52** |

Table 18: Breakout of Goal Three by Objective



Figure 14: Breakout of Goal Three Request by Objective

## Breakout of Goal Three Request by Program Activity

| | FY 2012 | | FY 2013 | | Change | |
|---|---|---|---|---|---|---|
| | $ (000) | FTE | $ (000) | FTE | $ (000) | FTE |
| Agency Direction | $1,639 | 7 | $1,633 | 7 | -$6 | 0 |
| Administrative Mgmt. & Support | 2,669 | 12 | 2,264 | 10 | -405 | -2 |
| Chief Economist | 1,815 | 8 | 3,012 | 12 | 1,197 | 4 |
| Clearing & Risk | 0 | 0 | 0 | 0 | 0 | 0 |
| Data & Technology | 4,380 | 6 | 5,901 | 7 | 1,521 | 1 |
| Enforcement | 37,283 | 162 | 51,002 | 210 | 13,719 | 48 |
| General Counsel | 4,242 | 19 | 4,545 | 20 | 303 | 1 |
| International Affairs | 0 | 0 | 0 | 0 | 0 | 0 |
| Inspector General | 227 | 1 | 276 | 1 | 49 | 0 |
| Market Oversight | 0 | 0 | 0 | 0 | 0 | 0 |
| Swap Dealer & Intermediary Oversight | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL:** | **$52,255** | **215** | **$68,633** | **267** | **$16,378** | **52** |

Table 19: Breakout of Goal Three by Program Activity



Figure 15: Breakout of Goal Three Request by Program Activity

**FY 2013 President's Budget & Performance Plan**

Goal Four: Enhance integrity of U.S. markets by engaging in cross–border cooperation, promoting strong international regulatory standards, and encouraging ongoing convergence of laws and regulation worldwide.

The Commission recognizes that markets are global as the result of electronic access, linkages, mergers, and cooperative business arrangements. The CFTC historically has supported programs that facilitate cross-border access to markets and products, such as our recognition program for intermediaries and our registration category for foreign boards of trade. Both of these programs are based on recognition of foreign home country regulators that comparably and comprehensively provide oversight, allowing the CFTC to rely on this foreign regulation. These programs reflect our understanding that no one regulator alone will have all of the information or authority to supervise global business.

Effective regulation requires international coordination and necessitates that the Commission cooperate with foreign market authorities to supervise U.S. markets and protect U.S. customers. Additionally, the Commission works closely with relevant international organizations to promote high-quality derivatives regulation worldwide and convergence where possible. The CFTC also provides technical assistance to emerging and recently-emerged markets to help these jurisdictions in establishing and implementing laws and regulations that foster global market integrity.

The Dodd-Frank Act increases the need for international outreach. Section 752 of the DFA states that the Commission "shall consult and coordinate" with foreign authorities to establish "consistent international standards" regarding regulation of swaps. Many of the new entities subject to regulation under the Dodd-Frank Act are located abroad and the Commission will closely coordinate with foreign regulators in order to supervise these global entities.

Summary of Goal Four Performance Indicators

| Objective 4.1: Cooperate and coordinate with domestic and foreign regulatory authorities. | | |
|---|---|---|
| Strategy 4.1.1: Develop arrangements for expeditious cooperation with foreign governments. | | |
| Performance Measure 4.1.1.1: Days allotted for acknowledgment of incoming requests for enforcement assistance from our international counterparts pursuant to our information sharing arrangements. | Plan | Est. Actual |
| FY 2011 | 5 Days | 1 Day |
| FY 2012 | 4 Days | |
| FY 2013 | 3 Days | |
| Performance Measure 4.1.1.2: Regular issuance of outgoing international requests for enforcement assistance and referrals made by the CFTC to foreign regulators pertaining to matters involving their jurisdictions. | Plan | Est. Actual |
| FY 2011 | N/A | N/A[18] |
| FY 2012 | N/A | |
| FY 2013 | N/A | |

| Objective 4.2: Promote high levels of internationally accepted standards of best practice. | | |
|---|---|---|
| Strategy 4.2.1: Promote high-quality principles internationally. | | |
| Performance Measure 4.2.1.1: Number of international regulatory and standard-setting working groups in which the Commission participates. | Plan | Est. Actual |
| FY 2011 | 9 | 12 |
| FY 2012 | 9 | |

---

[18] N/A = Not applicable. Performance data not available until applicable regulations are effective.

**FY 2013 President's Budget & Performance Plan**

| FY 2013 | | 9 |
|---|---|---|

| Objective 4.3: Provide Global Technical Assistance. | | |
|---|---|---|
| **Strategy 4.3.1:** Provide technical assistance to foreign regulators. | | |

| Performance Measure 4.3.1.1: Number of non-U.S. regulators trained. | Plan | Est. Actual |
|---|---|---|
| FY 2011 | 60 | 225 |
| FY 2012 | 65 | |
| FY 2013 | 70 | |

**FY 2013 President's Budget & Performance Plan**

## Breakout of Goal Four Request by Objective

| | FY 2012 $ (000) | FTE | FY 2013 $ (000) | FTE | Change $ (000) | FTE |
|---|---|---|---|---|---|---|
| ***GOAL FOUR: Enhance integrity of U.S. markets by engaging in cross-border cooperation, promoting strong international regulatory standards, and encouraging ongoing convergence of laws and regulation worldwide.*** | | | | | | |
| **Outcomes** | | | | | | |
| 4.1 Cooperate and coordinate with domestic and foreign regulatory authorities. | $1,745 | 8 | $2031 | 9 | $286 | 1 |
| 4.2 Promote high levels of internationally accepted standards of best practice. | 4,653 | 21 | 6,252 | 27 | 1,599 | 6 |
| 4.3 Provide Global Technical Assistance. | 1,228 | 5 | 1,282 | 5 | 54 | 0 |
| **Total Goal Four** | **$7,626** | **34** | **$9,565** | **41** | **$1,939** | **7** |

Table 20: Breakout of Goal Four by Objective



Figure 16: Breakout of Goal Four Request by Objective

**FY 2013 President's Budget & Performance Plan**

## Breakout of Goal Four Request by Program Activity

| | FY 2012 | | FY 2013 | | Change | |
|---|---|---|---|---|---|---|
| | $ (000) | FTE | $ (000) | FTE | $ (000) | FTE |
| Agency Direction | $1,631 | 7 | $1,621 | 7 | -$10 | 0 |
| Administrative Mgmt. & Support | 267 | 1 | 377 | 2 | 110 | 1 |
| Chief Economist | 259 | 1 | 377 | 1 | 118 | 0 |
| Clearing & Risk | 235 | 1 | 212 | 1 | -23 | 0 |
| Data & Technology | 0 | 0 | 0 | 0 | 0 | 0 |
| Enforcement | 915 | 4 | 977 | 4 | 62 | 0 |
| General Counsel | 499 | 2 | 455 | 2 | -44 | 0 |
| International Affairs | 2,042 | 10 | 3,512 | 16 | 1470 | 6 |
| Inspector General | 227 | 1 | 276 | 1 | 49 | 0 |
| Market Oversight | 0 | 0 | 0 | 0 | 0 | 0 |
| Swap Dealer & Intermediary Oversight | 1,551 | 7 | 1,758 | 7 | 207 | 0 |
| **TOTAL:** | **$7,626** | **34** | **$9,565** | **41** | **$1,939** | **7** |

Table 21: Breakout of Goal Four by Program Activity



Figure 17: Breakout of Goal Four Request by Program Activity

**FY 2013 President's Budget & Performance Plan**

Goal Five: Promote Commission excellence through executive direction and leadership, organizational and individual performance management, and effective management of resources.

Commission excellence reflected in the achievement of the agency's strategic mission and goals depends on clear executive direction, strong and focused management, and a well-resourced, dedicated and productive workforce. These attributes of a high-performing organization combine to support and drive the critical work of the Commission to provide a sound regulatory oversight and enforcement program for the American people. To ensure the Commission's continued success, continuity of operations and adaptation to the ever-changing markets it is charged with regulating, the Commission must maintain a well-qualified workforce supported by a modern information technology infrastructure and working environment.

During the next five years, the Commission will develop and implement a host of rules many of which address the Dodd-Frank requirements and many of which will also alter and expand the Commission's mission and operation. To successfully develop, implement and manage these rules, the Commission requires unambiguous and timely direction, the right quantity and quality of staff, aligned in an optimal operating structure supported by the necessary training and development, tools and resources.

## Summary of Goal Five Performance Indicators

| Objective 5.1: An organizational structure that is aligned and streamlined to operate and carry out its mission efficiently and effectively. | | | |
|---|---|---|---|
| **Strategy 5.1.1:** Ensure organizational structure best reflects the needs of the CFTC. | | | |
| **Performance Measure 5.1.1.1:** Executive approval and Commission adoption of efficient and effective organizational design. | | **Plan** | **Actual** |
| **FY 2011** | **Assess and identify organizational requirements. Prepare and design functional organization blueprints. Recommend and obtain approval for new organizational structure.** | **100%** | **100%** |
| **FY 2012** | **Complete implementation of new organizational structure: Identify and hire key leadership positions; Assign/re-assign staff to new divisions and offices as required; and, draft new career ladder and associated position descriptions as needed.** | **100%** | |
| **FY 2013** | **Use established organizational change procedures to adjust and improve organizational structure as needed.** | **100%** | |

| Objective 5.2: Effectively respond to a the regulatory needs of a dynamic and complex derivatives market place and efficiently allocate limited resources to the highest priority activities. | | | |
|---|---|---|---|
| **Strategy 5.2.1:** Develop and implement a set of integrated Strategic, Budget and Operating Plan processes. | | | |
| **Performance Measure 5.2.1.1:** Develop, adopt and implement a comprehensive planning process. | | **Plan** | **Actual** |
| **FY 2011** | **Develop and adopt well-defined and integrated planning process.** | **100%** | **50%**[19] |
| **FY 2012** | **Track high-level projects; redefine budget activity codes (BPAC).** | **100%** | |
| **FY 2013** | **Implement new BPAC; track major projects & activities; implement automated time & attendance.** | **100%** | |

---

[19] A planning process manual was developed in FY 2011 but has not been adopted or implemented.

**FY 2013 President's Budget & Performance Plan**

| Objective 5.3: Attract, engage, develop and retain an exceptionally qualified, diverse, and productive workforce. | | | |
|---|---|---|---|

| **Strategy 5.3.1:** Assess, develop and implement automated hiring system. | | | |
|---|---|---|---|
| **Performance Measure 5.3.1.1:** Assess, develop and implement automated hiring system. | | **Plan** | **Actual** |
| **FY 2011** | **Assess and procure best fit system based on CFTC requirements. Develop and/or improve recruitment business processes to maximize efficiency gains from automation.** | **100%** | **100%** |
| **FY 2012** | **Implement automated hiring system and associated business processes.** | **100%** | |
| **FY 2013** | **Optimize automated hiring system and associated business processes.** <br><br> **Demonstrate reduction in FTE years dedicated to recruitment and staffing.** | **100%** | |
| **Performance Measure 5.3.1.2:** Improve time to hire from 150 days to 80 days. | | **Plan** | **Actual** |
| **FY 2011** | **Improve time to hire by 10% in each of the next five years. – Saving 15 days** | **135 Days** | **79 Days** |
| **FY 2012** | **Improve time to hire by 10% in each of the next four years. – Saving 13.5 days** | **122 Days** | |
| **FY 2013** | **Improve time to hire by 10% in each of the next three years. – Saving 12 days** | **110 Days** | |

| **Strategy 5.3.2:** Develop, implement, execute and sustain a workplace that is top in its class. | | | |
|---|---|---|---|
| **Performance Measure 5.3.2.1:** CFTC is consistently rated by its employees as a small agency workplace of choice and listed annually as one of the top ten best places to work in the federal government (small agency category). CFTC identifies low scores determined to be of most significance to the agency year over year to inform its improvement plans. | | **Plan** | **Actual** |
| **FY 2011** | **Top 10 rating. Identify low scoring areas for focused improvement.** | **<= 10** | **8** |
| **FY 2012** | **Top 10 rating. Incorporate survey information into human capital planning.** | **<= 10** | |
| **FY 2013** | **Top 10 rating. Incorporate survey information into human capital strategic planning** | **<= 10** | |

| **Strategy 5.3.3:** Develop, implement and execute a robust learning program. | | | |
|---|---|---|---|
| **Performance Measure 5.3.3.1:** Develop and implement comprehensive development and education program. | | **Plan** | **Actual** |
| **FY 2011** | **Design learning plan to include legal, technical, regulatory and specialized training as well as management and supervisory training. Where practical, ensure that programming meets the criteria for continuing education requirements applicable to lawyers and other professionals so that credits may be earned and applied. Implement supervisory training for all new supervisors.** | **100%** | **100%** |
| **FY 2012** | **Augment and expand in-house legal and technical training to a comprehensive CFTC regulatory training program. Develop leadership and management training curriculum.** | **100%** | |
| **FY 2013** | **Increase by 10 to 25% over previous year the percentage of CFTC employees participating in CFTC's training program as funding and resources available will allow.** | **100%** | |
| **Performance Measure 5.3.3.2:** Assess requirements, design and implement a comprehensive CFTC-wide mentoring program focused on enhancing the competencies of CFTC's current and future workforce. | | **Plan** | **Actual** |
| **FY 2011** | **Assess and design program. Pilot program in the Office of General Counsel.** | **100%** | **100%** |
| **FY 2012** | **Expand mentoring program to other offices and divisions.** | **100%** | |
| **FY 2013** | **Increase participation in mentoring program 5-10% over previous year.** | **100%** | |

**FY 2013 President's Budget & Performance Plan**

| Objective 5.4: Information Technology (IT) supports and enhances mission accomplishment through effective and efficient infrastructure, systems and services. | | | |
|---|---|---|---|
| **Strategy 5.4.1:** Ensure the highest practical return on both business and IT investments. | | | |
| **Performance Measure 5.4.1.1:** Transparency and process maturity of IT governance for reinforcing business unit and IT partnership. | | **Plan** | **Actual** |
| FY 2011 | **Integrate Agency Strategic Planning with IT Strategic Planning.** | **100%** | **100%** |
| FY 2012 | **Align IT governance with reengineered BPAC structure.** | **100%** | |
| FY 2013 | **Institute CFTC-wide Data Management.** | **100%** | |
| **Performance Measure 5.4.1.2:** Implementation of IT strategy and architecture for Business Continuity (BC). | | **Plan** | **Actual** |
| FY 2011 | **Establish remote data replication of Tier 1, 2, and 3 to the Commission's collocation facility.** | **100%** | **100%**[20] |
| FY 2012 | **Establish system service support at the collocation facility for Tier 1 and 2 applications and data sets.** | **100%** | |
| FY 2013 | **Establish system service support at the collocation facility for Tier 3 applications and data sets.** | **100%** | |
| **Strategy 5.4.2:** Facilitate the usefulness and usage of information, increasing its availability, ensuring quality and reducing staff time necessary to analyze relevant data. | | | |
| **Performance Measure 5.4.2.1:** Develop and implement comprehensive development and education program. | | **Plan** | **Actual** |
| FY 2011 | **Develop data management governance and policy framework. Develop enterprise data management roadmap.** | **100%** | **100%** |
| FY 2012 | **Establish enterprise data warehouse and service oriented architecture for enterprise data management. Communicate enterprise data warehouse and service oriented architecture design to NFA, SEC, OFR, and other regulators. Integrate FILAC system into enterprise data warehouse.** | **100%** | |
| FY 2013 | **Integrate TSS into enterprise data warehouse. Include swaps data in enterprise data warehouse.** | **100%** | |
| **Performance Measure 5.4.2.2:** Direct Access to SROs and swap data repositories for effective oversight. | | **Plan** | **Actual** |
| FY 2011 | **Plan dedicated connections to high volume DCMs and SROs.** | **100%** | **92%** |
| FY 2012 | **Implement dedicated connections to high volume DCMs and SROs.** | **100%** | |
| FY 2013 | **Receive and process swaps data pushed from existing swap data repositories.** | **100%** | |
| **Strategy 5.4.3:** Automate key business processes. | | | |
| **Performance Measure 5.4.3.1:** CFTC-wide document and records management and intranet solutions for improved data security collaboration, retention, sharing, and disposal. | | **Plan** | **Actual** |
| FY 2011 | **Automate rule making support. Implement Forensics Lab. Implement Web site preservation system. Implement CFTCnet. Re-host CFTC.gov to provide improved services.** | **100%** | **92%** |
| FY 2012 | **Implement eDiscovery preservation and legal hold. Implement enhancements to document search and retrieval software. Implement EDRM enterprise search and taxonomy and metadata management. Division collaboration sites migrate to/integrate with CFTCnet.** | **100%** | |
| FY 2013 | **Implement automation of enterprise tips, complaints, and referral management. Implement Early Case Assessment System. Implement EDRM workflow and version control (5 process groups).** | **100%** | |

---

[20] All 3 tiers were replicated in June. Due to telecommunication circuit issues the Commission is only replicating Tiers 1 and 2 and eLaw data at present until the circuit is upgraded.

**FY 2013 President's Budget & Performance Plan**

| Objective 5.5: Ensure effective stewardship and management of CFTC financial resources | | | |
|---|---|---|---|
| **Strategy 5.5.1:** Reengineer budget process accounting codes (BPAC). | | | |
| **Performance Measure 5.5.1.1:** Reengineer, improve and implement CFTC's Cost Accounting Codes (BPAC). | | **Plan** | **Actual** |
| FY 2011 | Assess and procure reengineering options for BPAC. Design, develop and implement BPAC repository to retain all cost accounting codes. | 100% | 100% |
| FY 2012 | Choose best option for BPAC code structure in line with operating and reporting needs and in light of available resources. Implement new codes for use in FY 2013 budget formulation process. | 100% | |
| FY 2013 | Improve and adapt business processes associated with cost accounting codes. | 100% | |
| **Strategy 5.5.2:** Improve budget formulation and audit processes. | | | |
| **Performance Measure 5.5.2.1:** Management Control Reviews are conducted and documented. Recommendations are implemented. The Chairman and the CFO are able to give unqualified FMFIA management assurances. | | **Plan** | **Actual** |
| FY 2011 | Conduct Program and Administrative Risk Assessments, Prepare Three Year Plan, Begin Conducting Reviews | 100% | 100% |
| FY 2012 | Update Program and Administrative Risk Assessments and Three Year Plan, Continue Conducting Reviews, Developing Remediation Plans, and taking Corrective Actions. | 100% | |
| FY 2013 | Complete Corrective Action | 100% | |
| **Strategy 5.5.3:** Implement web-based time and attendance system. | | | |
| **Performance Measure 5.5.3.1:** Implement Web-based time and attendance system. | | **Plan** | **Actual** |
| FY 2011 | Complete Project to Modernize Budget Program Activity Code Structure and Configure WebTA to accommodate. | 100% | 25% |
| FY 2012 | Pilot WebTA | 100% | |
| FY 2013 | Go Live with WebTA | 100% | |

**FY 2013 President's Budget & Performance Plan**

## Breakout of Goal Five Request by Objective

| | FY 2012 | | FY 2013 | | Change | |
|---|---|---|---|---|---|---|
| | $ (000) | FTE | $ (000) | FTE | $ (000) | FTE |
| **GOAL FIVE: Promote Commission excellence through executive direction and leadership, organizational and individual performance management, and effective management of resources.** | | | | | | |
| **Outcomes** | | | | | | |
| 5.1 An organizational structure that is aligned and streamlined to operate and carry out its mission efficiently and effectively. | $1,976 | 9 | $2,500 | 11 | $524 | 2 |
| 5.2 Effectively respond to a the regulatory needs of a dynamic and complex derivatives market place and efficiently allocate limited resources to the highest priority activities. | 3,022 | 9 | 3,126 | 10 | 104 | 1 |
| 5.3 Attract, engage, develop and retain an exceptionally qualified, diverse, and productive workforce. | 2,312 | 10 | 2,333 | 10 | 21 | 0 |
| 5.4 Information Technology (IT) supports and enhances mission accomplishment through effective and efficient infrastructure, systems and services. | 39,222 | 61 | 58,004 | 81 | 18,782 | 20 |
| 5.5 Ensure effective stewardship and management of CFTC financial resources. | 2,315 | 10 | 2,333 | 10 | 18 | 0 |
| **Total Goal Five** | **$48,847** | **99** | **$68,296** | **122** | **$19,449** | **23** |

Table 22: Breakout of Goal Five by Objective



Figure 18: Breakout of Goal Five Request by Objective

**FY 2013 President's Budget & Performance Plan**

## Breakout of Goal Five Request by Program Activity

| | FY 2012 | | FY 2013 | | Change | |
|---|---|---|---|---|---|---|
| | $ (000) | FTE | $ (000) | FTE | $ (000) | FTE |
| Agency Direction | $1,631 | 7 | $1,638 | 7 | $7 | 0 |
| Administrative Mgmt. & Support | 8,808 | 39 | 9,621 | 42 | 813 | 3 |
| Chief Economist | 0 | 0 | 0 | 0 | 0 | 0 |
| Clearing & Risk | 0 | 0 | 0 | 0 | 0 | 0 |
| Data & Technology | 38,181 | 52 | 56,761 | 72 | 18,580 | 20 |
| Enforcement | 0 | 0 | 0 | 0 | 0 | 0 |
| General Counsel | 0 | 0 | 0 | 0 | 0 | 0 |
| International Affairs | 0 | 0 | 0 | 0 | 0 | 0 |
| Inspector General | 227 | 1 | 276 | 1 | 49 | 0 |
| Market Oversight | 0 | 0 | 0 | 0 | 0 | 0 |
| Swap Dealer & Intermediary Oversight | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL:** | **$48,847** | **99** | **$68,296** | **122** | **$19,449** | **23** |

Table 23: Breakout of Goal Five by Program Activity



Figure 19: Breakout of Goal Five Request by Program Activity

FY 2013 President's Budget & Performance Plan

# APPENDIX 5

## The Commission and the Industry We Regulate

Fundamental changes in the technology, products and platforms of U.S. futures trading have increased the Commission's need for sophisticated technology, specialized skills and additional resources to keep pace.

In the futures industry, exchanges, in particular, have undergone a decade-long transition from geographically-defined trading pits to electronic platforms with global reach. From 2000 to 2010, electronic trading grew from approximately nine percent of volume to 78 percent on all U.S. designated contract markets (DCMs). Over the same time period, the number of actively-traded futures and options contracts listed on U.S. exchanges increased more than nine-fold, from approximately 266 contracts in 2000 to approximately 2,466 contracts in 2010. Total DCM futures and options trading volume rose from approximately 580 million contracts in 2000 to approximately 3.11 billion in 2010, an increase of more than 436 percent.

## Industry Growth in Volume, Globalization and Complexity

In a marketplace driven by change, it may be helpful to look back at industry and CFTC trends over the past few years. The charts that follow reflect many of those changes affecting the CFTC:

- Industry growth versus staff growth;

- Estimated Annual Swap Volume;

- Growth in actively traded futures and option contracts;

- Notional value of futures/option open contracts;

- Notional value of exchange-traded and OTC contracts;

- Amount of customer funds held at futures commission merchants;

- Aggregate sum of house origin margin on deposit;

- Number of registrants;

- Contract markets designated by the CFTC;

- Number of derivatives clearing organizations registered with the CFTC;

- Exempt commercial markets; and

- Exempt boards of trade.

**FY 2013 President's Budget & Performance Plan**

## Growth in Volume of Futures & Option Contracts Traded

Trading volume increased steadily through 2008 and has recovered most of the losses due to the 2008 financial crisis in 2011. This budget assumes continued growth at the rate seen from 2009-2011. The increase in volume traded in the last year (10 percent) reflects increased activity of high-frequency traders, without a commensurate increase in notional value (see Figure 23).



Figure 20: Growth of Volume of Contracts Traded

**FY 2013 President's Budget & Performance Plan**

## Estimated Annual Swap Event Volume

Events[21] include new trades, innovations and terminations, but exclude intro-company trades and tear-ups. Products include: interest rate derivatives, credit derivatives, equity derivatives, currency options and commodity derivatives.[22]



Figure 21: Estimated Swap Event Volume

---

[21] Swap event volume data for FY 2011 will be available in April 2012.
[22] Reported participant monthly average multiplied by 12 months per year, multiplied by the number of participants in the relevant survey year, and divided by two to account for potential double counting for swap transactions between survey participants.

Case: 1:19-cr-00669 Document #: 98-6 Filed: 02/10/20 Page 160 of 178 PageID #:1119

## Actively Traded Futures & Option Contracts

The number of actively traded contracts on U.S. exchanges has increased almost ten-fold in the last decade.

Figure 22: Actively Traded Futures and Option Contracts

**FY 2013 President's Budget & Performance Plan**

## Notional Value of Futures / Option Open Contracts

For 2011, 0.5 increase for physical commodities and 1.0 increase for financial commodities. To date physical commodities has experienced price increases that would justify a higher percentage increase in notional value than for financial commodities.



Figure 23: Notional Value of Futures and Option Open Contracts

## Notional Value of Exchange–Traded and OTC Contracts

Currently, the Commission receives swap data on special price discovery contracts (SPDC) under provisions of the Food, Conservation and Energy Act of 2008 (Farm Bill). The estimated annual volume for SPDC in 2011 is about 244 million contracts with an estimated notional value of $147 million on May 2, 2011. The contracts declared SPDCs are a fraction of the commodity swaps market which had an outstanding notional value of $2,852 billion at the end of first half of 2010 according to the Bank for International Settlements (BIS). Furthermore, the commodity swaps market is the smallest sector of the overall swaps market comprising only 0.4% of the 583 dollar total notional value.



Figure 24: Notional Value of Exchange-Traded and OTC Contracts

23 Exchange-Traded Futures/Options are those traded on CFTC Designated Contract Markets.

24 Office of the Comptroller of the Currency (OCC) data is for the top 25 bank holding companies with the most derivative contracts and "OTC" includes: Forwards, Swaps, Options, and Credit Derivatives.

25 Bank of International Settlements (BIS) OCT data includes "Foreign Exchange, "Interest Rates", "Equity-linked", "Commodity", "Credit Default Swaps", and "Unallocated" contracts.

**FY 2013 President's Budget & Performance Plan**

## Customer Funds in Futures Commission Merchants Accounts

The amount of customer funds held at FCMs has increased 342 percent since FY 2001, and the $203 billion held by FCMs at September 2011 exceeds the pre-market disruption levels of approximately $201 billion at September 2008.



Figure 25: Customer Funds in FCM Accounts

**FY 2013 President's Budget & Performance Plan**

## Aggregate Sum of House Origin Margin on Deposit

Origin Margin (also referred to as Original or Initial Margin) is the initial deposit of margin money each clearing member firm is required to make according to clearing organization rules based upon positions carried, determined separately for customer and proprietary positions.[26]



Figure 26: Aggregate Sum of House Origin Margin on Deposit

---

[26] Source: Margin on Deposit amounts obtained at month-end from DCOs.

Appendix 5—Customer Funds in FCM Accounts

## Number of Registrants

Companies and individuals who handle customer funds, solicit or accept orders, or give trading advice must apply for CFTC registration through the NFA, a registered futures association and an SRO with delegated authority from the Commission.

The Commission regulates the activities of 65,370 registrants.

| Registration Category[27] | Number as of September 30, 2011 |
|---|:---:|
| Associated Persons (APs) (Salespersons) | 52,369 |
| Commodity Pool Operators (CPOs) | 1,183 |
| Commodity Trading Advisors (CTAs) | 2,530 |
| Floor Brokers (FBs) | 6,316 |
| Floor Traders (FTs) | 1,286 |
| Futures Commission Merchants (FCMs) | 123 |
| Retail Foreign Exchange Dealers (RFEDs) | 14 |
| Introducing Brokers (IBs) | 1,535 |
| Swap Dealers (SDs) [28] | 0 |
| Major Swap Participants (MSPs) [29] | 0 |
| TOTAL | 65,356 |

Table 24: Number of Registrants[30]

---

[27] A person who is registered in more than one registration category is counted in each category.
[28] New registration category proposed by the Commission for certain entities engaged in swap transactions at 75 Fed. Reg. 71379 (November 23, 2010).
[29] New registration category proposed by the Commission for certain entities engaged in swap transactions at 75 Fed. Reg. 71379 (November 23, 2010).
[30] Source: NFA's Monthly Membership and Registration Report to CFTC as of September 30, 2011.

## Contract Markets Designated by the CFTC

The following designated contract market (DCM) are boards of trade or exchanges that meet the criteria and core principles for trading futures or options by both institutional and retail participants. Currently, 16 DCM participants meet criteria and core principles for trading futures, options and swaps.

| Designated Contract Markets | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| Cantor Futures Exchange, L.P. | CX | | | | | ✓ | ✓ |
| Board of Trade of the City of Chicago | CBOT | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Chicago Climate Futures Exchange, LLC | CCFE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| CBOE Futures Exchange, Inc. | CFE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Chicago Mercantile Exchange, L.P. | CME | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ELX Futures, L.P. | ELX | | | | ✓ | ✓ | ✓ |
| Green Exchange, LLC | GREENEX | | | | | ✓ | ✓ |
| ICE Futures US, Inc. [31] | ICE US | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Kansas City Board of Trade | KCBT | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Minneapolis Grain Exchange, Inc. | MGE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| North American Derivatives Exchange, Inc. [32] | NADEX | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| NASDAQ OMX Futures Exchange, Inc. [33] | NFX/PBOT | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| NQLX LLC Futures Exchange | NQLX | | | | | | |
| New York Mercantile Exchange, Inc. /Commodity Exchange, Inc. | NYMEX (Incl. COMEX Inc.) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| NYSE Liffe US, LLC | NYSE LIFFE | | | ✓ | ✓ | ✓ | ✓ |
| OneChicago LLC Futures Exchange | OCX | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| The Trend Exchange | TRENDEX | | | | | ✓ | ✓ |
| US Futures Exchange, LLC | USFE | ✓ | ✓ | ✓ | ✓ | | |
| TOTAL | | 12 | 12 | 13 | 14 | 16 | 16 |

Table 25:  Contract Markets Designated by the CFTC

---

[31] Formerly, New York Board of Trade.
[32] Formerly, HedgeStreet Inc.
[33] Formerly, Philadelphia Board of Trade

**FY 2013 President's Budget & Performance Plan**

## Number of DCOs Registered with the CFTC

A clearinghouse that seeks to provide clearing services with respect to futures contracts, options on futures contracts, or swaps must register with the CFTC as a DCO. In FY 2011, 17 DCOs were registered with the CFTC.

| Derivatives Clearing Organizations | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|:---:|:---:|:---:|:---:|:---:|:---:|
| The Actuarials Exchange, LLC | AE Clearinghouse | ✔ | ✔ | | | | |
| Cantor Clearinghouse L.P. | Cantor Clearinghouse | | | | | ✔ | ✔ |
| Chicago Board of Trade | CBOT | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Clearing Corporation | CCorp | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Chicago Mercantile Exchange Clearing House | CME Clearing House | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Chicago Mercantile Exchange Europe Limited | CME Clearing Europe | | | | | | ✔ |
| ICE Clear Credit | ICE Clear Credit | | | | | | ✔ |
| ICE Clear Europe Ltd | ICE Clear Europe | | | | | ✔ | ✔ |
| ICE Clear US, Inc.[34] | ICE Clear US | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| International Derivatives Clearinghouse, LLC | IDC | | | | ✔ | ✔ | ✔ |
| Kansas City Board of Trade Clearing Corp | KCBT | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| London Clearing House Clearnet Ltd | LCH.Clearnet | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Minneapolis Grain Exchange Clearing House | MGE Clearing House | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Natural Gas Exchange Inc. | NGX | | | | ✔ | ✔ | ✔ |
| New York Portfolio Clearing, LLC | NYPC | | | | | | ✔ |
| North American Derivatives Exchange, Inc.[35] | NADEX | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| NYMEX Clearing House | NYMEX | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Options Clearing Corporation | OCC | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| **TOTAL** | | **11** | **11** | **10** | **12** | **14** | **17** |

Table 26: Derivatives Clearing Organizations Registered with the CFTC

---

34 Formerly, HedgeStreet, Inc.
35 Formerly, New York Clearing Cooperation.

## Exempt Commercial Markets

Electronic trading facilities providing for the execution of principal-to-principal transactions between eligible commercial entities in exempt commodities may operate as ECMs, as set forth under the CEA and the Commission's regulations. An ECM is subject to anti-fraud and anti-manipulation provisions and a requirement that, if performing a SPDF, must provide pricing information to the public. A facility that elects to operate as an ECM must give notice to the Commission and comply with certain information, record-keeping, and other requirements. An ECM is prohibited from claiming that the facility is registered with, or recognized, designated, licensed or approved by, the Commission.  A total of 37 ECMs have filed notices with the Commission.  In FY 2011, 21 ECMs were in business for at least part of the year; one, however, withdrew its ECM notification during the fiscal year.

| Exempt Commercial Markets | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|:---:|:---:|:---:|:---:|:---:|:---:|
| Agora-X, LLC | Agora-X | | | | ✓ | ✓ | |
| Chicago Climate Exchange, Inc. | CCX | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Commodities Derivative Exchange, Inc. | CDXchange | ✓ | | | | | |
| ChemConnect, Inc. | ChemConnect | ✓ | ✓ | | | | |
| CME ECM Inc. | CME ECM | | | | | | ✓ |
| DFOX | DFOX | | | | ✓ | | |
| EnergyCross.com | EnergyCross.com | | | | ✓ | ✓ | ✓ |
| EOX Holdings, LLC | EOXLIVE | | | ✓ | ✓ | ✓ | ✓ |
| Evolution Markets | Evolution Markets | | | | | ✓ | |
| FCRM Electronic Markets LLC | FCRM | | | | ✓ | ✓ | ✓ |
| Flett Exchange | Flett | | ✓ | ✓ | ✓ | | |
| GFI Group Inc., EnergyMatch | GFI | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Houston Mercantile Exchange | HMX | | | | | | ✓ |
| Houston Street Exchange, Inc. | HSE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ICAP Commodity and Commodity Derivatives Trading System | ICAP | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ICAP Electronic Trading Community | ICAPture | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ICAP Shipping Trading System | ICAP Shipping | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| ICAP Truequote Multilateral Trading Facility | ICAP Truequote | | | | | ✓ | ✓ |
| IntercontinentalExchange, Inc. | ICE | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| International Maritime Exchange | IMAREX | ✓ | ✓ | ✓ | ✓ | ✓ | |

**FY 2013 President's Budget & Performance Plan**

| Exempt Commercial Markets | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| Liquidity Partners, LP | Liquidity Partners | | | | | ✓ | ✓ |
| LiquidityPort, LLC | LiquidityPort | | ✓ | ✓ | ✓ | ✓ | |
| Natural Gas Exchange, Inc. | NGX | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Nodal Exchange, LLC | Nodal | | ✓ | ✓ | ✓ | ✓ | ✓ |
| NetThruPut | NTP | ✓ | ✓ | ✓ | ✓ | | |
| OILX (TFSOIL) | OILX | | | | ✓ | ✓ | ✓ |
| Optionable, Inc. | OPEX | ✓ | ✓ | ✓ | ✓ | | |
| Parity Energy, Inc. | Parity | | | ✓ | ✓ | ✓ | ✓ |
| Spectron Live.com Limited | SL | ✓ | ✓ | | | | |
| The TradeCapture Exchange (TFSE) | TCX | ✓ | ✓ | ✓ | ✓ | | |
| TFSWeather.com | TFSWeather | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| tpENERGYTRADE | tpENERGYTRADE | | | | ✓ | | |
| TraditionCoal.Com | Tradition Coal.com | | | ✓ | ✓ | ✓ | ✓ |
| Trading OptX LLC | Trading Optx | | | | ✓ | ✓ | |
| TradeSpark, LP | TS | ✓ | | | | | |
| WorldPulp.com | WORLDPULP | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| TOTAL | | 17 | 19 | 20 | 27 | 24 | 21 |

Table 27: Exempt Commerical Markets

## Exempt Boards of Trade

Transactions by eligible contract participants in selected commodities may be conducted on an EBOT as set forth under the CEA and the Commission's regulations. EBOTs are subject only to the CEA's anti-fraud and anti-manipulation provisions. An EBOT is prohibited from claiming that the facility is registered with, or recognized, designated, licensed, or approved by the Commission. Also, if it is performing a price discovery function, the EBOT must provide certain pricing information to the public. To date, 29 EBOTs filed notices with the Commission.  In FY 2011, 21 EBOTs were in business during the fiscal year.

| Exempt Boards of Trade | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| The Actuarials Exchange, LLC | AE | ✓ | ✓ | ✓ | ✓ | | |
| CME Alternative Marketplace, Inc. | CME AM | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Concredex LLC | Concredex | | | | | | ✓ |
| Countermatch | CTRMTCH | | | | | ✓ | ✓[36] |
| Currenex, Inc. | Currenex | | | | | | ✓ |
| Derivatives Bridge, LLC | Derivatives Bridge | | | ✓ | ✓ | ✓ | ✓ |
| ERIS Exchange, LLC | ERIS | | | | | ✓ | ✓ |
| FENICS | FENICS | | | | | ✓ | ✓ |
| FX Alliance | FXAll | | | | | | ✓ |
| FX Connect | FX Connect | | | | | | ✓ |
| GFI Group, Inc. - ForexMatch | GFI ForexMatch | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Intrade Board of Trade | Intrade | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| IRESE, Inc. | IRESE | | | ✓ | ✓ | ✓ | ✓ |
| LiquidityPort, LLC | LiquidityPort | | ✓ | ✓ | | | |
| Longitude, LLC | Longitude | | ✓ | ✓ | ✓ | ✓ | ✓ |
| M2 Trading Partners, LLC | M2 | | | | | ✓ | ✓ |
| MarketAxess Corporation | MarketAxess | | | | | | ✓ |

[36] This EBOT withdrew its EBOT notification during FY 2011.

**FY 2013 President's Budget & Performance Plan**

| Exempt Boards of Trade | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| MATCHBOXX ATS | MATCHBOXX ATS | ✓ | | | | | |
| ODEX Group, Inc. | ODEX | | | | | | ✓ |
| Storm Exchange, Inc. | Storm | ✓ | ✓ | ✓ | ✓ | ✓[37] | |
| SurfaceExchange | SURFEX | | | | | ✓ | ✓ |
| Swapstream Operating Services, Ltd. | Swapstream | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Tera (Spring Trading) | Tera | | | | | | ✓ |
| The American Civics Exchange | TACE | | | | ✓ | ✓ | ✓ |
| trueBOT Inc. | trueBOT | | | | | | ✓ |
| Weather Board of Trade, LLC | WBOT | ✓ | ✓ | | | | |
| WeatherXchange Limited | WXL | ✓ | ✓ | | | | |
| YellowJacket Software, Inc. | Yellow Jacket | | | ✓ | | | |
| TOTAL | | 8 | 10 | 11 | 10 | 14 | 21 |

Table 28: Exempt Boards of Trade

---

[37] This EBOT withdrew its EBOT notification during FY 2010.

# APPENDIX 6

Summary of OMB and Congressional Action on Appropriations FY 2003 – FY 2013



**FY 2013 President's Budget & Performance Plan**

# APPENDIX 7

## Privacy Policy for the CFTC Web Site

### Web Site Privacy Policy

The privacy of visitors to the CFTC Web site is of the utmost importance to the Commission. You are not required to give us any personal information to visit our Web site. While we automatically collect certain data for statistical purposes, that data does not include your name, mailing or email address.

### Information Collected and Stored Automatically

If you visit the CFTC Web site to read or download information, such as press releases or publications, we will collect and store certain technical information about your visit. We do not collect your name, email, mailing address or similar identifying information. We only collect the following:

- on your end, the name of the domain (the machine or Web site) from which you access the Internet (for example, aol.com if you are connecting from an America Online account) and/or the name and Internet Protocol (IP) address of the server you are using to access the CFTC Web site (the IP address is a series of numbers that identifies a server or computer connected to the Internet);
- the name and version of the web browser used to access a CFTC web page (for example, Microsoft Explorer or Firefox);
- on our side, the name and IP address of the CFTC server that received and logged the request;
- the date and time the request was received; and
- the information you are accessing (for example, which page or image you choose to read or download).

We use this information to measure the number of visitors to the different sections of the CFTC Web site, assess system performance and to help us make the Web site more useful to our visitors. In the event of a computer security incident, such data may be manually analyzed to allow computer security specialists to identify Internet service providers and, in extreme cases, to attempt to identify the specific computer and individual involved in an attack on the CFTC's site. The information below on "Intrusion Detection Monitoring" further explains this.

### Cookies

The information being collected automatically, as explained above, is collected through the use of "session cookies" set through Google Analytics. "Session cookies" are small bits of text placed on a user's hard drive for the duration of a web session, *i.e.*, for as long as your browser is accessing the CFTC Web site at one time. As soon as you close the CFTC Web site, the cookie expires.

The CFTC does not use "persistent cookies," which are small bits of text saved on a user's hard drive in order to identify that user, or information about that user, the next time the user logs on the a Web site. However, for some videos that are visible on http://www.cftc.gov or available on YouTube, a "persistent cookie" may be set by the third party providers when you click to play the video.

### If You Choose to Send Us Personal Information

You may choose to send us information which personally identifies you. For example, you may complete an on-line form, send a complaint concerning a regulated person or entity, report suspicious activity, send a comment or input on a proposed rule, or email the CFTC through the Web site. Such information is used to respond to your request and to help us get you the information you have

requested. We also use the information for the specific purposes identified on each form or on the web page requesting information.

For example, if you send us a comment letter on a proposed rule, that letter becomes part of the CFTC's comment file and generally is available to the public. The comments help the CFTC and other members of the public evaluate proposed Commission actions. If you register on www.cftc.gov and submit large trader data through the Position Entry for Reportable Traders application (PERT Online), this data will be used by the Commission for market oversight, *e.g.*, oversight of trader activities and enforcement of speculative position limits.

You may submit other forms to us, such as Freedom of Information Act requests or requests for correction of information. Such forms may contain information that CFTC staff use to track and respond to your request. Information you provide to the CFTC Division of Enforcement on our Report Suspicious Activities or Information form may be shared with other law enforcement or other Federal agencies when appropriate.

## Sharing of Your Information

The personal information you choose to provide to us will be shared with CFTC employees and contractors who need to know the information in the course of their official duties. Such employees and contractors are subject to confidentiality restrictions to protect your personal information. The information may also be shared by the CFTC with third parties to advance the purpose for which you provide the information, including other federal or state government agencies. For example, if you report suspicious activity that suggests a violation of the Commodity Exchange Act, the information you have provided may be shared with other Federal or state authorities. In this situation, the primary use of your personally identifiable information would be to enable the government to contact you in the event we have questions regarding the information you have reported.

Under certain circumstances, the CFTC may be required by law to disclose information you submit to other authorities for official purposes, for example, to respond to a Congressional inquiry or subpoena.

When you choose to send e-mail to the CFTC, you are consenting to the CFTC using the information provided therein, including personally identifiable information, in accordance with this notice, unless you expressly state in the email your objection to any use.

## Linking to Other Web sites

We provide links to Federal and non-Federal Web sites if we think they may be useful to our visitors or necessary for the performance of agency functions. This includes commercial Web sites such as Facebook, Twitter, Flickr and YouTube.

When you follow a link to a non-CFTC Web site, you will first be directed to a web page that reminds you that you are leaving CFTC.gov and that the Web site you are about to visit is not endorsed by the CFTC. These other Web sites are not within the CFTC's control. The CFTC does not guarantee the accuracy or completeness of any information on these sites. Be aware that the privacy protection provided to you on CFTC.gov may not be available at the external link. Once you link to another site, you are subject to the policies of that site.

## Use of Social Media Sites

The CFTC uses Twitter, Facebook, Flickr, YouTube and other Social Media Sites as additional ways to provide information to the public and fulfill its mission of protecting market participants and the commodity and futures markets from fraud, manipulation and abusive practices. Flickr and YouTube allow the CFTC to post pictures and videos that may be of interest to the public. Facebook allows the Commission to reach out to a different audience, those who may not seek out www.cftc.gov. Twitter allows us to post microblogs known as "tweets," *i.e.*, text-based posts of up to 140 characters. The

tweets allow our Office of Public Affairs to quickly notify reporters, the public and other "followers" of a new press release, upcoming event or other information of interest.

Using these media, the CFTC will only collect, maintain, or disseminate personally identifiable information (PII) found on Social Media Sites (SMS) in two situations.

One, for Public Affairs purposes, comments about the CFTC on SMS pages may be reviewed internally, and for newsworthy posts, included in internally-circulated daily news clips with the author's name and affiliated organization if publicly-available. Two, for enforcement purposes, when necessary for an investigation or enforcement proceedings (such as suspected violations of the Commodity Exchange Act or a threat of violence against the Commission), information obtained from the Internet may be collected and preserved. The information collected is offered to the Commission with consent or is from publicly-available sources on the Internet, except that in limited enforcement situations, when other investigative avenues are limited, a specifically approved Commission staff member may act as a member of the public by using a username and profile not affiliated with the CFTC to seek information about business opportunities that may violate the Act, simulating the day-to-day customer experience.

Information collected for investigative purposes and to which the Privacy Act of 1974 applies is maintained in the Commission's investigatory or enforcement system of records. See CFTC System of Record Notice (SORN) CFTC-10, Investigatory Records (Exempted), and CFTC-16, Enforcement Case Files, at Federal Register, 76 Fed. Reg. 5973-6002 (2011), as may be amended. To minimize privacy risks in this situation, a structured process is followed, very limited PII collected, only CFTC Internet users with a legitimate business "need to know" have access to this information, CFTC users have received specific training concerning the sensitivity of this type of information, and the CFTC provides public notice through this privacy policy, a Privacy Impact Assessment, and when feasible, a privacy notice on certain specific social media sites. See, *e.g*., Internet and Social Media Use Privacy Impact Assessment for details.

## Security

Personal information collected and maintained by the CFTC are protected from unauthorized access and misuse through comprehensive administrative, technical and physical security measures. Administrative measures include a privacy governance structure, mandatory annual privacy and security training for all CFTC employees, internal policies and controls over data handling practices, and regular auditing of systems. Technical security measures within CFTC include restrictions on computer access to authorized individuals, required use of strong passwords that are frequently changed, use of encryption for certain data types and transfers, and regular review of security procedures and best practices to enhance security. Physical measures include restrictions on building access to authorized individuals only and maintaining records in lockable offices and filing cabinets.

## Intrusion Detection Monitoring

The CFTC uses software programs to monitor this Web site for security purposes to ensure it remains available to all users and to protect information in the system. By accessing this Web site, you are expressly consenting to these monitoring activities. Unauthorized attempts to defeat or circumvent security features; to use the system for other than intended purposes; to deny service to authorized users; to access, obtain, alter, damage, or to destroy information; or otherwise to interfere with the system or its operation are prohibited. Evidence of such acts may be disclosed to law enforcement authorities and result in criminal prosecution under the Computer Fraud and Abuse Act of 1986 and the National Information Infrastructure Protection Act of 1996, 18 USC 1030, or other applicable criminal laws. Except for authorized law enforcement investigations, no other attempts are made to identify individual users or their usage habits.

## Other Privacy Information: Systems of Records Notices and Privacy Impact Assessments

The CFTC regularly publishes information in the Federal Register on its systems of records maintained under the Privacy Act of 1974. See CFTC Privacy Act Systems of Records Notices.

### Questions About Privacy

If you have questions about CFTC's privacy policy and information practices, you can email us at privacy@cftc.gov, or contact:

Chief Privacy Officer Commodity
Futures Trading Commission
1155 21st St., N.W. Washington DC 20581
Phone: 202-418-5000
Fax: 202-418-5532

**FY 2013 President's Budget & Performance Plan**

# APPENDIX 8

## Table of Acronyms

| | |
|---|---|
| AARP | American Association of Retired Persons |
| ALJ | Administrative Law Judge |
| AP | Associated Persons |
| CEA | Commodity Exchange Act |
| CFTC | Commodity Futures Trading Commission |
| CFMA | Commodity Futures Modernization Act of 2000 |
| COOP | Continuity of Operations Plan |
| COTS | Commitments of Traders |
| CPO | Commodity Pool Operator |
| CRA | CFTC Reauthorization Act of 2008 |
| CTA | Commodity Trading Advisor |
| DCIO | Division of Clearing, Swap Dealer and Intermediary Oversight (CFTC) |
| DCM | Designated Contract Market |
| DCO | Derivatives Clearing Organization |
| DSRO | Designated Self-Regulatory Organization |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 |
| DOJ | Department of Justice |
| DTEF | Derivatives Transaction Execution Facility |
| EBOT | Exempt Boards of Trade |
| ECM | Exempt Commercial Markets |
| Farm Bill | Food, Conservation, and Energy Act of 2008 |
| FB | Floor Broker |
| FBI | Federal Bureau of Investigation |
| FBIIC | Financial and Banking Information Infrastructure Committee |
| FBOT | Foreign Boards of Trade |
| FCA | Farm Credit Administration |
| FCM | Futures Commission Merchant |
| FDIC | Federal Deposit Insurance Corporation |
| FERC | Federal Energy Regulatory Commission |
| FinCEN | U.S. Treasury's Financial Crimes Enforcement Network |
| FSB | Financial Stability Board |
| FSRIA | Farm Security and Rural Investment Act |
| FMHA | Farmers Home Administration |
| FOREX | Foreign Currency |
| FT | Floor Trader |
| FTE | Full-time Equivalent |
| FY | Fiscal Year |
| GAO | Government Accountability Office |
| GSA | General Services Administration |
| IB | Introducing Broker |
| IOSCO | International Organization of Securities Commissions |
| ISS | Integrated Surveillance System |
| IT | Information Technology |
| JO | Judgment Officer |
| MOU | Memorandum of Understanding |
| NFA | National Futures Association |
| OCE | Office of Chief Economist (OCE) |
| OCX | OneChicago LLC Futures Exchange |

**FY 2013 President's Budget & Performance Plan**

| | |
|---|---|
| OED | Office of the Executive Director (CFTC) |
| OFM | Office of Financial Management (CFTC) |
| OGC | Office of the General Counsel (CFTC) |
| OHR | Office of Human Resources (CFTC) |
| OIA | Office of International Affairs (CFTC) |
| OITS | Office of Information and Technology Services (CFTC) |
| OMB | Office of Management and Budget |
| OMO | Office of Management Operations (CFTC) |
| OTC | Other-the-Counter |
| PWG | President's Working Group |
| RER | Rule Enforcement Review |
| RFED | Retail Foreign Exchange Dealers |
| RWG | Registration Working Group |
| SAN | Storage Area Network |
| SDR | Swap Data Repository |
| SEC | Securities and Exchange Commission |
| SEF | Swap Execution Facility |
| SFP | Security Futures Products |
| SPDC | Significant Price Discovery Contract |
| SRO | Self-Regulatory Organization |
| TSS | Trade Surveillance System |
| US | United States |
| USDA | United States Department of Agriculture |
| UK | United Kingdom |