**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OF AMERICA

    v.

GREGG SMITH,
MICHAEL NOWAK,
JEFFREY RUFFO, and
CHRISTOPHER JORDAN,

          Defendants.

Case No. 19-cr-00669

Hon. Edmond E. Chang

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION TO DISMISS THE INDICTMENT AND TO STRIKE SURPLUSAGE

| | |
|---|---|
| **KOBRE & KIM LLP** | **SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP** |
| 111 West Jackson Boulevard<br>Chicago, IL 60604 | Four Times Square<br>New York, NY 10036 |
| *Counsel for Gregg Smith* | 155 North Wacker Drive<br>Chicago, IL 60606 |
| | *Counsel for Michael Nowak* |
| **PETRILLO KLEIN & BOXER LLP** | **AKIN GUMP STRAUSS HAUER & FELD LLP** |
| 655 Third Avenue<br>New York, NY 10017 | One Bryant Park<br>New York, NY 10036 |
| *Counsel for Jeffrey Ruffo* | **MOLOLAMKEN LLP** |
| | 300 North LaSalle Street<br>Chicago, IL 60654 |
| | *Counsel for Christopher Jordan* |

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ....................................................................................1

II.     SUMMARY OF THE INDICTMENT ......................................................................3

        A.      Background.............................................................................................3

        B.      The Charged RICO Conspiracy ............................................................4

                1.      Spoofing.....................................................................................5

                2.      Barrier-Running .......................................................................6

                3.      Concealment..............................................................................6

        C.      Counts Two Through Fourteen..............................................................7

                1.      Conspiracy (All Defendants) ...................................................7

                2.      Attempted Price Manipulation (Smith and Nowak)..................7

                3.      Bank Fraud (Smith, Nowak, and Jordan) ................................8

                4.      Wire Fraud Affecting a Financial Institution (Smith, Nowak, and Jordan) ................................................................8

                5.      Commodities Fraud (Smith and Nowak)...................................9

                6.      Spoofing (Smith and Nowak) ...................................................9

III.    APPLICABLE LAW ................................................................................................9

IV.     ARGUMENT ............................................................................................................10

        POINT 1: THE CONDUCT ALLEGED DOES NOT CONSTITUTE FRAUD ...................10

        A.      The Spoofing Allegations Fail to State a Violation of the Bank Fraud, Wire Fraud, or Commodities Fraud Statutes.......................................10

                1.      Applicable Law ......................................................................10

                2.      Discussion ..............................................................................11

                        a.      *At-Risk Open-Market Orders, Standing Alone, Cannot Constitute a Scheme or Artifice to Defraud* ..............................11

                        b.      *The Spoofing-Based Fraud Charges in the Indictment Do Not Allege Any Misrepresentations or Omissions* .......................16

B.     As to Bank Fraud, the Indictment Does Not Allege Specific Intent to Defraud a Financial Institution ........................................................17

     1.     Applicable Law ................................................................18

     2.     Discussion .......................................................................19

          a.     *The Indictment Fails to Allege Specific Intent to Defraud "Other Financial Institutions"* ...................................................20

          b.     *The Indictment Fails to Allege Specific Intent to Defraud Bank A* ........................................................26

C.     The Spoofing-Based Fraud Allegations Are Unconstitutionally Vague ...............27

     1.     Applicable Law ................................................................27

     2.     Discussion .......................................................................28

          a.     *The Statutory Framework Does Not Provide Notice That Spoofing Is Fraudulent* ................................................28

          b.     *Prior Prosecutions Do Not Provide Notice That At-Risk Open-Market Orders Can Carry Material Misrepresentations* ........................................................29

D.     The Allegations of Barrier-Running Fail to State a Violation of the Bank Fraud, Wire Fraud, or Commodities Fraud Statutes ............................................32

     1.     Relevant Allegations in the Indictment ..................................32

     2.     Applicable Law ................................................................34

     3.     Discussion .......................................................................34

POINT 2: THE RICO CONSPIRACY CHARGE SHOULD BE DISMISSED ...................37

A.     The Conduct Alleged in the Indictment Is Not Racketeering Activity ................37

B.     With Regard to the Fraud Counts, If the Court Rejects Either the Barrier-Running Theory or the Spoofing Theory, the Remaining Allegations Would Not Form a Pattern of Racketeering Activity ..........................................38

     1.     Applicable Law ................................................................38

     2.     Discussion .......................................................................40

          a.     *The Alleged Acts of Spoofing, Standing Alone, Do Not Establish a Pattern* .....................................................40

        b.     *The Alleged Acts of Barrier-Running, Standing Alone, Do Not Establish a Pattern* .............................................................44

POINT 3: ALL TWELVE SUBSTANTIVE COUNTS SHOULD BE DISMISSED ...........46

    A.    The Attempted Price Manipulation, Spoofing, and Bank Fraud Counts Are Unconstitutionally Vague as Charged Because They Lack Specificity...............46

        1.    Applicable Law ......................................................................46

        2.    Discussion .............................................................................47

            a.     *The Attempted Price Manipulation and Spoofing Counts Fail to Specify Any Particular Allegedly Offending Trading Sequences* ............................................................47

            b.     *The Bank Fraud Counts Do Not Adequately Identify the Financial Institutions Purportedly Defrauded* .............................50

    B.    The Substantive Counts Are Duplicitous .............................................................52

        1.    Applicable Law ......................................................................52

        2.    Discussion .............................................................................54

            a.     *To the Extent That Both the Spoofing Allegations and the Allegations Regarding Barrier Options Are Upheld, Counts Three Through Twelve Are Duplicitous* .......................................54

            b.     *Even If the Trading Sequences Identified in Count One, Alone, Formed the Basis for the Attempted Price Manipulation and Spoofing Counts, Those Counts Would Be Duplicitous* ..........................................................................56

            c.     *The Bank and Wire Fraud Counts Are Duplicitous in Charging Alleged Conduct with Respect to More Than One Financial Institution*...................................................................57

    C.    The Substantive Counts Purport to Charge Time-Barred Conduct .....................60

    POINT 4: PARAGRAPHS 40 AND 41 CONTAIN PREJUDICIAL SURPLUSAGE ..........64

V.    CONCLUSION ....................................................................................................65

# TABLE OF AUTHORITIES

## CASES

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
    483 U.S. 143 (1987) ..................................................................................... 39

*Bd. of Trade of City of Chi. v. SEC*,
    883 F.2d 525 (7th Cir. 1989) .................................................................... 22, 23

*Bouie v. City of Columbia*,
    378 U.S. 347 (1964) ..................................................................................... 31

*CFTC v. Oystacher*,
    No. 15-CV-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016) .................. 21, 22

*CIB Bank v. Esmail*,
    No. 04 C 4870, 2004 WL 3119027 (N.D. Ill. Dec. 28, 2004) ................... 41, 44

*Conrad v. United States*,
    815 F.3d 324 (7th Cir. 2016) ....................................................................... 32

*CP Stone Fort Holdings, LLC v. Doe(s) (I)*,
    No. 16 C 4991, 2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) .................... 14, 15

*CP Stone Fort Holdings, LLC v. Doe(s) (II)*,
    No. 16 C 4991, 2017 WL 1093166 (N.D. Ill. Mar. 22, 2017) ........................ 15

*Emery v. Am. Gen. Fin., Inc.*,
    71 F.3d 1343 (7th Cir. 1995) ....................................................................... 34

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ........................................................................... 28, 31, 32

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.*,
    128 F.3d 1074 (7th Cir. 1997) ..................................................................... 13

*GFL Advantage Fund, Ltd. v. Colkitt*,
    272 F.3d 189 (3d Cir. 2001) ........................................................................ 15

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ..................................................................................... 28

*Guaranteed Rate, Inc. v. Barr*,
    912 F. Supp. 2d 671 (N.D. Ill. 2012) ........................................................... 42

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ..................................................................................... 39

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983) ...............................................................................35

*HTG Capital Partners, LLC v. Doe 1,*
    No. 15 C 02129, 2016 WL 612861 (N.D. Ill. Feb. 16, 2016).........................22

*Inteliquent, Inc. v. Free Conferencing Corp.,*
    No. 16-cv-06979, 2017 WL 1196957 (N.D. Ill. Mar. 30, 2017).....................42

*Jennings v. Auto Meter Products Inc.,*
    495 F.3d 466 (7th Cir. 2007)................................................................41, 42

*Jones v. Lampe,*
    845 F.2d 755 (7th Cir. 1988)................................................................38, 41

*LaSalle v. Medco Research, Inc.,*
    No. 93 C 5381, 1994 WL 535106 (N.D. Ill. Sept. 30, 1994), *rev'd on other*
    *grounds*, 54 F.3d 443 (7th Cir. 1995) ............................................................13

*Loughrin v. United States,*
    573 U.S. 351 (2014) ................................................................ 18, 19, 21, 25

*Meier v. Musburger,*
    588 F. Supp. 2d 883 (N.D. Ill. 2008) ............................................................39

*Menzies v. Seyfarth Shaw LLP,*
    943 F.3d 328 (7th Cir. 2019)........................................................................39

*Midwest Grinding Co. v. Spitz,*
    976 F.2d 1016 (7th Cir. 1992)........................................................ 38, 39, 44

*Miller v. Loucks,*
    No. 91 C 6539, 1992 WL 329313 (N.D. Ill. Nov. 5, 1992)................. 38, 41, 43

*Morgan v. Bank of Waukegan,*
    804 F.2d 970 (7th Cir. 1986)........................................................................40, 41

*Neder v. United States,*
    527 U.S. 1 (1999) ...............................................................................34, 35

*Olive Can Co. v. Martin,*
    906 F.2d 1147 (7th Cir. 1990)......................................................................42

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,*
    484 U.S. 97 (1987) ......................................................................................29

*Papachristou v. City of Jacksonville,*
    405 U.S. 156 (1972) ....................................................................................28

*Ploss v. Kraft Foods Grp., Inc.*,
    197 F. Supp. 3d 1037 (N.D. Ill. 2016) ........................................................... 35

*Proetz v. Dean Witter Reynolds, Inc.*,
    No. 87 C 4777, 1988 WL 17885 (N.D. Ill. Feb. 22, 1988) .............................. 13

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ........................................................................................ 45

*Rich-Taubman Assocs. v. Stamford Rest. Operating Co.*,
    587 F. Supp. 875 (S.D.N.Y. 1984) ................................................................. 40

*Russello v. United States*,
    464 U.S. 16 (1983) .......................................................................................... 29

*Saleh v. Merchant*,
    No. 14-CV-09186, 2019 WL 1331788 (N.D. Ill. Mar. 25, 2019) .............. 41, 42

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) .................................................................................. 37, 39

*Shaw v. United States*,
    137 S. Ct. 462 (2016) ...................................................................................... 18

*Stirone v. United States*,
    361 U.S. 212 (1960) ........................................................................................ 49

*Sullivan & Long, Inc. v. Scattered Corp.*,
    47 F.3d 857 (7th Cir. 1995) ............................................................................ 12

*Talbot v. Robert Matthews Distrib. Co.*,
    961 F.2d 654 (7th Cir. 1992) .......................................................................... 44

*Toussie v. United States*,
    397 U.S. 112 (1970) ........................................................................................ 61

*Triad Assocs., Inc. v. Chi. Hous. Auth.*,
    892 F.2d 583 (7th Cir. 1989) .......................................................................... 41

*United States v. Ali*,
    266 F.3d 1242 (9th Cir. 2001) ........................................................................ 51

*United States v. Askia*,
    893 F.3d 1110 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 2705 (2019) ............ 62

*United States v. Astheimer*,
    Crim. A. No. 91-0041, 1992 WL 20304 (E.D. Pa. Feb. 3, 1992),
    *aff'd*, 981 F.2d 1249 (3d Cir. 1992) ............................................................... 24

*United States v. Austin*,
    907 F.3d 995 (7th Cir. 2018)....................................................................25

*United States v. Banyan*,
    933 F.3d 548 (6th Cir. 2019)....................................................................25

*United States v. Berardi*,
    675 F.2d 894 (7th Cir. 1982)........................................................ 52, 53, 55

*United States v. Bessigano*,
    No. 2:08 CR 110, 2008 WL 4833110 (N.D. Ind. Nov. 4, 2008)...............54, 58

*United States v. Bogucki*,
    316 F. Supp. 3d 1177, 1181 (N.D. Cal. 2018) ..........................................36

*United States v. Bortnick*,
    No. Crim. A. 03–CR–0414, 2004 WL 2752471 (E.D. Pa. Nov. 29, 2004)....................51

*United States v. Bouchard*,
    828 F.3d 116 (2d Cir. 2016)........................................................... 18, 24

*United States v. Buchmeier*,
    255 F.3d 415 (7th Cir. 2001)....................................................................53

*United States v. Coscia*,
    100 F. Supp. 3d 653 (N.D. Ill. 2015) .......................................................14

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017)..........................................10, 13, 14, 16, 35

*United States v. Davis*,
    471 F.3d 783 (7th Cir. 2006)....................................................................53

*United States v. Dial*,
    757 F.2d 163 (7th Cir. 1985).......................................... 10, 13, 16, 23

*United States v. Doherty*,
    969 F.2d 425 (7th Cir. 1992)............................................................10, 19

*United States v. Edelkind*,
    467 F.3d 791 (1st Cir. 2006) ..................................................................25

*United States v. Farmigoni*,
    934 F.2d 63 (5th Cir. 1991).................................................... 51, 58, 60

*United States v. Fassnacht*,
    332 F.3d 440 (7th Cir. 2003)................................................... 47, 48, 52

*United States v. Finley*,
705 F. Supp. 1272 (N.D. Ill. 1988)...............................................................40

*United States v. Freed*,
No. 13-cr-951, 2016 WL 374133 (N.D. Ill. Feb. 1, 2016)................................60

*United States v. Gee*,
226 F.3d 885 (7th Cir. 2000)...................................................................34, 35

*United States v. Hall*,
613 F.3d 249 (D.C. Cir. 2010),
*reissued*, 945 F.3d 507 (D.C. Cir. 2019), *and amended per curiam*, No. 07-3036,
2019 WL 6794225 (D.C. Cir. Dec. 12, 2019)..............................................26

*United States v. Higgins*,
270 F.3d 1070 (7th Cir. 2001).................................................................18, 19

*United States v. Hillie*,
227 F. Supp. 3d 57 (D.D.C. 2017) ..............................................................49

*United States v. Hinton*,
127 F. Supp. 2d 548 (D.N.J. 2000)......................................................58, 59, 60

*United States v. Hollnagel*,
No. 10 CR 195, 2011 WL 3664885 (N.D. Ill. Aug. 19, 2011) ..................53, 60

*United States v. Horak*,
833 F.2d 1235 (7th Cir. 1987).....................................................................40

*United States v. Jaynes*,
75 F.3d 1493 (10th Cir. 1996)......................................................................63

*United States v. Johnson*,
945 F.3d 606, 613 (2d Cir. 2019) ................................................................36

*United States v. Josten*,
704 F. Supp. 841 (N.D. Ill. 1989).........................................................47, 49

*United States v. Kimberlin*,
781 F.2d 1247 (7th Cir. 1985)......................................................................53

*United States v. Lanier*,
520 U.S. 259 (1997) ............................................................................28, 31

*United States v. LeDonne*,
21 F.3d 1418 (7th Cir. 1994).................................................................18, 19

*United States v. Longfellow*,
   43 F.3d 318 (7th Cir. 1994) ............................................................. 62

*United States v. Marshall*,
   75 F.3d 1097 (7th Cir. 1996) ............................................................ 52

*United States v. Marshall*,
   985 F.2d 901 (7th Cir. 1993) ............................................................ 65

*United States v. Mason*,
   No. 15-CR-102, 2016 WL 2755401 (N.D. Ill. May 12, 2016) ............... 53, 55

*United States v. Miller*,
   883 F.3d 998 (7th Cir. 2018) ............................................................ 53

*United States v. Miro*,
   29 F.3d 194 (5th Cir. 1994) .......................................................... 62, 63

*United States v. Miserendino*,
   No. 05-CR-311, 2006 WL 1117828 (E.D. Wis. Apr. 26, 2006) .............. 54

*United States v. Morris*,
   821 F.3d 877 (7th Cir. 2016) ............................................................ 28

*United States v. Motz*,
   652 F. Supp. 2d 284 (E.D.N.Y. 2009) ............................................ 62, 63

*United States v. Neapolitan*,
   791 F.2d 489 (7th Cir. 1986), *cert. denied*, 479 U.S. 940 (1986) ............ 38

*United States v. Niven*,
   952 F.2d 289 (9th Cir. 1991), *overruled on other grounds by United States v.
   Scarano*, 76 F. 3d 1471 (9th Cir. 1996) ............................................. 62

*United States v. O'Brien*,
   No. 17 CR 239-1, 2017 WL 5192032 (N.D. Ill. Nov. 9, 2017) ......... 53, 55, 56, 60

*United States v. O'Brien*,
   No. 17 CR 239-1, 2018 WL 4205472 (N.D. Ill. Sept. 4, 2018) .......... 18, 19, 62

*United States v. Palumbo Bros.*,
   145 F.3d 850 (7th Cir. 1998) ................................................... 39, 45, 46

*United States v. Prescott*,
   42 F.3d 1165 (8th Cir. 1994) ............................................................ 56

*United States v. Pribble*,
   127 F.3d 583 (7th Cir. 1997) ............................................................ 19

*United States v. Radley*,
632 F.3d 177 (5th Cir. 2011) ........................................................................ 12, 15

*United States v. Radley*,
659 F. Supp. 2d 803 (S.D. Tex. 2009), *aff'd*, 632 F.3d 177 (5th Cir. 2011) ............... 12

*United States v. Redwood*,
No. 16 CR 00080, 2016 WL 4398082 (N.D. Ill. Aug. 18, 2016) ................................ 9

*United States v. Reicin*,
497 F.2d 563 (7th Cir. 1974) ............................................................................. 54

*United States v. Risk*,
843 F.2d 1059 (7th Cir. 1988) ............................................................................. 9

*United States v. Schock*,
No. 16-CR-30061, 2017 WL 4780614 (C.D. Ill. Oct. 23, 2017), *aff'd in part,
appeal dismissed in part*, 891 F.3d 334 (7th Cir. 2018) .................................... 54, 56

*United States v. Segal*,
248 F. Supp. 2d 786 (N.D. Ill. 2003) .............................................................. 43, 44

*United States v. Smith*,
230 F.3d 300 (7th Cir. 2000) ........................................................................ 18, 47

*United States v. Standard Drywall Corp.*,
617 F. Supp. 1283 (E.D.N.Y. 1985) ..................................................................... 40

*United States v. Stephens*,
421 F.3d 503 (7th Cir. 2005) ............................................................................. 16

*United States v. Stewart*,
No. 08 CR 720, 2009 WL 2149603 (N.D. Ill. July 17, 2009) ................................... 57

*United States v. Tanner*,
471 F.2d 128 (7th Cir. 1972) ............................................................................. 56

*United States v. Urso*,
369 F. Supp. 2d 254 (E.D.N.Y. 2005) .................................................................. 49

*United States v. Vendetti*,
No. 10–CR–00360–RJA–JJM, 2013 WL 5522860 (W.D.N.Y. Jan. 22, 2013),
*report and recommendation adopted*, No. 10–CR–360, 2013 WL 5522434
(W.D.N.Y. Oct. 3, 2013) .................................................................................. 50

*United States v. Vorley*,
No. 18 CR 00035, 2019 WL 5312335 (N.D. Ill. Oct. 21, 2019) ............. 10, 16, 17, 34, 35

*United States v. Weimert*,
   819 F.3d 351 (7th Cir. 2016)..................................................... 10, 11, 16, 34

*United States v. White*,
   610 F.3d 956 (7th Cir. 2010)..................................................................9

*United States v. White*,
   No. 08–CR–85, 2010 WL 10861118 (N.D. Ill. Dec. 16, 2010), *aff'd*, 698 F.3d
   1005 (7th Cir. 2012) ...........................................................................65

*United States v. Yashar*,
   166 F.3d 873 (7th Cir. 1999).................................................... 61, 62, 63

*United States v. Zeidman*,
   540 F.2d 314 (7th Cir. 2006)...............................................................60

## STATUTES

7 U.S.C. § 6b...........................................................................................29

7 U.S.C. § 6c.......................................................................................7, 29

7 U.S.C. § 9(1)........................................................................................36

7 U.S.C. § 13(a)(2) .........................................................................8, 34, 59

18 U.S.C. § 20.........................................................................................27

18 U.S.C. § 1343 ...............................................................4, 8, 33, 35

18 U.S.C. § 1344 ...............................................................4, 8, 21, 33

18 U.S.C. § 1348 .....................................................................8, 33, 34

18 U.S.C. § 1961......................................................................41, 42

18 U.S.C. § 1962(d) ................................................................................4

18 U.S.C. § 3282(a) ..............................................................................60

18 U.S.C. § 3293 ...........................................................................59, 60

18 U.S.C. § 3301(b) ..............................................................................60

## RULES

Fed. R. Crim. P. 7(c) .............................................................................47

Fed. R. Crim. P. 7(d) .............................................................................65

Fed. R. Crim. P. 12(b)(3)......................................................................................46, 48

Fed. R. Evid. 201 ....................................................................................................13

## REGULATIONS

Antidisruptive Practices Authority,
    78 Fed. Reg. 31,890 (May 28, 2013)..............................................................29

Antidisruptive Practices Authority Contained in the Dodd-Frank Wall Street Reform and
    Consumer Protection Act, 75 Fed. Reg. 67,301 (proposed Nov. 2, 2010) (to be
    codified at 17 C.F.R. ch. 1)..........................................................................29

## OTHER AUTHORITIES

Andrew M. Chisholm, *Derivatives Demystified: A Step-by-Step Guide to Forwards,*
    *Futures, Swaps and Options*, 213 (John Wiley & Sons Ltd 2004) ..................33

CME Grp., *CME Globex Reference Guide*,
    www.cmegroup.com/globex/files/GlobesRefGd.pdf .....................................22

CME Grp., *Introduction to Futures – Definition of a Futures Contract*,
    www.cmegroup.com/education/courses/introduction-to-futures/definition-of-a-
    futures-contract.html.....................................................................................24

Indictment, *United States v. Bases*, No. 18 CR 48, ECF No. 66 (N.D. Ill. July 17, 2018).....16, 21

Indictment, *United States v. Coscia*, No. 1:14-cr-00551, ECF No. 1 (N.D. Ill. Oct. 1,
    2014).......................................................................................................13, 57

Indictment, *United States v. Thakkar*, No. 1:18-cr-00036 CF No. 17 (N.D. Ill. Feb. 14,
    2018)............................................................................................................22

Indictment, *United States v. Vorley*,
    No. 18 CR 35, ECF No. 12 (N.D. Ill. July 24, 2018) ....................................17

Jury Trial Transcript, Vol. I, *United States v. Flotron* , No. 3:17CR220 (JAM), ECF No.
    229 (D. Conn. Apr. 16, 2018) .......................................................................22

Jury Trial Transcript, Vol. III, *United States v. Flotron* , No. 3:17CR220 (JAM), ECF No.
    231 (D. Conn. Apr. 19, 2018) .......................................................................23

Press Release, CFTC Closes Investigation Concerning the Silver Markets, CFTC Rel.
    No. 670913 (Sept. 25, 2013), www.cftc.gov/PressRoom/PressReleases/pr6709-13 ........65

Press Release, U.S. Attorney's Office (N.D. Ill.), High-Frequency Trader Convicted of
    Disrupting Commodity Futures Market in First Federal Prosecution of "Spoofing"
    (Nov. 3, 2015), www.justice.gov/usao-ndil/pr/high-frequency-trader-convicted-
    disrupting-commodity-futures-market-first-federal ......................................57

Press Release, U.S. Attorney's Office (N.D. Ill.), High-Frequency Trader Indicted for Manipulating Commodities Futures Markets in First Federal Prosecution for "Spoofing" (Oct. 2, 2014), www.justice.gov/usao-ndil/pr/high-frequency-trader-indicted-manipulating-commodities-futures-markets-first-federal ................................. 30

Superseding Indictment, *United States v. Flotron*, No. 3:17-cr-00220-JAM, ECF No. 58 (D. Conn. Jan. 30, 2018) ............................................................................................ 21

Superseding Indictment, *United States v. Segal*, No. 02 CR 112, ECF No. 51, 2002 WL 34337364 (N.D. Ill. Oct. 31, 2002) ............................................................................... 43

Trial Tr., *United States v. Allen*, No. 14 CR. 272 (JSR), ECF No. 150 (S.D.N.Y. Oct. 13, 2015) .................................................................................................................................. 59

*United States v. Bases*, No. 18 CR 48, ECF No. 236 (N.D. Ill. Jan 16, 2020) ............................ 17

*United States v. Coscia*, No. 1:14-*cr*-00551, ECF No. 35 (N.D. Ill. Apr. 16, 2016) .................... 31

U.S. Dep't of Justice, *Justice Manual* § 9-110.200 (Oct. 2016), www.justice.gov/jm/jm-9-110000-organized-crime-and-racketeering ................................................................... 46

Defendants Gregg Smith, Michael Nowak, Jeffrey Ruffo, and Christopher Jordan respectfully submit this memorandum of law in support of their joint motion to dismiss Counts One, Two (in part), and Three through Fourteen and to strike prejudicial surplusage in Paragraphs 40 and 41 of the Superseding Indictment ("Indictment" or "Indict."). (ECF No. 52.)

## I. PRELIMINARY STATEMENT

The fourteen-count Indictment charges three former traders and one former salesperson on the precious metals trading desk of a major international financial firm with participation in two conspiracies—a racketeering conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"), and a conspiracy to manipulate prices, violate several fraud statutes, and engage in spoofing—and five substantive offenses: attempted price manipulation, bank fraud, wire fraud affecting a financial institution, commodities fraud, and spoofing.[1] Notwithstanding the government's attempt to characterize conduct that bears no resemblance to traditional organized crime as racketeering, this case, at bottom, is about something quite different: (a) the alleged placing of bids and offers in the precious metals futures markets with intent to cancel those orders before execution, commonly known as spoofing; and (b) sparse, conclusory allegations of purportedly fraudulent but unspecified trading activity relating to barrier options, described by the government as "barrier-running" and "barrier-defending."[2]

The Indictment's core flaw is that, as alleged, the market activity undertaken by Defendants does not constitute fraud. As explained in detail below, the alleged spoof orders placed by Defendants were real, executable, open-market orders, and the Indictment does not

---

[1]   No Defendant is charged in all fourteen counts. *See infra*, Part II.B–C.

[2]   In this memorandum, we use the term "barrier-running" to refer to both barrier-running and -defending.

allege that they involved any misrepresentation (express or implied) or omission. Similarly, the bare-bones allegations regarding barrier-related trading activity do not make out an actionable theory of fraud. Accordingly, the substantive counts of bank fraud, wire fraud, and commodities fraud must be dismissed, along with the corresponding portions of the two conspiracy counts.

In addition, with respect to the bank fraud counts, there is no allegation that Defendants had the requisite specific intent to defraud a financial institution in connection with this purported conduct. Because the precious metals futures trading alleged in the Indictment occurred on anonymous CME Group exchanges, Defendants could not have known whether they were trading with a financial institution and thus could not have specifically intended to defraud one. The allegations regarding barrier options do not even assert that the clients purportedly defrauded were financial institutions. These circumstances are fatal to the bank fraud charges.

Furthermore, the Indictment's characterization of spoofing as fraud in violation of the bank, wire, and commodities fraud statutes violates Defendants' rights to due process because, at the time of the alleged conduct, neither the statutory framework and related guidance nor prior prosecutions gave fair notice that the conduct could be considered fraudulent. The fraud statutes are therefore unconstitutionally vague as applied to Defendants' alleged conduct, and the substantive fraud and conspiracy counts must be dismissed for that reason as well.

Because spoofing and barrier-running are not fraudulent conduct, that alleged activity cannot constitute predicate acts of bank or wire fraud for purposes of the RICO conspiracy charge, and that charge must be dismissed. Moreover, as alleged, that activity does not constitute a "pattern" as RICO requires, also warranting dismissal of the charge.

Finally, the substantive counts, Counts Three through Fourteen, must be dismissed because they variously lack specificity as to the trading sequences at issue, are impermissibly

duplicitous, and purport to charge trading activity outside the applicable statutes of limitations; and Paragraphs 40 and 41 of the Indictment contain prejudicial surplusage concerning a prior, unrelated investigation, which should be stricken.

## II.    SUMMARY OF THE INDICTMENT

### A. Background

The Indictment is directed at certain trading in the precious metals futures markets during the period March 2008 through August 2016. Indict. ¶ 18. Precious metals include "gold, silver, platinum, and palladium." *Id.* ¶ 1. As alleged, all four Defendants worked on the precious metals trading desk at Bank A. *Id.* ¶ 18. Messrs. Nowak and Jordan were hired by Bank A prior to March 2008, and Messrs. Smith and Ruffo became employees in May 2008, when Bank A acquired Bank B. During and after May 2008, Messrs. Smith, Nowak, and Jordan were precious metals traders at Bank A, and Mr. Ruffo was a salesperson. *Id.*[3]

The Indictment concerns trading in two types of financial instrument—namely, futures contracts and barrier options. A futures contract, as alleged, is an "agreement to buy or sell a particular product (such as gold, for example) at a fixed price but to be delivered and paid for later." *Id.* ¶ 2. "Gold and silver futures contracts" were traded on the Commodity Exchange, Inc. ("COMEX"), and "platinum and palladium futures contracts" were traded on the New York Mercantile Exchange, Inc. ("NYMEX"). *Id.* ¶ 12. Each of COMEX and NYMEX used an electronic trading system that permitted market participants to enter orders to buy (bids) or sell (offers) precious metals futures contracts at different prices and quantities. *Id.* ¶¶ 12–13. "An

---

[3] Mr. Jordan left Bank A in December 2009, after which he traded briefly at two other firms identified in the Indictment as Bank C and Company D. Indict. ¶ 18(d). The "Conspiracy Period" alleged in the Indictment continued for nearly seven years after Mr. Jordan's departure from Bank A. *See id.* ¶ 18.

order was 'filled' or 'executed' when a buyer's bid price and a seller's offer price matched for a particular contract." *Id.* ¶ 13.

An options contract "offered the purchaser of the option the right (but not the obligation) to buy or sell the underlying asset at an agreed-upon price during a certain period of time or on a specific date." *Id.* ¶ 15. "A 'barrier' option," as alleged, "was a type of option whose value depended on whether or not the underlying asset reached or exceeded a predetermined price during the lifetime of the option." *Id.* ¶ 16.

## B. The Charged RICO Conspiracy

Count One—which alleges that the precious metals trading desk at Bank A was a racketeering enterprise consisting of a group of individuals "associated in fact"—charges Defendants with conspiracy to violate the RICO statute, 18 U.S.C. § 1962(d), Indict. ¶¶ 17, 22, and describes as co-conspirators seven unindicted and unidentified "supervisors, salespeople, and traders on the Precious Metals Desk at Bank A's offices in New York, London, and Singapore at various times during the Conspiracy Period." *Id.* ¶ 21. According to the Indictment, Defendants and their purported co-conspirators knowingly and intentionally conspired to "conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts" of wire fraud affecting a financial institution, 18 U.S.C. § 1343, and bank fraud, 18 U.S.C. § 1344(1), all to: (i) "[m]aximiz[e] trading profits and minimiz[e] trading losses for the Defendants and their co-conspirators, the Precious Metals Desk at Bank A, and Bank A itself through unlawful trading practices," (ii) "[p]romot[e] and enhanc[e] the racketeering conspiracy and the activities of the Defendants and their co-conspirators," and (iii) "[c]onceal[] the unlawful activities of the Defendants and their coconspirators from scrutiny by Bank A, the CME Group, the CFTC, and law enforcement."

Indict. ¶¶ 22, 24(a)–(c). In connection with the RICO conspiracy and other charges, the Indictment describes two categories of alleged conduct: spoofing and barrier-running.

1. Spoofing

All of the precious metals futures orders characterized as "spoofing" were at-risk, open-market orders that could be executed. *See id.* ¶ 26(k). Nevertheless, the Indictment alleges that, "[i]n thousands of trading sequences," Defendants manually placed "Deceptive Orders," which were intended to be canceled "before execution," and "Genuine Orders," which Defendants "intended to execute." *Id.* ¶¶ 26(a), (b). Defendants allegedly placed the so-called Deceptive Orders "with the intent to fraudulently and artificially move the price of a given precious metals futures contract in a manner that would increase the likelihood that one or more of their own opposite-side Genuine Orders would be filled by other market participants." *Id.* ¶ 26(j). Once the Genuine Orders were executed, in whole or in part, as the Indictment alleges, Defendants "attempted to, and generally did, quickly cancel their Deceptive Orders before they could be executed." *Id.* ¶ 26(k). Nonetheless, at times, as the Indictment acknowledges, so-called Deceptive Orders were in fact executed. *Id.*

According to the Indictment, Defendants, in placing orders that they intended to cancel before execution, "intended to inject false and misleading information about the genuine supply and demand for precious metals futures contracts into the markets, and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand." *Id.* ¶ 26(f). The Indictment further alleges that the Deceptive Orders were "intended to, and at times did, trick other market participants, including competitor financial institutions and proprietary traders, into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices, and times that they otherwise likely would not have

traded." *Id.* ¶ 26(g). The Indictment, however, does not identify any specific counterparty who was allegedly deceived into trading at quantities and prices and times when it otherwise "likely would not have traded," nor does it allege any misrepresentation or omission.

Concerning acts of spoofing in furtherance of the alleged conspiracy, the Indictment alleges a non-exhaustive list of "trading sequences" for each of Mr. Smith, *id.* ¶¶ 30(a)–(y) (twenty-five trading sequences), Mr. Nowak, *id.* ¶¶ 31(a)–(n) (fourteen trading sequences), and Mr. Jordan, *id.* ¶¶ 32(a)–(h) (eight trading sequences), each allegedly involving the use of "Deceptive Orders." Two alleged sequences refer to Mr. Ruffo as having accepted orders from "Hedge Fund E" and "Hedge Fund F" to sell specific quantities of silver and gold, respectively. *Id.* ¶¶ 30(i), (j).

### 2. Barrier-Running

The Indictment provides scant detail about the conduct it terms barrier-running and barrier-defending. Per the Indictment, barrier-running is the allegedly "unlawful practice" of trading in precious metals futures contracts to trigger barrier options held by Bank A, and barrier-defending is the allegedly "unlawful practice" of trading in precious metals futures contracts to avoid triggering barrier options held by clients of Bank A. *Id.* ¶¶ 16, 27. The Indictment alleges, without averring any dates, trade participants, clients, or misrepresentations or omissions, that Defendants "defrauded clients of Bank A who had bought or sold barrier options, by trading in a manner that was calculated to push the price of the underlying assets away from the price point at which Bank A would lose money on the options and toward the price point at which Bank A would profit from the options." *Id.* ¶ 27.

### 3. Concealment

Framing Defendants' statements that they did not engage in misconduct, or were not aware of misconduct, as false, Count One concludes with the allegation that Defendants

concealed their allegedly "unlawful activities," *id.* ¶ 24(c), by lying to Bank A, *id.* ¶¶ 43–44 (alleging that Defendants falsely represented to Bank A that they were in compliance with Bank A's code of conduct), the CME Group, *id.* ¶ 42 (alleging that Mr. Smith lied to the CME Group when, in an interview in October 2013, he allegedly affirmed that he had wanted to trade certain orders), and the Commodity Futures Trading Commission ("CFTC"), *id.* ¶ 40 (alleging that Mr. Nowak lied to the CFTC when, in investigative testimony in August 2010, he answered in the negative when asked whether, to his knowledge, precious metals traders at Bank A had "put up bids or offers to the market which they didn't intend to execute and then pulled them before they got hit or lifted"); *id.* ¶ 41 (alleging that Mr. Jordan lied to the CFTC when, in investigative testimony in September 2010, he was asked, "Did you ever a show a bid or offer on Globex that you didn't intend to execute," and he responded, "Only if it, I would cancel something if I changed my mind or if it was put in in error, but, no.").

## C. Counts Two Through Fourteen

The remaining counts in the Indictment rely exclusively on the allegations contained in Count One, each re-alleging and incorporating certain allegations in Count One without making additional factual allegations.

### 1. Conspiracy (All Defendants)

Count Two charges Defendants with engaging in a conspiracy, in violation of 18 U.S.C. § 371, to commit price manipulation, 7 U.S.C. § 13(a)(2), bank fraud, 18 U.S.C. § 1344(1), wire fraud affecting a financial institution, 18 U.S.C. § 1343, and commodities fraud, 18 U.S.C. § 1348, and to engage in spoofing, 7 U.S.C. §§ 6c(a)(5)(C), 13(a)(2). Indict. ¶¶ 45–51.

### 2. Attempted Price Manipulation (Smith and Nowak)

Counts Three and Four charge Messrs. Smith and Nowak, respectively, with attempted price manipulation. Indict. ¶¶ 52–57. These charges track the statutory language of 7 U.S.C. §

13(a)(2), and aver as specific alleged acts, among others, the trading sequences identified in Paragraphs 30 and 31. *Id.* ¶ 54 ("SMITH did commit, and cause to be committed the overt acts alleged in Paragraph 30 above, among others . . ."); *id.* ¶ 57 ("NOWAK did commit, and cause to be committed the overt acts alleged in Paragraph 31 above, among others . . .").

### 3. Bank Fraud (Smith, Nowak, and Jordan)

Counts Five through Seven charge Messrs. Smith, Nowak, and Jordan, respectively, with substantive bank fraud, *id.* ¶¶ 58–63, naming Bank A as one of the purported intended victims of such fraud, *id.*—notwithstanding the fact that Count One alleges that a purpose of the RICO conspiracy charged in that count was to maximize trading profits and minimize trading losses for, among others, "Bank A itself." *Id.* ¶ 24.[4] The Indictment thus presents Bank A as both a beneficiary and a victim of the conduct alleged.[5]

### 4. Wire Fraud Affecting a Financial Institution (Smith, Nowak, and Jordan)

Counts Eight through Ten charge Messrs. Smith, Nowak, and Jordan, respectively, with substantive wire fraud affecting a financial institution. *Id.* ¶¶ 64–69. The Indictment alleges that Defendants transmitted or caused transmission of wires, including with respect to the so-called Deceptive Orders alleged in Paragraphs 30, 31, and 32, "all affecting one or more financial institutions, including Bank A and other financial institutions," without alleging that any specific financial institution was a counterparty to, or otherwise the victim of, any alleged trade. *Id.* ¶¶ 65, 67.[6]

---

[4] Count Seven (as to Mr. Jordan) also names Bank C as a purported intended victim of the alleged fraud. Indict. ¶ 63.

[5] Similarly, Count Two, which alleges a conspiracy to commit bank fraud (among other things), identifies Bank A as a purported victim, *id.* ¶ 46(b), even though one of the alleged "purposes of the conspiracy" was to "[m]aximiz[e] trading profits and minimize[e] losses for the Defendants and their co-conspirators, the Precious Metals Desk at Bank A, and *Bank A itself* through unlawful trading practices." *Id.* ¶ 47(a) (emphasis added).

[6] Count Ten (as to Mr. Jordan) also alleges that Bank C was affected by the purported fraud. Indict. ¶ 69.

5. Commodities Fraud (Smith and Nowak)

Counts Eleven and Twelve charge Messrs. Smith and Nowak, respectively, with engaging in substantive commodities fraud. *Id.* ¶¶ 70–73. The counts also do not identify any particular intended or actual victim or allege any misrepresentation or omission.

6. Spoofing (Smith and Nowak)

Counts Thirteen and Fourteen charge Messrs. Smith and Nowak, respectively, with substantive violations of the anti-spoofing provision of the Commodity Exchange Act ("CEA") as amended by the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd–Frank"). *Id.* ¶¶ 74–77.

## III.    APPLICABLE LAW

An indictment must be dismissed where it fails to "'allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating.'" *United States v. Redwood*, No. 16 CR 00080, 2016 WL 4398082, at *2 (N.D. Ill. Aug. 18, 2016) (St. Eve, J.) (quoting *United States v. Gimbel*, 830 F.2d 621, 624 (7th Cir. 1987)); *see United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (an indictment must "(1) state[] all the elements of the crime charged; (2) adequately inform[] the defendant of the nature of the charges so that he may prepare a defense; and (3) allow[] the defendant to plead the judgment as a bar to any future prosecutions"); *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) (upholding dismissal of indictment where the district court reasoned that the government's allegations, taken as true, "did not constitute a violation of any statute").

## IV.    ARGUMENT

## POINT 1: THE CONDUCT ALLEGED DOES NOT CONSTITUTE FRAUD

### A.  The Spoofing Allegations Fail to State a Violation of the Bank Fraud, Wire Fraud, or Commodities Fraud Statutes

To successfully state the offenses of bank, wire, and commodities fraud, the Indictment must allege a scheme or artifice to defraud.  With respect to the spoofing allegations, the Indictment fails to do so for at least two reasons.  First, consistent with the Seventh Circuit's decision in *United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017), open-market orders that are alleged to carry a genuine risk of execution cannot, by themselves, constitute a scheme or artifice to defraud.  Second, the Indictment alleges no misrepresentation or omission, and therefore fails on its face to allege a requisite element of a scheme to defraud.  Accordingly, the spoofing-related allegations in Counts Five through Seven (bank fraud), Eight through Ten (wire fraud), and Eleven and Twelve (commodities fraud) should be dismissed.[7]

### 1.  Applicable Law

To state offenses for wire, bank, and commodities fraud under 18 U.S.C. §§ 1343, 1344(1), and 1348(1), the Indictment must allege, among other things, that Defendants knowingly devised a "scheme or artifice to defraud."  *See Coscia*, 866 F.3d at 799; *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016); *United States v. Dial*, 757 F.2d 163, 168 (7th Cir. 1985); *see also United States v. Doherty*, 969 F.2d 425, 429 (7th Cir. 1992) ("'[S]cheme to defraud' means the same thing under §§ 1341, 1343 and 1344 . . . ."); *United States v. Vorley*, No. 18 CR 00035, 2019 WL 5312335, at *6 n.13 (N.D. Ill. Oct. 21, 2019) (Tharp, J.) ("Congress intended no distinction between the meaning of the phrase ['scheme to defraud'] in the mail and

---

[7]  To the extent that the conspiracies charged in Counts One and Two rely on purported fraud violations arising from Defendants' alleged spoofing activity, those counts likewise should be dismissed.

wire fraud statutes on the one hand and the bank and securities/commodities fraud statutes on the other."). The Indictment must also allege that Defendants knowingly devised or participated in such a scheme or artifice with the specific "intent to defraud," which means acting knowingly and with the specific intent to deceive for the purpose of financial gain or to cause financial loss to another. *Weimert*, 819 F.3d at 355 (citation omitted).

The Seventh Circuit observed in *Weimert* that "[t]he mail and wire fraud statutes 'have been invoked to impose criminal penalties upon a staggeringly broad swath of behavior,' creating uncertainty in business negotiations and challenges to due process and federalism." *Id.* at 356 (citation omitted). Given the risk of overbroad application by prosecutors, courts "must take care not to stretch the long arms of the fraud statutes too far," as "[n]ot all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud.'" *Id.* at 356–57 (citations omitted).

2. Discussion

a. *At-Risk Open-Market Orders, Standing Alone, Cannot Constitute a Scheme or Artifice to Defraud*

Paragraph 26 of the Indictment sets forth the government's theory of fraud with respect to spoofing activity: "Defendants and their co-conspirators intended to inject false and misleading information about the genuine supply and demand for precious metals futures contracts into the markets, and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand." Indict. ¶ 26(f). The only allegation of Defendants' conduct that purportedly supports this theory is the claim that Defendants placed a series of "orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution." *Id.* ¶ 26.

This theory fails to allege a scheme or artifice to defraud because, as a matter of law, a subjective intent to cancel orders before execution, on its own, does not—and cannot—render false an executable, open-market order or the actual supply or demand that the order provides to the marketplace while it remains open in the order book. In other words, the placement of executable, open-market orders, alone, cannot constitute fraud, regardless of intent.

The case of *United States v. Radley* is on point. There, commodities traders were charged with wire fraud for allegedly placing large "stacked" bids and offers for propane "without intending to enter into a transaction based on each bid," *United States v. Radley*, 632 F.3d 177, 183 (5th Cir. 2011), to "trick other market participants into believing that demand for the commodity was strong." *Id.* at 180. The trial court found that the "bids and offers would have created legally enforceable obligations if accepted," and noted that "some [in fact] were accepted." *United States v. Radley*, 659 F. Supp. 2d 803, 810 (S.D. Tex. 2009), *aff'd*, 632 F.3d 177 (5th Cir. 2011). The court dismissed the wire fraud count on the basis that such activity was not fraudulent, even though the defendants intended to increase the price of propane through that activity. *Id.* at 820; *see also Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 864 (7th Cir. 1995) (finding no false impression of supply and demand under the securities laws when transactions are not "fictitious[]" but rather involve "real buyers" acting on real offers).

So too, here, the Indictment concedes (as it must) that traders on the opposite side of Defendants' alleged spoof orders were free to accept those orders, and that, had they done so, that would have created legally enforceable obligations for both parties. Indict. ¶ 26(k). Critically, the government acknowledged as much when it alleged in the Indictment that, in some instances, Defendants "were unable to cancel [their alleged spoof orders] quickly enough, and *had to accept* unintended (and unwanted) executions." *Id.* (emphasis added). Indeed, in a

cleared trading environment such as a CME Group exchange, there is zero risk that an order, once accepted, will not be executed. *Dial*, 757 F.2d at 165 (noting that "the transaction is guaranteed by the clearing members of the exchange").[8]

The Seventh Circuit's opinion in *Coscia* supports the principle that actual, executable orders can constitute fraud only if, at the time that the orders were placed, the trader took action to ensure they would not be executed. In *Coscia*, the indictment and the court detailed how the defendant's algorithm operated to prevent his spoof orders from being executed. Specifically, the court found that the defendant, a high-frequency trader, preprogrammed algorithms to "pump the market" with large-volume orders that were "*specifically designed* to be cancelled if they ever risked actually being filled," and "structur[ed] that system to avoid the filling of large orders." *Coscia*, 866 F.3d at 794, 797, 800. In other words, unlike in this case, where the government concedes in its Indictment that Defendants' orders were subject to real risk of execution regardless of their alleged intent to cancel, Indict. ¶ 26(k), the indictment in *Coscia* alleged that, given the algorithms that the defendant used, his orders were virtually incapable of being executed. Indictment 4–6, *United States v. Coscia*, No. 1:14-cr-00551, ECF No. 1 (N.D. Ill. Oct. 1, 2014) ("*Coscia* Indictment").

The import of *Coscia* is that a scheme to defraud plainly requires more than just placing open-market orders with the intent to quickly cancel them. The court found a basis for fraud precisely because, at the time that the spoof orders were placed, the defendant's algorithmic

---

[8] The Court may take judicial notice of certain indisputable facts concerning the operation of the commodity futures exchanges referenced in the Indictment and the basic terms of orders placed on those exchanges. *See* Fed. R. Evid. 201; *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) ("A court may take judicial notice of an adjudicative fact that is both 'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'") (quoting Fed. R. Evid. 201(b)); *Proetz v. Dean Witter Reynolds, Inc.*, No. 87 C 4777, 1988 WL 17885, at *3 (N.D. Ill. Feb. 22, 1988) (Grady, C.J.); *see also LaSalle v. Medco Research, Inc.*, No. 93 C 5381, 1994 WL 535106, at *10 (N.D. Ill. Sept. 30, 1994) (Marovich, J.), *rev'd on other grounds*, 54 F.3d 443 (7th Cir. 1995).

system all but ensured that the orders would not be executed. *See Coscia*, 866 F.3d at 797. Notably, the court did not take issue with the *Radley* court's conclusion that "'[s]ince [the *Radley*] defendants were willing and able to follow through on all of the bids, they were not misleading,'" *id.* at 797 n.64 (quoting *Radley*, 659 F. Supp. 2d at 815), though it distinguished *Radley* by pointing to "the [*Coscia* defendant's] development of a specific program to create the illusion of market movement," by means of which "Mr. Coscia artificially moved the market by cancelling all but 0.08% of his . . . orders." *Id.*[9]

　　*CP Stone Fort Holdings, LLC v. Doe(s)*, a civil securities fraud case, is also instructive. In that case, the defendants were electronic traders of U.S. Treasury securities who allegedly manipulated those markets "by submitting orders to the platforms that [they] never intended to have executed" and "intend[ing] to create the false appearance of market demand in a certain direction . . . when in actuality the demand did not exist." *CP Stone Fort Holdings, LLC v. Doe(s) (I)*, No. 16 C 4991, 2016 WL 5934096, at *2 (N.D. Ill. Oct. 11, 2016) (Gettleman, J.). In dismissing the complaint, the court reasoned that the orders "were legitimate and could have been matched at any time by a willing participant placing an aggressive order" and "remained on the order book until they were either matched up with a counter-party offer, or cancelled." *Id.* at *6. Further, the complaint, like the Indictment here, was "devoid of any allegation that [the] defendant refused to execute on any matched orders." *Id.* Subsequently, the plaintiffs amended their complaint to allege that the defendants had taken action "to ensure" that their orders would not be executed, by "parking" those orders in the queue behind $27 million (on average) in existing orders—and it was only based on that amendment that the court found that the orders

---

[9]　　The district court in *Coscia* also distinguished *Radley*, for the very reason that *Radley* supports dismissal of the Indictment here: "[The *Radley*] defendants were apparently willing and able to follow through with the bids they placed," whereas the defendant in *Coscia* was not. *United States v. Coscia*, 100 F. Supp. 3d 653, 660 (N.D. Ill. 2015) (Leinenweber, J.).

could be a basis for fraud. *CP Stone Fort Holdings, LLC v. Doe(s) (II)*, No. 16 C 4991, 2017 WL 1093166, at *3–4 (N.D. Ill. Mar. 22, 2017) (Gettleman, J.). *CP Stone Fort (II)*, like *Coscia*, thus stands for the proposition that fraud requires more than placing orders with the intent to cancel them. As in *Coscia*, the decisive factor in *CP Stone Fort (II)* was the allegation that the defendants took action, at the time that they placed their orders, "to ensure" that they would not be executed. *CP Stone Fort (II)*, 2017 WL 1093166, at *3–4. Here, by contrast, the Indictment does not allege that Defendants employed an algorithm or took any other action at the time that they placed their purported spoof orders to ensure that the orders would not be executed.

To the extent that the Indictment's theory of fraud is premised on the allegation that Defendants "intended to inject false and misleading information about the genuine supply and demand . . . into the markets," Indict. ¶ 26(f), it also fails. For the same reasons that open-market orders are inherently "real" and executable, any impression of supply and demand that they created was equally genuine. *See CP Stone Fort (I)*, 2016 WL 5934096, at *6 (reasoning that had the legitimate orders "been so matched, the market reaction would have been legitimate"); *see also Radley*, 632 F.3d at 183 (rejecting the argument that traders entered bids "for the purpose of misleading other market participants about the demand," because the bids were "genuine," and "a counter-party could have accepted them" at any time); *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 208, 214 (3d Cir. 2001) (concluding that a trader does not "inject[] . . . inaccurate information into the market or creat[e] . . . a false impression of supply and demand for a stock" by engaging in "legitimate transactions with real buyers on the other side of the sale"); *cf. Dial*, 757 F.2d at 169 (holding that the practice of "front-running" customer orders without margin gave "a misleading signal" because it was a "signal not backed by any

cash").  The spoofing-based fraud charges in the Indictment thus fail to allege a scheme to

defraud and should be dismissed for that reason.[10]

> ### b.  *The Spoofing-Based Fraud Charges in the Indictment Do Not Allege Any Misrepresentations or Omissions*

As a separate ground for dismissal, the spoofing-based fraud charges in the Indictment

are deficient because they do not allege any express or implied misrepresentation or omission.  In

the Seventh Circuit, a scheme to defraud must include allegations that a defendant "made a

material false statement, misrepresentation, or promise, or concealed a material fact."  *Weimert*,

819 F.3d at 355; *see also United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005).  A

scheme to defraud may include "express" or "implied misrepresentations."  *Vorley*, 2019 WL

5312335, at *3.

Notably, the Indictment differs from the two other spoofing-based fraud indictments

pending in this District.  In both *United States v. Bases* and *United States v. Vorley*, the

government alleged that the defendants' orders were fraudulent because they contained some

form of a misrepresentation.  Indictment ¶ 11, *United States v. Bases*, No. 18 CR 48, ECF No. 66

(N.D. Ill. July 17, 2018) ("*Bases* Indictment") ("It was further part of the conspiracy that the

Fraudulent Orders placed by [Defendants] were material misrepresentations that falsely and

fraudulently represented to market participants that [Defendants] were willing to trade the

---

[10]  To the extent Judge Tharp's recent decision in *United States v. Vorley* suggests otherwise, we respectfully submit that it should not be followed by this Court.  *Vorley* addressed the issue (not presented here) of whether a "scheme to defraud" under the wire fraud statute is different from the "scheme to defraud" prohibited by the commodities fraud statute (i.e., whether wire fraud requires an express as opposed to implied misrepresentation) as a matter of law.  *See Vorley*, 2019 WL 5312335, at *1.  The court held that the schemes contemplated by the two statutes are the same, and that an implied misrepresentation thus could be sufficient to allege wire fraud.  *Id.* at *4.  We do not take issue with this aspect of *Vorley*, but we respectfully submit that the court erred in taking the additional step of finding, broadly, that "a spoofing scheme can constitute a 'scheme to defraud.'"  *Id.* (citing *Coscia*, 866 F.3d at 796–97).  To the contrary, as noted above, *Coscia* does not support this broad proposition, because the spoofing conduct alleged there—structuring orders "to evade execution," *Coscia*, 866 F.3d at 800—is not the same conduct alleged in the Indictment here.

Fraudulent Orders when, in fact, they were not because, at the time the Fraudulent Orders were placed, [Defendants] intended to cancel them."); Indictment ¶ 11, *United States v. Vorley*, No. 18 CR 35, ECF No. 12 (N.D. Ill. July 24, 2018) ("It was further part of the conspiracy that the Fraudulent Orders placed by [Defendants] were material misrepresentations that falsely and fraudulently represented to traders that [Defendants] were intending to trade the Fraudulent Orders when, in fact, they were not because, at the time the Fraudulent Orders were placed, [Defendants] intended to cancel them before execution.").

Based on those allegations (which the court in *Vorley* characterized as *implied* misrepresentations), the court held that it was a question of fact for the jury whether an open-market order placed with the intent to cancel carried with it an implied misrepresentation. *Vorley*, 2019 WL 5312335 at *15. Here, the Indictment makes no allegation of any such misrepresentations (implicit or otherwise) or omissions. Accordingly, the court's findings in *Vorley* on this issue are inapposite.[11]

## B. As to Bank Fraud, the Indictment Does Not Allege Specific Intent to Defraud a Financial Institution

The Indictment alleges, in five different counts, that Defendants committed bank fraud in violation of 18 U.S.C. § 1344(1). This is the sole allegation in Counts Five through Seven (substantive bank fraud charges against Messrs. Smith, Nowak, and Jordan, respectively), and it is incorporated into Count One, which alleges acts of bank fraud as predicate acts of the charged RICO conspiracy, and Count Two, which alleges bank fraud as one of the objects of the charged conspiracy under 18 U.S.C. § 371. *See* Indict. ¶¶ 22(b), 46(b), 58–63. However, as set forth below, the Indictment, when read as a whole, does not and cannot allege the core element of

---

[11] The court in *Bases* denied the defendants' motion to dismiss the indictment but has yet to issue a written order. *See United States v. Bases*, No. 18 CR 48, ECF No. 236 (N.D. Ill. Jan. 16, 2020) (Lee, J.) (minute entry denying motion).

bank fraud: specific intent to defraud a financial institution (as defined in 18 U.S.C. § 20). *See*

*United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000) ("Indictments are reviewed on a

practical basis and in their entirety, rather than in a hypertechnical manner.") (citation omitted).

Accordingly, the bank fraud allegations must be dismissed.

    1.  <u>Applicable Law</u>

    The bank fraud statute provides, in relevant part, "Whoever knowingly executes, or

attempts to execute, a scheme or artifice—(1) to defraud a financial institution" shall be guilty of

a crime. 18 U.S.C. § 1344. As the Supreme Court stated in *Loughrin v. United States*, 573 U.S.

351 (2014), in order to establish a violation the government must prove "that a defendant

intended to 'defraud a financial institution'; indeed, that is § 1344(1)'s whole sum and

substance." *Id.* at 357 (citation omitted); *accord Shaw v. United States*, 137 S. Ct. 462, 469

(2016) (to fall within the statute, a "scheme must be one to deceive the bank and deprive it of

something of value"); *United States v. Higgins*, 270 F.3d 1070, 1073 (7th Cir. 2001) ("In order to

support a conviction under § 1344(1), the government must prove that the defendant engaged in

a 'pattern or course of conduct designed to deceive a financial institution . . . .'") (quoting *United

States v. LeDonne*, 21 F.3d 1418, 1428 (7th Cir. 1994)); *United States v. O'Brien*, No. 17 CR

239-1, 2018 WL 4205472, at *11 (N.D. Ill. Sept. 4, 2018) (Durkin, J.) ("As the Supreme Court

held in *Loughrin v. United States*, 134 S. Ct. 2384 (2014), proof of specific intent to defraud a

financial institution . . . is required under § 1344(1)."). By contrast, "a defendant cannot be

convicted of violating § 1344(1) merely because he intends to defraud an entity . . . that is not in

fact covered by the statute." *United States v. Bouchard*, 828 F.3d 116, 125 (2d Cir. 2016).

    The bank fraud statute is an exceptionally powerful tool for the government. Unlike

commodities fraud under 18 U.S.C. § 1348, spoofing under 7 U.S.C. § 6(c)(a)(5), or attempted

price manipulation under 7 U.S.C. § 13(a)(2), it carries a ten-year statute of limitations and can

serve as a predicate act for RICO. The Supreme Court has warned of the potential for abuse if the bank fraud statute is applied in an overbroad manner that is not closely tethered to the statutory language, cautioning that Section 1344 should not be construed "as a plenary ban on fraud." *Loughrin*, 573 U.S. at 362.

Consistent with these precedents, the Seventh Circuit cases addressing Section 1344(1) invariably have arisen from schemes directed squarely at financial institutions—e.g., check kiting, bad checks, and loan fraud. *See, e.g.*, *Doherty*, 969 F.2d at 426 (check kiting); *United States v. LeDonne*, 21 F.3d 1418, 1421–22 (7th Cir. 1994) (check kiting); *Higgins*, 270 F.3d at 1073–74 (knowing deposit of bad checks); *United States v. Pribble*, 127 F.3d 583, 587 (7th Cir. 1997) (false statements in loan documents); *see also O'Brien*, 2018 WL 4205472, at *2 (false statements in mortgage documents, loan applications, and credit applications). In each case, the defendant specifically intended to defraud a financial institution; that was the essence of the scheme.

2. Discussion

In this case, the Indictment contains only a skeletal description of the alleged bank fraud scheme. It alleges that Defendants "knowingly and with the intent to defraud executed and attempted to execute a scheme and artifice to defraud one or more financial institutions, including Bank A and other financial institutions who were participants in the precious metals futures markets." *See* Indict. ¶¶ 59, 61; *see also id.* ¶ 46(b) (substantially similar language in conspiracy count).[12] To complement this bare-bones language, the bank fraud and conspiracy

---

[12] As noted above, Count Seven, which is applicable only to Mr. Jordan, alleges in relevant part that he "knowingly and with the intent to defraud executed and attempted to execute a scheme and artifice to defraud one or more financial institutions, including Banks A *and C* and other financial institutions who were participants in the precious metals futures markets." Indict. ¶ 63 (emphasis added). Because the allegation with respect to Bank C is not relevant to any other Defendant, the discussion in this memorandum will largely be limited to Bank A. However, with respect to Mr. Jordan, the arguments are equally applicable to Bank C.

counts incorporate other allegations in the Indictment, including that Defendants traded precious metals futures contracts "on markets designated and regulated by the United States Commodity Futures Trading Commission" (specifically the COMEX and NYMEX exchanges operated by the CME Group) and that they "placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution, including in an attempt to artificially affect prices and to profit by deceiving other market participants." *See* Indict. ¶¶ 2, 11–12, 26 (incorporated by reference in conspiracy and bank fraud counts in ¶¶ 45, 58, 60, and 62). As set forth below, these allegations are insufficient to support any viable theory that Defendants possessed the requisite intent to defraud a financial institution.

      a.   *The Indictment Fails to Allege Specific Intent to Defraud "Other Financial Institutions"*

To the extent that the bank fraud charges are premised on the allegation that Defendants intended to defraud financial institutions *other* than Bank A, the government's theory appears to be that the practice of placing orders with the intent to cancel them before execution was intended to defraud the particular financial institutions who turned out to be trading counterparties of Bank A on a futures exchange. This theory is set out in Paragraph 26 of the Indictment, which alleges: (a) that Defendants placed "Deceptive Orders" (i.e., "orders that they intended to cancel before execution"); (b) that the Deceptive Orders were "intended to inject false and misleading information about the genuine supply and demand for precious metals futures contracts into the markets"; and (c) that the "false and misleading information was intended to, and at times did, trick other market participants, *including competitor financial institutions* . . . into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices, and times that they otherwise likely would not have traded." Indict. ¶¶ 26(b), (f), and (g) (emphasis added).

According to the Indictment, all of this was done to allow "the Defendants and their co-conspirators to generate trading profits and avoid losses for themselves and other members of the Precious Metals Desk at Bank A, the Precious Metals Desk itself, and ultimately, Bank A." *Id.* ¶ 26(j).

However, this theory lacks foundation because trading on the CME Group exchanges referenced in the Indictment is anonymous. As a result, Defendants *did not and could not* know the identity of the party on the other side of any of their trades, which in turn makes it impossible for the government to allege or establish that they specifically intended to defraud a financial institution. Because this is the very "sum and substance" of Section 1344(1), *Loughrin*, 573 U.S. at 357, the bank fraud allegations must be dismissed.

Notably, the Indictment does not address the anonymity of trading on CME Group exchanges. However, this fact is widely known and incontrovertible (particularly by the government). In a number of prior spoofing-related indictments, the government included language to highlight the anonymity of trading on CME Group exchanges, and this was a key theme in the government's presentation of evidence in the spoofing case *United States v. Flotron*.[13] Courts have likewise recognized the anonymity of futures trading, *see CFTC v. Oystacher*, No. 15-CV-9196, 2016 WL 3693429, at *9 (N.D. Ill. July 12, 2016) (St. Eve, J.)

---

[13] *See Bases* Indictment ¶ 1(l) ("Trading on Globex was conducted electronically using a visible 'order book' that displayed quantities of anonymous orders (i.e., offers to sell futures contracts and bids to buy futures contracts)."); Superseding Indictment ¶ 8, *United States v. Flotron*, No. 3:17-cr-00220-JAM, ECF No. 58 (D. Conn. Jan. 30, 2018) ("Globex uses an 'order book' that displays anonymous orders either to buy or to sell futures contracts."); Indictment ¶ 8, *United States v. Thakkar*, No. 1:18-cr-00036, ECF No. 17 (N.D. Ill. Feb. 14, 2018) ("Trading on Globex was conducted electronically using a visible 'order book' that displayed quantities of anonymous orders (i.e., offers to sell futures contracts and bids to buy futures contracts)."); Jury Trial Transcript, Vol. I, at 23:19–21, *United States v. Flotron*, No. 3:17CR220 (JAM), ECF No. 229 (D. Conn. Apr. 16, 2018) ("The last thing that you need to understand about how the exchange worked is that it's completely anonymous.") (opening statement of the prosecutor, Avi Perry); *id.* at 53:20–24 (Q: "Now, the traders who trade on this exchange, are their identities known?" A: "No." Q: "So is the trading anonymous?" A: "It should be, yes.") (testimony of the government's case agent).

("[M]arket participants, anonymous to all other participants in the market, submit orders to an exchange's order gateways either manually or automatically through automated trading systems."); *Bd. of Trade of City of Chi. v. SEC*, 883 F.2d 525, 527 (7th Cir. 1989) (parties who transact on an exchange deal "exclusively with the clearing house," which "matches transactions" and provides anonymity: "[n]either the buyer nor the seller need know who is on the other side of the transaction."); *HTG Capital Partners, LLC v. Doe 1*, No. 15 C 02129, 2016 WL 612861, at *1 (N.D. Ill. Feb. 16, 2016) (Chang, J.) ("HTG sued the spoofers but could only name them as unknown John Does, because trading on the CBOT is anonymous."). The point is further confirmed on the CME Group's website, which states that "[t]he anonymity of traders and firms is protected electronically in all bids, offers and trades."[14] It is telling that in this case—the first time the government has ever charged spoofing-related conduct as bank fraud—the Indictment conspicuously lacks any acknowledgment of the anonymous exchange. But this omission does not create an issue of fact that precludes dismissal.[15]

Trading on an anonymous futures exchange is fundamentally different from bilateral trading in an over-the-counter market, where counterparties engage directly with one another. When a trader places an order to buy or sell a futures contract on a CME Group exchange, he or she has no way of knowing who will end up on the other side of any trade that occurs. Indeed, this information is *never* made known to the trader, because the transaction counterparties face the exchange, not each other. *See Dial*, 757 F.2d at 165 (because futures transactions are "guaranteed by the clearing members of the exchange, the buyer does not have to worry about

---

[14] CME Grp., *CME Globex Reference Guide* 3, www.cmegroup.com/globex/files/GlobexRefGd.pdf.

[15] We do not anticipate that the government will contest this point, but if we are wrong, the Court should take judicial notice of the anonymity of trading on CME Group exchanges as it considers this motion to dismiss. *See supra*, n.8.

whom he is dealing with") (citation omitted); *Bd. of Trade*, 883 F.2d at 527 (same). When a trader initiates an order on a CME Group exchange, it would be sheer and utter speculation for the trader to try to divine who might wind up on the other side of any transaction that occurs. It could possibly be a financial institution (as defined in 18 U.S.C. § 20), but it could also be one of any number of other types of market participant—e.g., a trading firm employing an algorithm (a type of trader specifically highlighted in the Indictment, *see* Indict. ¶ 4), a hedge fund, a corporation, an individual speculator, or any other participant with an account that authorizes it to trade on the exchange.[16]

In short, the identity of any possible transaction counterparty is unknown and unknowable. From the perspective of the trader who places the order, it is also entirely irrelevant. There is no reason for a trader to be concerned with the identity of the other market participant or participants whose order will be matched against the trader's order in the event of a transaction. This is because upon the consummation of a transaction, the trader faces the *exchange*, and not the transaction counterparty. In turn, the exchange ensures that settlement occurs.[17] Because of the market structure of CME Group exchanges, it is impossible for the government to allege or prove that Defendants, in placing their orders to buy and sell precious

---

[16] In the *Flotron* trial, the two alleged victims who testified were from high-frequency trading firms that are not financial institutions. *See* Jury Trial Transcript, Vol. III at 645:17–676:3, *Flotron*, ECF No. 231 (Apr. 19, 2018) (testimony of John Huth of Quantlab Financial); *id.* 675:6–697:11 (testimony of Anand Twells of Citadel Securities). Consistent with the anonymous nature of trading on CME Group exchanges, representatives of both Quantlab and Citadel testified that they did not know the identity of other market participants who placed orders in the market. *Id.* at 657:2–3 (Q: "Do you know who placed the 33-lot sell-side order?" A: "I do not know that from our data."); *id* at 682:8–9 ("We don't know our counterparties that we trade with in this particular market.").

[17] As explained in the CME Group's publication *Definition of a Futures Contract*: "Every exchange-traded futures contract is centrally cleared. This means that when a futures contract is bought or sold, the exchange becomes the buyer to every seller and the seller to every buyer. This greatly reduces the credit risk associated with the default of a single buyer or seller. The exchange thereby eliminates counterparty risk and, unlike a forward contract market, provides anonymity to futures market participants." *See* CME Grp., *Introduction to Futures – Definition of a Futures Contract*, www.cmegroup.com/education/courses/introduction-to-futures/definition-of-a-futures-contract.html.

metals futures contracts, specifically intended to defraud a financial institution. Accordingly, the bank fraud allegations must be dismissed.[18]

The Second Circuit's reasoning in *Bouchard* is instructive. There, the court reversed a conviction arising from the government's application of the bank fraud statute in an overbroad manner. The defendant was charged with bank fraud based on false documents that he submitted to obtain mortgage loans from a lender called BNC Mortgage ("BNC"). At the time of the offense, mortgage lenders such as BNC were not included within the statutory definition of "financial institution" because they were not federally insured. *Bouchard*, 828 F.2d at 120, 123.[19] After the defendant was found guilty by a jury, he moved for a new trial on the ground that he could not be liable for bank fraud because BNC was not a "financial institution" within the meaning of Section 1344, and therefore that he did not direct his fraudulent scheme at a bank, as required by the statute. The trial court rejected this argument, citing the fact that BNC's parent company, Lehman Brothers, was federally insured and had provided funds for the mortgage loans as part of an "integrated transaction." *Id*. at 123 (citation omitted).

On appeal, the Second Circuit reversed. As the court explained, "§ 1344(1) requires the Government to show that a defendant intended to defraud the financial institution *itself*" and "a defendant cannot be convicted of violating § 1344(1) merely because he intends to defraud an entity, like BNC, that is not in fact covered by the statute." *Id.* at 125. The court emphasized the

---

[18] We have found only one bank fraud case arising from trading on a futures exchange, but the facts are plainly distinguishable. In *United States v. Astheimer*, Crim. A. No. 91–0041, 1992 WL 20304 (E.D. Pa. Feb. 3, 1992), *aff'd*, 981 F.2d 1249 (3d Cir. 1992), a bank employee engaged in futures trading on behalf of his employer, the bank. The trader also had his own personal trading account, and improperly engaged in a "cherry picking" scheme in which he allocated winning trades to his own account and losing trades to the bank's account. *Id.* at *2. Not surprisingly, the court found that this fraud was "intentionally and knowingly" directed at a bank. *Id.* at *5. Here, Defendants' alleged conduct was entirely different.

[19] In 2009, after the defendant's offense conduct, the statutory definition of "financial institution," 18 U.S.C. § 20, was broadened to encompass mortgage lenders that are not federally insured. *See Bouchard*, 828 F.3d at 124.

need to construe the statute with rigor: "a 'financial institution' is not a loose or colloquial term, but a term of precise definition that can lead to grave criminal consequences." *Id.* at 126 (citation omitted). Strict construction is necessary, the court explained, because the bank fraud statute is not intended to "'federaliz[e] frauds that are only tangentially related to the banking system,' which is § 1344's core concern." *Id.* (quoting *Loughrin*, 573 U.S. at 362).

The Sixth Circuit reached the same result in the recent case of *United States v. Banyan*, 933 F.3d 548 (6th Cir. 2019), which, like *Bouchard*, was a bank fraud prosecution based on the submission of fraudulent loan applications to a non-federally insured mortgage company. As the *Banyan* court noted, bank fraud "has a longer limitations period" than other federal fraud statutes, but it "brings the complication that the fraud must be perpetrated against a bank." *Id.* at 551. With respect to Section 1344(1), the government was required "to prove that a defendant specifically 'intend[ed] to defraud a financial institution.'" *Id.* at 555 (quoting *Loughrin* at 357) (internal quotation marks omitted). Because the government failed to "present proof of any such specific intent," the court threw out the conviction. *Id.*[20] *But see United States v. Edelkind*, 467 F.3d 791, 797–98 (1st Cir. 2006) (pre-*Loughrin* decision finding that the bank fraud statute applied "where the federally insured institution takes part in an integrated transaction and is thereby injured by the defendant, who intended to defraud another [non-federally insured] party to the transaction"); *United States v. Hall*, 613 F.3d 249, 252 (D.C. Cir. 2010) (pre-*Loughrin* decision finding that a loss to a wholly owned or operating subsidiary of a federally insured financial institution constituted a loss to the federally insured institution), *reissued*, 945 F.3d 507

---

[20] Similarly, and in this district, the government conceded error where it improperly included mortgage-lending businesses, which were not defined as "financial institutions" at the time of the conduct, as "victims" of a bank fraud scheme. *See United States v. Austin*, 907 F.3d 995, 1000 (7th Cir. 2018) (citation omitted).

(D.C. Cir. 2019), *and amended per curiam*, No. 07-3036, 2019 WL 6794225 (D.C. Cir. Dec. 12, 2019).

Although the factual predicate in the instant case is different from *Bouchard* and *Banyan*, their animating principle exposes the Indictment's flaw. Because Defendants did not and could not specifically direct their precious metals futures orders to a financial institution (or indeed to any counterparty or type of counterparty), the Indictment fails to contain the indispensable element that they specifically intended to defraud a financial institution. Accordingly, to the extent the Indictment alleges that Defendants intended to defraud financial institutions other than Bank A, it fails to state a cognizable bank fraud offense, and must be dismissed.

b. *The Indictment Fails to Allege Specific Intent to Defraud Bank A*

The charging language in Counts Two, Five, Six, and Seven also alleges that Defendants "executed and attempted to execute a scheme and artifice to defraud . . . Bank A." *See* Indict. ¶¶ 46(b), 59, 61; *see also id.* ¶ 63.[21] The Indictment provides no basis for this allegation.[22] Its essential allegation with respect to spoofing is that Defendants placed so-called "Deceptive Orders" to improperly affect market prices and deceive other market participants. *See* Indict. ¶ 26. But this conduct cannot rationally be viewed as an intentional fraud on Bank A, and in fact the Indictment alleges precisely the opposite. The government alleges that Defendants' goal was to "*generate trading profits and avoid losses for* themselves and other members of the Precious Metals Desk at Bank A, the Precious Metals Desk itself, and ultimately, *Bank A*." *See* Indict. ¶ 26(j) (emphasis added). Given the absence of a coherent theory of wrongdoing that would be

---

[21] As noted above, Count Seven separately alleges that Mr. Jordan executed and attempted to execute a scheme and artifice to defraud Bank C. Indict. ¶ 63.

[22] Defendants wrote to the government in 2019 seeking discovery that underpins the alleged bank fraud on Bank A, but the government has not responded.

sufficient to satisfy the statutory elements, the bank fraud counts must be dismissed to the extent they allege a scheme to defraud Bank A.

## C. The Spoofing-Based Fraud Allegations Are Unconstitutionally Vague

Even if the Indictment could state the offenses of bank, wire, or commodities fraud on the basis of Defendants' alleged spoofing activity, the characterization of spoofing as fraud deprives Defendants of their constitutional rights to due process for two reasons. First, the existing statutory and legal guidance at the time that the alleged conduct occurred provided no notice that placing open-market orders with the intent to cancel them—standing alone—carried any implied representation about a trader's desire to transact, the theory of the Indictment here. In addition, even after the enactment of Dodd–Frank, placing orders with the intent to cancel them before execution was prohibited as a "disruptive trading" practice, not as fraud. Second, the recent unprecedented shift in application of the fraud statutes to spoofing conduct did not put Defendants on fair notice that their trading activities communicated anything other than the terms of their orders, or that executable orders could somehow be considered fraudulent. The government's novel retrofit of the fraud statutes to cover spoofing threatens to penalize Defendants more than twice as harshly without fair notice. For these reasons, too, Counts Five through Twelve, and the conspiracy counts relying on them, should be dismissed.[23]

### 1. Applicable Law

Due process requires laws to be sufficiently clear to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and to "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09

---

[23] Unlike the defendant in *Coscia*, Defendants here do not challenge the anti-spoofing provision as void for vagueness. Instead, they challenge the bank, wire, and commodities fraud statutes as unconstitutionally vague as applied to their alleged conduct. *See United States v. Morris*, 821 F.3d 877, 879 (7th Cir. 2016) ("Vagueness challenges to statutes . . . are examined in light of the facts of the case at hand.").

(1972). "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; [and] second, [that] precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The "touchstone" of constitutional fair notice "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997); *see Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).

    2.  <u>Discussion</u>

        a.  *The Statutory Framework Does Not Provide Notice That Spoofing Is Fraudulent*

The anti-spoofing provision does not provide fair notice that placing an order with the intent to cancel it—without more—is fraudulent. Instead, the text of the anti-spoofing provision, the framework of the CEA, and CFTC interpretive guidance all make clear that spoofing is different from fraud.

That Congress deliberately chose to bifurcate the CEA's prohibitions on "disruptive" practices (which appear in Section 4 of the CEA, 7 U.S.C. § 6c) from its prohibition on fraud (which appears in Section 4b of the CEA, 7 U.S.C. § 6b) supports the conclusion that Defendants were not on notice that their alleged trading practices could be considered fraudulent. Indeed, if Congress intended spoofing to be synonymous with fraud, there would be no reason to create a new category of prohibited conduct and place it in a section of the CEA separate and apart from the existing prohibition. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the

disparate inclusion or exclusion.") (citation omitted); *see also Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 106 (1987) (whereas Congress "expressly provided" for nationwide service of process in some CEA enforcement provisions, with respect to Section 22, the absence of any express provision confirms that "such authorization was not its intention").

The interpretation of spoofing as a distinct crime relative to fraud finds support from the CFTC as well. Tellingly, months after the anti-spoofing provision was added to the CEA, the CFTC sought the public's assistance in defining the term "spoofing" through an advance notice of proposed rulemaking, *see* Antidisruptive Practices Authority Contained in the Dodd-Frank Wall Street Reform and Consumer Protection Act, 75 Fed. Reg. 67,301, 67,302 (proposed Nov. 2, 2010) (to be codified at 17 C.F.R. ch. 1), and did not issue guidance until more than two and a half years later, in May 2013, *see* Antidisruptive Practices Authority, 78 Fed. Reg. 31,890 (May 28, 2013). Even then, the CFTC was unable to provide a concrete definition for the term and did not characterize it as fraudulent. *See* Antidisruptive Practices Authority, 78 Fed. Reg. at 31,896 (stating that the CFTC would "distinguish between legitimate trading and 'spoofing' by evaluating all of the facts and circumstances of each particular case"). As such, there was no message from the primary regulator, much less a clear understanding within the industry, that spoofing was fraudulent.

Accordingly, the relevant statutes do not provide sufficient notice to Defendants that the mere placement of orders with the intent to cancel them can be prosecuted under the bank, wire, and commodities fraud statutes.

      b. *Prior Prosecutions Do Not Provide Notice That At-Risk Open-Market Orders Can Carry Material Misrepresentations*

The bank, wire, and commodities fraud statutes were enacted long before the passage of Dodd–Frank in July 2010. *See* 18 U.S.C. § 1343 (enacted July 16, 1952); 18 U.S.C. § 1344

(enacted Oct. 12, 1984); 18 U.S.C. § 1348 (amended May 20, 2009).  Nevertheless, prior to Dodd–Frank, the government did not bring any prosecutions under the bank, wire, or commodities fraud statutes—let alone any other fraud statute—targeting conduct that could be characterized as spoofing.  Thus, no reasonable person would have understood at that time that the government could prosecute alleged spoofing at all, let alone as a form of fraud.

It was not until years after the enactment of Dodd–Frank, and years after the alleged conspiracy period in the Indictment began, that the Department of Justice first sought to use the wire fraud statute to prosecute spoofing as fraud.  With respect to commodities fraud, the first-ever application of the statute involving alleged spoofing (in an entirely distinct context involving a pre-programmed algorithm) was not publicly announced until October 2, 2014.[24]  As for bank fraud, the instant case is the very first in which the government has charged spoofing under that statute.  The unprecedented shift in the application of these statutes provided no meaningful notice to Defendants that their alleged spoofing could be deemed fraudulent, let alone the constitutionally required fair notice that they could "be held criminally responsible for conduct which [they] could not reasonably understand to be proscribed."  *Lanier*, 520 U.S. at 265 (citation omitted);[25] *see also Fox Television*, 567 U.S. at 254 (holding that the Federal Communications Commission's sudden application of 18 U.S.C. § 1464, enacted in 1948, to a

---

[24] *See* Press Release, U.S. Attorney's Office (N.D. Ill.), High-Frequency Trader Indicted for Manipulating Commodities Futures Markets in First Federal Prosecution for "Spoofing" (Oct. 2, 2014), www.justice.gov/usao-ndil/pr/high-frequency-trader-indicted-manipulating-commodities-futures-markets-first-federal (announcing the indictment of Michael Coscia as the "first federal prosecution of its kind" for commodities fraud related to spoofing).

[25] Due process bars a court from applying a novel construction of criminal conduct "that neither the statute nor *any prior judicial decision* has fairly disclosed to be within its scope." *Id.* at 266 (emphasis added).  Therefore, under the analysis in *Lanier* and its progeny, the earliest that the charges against *Coscia* could even arguably be considered "fair notice" was when the court denied *Coscia*'s motion to dismiss—which did not occur until April 16, 2015.  *See United States v. Coscia*, No. 1:14-cr-00551, ECF No. 35 (N.D. Ill. Apr. 16, 2015) (Leinenweber, J.) (minute entry denying motion).

"fleeting expletive or a brief shot of nudity" "fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited" and was unconstitutionally vague as applied) (citation omitted).

Further, the retroactive application of these statutes to conduct that is not fraudulent *per se* warrants particular scrutiny here. As explained above, Congress criminalized spoofing, despite the existence of fraud statutes, because it wanted to create a distinct category of crime for disruptive practices. That Congress did not intend spoofing to be treated like fraud is underscored by its determination that spoofing would be punishable by no more than 10 years of imprisonment. *See* 7 U.S.C. § 13(a)(2). By contrast, the commodities fraud statute authorizes imprisonment of up to 25 years, *see* 18 U.S.C. § 1348, and the bank and wire fraud statutes authorize imprisonment up to 30 years, *see* 18 U.S.C. §§ 1343, 1344. The added exposure of potential penalties two-and-a-half or three times greater than what Congress deemed appropriate for spoofing through misapplication of the fraud statutes carries grave constitutional implications. *See Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964) (describing such expansion as akin to an ex post facto violation). Indeed, it is unlawful to "increas[e] retroactively the punishment for conduct [that is] clearly criminal when the defendant engaged in it." *Conrad v. United States*, 815 F.3d 324, 327 (7th Cir. 2016). Considering that this principle applies even when the underlying conduct is "clearly criminal," it necessarily applies where, as here, the conduct was not clearly criminal prior to the enactment of the anti-spoofing provision.

In sum, no source of authority put Defendants on fair notice that the trading activity at issue communicated anything other than the terms of their orders, let alone their subjective desire to transact, and could therefore be considered fraudulent. Accordingly, the Due Process Clause of the Fifth Amendment precludes sweeping the alleged spoofing activity within the purview of

the bank, wire, and commodities fraud statutes and "imposing an unforeseen heavier

punishment" on Defendants. *Id.*; *see Fox Television*, 567 U.S. at 253.[26]

### D. The Allegations of Barrier-Running Fail to State a Violation of the Bank Fraud, Wire Fraud, or Commodities Fraud Statutes

The allegations of barrier-running fail to state a violation of the bank fraud, wire fraud, or

commodities fraud statutes because the Indictment does not allege that those acts involved any

misrepresentation or omission, or any other form of deception.

#### 1. Relevant Allegations in the Indictment

Separate and apart from the spoofing-related allegations that are at the core of this case,

the Indictment alleges, in conclusory fashion, that Defendants defrauded clients of Bank A by

engaging in open-market trading in relation to barrier-options contracts that Bank A had entered

into with unspecified third-party clients. *See* Indict. ¶ 27. The alleged fraud with respect to

barrier options is cited among the "means and methods" of the charged RICO conspiracy, *see id.*,

and, to the extent that certain paragraphs of the Indictment are incorporated by reference, as a

basis for the Section 371 conspiracy charged in Count Two as well as the substantive counts of

attempted price manipulation, bank fraud, wire fraud affecting a financial institution, and

commodities fraud charged in Counts Three through Twelve.

The Indictment defines a barrier option as "a type of option whose value depended on

whether or not the underlying asset reached or exceeded a predetermined price during the

---

[26] The Due Process Clause likewise precludes charging Defendants' purported barrier-running as bank, wire, or commodities fraud. We are not aware of any prior prosecution under these fraud statutes based solely on allegations of "trading in a manner that was calculated to push the price" of an asset toward or away from a particular point. Indict. ¶ 27. Accordingly, no authority put Defendants on notice that trading in this manner, without more, could constitute fraud in violation of the bank, wire, and commodities fraud statutes.

lifetime of the option."[27]  Indict. ¶ 16.  The Indictment purports to identify two "unlawful

practices" regarding barrier options:

> "Barrier-running" was the unlawful practice of maneuvering the market
> price for the underlying asset *toward* a particular price point to deliberately
> trigger a barrier option.  "Barrier-defending" was the unlawful practice of
> maneuvering the market price for the underlying asset *away* from a
> particular price point in order to avoid triggering a barrier option.

*Id*.  Aside from these brief, general definitions, the Indictment's only reference to barrier options

is in Paragraph 27, which alleges that Defendants "defrauded clients of Bank A who had bought

or sold barrier options, by trading in a manner that was calculated to push the price of the

underlying assets away from the price point at which Bank A would lose money on the options

and toward the price point at which Bank A would profit from the options."  *Id*. ¶ 27.  Tracking

the earlier definitions, Paragraph 27 alleges that:

> (a) The Defendants and their co-conspirators engaged in barrier-*running* by
> placing orders for precious metals futures contracts in a manner that was
> intended to deliberately trigger barrier options held by Bank A.
>
> (b) The Defendants and their co-conspirators also engaged in barrier-
> *defending* by placing orders for precious metals futures contracts in a
> manner that was intended to deliberately avoid triggering barrier options
> held by clients of Bank A.

*Id*.

The allegations regarding barrier-related trading are conclusory and lack even the most

basic information, such as the relevant dates and times with respect to the barrier-options

contracts, the contract terms, the underlying assets, the counterparties, and the specific trades

underlying the allegations.  The Indictment fails even to identify which of the Defendants (or

---

[27] Stated more precisely, a barrier option is an off-exchange contract between two parties that includes a condition that a particular reference price of the underlying product (e.g., gold) is reached at some point in time, as stated in the contract.  *See* Andrew M. Chisholm, *Derivatives Demystified: A Step-by-Step Guide to Forwards, Futures, Swaps and Options*, 213 (John Wiley & Sons Ltd 2004) (defining a "barrier option" as "[a]n option whose payoff depends on whether the underlying has hit one or more threshold or barrier levels").

purported co-conspirators) allegedly engaged in the supposed fraud with respect to barrier options.

   2.   <u>Applicable Law</u>

A "scheme to defraud" charged as wire or bank fraud must involve "a misrepresentation or concealment of material fact." *Neder v. United States*, 527 U.S. 1, 20, 22 (1999); *see also United States v. Gee*, 226 F.3d 885, 891–92 (7th Cir. 2000) (a scheme to defraud under the mail and wire fraud statutes is insufficient where it fails to allege false or misleading statements); *Emery v. Am. Gen. Fin., Inc.*, 71 F.3d 1343, 1346–47 (7th Cir. 1995) (mail fraud requires a misleading statement made to obtain a thing of value); *Vorley*, WL 5312335, at *11 (quoting *Weimert*, 819 F.3d at 355) (to state a wire fraud offense, the government must allege an express misrepresentation or "the omission or concealment of material information . . . if the omission was intended to induce a false belief and action" to advantage the schemer and disadvantage the victim).

In *Vorley*, the court recognized that the requirement of a misrepresentation or omission of material fact likewise applies to the commodities fraud statute, which contains "the same 'scheme to defraud' formulation" as the wire and bank fraud statutes. *Id.* at *6 n.13 (citing *Neder*, 527 U.S. at 22); *see also Coscia,* 866 F.3d at 797 (affirming commodities fraud conviction in part because the defendant's "scheme was deceitful").

   3.   <u>Discussion</u>

Here, the Indictment alleges that Defendants committed fraud by trading with the purpose of "push[ing]" prices, and, in so doing, "defrauded clients of Bank A" in some unspecified way. Indict. ¶ 27. However, the Indictment fails to plead actionable bank fraud, wire fraud, or commodities fraud, because it *does not* allege that Defendants misrepresented or omitted any material fact in connection with their purported trading activity relating to barrier options, nor

that they made any misrepresentation or omission to Bank A's barrier-option clients. Indeed, the government's fraud theory with respect to barrier options, as alleged, is not premised on any deception whatsoever. Accordingly, the Indictment fails to state the offenses of bank, wire, and commodities fraud with respect to barrier-running, and those charges should be dismissed insofar as they are based on that alleged conduct.

First, the allegation that Defendants traded—even in a manner "calculated to push" prices, *id.*—does not in itself amount to an allegation that they made any misrepresentation (express or implied) or material omission.[28] *Cf. Vorley*, 2019 WL 5312335, at *15 & n.30 (denying motion to dismiss fraud charges based on alleged spoofing, in part because the indictment expressly alleged that the orders themselves "were material misrepresentations") (citation omitted).

Second, trading conducted with the intent to affect price is not, without more, a "scheme to defraud" within the meaning of the bank fraud, wire fraud, and commodities fraud statutes. Two recent criminal prosecutions make clear that, in order for such trading to constitute fraud under these statutes, it must be part of a scheme to make actionable misrepresentations or material omissions. In *United States v. Bogucki*, the government alleged that Barclays had agreed to purchase foreign-exchange options from a counterparty at a formula-based price, and that Bogucki, a Barclays trader, intentionally engaged in selling activity calculated to impact the formula so that the purchase price would be more favorable to Barclays and less favorable to the

---

[28] It bears noting that this Court's decision in *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037 (N.D. Ill. 2016) (Chang, J.), does not suggest otherwise. There, the Court held that a manipulation claim under Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), can be based on market activity without a misrepresentation. *Ploss*, 197 F. Supp. 3d at 1055–56. The instant case, though, involves three Title 18 fraud statutes, which have text, purpose, and history distinct from Section 6(c)(1). *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 388–89 (1983) (explaining that the securities fraud statutes, on which Section 6(c)(1) is based, are broader than common law doctrines of fraud); *Neder,* 527 U.S. at 22–23 (noting that the wire and bank fraud statutes are defined by common law doctrines of fraud). As discussed above, these Title 18 fraud statutes, unlike Section 6(c)(1), *do* require a scheme to make a misrepresentation or material omission. *See Neder*, 527 U.S. at 22; *Gee*, 226 F.3d at 891–92.

counterparty.  316 F. Supp. 3d 1177, 1181 (N.D. Cal. 2018).  In reference to Bogucki's selling activity (i.e., the alleged scheme), the court observed, "Of course, a defendant does not commit wire fraud simply by trading.  Wire fraud requires a misrepresentation (or an omission in the presence of a duty)."  *Id.* at 1182.  The indictment's allegation that Bogucki made a separate misrepresentation to the counterparty about his anticipated trading activity appears to have saved the charge from dismissal.  *See id.* at 1190 (agreeing with the defense that, "had Bogucki traded without misrepresenting his actions to [the counterparty], there could be no claim that he committed wire fraud").  Similarly, in *United States v. Johnson*, the government alleged that, in a particular transaction, the defendant had represented to a customer that he would obtain a fair price for him and would not "ramp" up a relevant benchmark, but then traded in a manner designed to move the benchmark, impacting the price of the transaction.  945 F.3d 606, 613 (2d Cir. 2019).  The court found the evidence of those two misrepresentations sufficient to support a wire fraud conviction.  *Id.*

The Indictment here, in contrast to the allegations in *Bogucki* and *Johnson*, lacks any allegation that Defendants or their purported co-conspirators made any representation (or misrepresentation) to Bank A's barrier-options clients as to their trading, or that their trading activity itself somehow constituted a misrepresentation or material omission, or any other deception.

Counts Five through Seven (bank fraud) should be dismissed insofar as they rely on the barrier-options allegations for an additional reason:  The Indictment does not allege that the purported victims of the barrier-related conduct were "financial institutions."  *See* Indict. ¶ 27 (alleging only that "Defendants and their co-conspirators also defrauded clients of Bank A who had bought or sold barrier options").  In the absence of a well-pleaded allegation that Defendants

intended to defraud a financial institution, the allegations regarding barrier options are insufficient to state a violation of the bank fraud statute. *See supra*, Point 1.B (to plead a violation of 18 U.S.C. § 1344(1), the government must allege that the defendant specifically intended to defraud a financial institution).

In sum, the Indictment fails to state a violation of the bank, wire, or commodities fraud statutes with respect to barrier-running, and those charges should be dismissed as to that alleged conduct.

## POINT 2: THE RICO CONSPIRACY CHARGE SHOULD BE DISMISSED

### A. The Conduct Alleged in the Indictment Is Not Racketeering Activity

The RICO conspiracy charge should be dismissed for failure to adequately allege an agreement to conduct the affairs of an enterprise through a pattern of racketeering activity. The Indictment charges a conspiracy to violate 18 U.S.C. § 1962(c), which prohibits the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Here, the alleged racketeering activity appears to consist of multiple purported acts of spoofing and barrier-running in violation of the bank fraud and wire fraud statutes.[29] Indict. ¶¶ 26–27.[30] *See United States v. Neapolitan*, 791 F.2d at 499

---

[29] The Indictment also alleges that Defendants "perpetuated the racketeering conspiracy and shielded their unlawful activities from detection and themselves from discipline" by making false statements about their trading practices to Bank A, the CME Group, and the CFTC. Indict. ¶ 28. But these allegations—consisting of Defendants' statements that they were unaware of, or did not engage in, spoofing, and that they complied with Bank A's Code of Conduct, *see id.* ¶¶ 40–44—are not predicate acts of racketeering, as defined by statute. Therefore they are insufficient, standing alone, to support the RICO conspiracy charged in Count One. *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 n.3 (7th Cir. 1992) (alleged "cover-up" activities must rise to the level of mail fraud or obstruction of justice to be predicate acts); *United States v. Neapolitan*, 791 F.2d 489, 501 (7th Cir. 1986), *cert. denied*, 479 U.S. 940 (1986) (predicate acts are elements of the crime under RICO and are, by definition, distinct offenses), *abrogation on other grounds recognized by United States v. Rogers*, 89 F.3d 1326, 1336–37 (7th Cir. 1996); *Miller v. Loucks*, No. 91 C 6539, 1992 WL 329313, at *10 (N.D. Ill. Nov. 5, 1992) (Zagel, J.) ("[C]over-up activities do not constitute RICO predicate acts sufficient to support a separate scheme to defraud."); *accord Jones v. Lampe*, 845 F.2d 755, 759 (7th Cir. 1988).

[30] It is unclear from the Indictment whether the barrier-related conduct is even alleged to constitute predicate acts of racketeering, because, while the Indictment describes this conduct as part of the conspiracy's "means and

("racketeering activity" means the commission of "predicate acts," which can include acts of bank fraud or wire fraud); 18 U.S.C. § 1961(1). For the reasons set forth in Point 1 above, this alleged conduct cannot violate the wire and bank fraud statutes. The Indictment therefore fails to adequately allege the element of racketeering activity, and thus fails to state the offense of RICO conspiracy.

**B. With Regard to the Fraud Counts, If the Court Rejects Either the Barrier-Running Theory or the Spoofing Theory, the Remaining Allegations Would Not Form a Pattern of Racketeering Activity**

If the Court finds that one type of alleged conduct but not the other (i.e., acts of spoofing, alone, or acts of barrier-running, alone) can violate the wire fraud or bank fraud statutes and thus can constitute racketeering activity, Count One would be rendered deficient, because it would not sufficiently allege a "pattern" of such activity under the standard in this Circuit. Accordingly, Count One, in that event, should be dismissed for failure to state an offense.[31]

1. _Applicable Law_

At "the heart of any RICO complaint is the allegation of a pattern of racketeering." _Agency Holding Corp. v. Malley-Duff & Assocs., Inc._, 483 U.S. 143, 154 (1987). Accordingly, "an agreement to commit acts that do not constitute a pattern cannot be an agreement to violate RICO." _Meier v. Musburger_, 588 F. Supp. 2d 883, 912 (N.D. Ill. 2008) (Cole, J.). A pattern "requires at least two acts of racketeering activity," 18 U.S.C. § 1961(5), though two acts may

---

methods," Indict. ¶¶ 25–28, it fails to include any act relating to barrier-running within the section titled "Acts in Furtherance of the Racketeering Conspiracy," _id._ ¶¶ 29–44.

[31] Should this Court find that the allegations in the Indictment are sufficient to state the offense of bank fraud or wire fraud as to _both_ spoofing and barrier-running, it may conceivably conclude that those two types of alleged conduct, together, could form a pattern as required under 18 U.S.C. §§ 1962(c) and 1962(d). However, in the event that the government provides particulars with respect to its barrier-options allegations that impact the arguments made in this motion or give rise to additional arguments, we may seek the Court's permission to submit additional briefing, including on whether there is a sufficient relationship between the two types of conduct alleged. We have requested further detail on the barrier-options allegations in several letters to the government, but the government has not responded.

not be sufficient.  *See Sedima*, 473 U.S. at 496 n.14.  A pattern must satisfy the "continuity plus relationship" test, which requires (i) a relationship between the predicate acts and (ii) a threat of continuing criminal activity.  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (citation omitted).  Although "explicit allegations of continuity" are not necessary, an indictment must include "supplemental facts that reasonably substantiate the existence of continuity."  *United States v. Palumbo Bros.*, 145 F.3d 850, 878 (7th Cir. 1998).

The government must demonstrate either "open-ended" continuity (where the conspiracy is "short-lived" but "shows clear signs of threatening to continue into the future") or "closed-ended" continuity (where the conspiracy existed for an extended period of time).  *Midwest Grinding Co.*, 976 F.2d at 1022–23.  Because the Indictment alleges a conspiracy that spanned an eight-year period, the government must demonstrate closed-ended continuity here.  *See id.*; *see also Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 337 (7th Cir. 2019).  In this Circuit, four factors are relevant in determining whether closed-ended continuity has been established: (i) the presence of separate schemes: (ii) the number and variety of predicate acts, and the length of time over which they were committed; (iii) the number of victims; and (iv) the occurrence of distinct injuries.  *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986).[32]  No single factor is "necessarily determinative."  *Id.* at 976.

---

[32] Courts in this Circuit routinely rely on civil RICO precedent, including *Morgan*, in criminal RICO cases.  *See, e.g.*, *United States v. Horak*, 833 F.2d 1235, 1240 (7th Cir. 1987); *United States v. Finley*, 705 F. Supp. 1272, 1291 (N.D. Ill. 1988) (Rovner, J.); *see also United States v. Standard Drywall Corp.*, 617 F. Supp. 1283, 1294 n.9 (E.D.N.Y. 1985) ("Interpretation of section 1962(c) is assisted by reference to both civil and criminal RICO cases, since the elements of the claim are identical."); *Rich-Taubman Assocs. v. Stamford Rest. Operating Co.*, 587 F. Supp. 875, 878 (S.D.N.Y. 1984) ("The elements of this RICO claim are the same whether the case is civil or criminal.").

2.  Discussion

The RICO conspiracy charged in Count One is principally based on an alleged eight-year scheme "to artificially affect prices and to profit by deceiving other market participants" through the placement of orders to buy and sell precious metals futures contracts with intent to cancel (i.e., spoofing).  Indict. ¶ 26.  The Indictment also alleges that Defendants defrauded Bank A's barrier-options clients by engaging in barrier-related trading activity (i.e., barrier-running).  *Id.* ¶ 27; *see supra*, Point 1.D.  If the Court grants Defendants' motion to dismiss the fraud counts with respect to barrier-running but not spoofing (or vice versa), the remaining alleged predicate acts would not meet the standard for continuity required for a "pattern" of racketeering activity as set out in *Morgan*.  Accordingly, Count One should be dismissed on that basis.

a.  *The Alleged Acts of Spoofing, Standing Alone, Do Not Establish a Pattern*

As discussed below, application of the four factors set forth in *Morgan* shows that the acts of spoofing-based fraud alleged in the Indictment do not establish a pattern.

−  **First Factor: The Unitary Spoofing Scheme**

If the Court dismisses the fraud counts with respect to barrier options but finds that the allegations of spoofing do state a wire or bank fraud offense, then Count One will rest on just a single scheme (i.e., to spoof), not separate schemes—a factor that weighs against a finding of continuity.  *See Morgan*, 804 F.2d at 975.  The spoofing scheme, as alleged, had one purpose— to artificially affect prices and to profit by deceiving other market participants—and one methodology—to place orders to buy and sell precious metals futures contracts with intent to cancel them before execution, effected through "thousands of trading sequences" of a generally similar nature.  Indict. ¶ 26, (a), (d), (e).

Although the existence of "a 'single overall scheme' does not automatically bar a finding of continuity, courts rarely find a pattern of racketeering in such instances."  *Loucks*, 1992 WL

329313, at *10 (citation omitted); *see also Jones*, 845 F.2d at 758 ("predicate acts relat[ing] to only one overall scheme" fail to establish a pattern as a general rule, but not automatically) (citation omitted); *but see Morgan*, 804 F.2d at 975 (predicate acts need not always occur as part of separate schemes to satisfy the continuity aspect of the pattern requirement). The standard is "factually-oriented" and turns on a "case-by-case analysis," *Morgan*, 804 F.2d at 977, but courts in this Circuit have repeatedly cited the absence of multiple schemes as a key factor in finding a failure to allege continuity under the *Morgan* factors, despite the presence of multiple predicate acts. This is true both where the scheme involves a single transaction or incident—*see, e.g.*, *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 476 (7th Cir. 2007) (single scheme to interfere with a patent application); *Loucks*, 1992 WL 329313, at *10 ("one-shot effort" to remove a company's name from a boycott blacklist); *Triad Assocs., Inc. v. Chi. Hous. Auth.*, 892 F.2d 583, 595 (7th Cir. 1989) (scheme related to only one transaction that came to fruition)—and where the scheme involves multiple discrete transactions or events, *see, e.g.*, *CIB Bank v. Esmail*, No. 04 C 4870, 2004 WL 3119027, at *5 (N.D. Ill. Dec. 28, 2004) (Aspen, J.) (single scheme to repeatedly divert money obtained through a series of loans and buy unapproved assets); *Saleh v. Merchant*, No. 14-CV-09186, 2019 WL 1331788, at *15 (N.D. Ill. Mar. 25, 2019) (Tharp, J.) (single scheme to induce targets to buy properties at fraudulently inflated prices); *Inteliquent, Inc. v. Free Conferencing Corp.*, No. 16-cv-06979, 2017 WL 1196957, at *22–23 (N.D. Ill. Mar. 30, 2017) (Blakey, J.) (single scheme to repeatedly submit invoices for services not performed); *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 691 (N.D. Ill. 2012) (Kendall, J.) (single scheme to sell units in a development at artificially inflated prices). Here, Defendants similarly are alleged to have engaged in a series of transactions (i.e.,

"thousands" of spoofing sequences) in furtherance of a single scheme (to spoof). Accordingly, the single-scheme factor strongly weighs against a finding of continuity.

### – Second Factor: The Number, Variety, and Duration of the Spoofing Acts

The number and variety of the alleged acts of spoofing and the length of time over which they were committed—collectively, generally the "most important" *Morgan* factor, *Inteliquent,* 2017 WL 1196957, at *8—do not establish continuity here. While the Indictment alleges that there were "thousands" of instances of spoofing over an eight-year period, courts in this Circuit have "repeatedly rejected RICO claims that rely . . . heavily on mail and wire fraud allegations to establish a pattern," recognizing that the fraud statutes sweep so broadly that one could repeatedly violate them without engaging in the array of diverse misconduct generally required for liability under the RICO statute. *Jennings*, 495 F.3d at 474–76. The numerous instances of purported spoofing are all alleged to have occurred in a nearly identical fashion. *See* Indict. ¶¶ 26, 30–32. This set of homogenous acts does not form a "pattern" under Seventh Circuit law. *See Olive Can Co. v. Martin*, 906 F.2d 1147, 1151 (7th Cir. 1990) (finding that "a large number of predicate acts" of mail and wire fraud did not establish continuity, in part because those acts— i.e., repeated omissions of material fact all designed to induce suppliers to continue providing supplies on credit—were "not of great variety"); *Saleh*, 2019 WL 1331788, at *15 (finding no continuity, in part because the acts at issue—a series of communications of false property appraisals to unsuspecting purchasers—exhibited a "lack of diversity"); *but see United States v. Segal*, 248 F. Supp. 2d 786, 792 (N.D. Ill. 2003) (Castillo, J.) (finding continuity, in part because the predicate acts alleged were "sufficient in quantity" even if "generally of the same type").[33]

---

[33] The predicate acts in *Segal*, which the court concluded were "generally of the same type," were in fact distinct from each other, and are thus distinguishable from the predicate acts alleged here (i.e., the alleged repeated placing of bids and offers with intent to cancel). For example, the indictment in *Segal* identified fifteen predicate acts,

Moreover, the length of time over which the alleged acts occurred—here, roughly eight years—is not determinative. Courts in this Circuit have found no continuity in schemes spanning even ten years, particularly when those schemes consisted only of mail or wire fraud violations. *See, e.g.*, *Loucks*, 1992 WL 329313 at *10 (finding no pattern where the "acts [of mailing] occurred over a lengthy period of time, approximately ten years"). Accordingly, this factor does not establish a pattern.

### – Third and Fourth Factors: The Spoofing Victims and Injuries

Finally, the remaining two factors for consideration—the number of victims and the occurrence of distinct injuries—also weigh against a finding that the Indictment sufficiently alleges a pattern of acts of racketeering. The Indictment does not identify the purported victims, other than Bank A with respect to certain counts; nor does it contain allegations from which the number of victims of the alleged spoofing can be determined. The Indictment merely refers broadly to "other market participants," including competitor financial institutions and proprietary traders. *See* Indict. ¶ 26.

By the same token, the Indictment describes only one type of vague harm, and that alleged harm is not a cognizable loss or injury. In this Circuit, predicate acts of racketeering that do not result in multiple forms of injury have been found to fail the pattern requirement. *See Midwest Grinding Co.*, 976 F.2d at 1024 (finding no pattern, in part because the complaint alleged only "one type of injury," i.e., loss of business); *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 663 (7th Cir. 1992) (finding no pattern, in part because the scheme "resulted in nondistinct injuries," i.e., deprivation of employment); *see also CIB Bank*, 2004 WL 3119027, at

some involving fraudulent mailings to the Illinois Department of Insurance (mail fraud) and others involving fraudulent wire transfers from a trust account to various private accounts in other states (wire fraud). Superseding Indictment 19–34, *United States v. Segal*, No. 02 CR 112, ECF No. 51, 2002 WL 34337364 (N.D. Ill. Oct. 31, 2002). Furthermore, we are not aware of any other decision citing *Segal*.

*6 (finding no pattern, in part because "ten repeated instances of the same fraudulent act" were "properly considered only one distinct injury," and noting that "[t]he occurrence of distinct injuries is the occurrence of different *types* of injuries, not multiple instances of the same injury") (emphasis in original); *but see Segal*, 248 F. Supp. 2d at 793 (at odds with *Morgan*, *Midwest Grinding Co.*, and *Talbot* in relying on "a commonsense reading of the indictment . . . to conclude that there were victims of the scheme . . . that suffered harm[]," without considering whether the injuries were distinct). Here, the Indictment alleges that, due to Defendants' purported scheme to artificially affect prices and profit by deceiving other market participants, market participants executed trades "at quantities, prices, and times that they otherwise likely would not have traded." Indict. ¶ 26(g). The Indictment does not allege a financial or other tangible loss, and the assertion that market participants traded at times when they otherwise would not have traded, without more, does not state an injury. Accordingly, the final two factors suggest that continuity is not present here.

In sum, a fair balancing of the *Morgan* factors demonstrates that predicate acts of spoofing, standing alone, do not establish a pattern for purposes of RICO, warranting dismissal of Count One.

> b. *The Alleged Acts of Barrier-Running, Standing Alone, Do Not Establish a Pattern*

Alternatively, if the Court dismisses the fraud counts with respect to the spoofing allegations but finds that the allegations of barrier-running do state a wire or bank fraud offense, those allegations also fail to establish continuity. That is in large part because the Indictment contains almost no information about the alleged barrier-options fraud: It fails to quantify the number of alleged predicate acts, the duration, the number and nature of the victims, or the type and extent of any alleged injury. *See* Indict. ¶ 27. Moreover, the Indictment's skeletal

description of the purported acts of barrier-running indicates that the conduct was part of a single, undifferentiated scheme to move prices in a manner advantageous to Bank A. *See id.* Applying the *Morgan* factors, continuity has not been sufficiently alleged as to barrier-running, such that dismissal of Count One is warranted if the fraud counts are dismissed with respect to the spoofing allegations.

*    *    *

Collectively, the *Morgan* factors underscore the fact that the government's spoofing allegations and scant allegations of barrier-running are far afield of the RICO statute's heartland. RICO authorizes extremely severe penalties, and should not be applied "to new purposes that Congress never intended." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993); *accord Palumbo*, 145 F.3d at 865 n.9 ("The responsible use of prosecutorial discretion is particularly important with respect to criminal RICO prosecutions—which often rely on mail and wire fraud as predicate acts—given the extremely severe penalties authorized by RICO's criminal provisions.") (citation omitted). For this reason, the Justice Manual cautions prosecutors that RICO offenses should be charged "selectively and uniformly," and warns against "'imaginative' prosecutions . . . which are far afield from the congressional purpose of the RICO statute."[34] *See also Palumbo*, 145 F.3d at 865 n.9 ("Federal prosecutors are . . . instructed that '[u]tilization of the RICO statute, more so than most other criminal sanctions, requires particularly careful and reasoned application.'") (citation omitted). The RICO conspiracy charged here is based on an alleged scheme by precious metals traders to commit repeated, virtually identical acts during their day-to-day work at Bank A, and lacks allegations suggesting distinct victims and injuries.

---

[34] U.S. Dep't of Justice, *Justice Manual* § 9-110.200 (Oct. 2016), www.justice.gov/jm/jm-9-110000-organized-crime-and-racketeering.

It has no connection whatsoever to the traditional organized crime syndicates that prompted Congress to enact RICO, and, if upheld, would stretch far beyond the statute's intended reach.

## POINT 3: ALL TWELVE SUBSTANTIVE COUNTS SHOULD BE DISMISSED

### A. The Attempted Price Manipulation, Spoofing, and Bank Fraud Counts Are Unconstitutionally Vague as Charged Because They Lack Specificity

Counts Three and Four (attempted price manipulation), Thirteen and Fourteen (spoofing), and Five through Seven (bank fraud) must be dismissed for lack of specificity, *see* Fed. R. Crim. P. 12(b)(3)(B)(iii), because, as pleaded, they fail to allege an offense in a manner that meets the requirements of the Fifth and Sixth Amendments. Each count must specify the dates, times, and conduct giving rise to the offense charged, and must state each of the elements of the crime. Here, instead, Counts Three, Four, Thirteen, and Fourteen make the generalized and undifferentiated allegation that Messrs. Smith and Nowak engaged in a multi-year course of misconduct, without specifying any particular allegedly offending trading sequences; and Counts Five through Seven do not adequately identify the financial institutions purportedly defrauded, and thus fail to plead an element of the offense. As a result, Counts Three through Seven, Thirteen, and Fourteen are improperly pleaded and must be dismissed on grounds of vagueness.

#### 1. Applicable Law

"The Fifth Amendment guarantee of the right to indictment by a grand jury, its protection against double jeopardy, and the Sixth Amendment guarantee that a defendant be informed of the nature of the charges against him establish the minimum requirements for an indictment." *United States v. Fassnacht*, 332 F.3d 440, 444 (7th Cir. 2003). "For an indictment to be legally sufficient, it must accomplish three functions: it must state each of the elements of the crime charged; it must provide adequate notice of the nature of the charges so that the accused may prepare a defense; and it must allow the defendant to raise the judgment as a bar to future

prosecutions for the same offense." *Id.* at 444–45; *see also* Fed. R. Crim. P. 7(c)(1) ("The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . ."). "[A]n indictment that tracks the statutory language can . . . be considered deficient if it does not provide enough factual particulars to 'sufficiently apprise the defendant of what he must be prepared to meet.'" *Smith*, 230 F.3d at 305 (quoting *Russell v. United States*, 369 U.S. 749, 763 (1962)). The Seventh Circuit therefore requires, "at a minimum," that the indictment itself "provide some means of pinning down the specific conduct at issue." *Id.* "[I]t is well-settled that the adequacy of notice must be determined from the face of the indictment; neither a bill of particulars nor open discovery can cure an overly vague indictment." *United States v. Josten*, 704 F. Supp. 841, 844 (N.D. Ill. 1989) (Marshall, J.).

2. Discussion

a. *The Attempted Price Manipulation and Spoofing Counts Fail to Specify Any Particular Allegedly Offending Trading Sequences*

The attempted price manipulation counts each comprise three paragraphs, while the spoofing counts each comprise two paragraphs. In each of the counts, the first paragraph simply "re-allege[s] and incorporate[s]" earlier paragraphs in the Indictment. As relevant here, Counts Three and Thirteen incorporate Paragraph 30, which begins by alleging that "SMITH executed the following trading sequences, *among others*, involving Deceptive Orders," Indict. ¶ 30 (emphasis added), and proceeds to identify 25 specific trading sequences in Paragraphs 30(a)– (y). *See id.* ¶¶ 30, 52, 74. Counts Four and Fourteen, in turn, incorporate Paragraph 31, which begins by alleging that "NOWAK executed the following trading sequences, *among others*, involving Deceptive Orders," *id.* ¶ 31 (emphasis added), and proceeds to identify 14 specific trading sequences in Paragraphs 31(a)–(n). *See id.* ¶¶ 31, 55, 76. The counts otherwise allege *no* specific trading sequences as charged violations, instead merely tracking statutory language and

identifying broad, years-long periods over which the purported violations occurred.[35]  *Id.* ¶¶ 52–57, 74–77.  Nor do the counts limit the trading sequences alleged to be violations to those identified in the paragraphs incorporated by reference.

Accordingly, the four counts are facially invalid.  Substantive counts that fail, as these do, to particularize any alleged facts, whether through a "to wit" clause or otherwise, fail to meet the requirements of Fed. R. Crim. P. 12(b)(3)(B)(iii).  As such, the allegations in these counts fail to provide Defendants with the constitutionally required notice of the "nature of the charges" they face.  *Fassnacht*, 332 F.3d at 444.[36]

The absence of any factual specificity in Counts Three, Four, Thirteen, and Fourteen also fails to ensure, as required by the Fifth Amendment, that the evidence that will be presented to the petit jury in support of the counts tracks the evidence considered by the grand jury.  *See Stirone v. United States*, 361 U.S. 212, 218 (1960) ("The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."); *United States v. Hillie*, 227 F. Supp. 3d 57, 70 (D.D.C. 2017) (the Fifth Amendment "guarantees that a criminal defendant can only be prosecuted for offenses that a grand jury has actually passed up on").  The counts should therefore be dismissed.  *See United States v. Urso*, 369 F. Supp. 2d 254, 265 (E.D.N.Y. 2005) (dismissing loansharking counts where "indictment provide[d] no details of the

---

[35]  As noted below in further detail, the third paragraph in each attempted price manipulation count (which asserts that the named defendant "commit[ted], and cause[d] to be committed, the overt acts [respectively] alleged in Paragraph[s]" 30 and 31) does not remedy this omission.  Indict. ¶¶ 54, 57.

[36]  Similarly, the Indictment's sparse, conclusory allegations of barrier-running are unconstitutionally vague as charged.  As noted above, the allegations lack basic information, such as the relevant dates and times with respect to the barrier-options contracts, the contract terms, the underlying assets, the counterparties, and the specific trades underlying the allegations.  The Indictment does not even identify which of the Defendants (or purported co-conspirators) allegedly engaged in the supposed fraud with respect to barrier options.  The allegations thus fail to put Defendants on notice of the nature of the charges with respect to barrier options.

loansharking violations . . . other than to allege that they took place during a two-year period, and that some part of the charged criminal activity was carried out within the Eastern District of New York"); *Josten*, 704 F. Supp. at 844 (where indictment did not state allegedly false representations, did not name the victims of the allegedly improper conduct or the accounts to which it pertained, and did not give any specific dates upon which the challenged activity took place, defendant was left "speculating as to which of the many transactions and representations that took place over the eight month period are the subject of his indictment.").

The vagueness of the attempted price manipulation and spoofing counts is not resolved by the incorporation by reference of Paragraphs 30 and 31, as applicable, which identify certain discrete alleged trading sequences, *see supra*, Part II.B.1. The counts themselves do not limit the conduct purporting to underlie such counts to those incorporated trading sequences. And, importantly, no such limitation is contained in the incorporated paragraphs. Rather, in Paragraphs 30 and 31, the Indictment purports to treat the trading sequences merely as alleged examples of spoofing. *See, e.g.*, Indict. ¶ 30 ("SMITH executed the following trading sequences, *among others*, involving Deceptive Orders . . . .") (emphasis added). In fact, the government claims in discovery correspondence that it plans to prove misconduct by offering evidence of *thousands* of trading sequences.[37] The government's assertion underscores that the substantive counts fail the test of *Fassnacht*. First, in falling short of the requirements of Rule 12, the counts fail to provide adequate notice of the charges. Second, the government's intention to use these thousands of sequences raises the question whether the trading sequences were presented to the grand jury, bearing on the Fifth Amendment's requirement that the petit jury decide charges that

---

[37] On December 20, 2019, the government provided defense counsel with a spreadsheet containing 54,456 trading sequences that, according to the government, "underlie the charges in the superseding indictment." Dec. 20, 2019 E-mail from Matthew Sullivan. The spreadsheet contains 38,121 alleged trading sequences with respect to Mr. Smith and 3,589 alleged trading sequences with respect to Mr. Nowak that are not alleged in the Indictment.

were actually considered by the grand jury. *United States v. Vendetti*, No. 10–CR–00360–RJA–JJM, 2013 WL 5522860, at \*5 (W.D.N.Y. Jan. 22, 2013) (dismissing counts for transporting stolen goods in violation of 18 U.S.C. §§ 2314 and 2 because, "[a]s drafted, the Second Superseding Indictment provides the government with wide latitude in selecting the transactions it may seek to establish at trial—with no assurance that those transactions were considered by or even presented to the grand jury"), *report and recommendation adopted*, No. 10–CR–360, 2013 WL 5522434 (W.D.N.Y. Oct. 3, 2013).

Accordingly, Counts Three, Four, Thirteen, and Fourteen must be dismissed.

  b. *The Bank Fraud Counts Do Not Adequately Identify the Financial Institutions Purportedly Defrauded*

In Counts Five and Six, the Indictment alleges that Messrs. Smith and Nowak, respectively, "knowingly and with the intent to defraud executed and attempted to execute a scheme and artifice to defraud *one or more* financial institutions, *including Bank A and other financial institutions* who were participants in the precious metals futures markets." Indict. ¶¶ 59, 61 (emphasis added). Count Seven similarly alleges that Mr. Jordan "executed and attempted to execute a scheme and artifice to defraud *one or more* financial institutions, *including Banks A and C and other financial institutions* who were participants in the precious metals futures markets." *Id.* ¶ 63 (emphasis added). All three counts fail to adequately identify the financial institutions purportedly defrauded by Defendants. The counts must therefore be dismissed.

Bank fraud, as charged here, is the knowing execution or attempt to execute a scheme or artifice "to defraud *a financial institution*." 18 U.S.C. § 1344(1) (emphasis added). The financial institution is an element of the offense, such that an indictment charging bank fraud must identify the institution and plead that it is a "financial institution" within the meaning of 18

U.S.C. § 20. *See United States v. Farmigoni*, 934 F.2d 63, 66 (5th Cir. 1991) ("... [an]

identified[] defrauded bank is elemental to a violation of § 1344"); *United States v. Bortnick*, No.

Crim. A. 03–CR–0414, 2004 WL 2752471, at *1 (E.D. Pa. Nov. 29, 2004) ("[T]o survive a

motion to dismiss for failing to state a criminal offense, an indictment under § 1344 must contain

proof that the victim is a federally-insured financial institution. In addition to being an essential

element of a criminal charge under § 1344, proof of FDIC insurance is the basis for federal

jurisdiction in bank fraud cases.") (citing *United States v. Schultz*, 17 F.3d 723, 725 (5th Cir.

1994)); *see also United States v. Ali*, 266 F.3d 1242, 1243 (9th Cir. 2001) ("Proof of federally-

insured status of the affected institution is, for . . . section 1344 . . . a jurisdictional prerequisite as

well as an element of the substantive crime.") (quoting *United States v. Key*, 76 F.2d 350, 353

(11th Cir. 1996) (per curiam)).

Counts Five through Seven are unconstitutionally vague to the extent that they purport to

charge Messrs. Smith, Nowak, and Jordan with defrauding financial institutions other than Bank

A (and Bank C, as to Jordan). The Indictment fails to identify the "other financial institutions,"

and fails even to plead that they were financial institutions within the meaning of the statute.

*Compare* Indict. ¶ 5 ("Bank A was a financial institution within the definition of Title 18, United

States Code, Section 20.") *with id.* ¶¶ 59, 61, 63 (making no such allegation as to the "other

financial institutions"). The bank fraud counts thus fail the test of *Fassnacht*, 332 F.3d at 444–

45 (indictment must "state each of the elements of the crime charged," "provide adequate notice

of the nature of the charges," and "allow the defendant to raise the judgment as a bar to future

prosecutions for the same offense"). Accordingly, Counts Five through Seven must be

dismissed.

### B. The Substantive Counts Are Duplicitous

The twelve substantive counts of the Indictment are impermissibly duplicitous, in three ways. First, Counts Three through Twelve are duplicitous because they combine allegations of both spoofing and barrier-running (to the extent that neither set of allegations is dismissed). Second, even if the conduct charged in Counts Three and Four (attempted price manipulation) and Thirteen and Fourteen (spoofing) were limited to the particular trading sequences incorporated by reference therein, each count would impermissibly allege multiple trading sequences. Third, Counts Five through Seven (bank fraud) and Eight through Ten (wire fraud affecting a financial institution) are duplicitous to the extent that they allege fraud with respect to more than one financial institution.

#### 1. Applicable Law

Duplicity is "the joining of two or more offenses in a single count." *United States v. Marshall*, 75 F.3d 1097, 1111 (7th Cir. 1996). "[T]he prohibition of duplicitous counts is embodied in Rule 8(a) of the Federal Rules of Criminal Procedure, which provides for 'a separate count for each offense.'" *United States v. Berardi*, 675 F.2d 894, 897 n.5 (7th Cir. 1982) (citation omitted). "[F]our concerns" drive the ban on duplicitous indictments: (1) the "fail[ure] to give defendants adequate notice of the nature of the charges against which they must prepare a defense," (2) potential for "prejudicial evidentiary rulings at trial," (3) "trial records inadequate to" protect against double jeopardy, and (4) the risk of conviction "by a nonunanimous verdict." *United States v. Kimberlin*, 781 F.2d 1247, 1250 (7th Cir. 1985); *see also United States v. Davis*, 471 F.3d 783, 790 (7th Cir. 2006); *United States v. O'Brien*, No. 17 CR 239-1, 2017 WL 5192032, at *1 (N.D. Ill. Nov. 9, 2017) (Durkin, J.) ("The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or both.") (citation

omitted). "Congress determines the intended unit of prosecution for a particular statute," and thus, whether an offense is impermissibly duplicitous depends on the language of the specific statute at issue. *United States v. Miller*, 883 F.3d 998, 1003 (7th Cir. 2018).

With respect to scheme-based offenses, two factors are generally relevant in assessing whether a count is impermissibly duplicitous: (1) whether the defendant's alleged actions can be deemed a single course of conduct during a discrete time period; and (2) whether the defendant would be prejudiced by prosecution on a single count. *See United States v. Buchmeier*, 255 F.3d 415, 421, 425 (7th Cir. 2001); *O'Brien*, 2017 WL 5192032, at *4. Transactions can qualify as a "single course of conduct" when they "have a sufficiently close nexus or are sufficiently interrelated[,] with an eye toward meaningful commonalities and differences." *O'Brien*, 2017 WL 5192032, at *4 (citation omitted); *see also United States v. Mason*, No. 15-CR-102, 2016 WL 2755401, at *2 (N.D. Ill. May 12, 2016) (Coleman, J.). Where acts are alleged to be fraudulent, the purpose, victims, types of communication, timeframe, and parties involved are factors to be considered in determining whether those acts are part of a single course of conduct. *See, e.g.*, *Berardi*, 675 F.2d at 898–99; *United States v. Hollnagel*, No. 10 CR 195, 2011 WL 3664885, at *9–11 (N.D. Ill. Aug. 19, 2011) (St. Eve, J.); *United States v. Miserendino*, No. 05-CR-311, 2006 WL 1117828, at *5–7 (E.D. Wis. Apr. 26, 2006). A common actor or location generally is insufficient, without more, to link disparate acts into single scheme; and a single scheme typically involves consistent conduct with respect to the scheme's victims. *See United States v. Reicin*, 497 F.2d 563, 570 (7th Cir. 1974).

Charges found to be prejudicially duplicitous at an early stage of the pre-trial process should be dismissed. *See United States v. Bessigano*, No. 2:08 CR 110, 2008 WL 4833110, at *3 (N.D. Ind. Nov. 4, 2008) ("[B]ecause defendant properly raised this issue before trial, the proper

remedy is dismissal of the duplicitous count, rather than trying to clarify the indictment via jury instructions."); *United States v. Schock*, No. 16-CR-30061, 2017 WL 4780614, at *21 (C.D. Ill. Oct. 23, 2017) (dismissing charge as impermissibly duplicitous), *aff'd in part, appeal dismissed in part*, 891 F.3d 334 (7th Cir. 2018).

    2.  <u>Discussion</u>

        a.  *To the Extent That Both the Spoofing Allegations and the Allegations Regarding Barrier Options Are Upheld, Counts Three Through Twelve Are Duplicitous*

Counts Three through Twelve combine allegations of two distinct forms of misconduct: (i) spoofing and (ii) barrier-running. These acts, as alleged, constitute separate schemes, such that charging them together would prejudice Defendants by presenting a substantial risk of a non-unanimous verdict as to each of the offenses charged. Therefore, to the extent that both the spoofing allegations and the allegations of barrier-running are upheld, Counts Three through Twelve are duplicitous and should be dismissed.

Each of Counts Three through Twelve is based on allegations of both spoofing and barrier-running. Indict. ¶¶ 52, 55, 58, 60, 62, 64, 66, 68, 70, and 72 (allegations incorporated by reference). But those alleged acts, as described in the Indictment, plainly do not constitute a single course of conduct over a discrete period of time. *See generally O'Brien*, 2017 WL 5192032. Rather, the Indictment alleges that Defendants engaged in two distinct types of misconduct, with different goals, targeting different victims, over an extended time period.

As alleged, the two types of conduct impacted different victims: Whereas barrier-running "defrauded" Bank A's clients, spoofing was purportedly intended to defraud other market participants while helping to "service and benefit" Bank A's clients. Indict. ¶¶ 26(l), 27; *cf. O'Brien*, 2017 WL 5192032, at *4 (finding no duplicity in part because the conduct involved the same class of victims and the same goals). While both schemes allegedly enriched Bank A,

54

"a broadly alleged motive like 'financial gain' is not enough to link crimes together that are very different in nature." *O'Brien*, 2017 WL 5192032, at *7.

The two types of alleged conduct involved distinct activities. Spoofing, as alleged, involved placing and quickly canceling "deceptive" futures orders to trick other futures market participants into buying and selling futures "at quantities, prices, and times that they otherwise likely would not have traded." Indict. ¶ 26(g). By contrast, barrier-running allegedly involved trading futures to push the price of the underlying assets up or down, and is not alleged to have involved deception of other market participants. *Id.* ¶ 27; *cf. O'Brien*, 2017 WL 5192032, at *4, 7. The acts did not occur over a brief period of time: The spoofing scheme allegedly took place over an eight-year period, while the barrier-options conduct allegedly occurred during some unspecified period within that timeframe. *See* Indict. ¶ 22; *cf. Berardi*, 675 F.2d at 898 (no duplicity where conduct occurred within four months, involved one defendant and one witness, and had a singular goal); *O'Brien*, 2017 WL 5192032, at *7 (no duplicity where transactions occurred over three years); *Mason*, 2016 WL 2755401, at *2 (no duplicity where conduct occurred repeatedly over two years, targeted one type of victim, utilized similar communications, and had the same goal).

Allowing the government to prosecute the two forms of alleged misconduct here in a single count would prejudice Defendants, because it would present a substantial risk of a non-unanimous verdict. *See Schock*, 2017 WL 4780614, at *21 (dismissing a charge as impermissibly duplicitous because "the Government has made it impossible for Defendant (and the court) to determine which [transaction] could have given rise to the alleged violation"); *cf. O'Brien*, 2017 WL 5192032, at *7 (finding no prejudice in part because the indictment alleged "only one discrete and well-described execution in each count [i.e., a mailing in one count and a

loan in the other]").  To the extent that both the spoofing allegations and the allegations regarding barrier options are upheld, Counts Three through Twelve should therefore be dismissed.

> **b.** *Even If the Trading Sequences Identified in Count One, Alone, Formed the Basis for the Attempted Price Manipulation and Spoofing Counts, Those Counts Would Be Duplicitous*

Counts Three, Four, Thirteen, and Fourteen fail to allege any specific trading sequences, as discussed above.  *See supra*, Point 3.A.  But even reading those counts as limited to the trading sequences incorporated by reference therein, Counts Three and Thirteen (naming Mr. Smith) charge 25 different trading sequences allegedly executed between May 27, 2008, and April 17, 2015, *see* Indict. ¶¶ 30, 52, 74, and Counts Four and Fourteen (Mr. Nowak) charge 14 different trading sequences allegedly executed between September 22, 2009, and March 3, 2014, *see id.* ¶¶ 31, 55, 76.  Each of these incorporated alleged trading sequences is a separate alleged offense that cannot be charged in a single count.  *See United States v. Prescott*, 42 F.3d 1165, 1166 (8th Cir. 1994) (money laundering count duplicitous where it referred to "transactions in the plural, occurring in a time period" spanning several years); *United States v. Tanner*, 471 F.2d 128, 138–39 (7th Cir. 1972) (count charging "transporting explosives in interstate commerce" over a period of three months to multiple geographic locations was duplicitous "since [the count] alleges a substantive offense" rather than a "general conspiracy allegation").

The spoofing charges in *United States v. Coscia* are illustrative.  There, in a prosecution under the anti-spoofing statute, the indictment charged six counts of spoofing, with each count based on a particular trading sequence.[38]  *See, e.g.*, *Coscia* Indictment 15 ("COUNT EIGHT . . .

---

[38] Press Release, U.S. Attorney's Office (N.D. Ill.), High-Frequency Trader Convicted of Disrupting Commodity Futures Market in First Federal Prosecution of "Spoofing" (Nov. 3, 2015), www.justice.gov/usao-ndil/pr/high-frequency-trader-convicted-disrupting-commodity-futures-market-first-federal.

On or about September 2, 2011, at approximately 9:39 a.m.," the defendant "transmitted . . . gold commodity futures contract orders that he intended to cancel before execution, so he could purchase 28 contracts at a below-market price and then sell them immediately thereafter for a higher price, in order to obtain a profit of approximately $560 in less than a second."). Here, by contrast, the four counts, even if read to allege only the trading sequences incorporated by reference, allege many such sequences on different dates and at different times—a textbook example of duplicitous pleading.

Accordingly, even if Counts Three, Four, Thirteen, and Fourteen were to be read as limited to the incorporated trading sequences, the counts should be dismissed as duplicitous. Ordinarily, in the alternative, the Court could instruct the jury that conviction requires unanimous agreement that a particular pleaded trading sequence or set of sequences constitutes spoofing. *See United States v. Stewart*, No. 08 CR 720, 2009 WL 2149603, at *3 (N.D. Ill. July 17, 2009) (Higgins, J.) (clarifying jury instructions may be used to address a potentially duplicitous indictment). But here, in view of the Fifth and Sixth Amendment problems presented by these counts, *see supra*, Point 3.A, as well as the statute-of-limitations issue discussed below, *see infra*, Point 3.C, we respectfully submit that dismissal is well warranted. *See also Bessigano*, 2008 WL 4833110, at *3 (dismissal warranted where duplicity raised before trial).

      c.   *The Bank and Wire Fraud Counts Are Duplicitous in Charging Alleged Conduct with Respect to More Than One Financial Institution*

As noted above, Counts Five through Seven (bank fraud) charge Messrs. Smith, Nowak, and Jordan with executing and attempting to execute a scheme to defraud Bank A, Bank C (as to Mr. Jordan only), "*and other financial institutions* who were participants in the precious metals futures markets." Indict. ¶¶ 59, 61, 63 (emphasis added). By the same token, Counts Eight through Ten charge the same three Defendants with wire fraud "affecting *one or more* financial

institutions, *including*" Bank A, Bank C (as to Mr. Jordan only), "and *other financial institutions,* as well as other participants in the precious metals futures markets." *Id.* ¶¶ 65, 67, 69 (emphasis added). All six bank and wire fraud counts are impermissibly duplicitous, because they charge purported schemes against, or schemes affecting, more than one financial institution. On that basis, the six counts should be dismissed.

Bank fraud, as noted above, is the knowing execution or attempt to execute a scheme or artifice "to defraud *a financial institution.*" 18 U.S.C. § 1344(1) (emphasis added). Likewise, wire fraud, as charged here, carries a ten-year statute of limitations only "if the offense affects *a financial institution.*" 18 U.S.C. § 3293(2) (emphasis added). As the singular statutory language indicates, the scheme charged must be one to defraud, or one affecting, *one* financial institution. *See Farmigoni*, 934 F.2d at 66 (reading bank fraud count "within the context of the clearly singular wording of the statute, which makes it a crime to defraud *a financial institution*," and finding, on that basis, that the defendant's guilty plea extended only to his conduct with respect to the one financial institution identified by name in the indictment, and not the "'other financial institutions'" vaguely referenced there) (emphasis in original); *United States v. Hinton*, 127 F. Supp. 2d 548, 554 (D.N.J. 2000) ("The plain language of the statute defines one of the elements of bank fraud as a scheme to defraud 'a financial institution,' not a scheme to defraud financial institutions."); Trial Tr. 33:5–8, *United States v. Allen*, No. 14 CR. 272 (JSR), ECF No. 150 (S.D.N.Y. Oct. 13, 2015) (The Court: "I don't see that the indictment [charging wire fraud affecting a financial institution] really speaks to financial institutions worldwide were defrauded. That is a much-too-liberal reading of the indictment and *not to be countenanced in a criminal case.*") (emphasis added).

The case of *United States v. Hinton* is instructive. There, the government charged "a scheme to defraud six financial institutions" in a single count of bank fraud. 127 F. Supp. 2d at 552. The court recognized the singular statutory language, *id.* at 554, and concluded:

> The Second Superseding Indictment charges one violation of 18 U.S.C. § 1344, yet it embraces at least 128 transactions executed in furtherance of frauds against six separate financial institutions. . . . In the event of a conviction, it would not be possible to determine which aspects of this so called unified scheme had been proved as to which financial institutions. . . . Although it is understandable that the government would want to conserve its resources and simplify the prosecution of this defendant who is alleged to have managed the fraudulent transactions with each bank, for one unified scheme, it cannot do so in a one count indictment where six financial institutions are involved, even if distinct similarities in the means and methods of the schemes directed against each bank exist in the proofs.

*Id.* at 556.[39]

Here, as in *Hinton*, Counts Five through Ten charge schemes with respect to multiple financial institutions. All six counts are plainly duplicitous and raise the same constitutional issues presented there, as they allege multiple "other financial institutions" in addition to Bank A, contrary to the singular construction of the statutes. Indict. ¶¶ 59, 61, 63, 65, 67, 69; *see Hinton*, 127 F. Supp. 2d at 554; *accord Farmigoni*, 934 F.2d at 66. Counts Seven and Ten (charging Mr. Jordan) are impermissibly duplicitous for an additional reason, because each of those counts alleges a scheme to defraud, or a scheme affecting, two financial institutions: Bank

---

[39] The court noted that it had identified "only one case in which a court allowed a single count of bank fraud to charge a defendant with orchestrating a scheme to defraud more than one financial institution"—*United States v. Brown*, 894 F. Supp. 1150 (N.D. Ill. 1995) (Castillo, J.), where the government had charged "a scheme to defraud twenty-two Chicago-area financial institutions" in a single count. *Hinton*, 127 F. Supp. 2d at 554. The court observed that the *Brown* court had apparently avoided the issue by "requir[ing] the government to prove each of the many underlying fraudulent transactions beyond a reasonable doubt," as to each and every one of the 22 financial institutions, "in order to succeed in proving the unified scheme." *Id.* at 555.

A and Bank C. *Id.* ¶¶ 63, 69. As in *Hinton*, the appropriate remedy, on all six counts, is dismissal.[40]

## C. The Substantive Counts Purport to Charge Time-Barred Conduct

Each of Counts Three through Fourteen purports to charge conduct outside the applicable statute of limitations. The counts should be dismissed to the extent that they allege time-barred conduct.

The applicable statutes of limitations here are five years for attempted price manipulation and spoofing, 18 U.S.C. § 3282(a), six years for commodities fraud, 18 U.S.C. § 3301(b), and ten years for bank fraud and wire fraud affecting a financial institution, 18 U.S.C. § 3293. Yet the spoofing counts allege conduct beginning nearly a decade ago, on July 16, 2011 (i.e., the effective date of the anti-spoofing statute), Indict. ¶¶ 75, 77; the commodities fraud counts allege conduct beginning even further back, on May 20, 2009 (the effective date of the commodities fraud statute), *id.* ¶¶ 71, 73; the attempted price manipulation counts allege conduct beginning in January 2008 (for Mr. Smith) and May 2008 (for Mr. Nowak), *id.* ¶¶ 53, 56; and the bank and wire fraud counts allege conduct beginning in January 2008 (Mr. Jordan) and May 2008 (Messrs. Smith and Nowak), *id.* ¶¶ 59, 61, 63, 65, 67, 69.

---

[40] In *United States v. O'Brien*, No. 17 CR 239-1, 2017 WL 5192032 (N.D. Ill. Nov. 9, 2017) (Durkin, J.), a court in this District considered but declined to follow *Hinton* in ruling against a defendant's motion to dismiss a charge of bank fraud on grounds of duplicity. *Id.* at *6. We respectfully submit that the court in *O'Brien* erred in rejecting *Hinton*. The court cited *United States v. Zeidman*, 540 F.2d 314, 315 (7th Cir. 2006) for the proposition that, in this Circuit, "alleged fraud involving even two different 'classes of victims' . . . [is] properly joined as a single course of conduct," *O'Brien*, 2017 WL 5192032, at *6 (citation omitted), and pointed to *Zeidman*, as well as *United States v. Hollnagel*, No. 10 CR 195, 2011 WL 3664885 (N.D. Ill. Aug. 19, 2011) (St. Eve, J.) and *United States v. Freed*, No. 13-cr-951, 2016 WL 374133 (N.D. Ill. Feb. 1, 2016) (Dow, J.), as cases in which "courts have found transactions involving several different classes of victims to be part of a single course of conduct." *O'Brien*, 2017 WL 5192032, at *6. But in all three cases, the language and analysis that *O'Brien* relied on concerned mail or wire fraud, not bank fraud. *See Zeidman*, 540 F.2d at 315; *Hollnagel*, 2011 WL 3664885, at *9; *Freed*, 2016 WL 374133, at *3. *O'Brien* thus did not consider the bank fraud statute's distinct focus on schemes to defraud a singular financial institution.

The limitations period "normally begin[s] to run when the crime is complete." *Toussie v. United States*, 397 U.S. 112, 114–15 (1970) (citations omitted). Courts have recognized a narrow exception for "continuing" offenses, *id.* at 115, but that exception does not apply here, notwithstanding the Indictment's broad characterization of Defendants' alleged conduct as having occurred "[b]etween March 2008 [sic] and August 2016," Indict. ¶ 22.

The "continuing offense" doctrine operates to extend the statute of limitations where either: (a) "the explicit language of the substantive criminal statute compels such a conclusion," or (b) "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie*, 397 U.S. at 115; *see United States v. Yashar*, 166 F.3d 873, 877 (7th Cir. 1999). The focus in identifying a continuing offense is the statutory language: "If the statute describes an offense that by its nature continues after the elements have been met, then the offense is a continuing one regardless of the nature of defendant's actions beyond that point." *Yashar*, 166 F.3d at 877. The Supreme Court has admonished that the "continuing offense" exception must be narrowly construed, because it extends the statute of limitations. *Toussie*, 397 U.S. at 115. "[F]or offenses that are not continuing offenses under *Toussie*, the offense is committed and the limitations period begins to run once all elements of the offense are established, regardless of whether the defendant continues to engage in criminal conduct." *Yashar*, 166 F.3d at 879–80.

Here, neither the relevant statutory language nor the nature of the alleged conduct supports the application of the "continuing offense" doctrine. Rather, the purported offenses, as alleged, were complete at the conclusion of each trading sequence.[41] The spoofing, commodities

---

[41] While a charge under the Title 18 fraud statutes contemplates a "scheme," which may at times include conduct outside of the limitations period, the scheme alleged here encompasses thousands of individual trades, each of which is chronologically and substantively independent. This is in stark contrast to cases where the indictments

fraud, wire fraud, bank fraud, and price manipulation statutes do not "describe[] an offense that

by its nature continues after the elements have been met," *Yashar*, 166 F.3d at 877. *See United*

*States v. Niven*, 952 F.2d 289, 293 (9th Cir. 1991) (holding that mail and wire fraud are not

continuing offenses), *overruled on other grounds by United States v. Scarano*, 76 F.3d 1471,

1477 (9th Cir. 1996); *United States v. Motz*, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009) (granting

partial motion to dismiss and concluding that "[a]lthough it is true that securities fraud schemes

are frequently carried out over a period of time, 18 U.S.C. 1348 itself does not contemplate a

prolonged course of conduct"); *accord United States v. Miro*, 29 F.3d 194, 198 (5th Cir. 1994)

("Notwithstanding the continuing nature of the scheme itself, each mailing constitutes a

completed offense."). Each time Defendants engaged in an alleged "Deceptive Order," the

applicable statute of limitations therefore began to run with respect to that purported violation.

*See Motz*, 652 F. Supp. 2d at 294; *see also United States v. Askia*, 893 F.3d 1110, 1119 (8th Cir.

2018), *cert. denied*, 139 S. Ct. 2705 (2019). The fact that Defendants have been charged with

repeatedly violating those statutes over a period of time through the same form of trading activity

does not transform the alleged violations into continuing offenses for statute-of-limitations

purposes. *See Yashar*, 166 F.3d at 877 ("[T]he active or passive nature of a defendant's actions

has never been the benchmark of a continuing offense under *Toussie*."); *United States v. Jaynes*,

75 F.3d 1493, 1506 & n.12 (10th Cir. 1996) ("[A] continuing offense is not the same as a scheme

---

allege a scheme to defraud involving a handful of executions that are all related to each other. *See, e.g.*, *O'Brien*, 2018 WL 4205472, at *14–15; *see also United States v. Longfellow*, 43 F.3d 318, 325 (7th Cir. 1994). Accordingly, as alleged, each time Defendants executed a purportedly fraudulent trade, the requisite elements of bank, wire, or commodities fraud were satisfied and the applicable statute of limitations began to run with respect to that specific alleged violation. To hold otherwise would permit the government to allege a scheme against any trader with an unlimited statute of limitations, inclusive of trades spanning the entirety of his career, thus defeating the purpose of the statute of limitations.

or pattern of illegal conduct. . . . Separate offenses may be part of a common scheme without being 'continuing' for limitation purposes."); *Miro*, 29 F.3d at 198; *Motz*, 652 F. Supp. 2d at 294.

In sum, it does not matter that the government chose to charge the alleged conduct in one count per Defendant per statute rather than multiple counts. The government's choice does not have the effect of delaying the running of the limitations period, which serves as a "check on governmental delay in prosecution" and is not a "function of prosecutorial discretion." *Yashar*, 166 F.3d at 879.

Messrs. Smith and Nowak each reached an agreement with the government that "the time period beginning on February 1, 2019, and continuing until midnight on September 15, 2019 . . . shall be excluded" in calculating statutes of limitations in connection with this case.[42] Mr. Jordan did not enter into such an agreement with the government, such that, as to Mr. Jordan, the measuring point for statute-of-limitations purposes is August 22, 2019, the date on which the first indictment in this case was returned. (ECF No. 1.) Consequently, only trading sequences alleged to have been completed on or after February 1, 2009 (for Counts Five, Six, Eight, and Nine), August 22, 2009 (for Counts Seven and Ten), February 1, 2013 (for Counts Eleven and Twelve), and February 1, 2014 (for Counts Three, Four, Thirteen, and Fourteen), fall within the applicable limitations periods.

| Count | Alleged Offense | Statute of Limitations | Defendant | Earliest Date of Alleged Conduct | Earliest Date Within Limitations Period |
|-------|-----------------|------------------------|-----------|----------------------------------|------------------------------------------|
| Three | Attempted price manipulation | Five years | Smith | Jan. 2008 | Feb. 1, 2014 |
| Four | | | Nowak | May 2008 | |
| Five | Bank fraud | Ten years | Smith | May 2008 | Feb. 1, 2009 |
| Six | | | Nowak | | |
| Seven | | | Jordan | Jan. 2008 | Aug. 22, 2009 |

---

[42] Feb. 8, 2019 Statute of Limitations Tolling Agreement (Smith); Feb. 7, 2019 Statute of Limitations Tolling Agreement (Nowak).

| Count | Alleged Offense | Statute of Limitations | Defendant | Earliest Date of Alleged Conduct | Earliest Date Within Limitations Period |
|-------|-----------------|------------------------|-----------|----------------------------------|------------------------------------------|
| Eight | Wire fraud affecting a financial institution | Ten years | Smith | May 2008 | Feb. 1, 2009 |
| Nine | | | Nowak | | |
| Ten | | | Jordan | Jan. 2008 | Aug. 22, 2009 |
| Eleven | Commodities fraud | Six years | Smith | May 20, 2009 | Feb. 1, 2013 |
| Twelve | | | Nowak | | |
| Thirteen | Spoofing | Five years | Smith | July 16, 2011 | Feb. 1, 2014 |
| Fourteen | | | Nowak | | |

Any trading sequences alleged to have been completed prior to those dates are therefore untimely. Accordingly, the Court should dismiss the counts to the extent that they purport to charge earlier-completed trading sequences.

## POINT 4: PARAGRAPHS 40 AND 41 CONTAIN PREJUDICIAL SURPLUSAGE

The Indictment states that Mr. Nowak "was interviewed by the CFTC in connection with a CFTC inquiry into the manipulation of silver prices," and that he "knowingly and intentionally gave false answers to questions from a CFTC investigator." Indict. ¶ 40. The Indictment states that Mr. Jordan likewise "was interviewed by the CFTC in connection with a CFTC inquiry into the manipulation of silver prices," and that he "knowingly and intentionally gave false answers to questions from a CFTC investigator." *Id.* ¶ 41. These references to a CFTC investigation concerning manipulation of silver prices are prejudicial to Messrs. Nowak and Jordan and irrelevant to the charges in this case. The language describing the interviews as "in connection with a CFTC inquiry into the manipulation of silver prices" and describing the questioning as "from a CFTC investigator" should therefore be stricken from Paragraphs 40 and 41.

"[S]urplusage may be stricken from [an] indictment [where] the court finds the language to be immaterial, irrelevant, or prejudicial." *United States v. Marshall*, 985 F.2d 901, 905 (7th Cir. 1993); *see also* Fed R. Crim. P. 7(d); *United States v. White*, No. 08–CR–851, 2010 WL 10861118, at *9 (N.D. Ill. Dec. 16, 2010) (Adelman, J.), *aff'd*, 698 F.3d 1005 (7th Cir. 2012)

(same).  The language in question is plainly irrelevant:  The existence and subject matter of a prior CFTC inquiry—and the fact that Messrs. Nowak and Jordan were interviewed by a "CFTC investigator" as opposed to CFTC staff in some other context—are irrelevant to the offenses charged in the Indictment and to the government's allegation that Messrs. Nowak and Jordan made false statements.  Moreover, the fact that the government has not provided any discovery relating to this other inquiry supports the conclusion that the other inquiry is not relevant to this case.  That language is also unfairly prejudicial, because it strongly implies that the CFTC had identified manipulation of silver prices in which Messrs. Nowak and Jordan were somehow involved (or suspected to be involved), notwithstanding the fact that the CFTC brought no charges and closed its inquiry with a public statement that "there is not a viable basis to bring an enforcement action with respect to any firm or its employees related to our investigation of silver markets."[43]

The language "in connection with a CFTC inquiry into the manipulation of silver prices" and "from a CFTC investigator" in Paragraphs 40 and 41 is therefore prejudicial surplusage and should be stricken.

## V.  CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Counts One, Two (in part), and Three through Fourteen and strike the prejudicial surplusage in Paragraphs 40 and 41 of the Indictment.

---

[43]  Press Release, CFTC Closes Investigation Concerning the Silver Markets, CFTC Rel. No. 670913 (Sept. 25, 2013), www.cftc.gov/PressRoom/PressReleases/pr6709-13.

Dated: February 28, 2020

Respectfully submitted,

/s/ Jonathan D. Cogan
Jonathan D. Cogan
Sean S. Buckley
Alexa R. Perlman
KOBRE & KIM LLP
111 West Jackson Boulevard
Chicago, IL 60604
(212) 488-1206

*Counsel for Gregg Smith*

/s/ David Meister
David Meister
Jocelyn E. Strauber
Chad E. Silverman
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
(212) 735-2100

William E. Ridgway
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, IL 60606
(312) 407-0449

*Counsel for Michael Nowak*

/s/ Guy Petrillo
Guy Petrillo
Daniel Z. Goldman
PETRILLO KLEIN & BOXER LLP
655 Third Avenue
New York, NY 10017
(212) 370-0331

*Counsel for Jeffrey Ruffo*

/s/ James J. Benjamin, Jr.
James J. Benjamin, Jr.
Parvin D. Moyne
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-8091

Megan Cunniff Church
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 450-6716

*Counsel for Christopher Jordan*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2020, I caused a copy of the foregoing

MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION TO DISMISS THE

INDICTMENT AND TO STRIKE SURPLUSAGE to be filed with the Clerk of the Court

through the CM/ECF system, which will provide notice of the filing to all counsel of record.


 /s/ David Meister
David Meister
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
(212) 735-2100

*Counsel for Michael Nowak*